**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**LINDEN CARE, LLC,**

                         **Plaintiff,**

**v.**                                                **1:15-cv-1335 (BKS/CFH)**

**EXPRESS SCRIPTS, INC.,**

                         **Defendant.**
_____

**APPEARANCES:**

**_For Plaintiff_**
Linda J. Clark
David M. Cost
Joseph A. Murphy
Barclay Damon, LLP
80 State Street
Albany, New York 12207

**_For Defendant_**
Sarah C. Hellmann
Christopher A. Smith
Husch Blackwell LLP
190 Carondelet Plaza, Suite 600
St. Louis, Missouri 63033

Patrick B. Sardino
Cozen O'Connor
45 Broadway, 16th Floor
New York, New York 10006

Tamar S. Wise
Cozen O'Connor
277 Park Avenue
New York, New York 10172

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

On November 10, 2015, plaintiff Linden Care, LLC, a pharmacy in Woodbury, New York, received a letter via overnight delivery from defendant Express Scripts, Inc., stating that it had terminated Linden Care as a provider in Express Scripts' retail pharmacy network. Dkt. No. 10-1. The letter, dated the day before (November 9, 2015), advised Linden Care that termination was "immediate." *Id*. Linden Care commenced this action the same day it received the termination letter and moved for a temporary restraining order and a preliminary injunction directing Express Scripts to "reinstate [it] to [Express Scripts'] pharmacy network." Dkt. No. 5. The amended complaint contains five causes of action: (1) violation of New York State Insurance Law section 4803(b); (2) violation of New York State Public Health Law Section 4406-d; (3) breach of contract; (4) tortious interference with business relations and prospective economic advantage; and (5) violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 4 of the Clayton Act, 15 U.S.C. § 15. Dkt. No. 10.

Linden Care contends that Express Scripts' termination of its status as a provider "will cripple [its] business and have disastrous consequences for the thousands of patients it serves nationwide." Dkt. No. 5-3. Express Scripts opposes Linden Care's motion.[1] Dkt. Nos. 9, 30. The

---

[1] Express Scripts cross-moved to (1) dismiss the complaint under Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of diversity jurisdiction and (2) to transfer this case to Missouri. Dkt. No. 9. Linden Care, however, filed an amended complaint alleging a cause of action under the Sherman Act, 5 U.S.C. §§ 1 and 2. Dkt. No. 10, p. 15. In light of the federal question alleged in the amended complaint, Express Scripts withdrew its motion to dismiss on the record at the evidentiary hearing. Dkt. No. 59, p. 4.

Court held oral argument via teleconference on November 10, 2015 and November 13, 2015, and directed further briefing. On November 20 and 23, 2015, the Court held an evidentiary hearing on Linden Care's motion for a temporary restraining order and preliminary injunction at which seven witnesses, including two Linden Care patients, testified.[2] On November 25, 2015, the Court issued the following Text Order denying Linden Care's motion:

> TEXT ORDER: After considering the parties' arguments, submissions, the evidence offered at the evidentiary hearing, and the testimony of the witnesses, the Court concludes that Plaintiff has failed to make "a clear showing that [it] is entitled to the relief requested" or that "extreme or very serious damage will result from a denial of preliminary relief." *Tom Doherty Associates, Inc. v. Saban Entmt, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). The Court notes that even assuming Plaintiff was requesting prohibitory - as opposed to mandatory - relief, Plaintiff has failed to show irreparable harm and "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of" plaintiff. *Otoe-Missouria Tribe of Indians v. New York State Dept of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014). Accordingly, Plaintiff's motion 5 and amended motion 11 for a temporary restraining order and preliminary injunction are denied. A written decision incorporating the Court's findings of fact and conclusions of law, as required by Rule 52(a)(2) of the Federal Rules of Civil Procedure, will be issued shortly.

---

Express Scripts moved for an order transferring this case to the Eastern District of Missouri based on a provision in an alleged amendment to the parties' agreement containing a mandatory forum selection clause requiring all litigation to take place in St. Louis, Missouri, and requested sanctions against Linden Care for commencing this action in the Northern District of New York. Express Scripts withdrew its mandatory forum selection clause arguments at a telephone conference and its request for sanctions at the evidentiary hearing. It subsequently amended its motion and sought transfer of this case to Missouri for binding arbitration. Following the evidentiary hearing, the parties agreed to binding arbitration in New York, New York. Dkt. No. 63. Accordingly, Express Scripts' motion to transfer is denied as moot.

[2] The transcript of the evidentiary hearing was filed in two volumes; they are numbered consecutively. *See* Dkt. No. 59 (Transcript of November 20, 2015 Hearing, pages 1-234); Dkt. No. 60 (Transcript of November 23, 2015 Hearing, pages 235-380). The Court refers to the transcript as "T.___."

Dkt. No. 66.[3] The following constitutes the Court's findings of fact and conclusions of law in

accordance with Rule 52(a)(2).

## II.     FINDINGS OF FACT

### A.     *The Parties*

#### 1.     Linden Care

Linden Care is a "bricks-and-mortar retail pharmacy"[4] in Woodbury, New York. Dkt.

No. 11-5, ¶¶ 2, 23. It is licensed in forty-nine states and the District of Columbia, but not in

California. Dkt. No. 5-2, ¶ 22. It serves hundreds of thousands of patients on an annual basis

both at its retail location and in other states via FedEx. T. 22; Dkt. No. 11-5, ¶ 24. Linden Care

dispenses all its prescriptions from its retail location, which occupies a 15,000-square-foot office

building. T. 278. It has a staff of over one hundred, including eight pharmacists. T. 22-23. At

present, Linden Care is just "shy of a billion dollar a year company." T. 287

Mark Wiener,[5] Linden Care's Chief Executive Officer, described it as "a retail pharmacy

with a focus on pain management to meet the unique needs and challenges facing patients, their

caregivers and practitioners." Dkt. No. 5-2, ¶ 2. Linden Care serves, among others, oncology

─────────────────

[3] Linden Care filed a Notice of Appeal the same day. Dkt. No. 67. While an interlocutory appeal of the denial of a preliminary injunction divests a district court of jurisdiction to consider a second motion arising from the same facts, *see, e.g., Int'l Bus. Machines Corp. v. Johnson*, 355 F. App'x 454, 455 (2d Cir. 2009), Linden Care filed its Notice of Appeal before the Court had issued the findings of facts and conclusions of law, which the Text Order, Dkt. No. 66, noted would be issued. The appeal, therefore, does not divest the Court of jurisdiction to issue its findings of fact and conclusions of law. *See, e.g., Burger King Corp. v. The Horn & Hardart Co.*, 893 F.2d 525, 527 (2d Cir. 1990) (holding that premature notice of appeal from a non-final order of the district court not disposing of all issues in the complaint and counter-complaint does not divest district court of jurisdiction).

[4] Linden Care only sells prescription medication; there are no over-the-counter drugs or other items for sale. T. 279.

[5] There are two spellings in the record: Mr. Wiener's name is spelled Wiener in his declarations and Weiner in the transcript of the evidentiary hearing. *Compare*, Dkt. No. 5-2, *with* T. 239.

patients and patients in different disease states or with multiple sclerosis, arthritis, or "any type

of pain that's secondary to a certain disease." T. 22. It "works closely with leading pain

pharmaceutical manufacturers and physicians to formulate patient management programs." Dkt.

No. 5-2, ¶ 2. Linden Care "is the number one" or "number two largest dispenser of narcotic and

controlled medications in the country," T. 273, and approximately ninety percent of its business

is pain control management. T. 273-74.

Linden Care is part of TIRF REMS,[6] a federal program run by the FDA that provides

guidelines for the prescription and dispensation of fentanyl products.[7] T. 21. According to

Linden Care pharmacist Jordan Fogel, "some" but "not many" pharmacies in New York have the

TIRF REMS program. T. 21. Fogel explained that "[m]any pharmacists shy away from ordering

these drugs because of their higher regulations . . . the administrative work . . . the ordering, the

stocking of the medications, the security of the medication, and also cost" because the

medications are "very expensive." T. 21. Fogel stated that he orders $1 to $2 million per day of

"these drugs" and that he keeps $2 to $3 million "in stock just in case there is a shortage." T. 21-

22.

Wiener testified that while Linden Care dispenses hundreds of prescriptions each week

for people who "walk in the door," it ships a "higher number," possibly "thousands" of

prescriptions to members out of state. T. 280. "It has a broad geographical reach and makes

_____

[6] The Transmucosal Immediate Release Fentanyl (TIRF) Risk Evaluation and Mitigation Strategy (REMS) program is "an FDA-required program designed to ensure informed risk-benefit decisions before initiating treatment and during treatment to ensure appropriate use of TIRF medicines." Dkt. No. 5-2, ¶ 5.

[7] Jordan Fogel testified that "fentanyl products are extremely potent and . . . about 100 times more potent than morphine." T. 21.

home deliveries to many patients" via FedEx. Dkt. No. 11-5, ¶¶ 23-24. Fogel testified that home delivery is important to Linden Care's patients with debilitating diseases, who may be bedridden. T. 30. Wiener explained that: "Linden Care's patients are typically chronically ill and find it extraordinarily inconvenient, if not impossible, to travel for such mundane activities as visiting their local pharmacy. They prefer, and in many instances their condition requires, that their medications come to them." Dkt. No. 5-2, ¶ 3.

In addition to home delivery, Linden Care provides "[s]pecialty services" to its patients, including "pharmacy benefit coordination, obtaining prior authorization for pain medications, access to manufacturer co-pay or eVoucher programs, dispensing of brand drugs and honoring 'do not substitute' with generics." Dkt. No. 5-2, ¶ 2.

### 2.     Express Scripts

Express Scripts is a pharmacy benefit manager ("PBM"); it "contracts with third-party payors and health plan administrators—such as insurers, HMOs and employers—to facilitate delivery of prescription drugs to the health plan members or other beneficiaries." Dkt. No. 9-3, ¶ 6.  Bonnie Roberts, Express Scripts' Director of Provider Credentialing, explained that in order "to fulfill its role, Express Scripts creates pharmacy provider networks by negotiating with pharmacies that agree to fill prescriptions for health plan members." Dkt. No. 9-3, ¶ 7. "In exchange the pharmacies get a number of benefits, including access to Express Scripts' clients' health plan members as customers, payment within specified times, dispensing fees, marketing and advertising, [and] on-line determination of member eligibility." Dkt. No. 9-3, ¶ 7. Roberts testified that Express Scripts has a number of different pharmacy networks, including general networks, which contain "65,000 or so retail pharmacies," long term care networks, home

6

infusion networks, and "specific specialty Medicare networks." T. 124. Express Scripts also administers a mail order network, through which it "authorizes its network pharmacies to dispense drugs throughout the United States." Dkt. No. 5-2, ¶ 13.

Express Scripts services thousands of clients, including managed health care organizations, health plans, independent businesses, and government entities, including the Department of Defense. T. 125. There are more than sixty million members that are "under the Express Scripts umbrella of clients." T. 187. Express Scripts is a multi-billion dollar corporation with approximately 30,000 employees. T. 125.

In addition to being a PBM, "Express Scripts has pharmacies that are subsidiaries of the larger corporation." T. 131-32. Roberts stated that Express Scripts also has mail order pharmacies that provide the same medications that retail pharmacies provide. T. 132.  Accredo, for example, is a "specialty pharmacy"[8] that is wholly owned by Express Scripts. T. 219. Express Scripts described Accredo in a press release as a "specialty pharmac[y] . . . that deliver[s] a superior level of specialized care for patients living with complex specialty conditions." T. 221. Roberts testified that Accredo does not provide the same medications as Linden Care. T. 219.

    **B.**    ***Provider Agreement, Provider Manual, and Addenda***

---

[8] Roberts testified that her definition of "a specialty pharmacy is a pharmacy that primarily manages and dispenses medications for particular disease states . . . states such as hemophilia or HIV, and . . . there [are] very specific medications that are related to those disease states." T. 189. Roberts stated that she did not consider Linden Care to be a specialty pharmacy and that "they didn't contract as a specialty pharmacy." T. 189.

On May 7, 2009, the parties executed a pharmacy provider agreement (the "Agreement") authorizing Linden Care to participate as a retail provider[9] in the Express Scripts pharmacy network. Dkt. No. 10-2. The Agreement states that it "may be terminated by either party without cause upon ninety (90) days written notice to the other party, with such termination effective at the end of such 90-day notice period." Dkt. No. 10-2, § 4.2.a. The Agreement also contains an "Immediate Termination" provision, which states:

> ESI shall have the right to immediately terminate this Agreement upon written notice to Provider in the event that: [] Provider ceased to be licensed by the appropriate licensing authority . . . any representation to ESI or any response to a question set forth on the Provider Certification is untrue or becomes untrue . . . ESI determines that the Provider is dispensing Covered Medications in violation of any applicable law, rule and/or regulation . . . or . . . ESI determines that Provider's continued performance of services poses a risk to the health, welfare or safety of any Member.

Dkt. No. 10-2, § 4.2.c. The Agreement required Linden Care to warrant to Express Scripts that it met the definition of a retail provider, that it was appropriately licensed, that the questions

---

[9] The Agreement states that:

> "Retail Provider" shall mean a pharmacy that primarily fills and sells prescriptions via a retail, storefront location, is determined by ESI to fulfill an ESI business need with respect to participation in its retail network(s) and meets such other criteria established by ESI from time to time including any specific needs of a population as determined by ESI in its sole discretion. "Retail Provider" shall not include mail order pharmacies or such other provider types that do not meet ESI's Retail Provider criteria established from time to time.

Dkt. No. 10-2, § 1.14. Roberts acknowledged the provision in the Agreement that refers to "criteria" Express Scripts establishes from "time to time" with respect to retail providers but testified that she was "not sure" whether there was other written criteria outside the Agreement. T. 161-62.

contained on the provider certification were true and accurate and that Linden Care would notify Express Scripts of any changes. T. 190.

On or about October 3, 2011, Express Scripts amended the agreement to incorporate the New York State Department of Health's "Standard Clauses for Managed Care Provider/IPA Contracts," Dkt. No. 29-2, p. 1. The parties have submitted portions of Express Scripts' Network Provider Manual. Dkt. No. 21-1. The Provider Manual contains a "New York Addendum to the Participating Provider Agreement" (the "Addendum") and a "New York Medicaid Addendum to Participating Provider Agreement" (the "Medicaid Addendum"). Dkt. No. 32-4. The Addendum contains termination and arbitration provisions. Dkt. No. 32-4, p. 6. The termination provision states:

> Termination . . . of an agreement between a [Managed Care Organization ("MCO")] and an [Independent Practice Association ("IPA")], institutional network provider, or medical group Provider that serves five percent or more of the enrolled population in a county, or the termination . . . of an agreement between an IPA and an institutional Provider or medical group Provider that services five percent or more of the enrolled population in a county, requires notice to the Commissioner of Health. Unless otherwise provided by statute or regulation, the effective date of termination shall not be less than 45 days after receipt of notice by either party, provided, however, that termination by the MCO may be effected on less than 45 days notice provided the MCO demonstrates to the [Department of Health's] satisfaction prior to termination that circumstances exist which threaten imminent harm to enrollees or which result in Provider being legally unable to deliver the covered services and, therefore, justify or require immediate termination.
>
> If this Agreement is between the MCO and a health care professional, the MCO shall provide to such health care professional a written explanation of the reasons for the proposed contract termination, other than non-renewal, and an opportunity for review as required by state law.

Dkt. No. 32-4, p. 6, §§ 5.1, 5.2. The Medicaid Addendum incorporates the New York

Addendum's standard clauses, Dkt. No. 32-4, p. 8, § 19, but contains the following termination

provision:

> In the event Provider is terminated pursuant to the Provider Agreement,
> [Pharmacy Benefits Manager ("PBM")] shall provide Provider with a written
> explanation of the reason for the termination. Provider shall have the right to
> appeal any such termination within thirty (30) days written notice before a panel
> appointed by PBM (the "PBM Panel"). The hearing shall occur within thirty (30)
> days of receipt of the request. The PBM panel shall include at least three
> individuals appointed by PBM. At least one individual on the panel shall be a
> pharmacist. The hearing panel shall render a decision on the proposed action in a
> timely manner. Such decision shall include (a) reinstatement of Provider, or (b)
> termination of Provider. Such decision shall be effective not less than thirty (30)
> days after the receipt by the health care professional of the PBM Panel's decision.
> Unless otherwise required by law or requested by Sponsor, termination without
> cause will be effective no earlier than sixty (60) days from the receipt of the
> notice of termination. This section shall not apply to cases involving imminent
> harm to patients, [or] cases involving fraud.

*Id*. at p. 8, § 13.

In the "Express-Scripts Re-Credential Verification Form," dated December 20, 2013,

Linden Care stated that its "Pharmacist/Provider in Charge" was Jordan Fogel, Dkt. No. 16-4, p.

1. In the section entitled "Type of Practice," which instructed Linden Care to "[i]ndicate the

anticipated percent of RX volume in each setting," Linden Care indicated: fifty percent "Open

Door Retail/Community," thirty-nine percent "Local" and "Out of State" "Mail Order," ten

percent "Workers Comp," and one percent "Compounds." Dkt. No. 16-4, p. 2. It did not indicate

any volume with respect to "Medicaid" or "Self Administered Injectable/Specialty." *Id*.

### C.   *Termination*

Roberts testified that Express Scripts became concerned about Linden Care after "we

read an article in *The New York Times* in October that specifically mentioned Linden Care and

[its] potential relationship with Horizon Pharma," a drug manufacturer. T. 142. Roberts stated that "Horizon Drugs are not on the Express Scripts national preferred formulary,"[10] and that when Express Scripts found out that Linden Care was dispensing Horizon drugs, it made it "stop and take a look."[11] T. 203.

Roberts stated that "[t]here were a number of people [and departments] involved in the discussions" to terminate Linden Care from the network. T. 140. Roberts testified that Express Scripts' fraud and waste and abuse teams were "involved in looking at the claims data," that Express Scripts asked the "retail contracting team [to] look at the contract that is held with Linden Care," and that her "team pulled the credentialing documents to look at information we had directly from Linden Care." T. 140.

Roberts testified that following this review, Express Scripts "determined that 70 percent of [Linden Care's] prescriptions were going out of state," which was higher than the thirty-nine percent mail order Linden Care had reported in its re-credentialing documents.[12] T. 151, 162.

_____

[10] Roberts explained that a "formulary" is "a list of preferred prescription medications that either a client or somebody like Express Scripts benefit manager has documented." In other words, it is a menu of the drugs that are covered by a plan. T. 127. Express Scripts has a "national preferred formulary," T. 203, and while Express Scripts' national preferred formulary may be the most widely used, each plan has their own formulary. T. 214. Express Scripts had no evidence that Linden Care was filling prescriptions for drugs that were not on the formularies for the patients' plans. T. 214.

[11] Roberts testified that she believed that Express Scripts learned after the termination letter was issued that Linden Care predominantly dispensed Horizon prescription drugs, though there was nothing in the Provider Agreement or Manual that prohibited that practice. T. 145.

[12] Roberts testified that there is no percentage indicated in the Agreement with respect to "the amount of home delivery a provider can use and still be in the retail network." T. 151. Roberts stated, however, that if a pharmacy applying to be in Express Scripts' Network indicated that it was a "10 percent or more mail order," that pharmacy "would not qualify to be a retail pharmacy or qualify for a retail contract." T. 151. Roberts acknowledged that Linden Care represented in its re-credentialing documents, in response to "mail order," that "[t]hey were 39 percent local and out of state," T. 151, which was more than Express Scripts' requirement that a retail pharmacy not be more than "10 percent" mail order, and stated that, to her knowledge, no one from Express Scripts contacted Linden Care

Roberts stated that in addition, after reviewing Linden Care's claims data, she found that "there

were more than a dozen patients that had addresses in California," where Linden Care is not

licensed, and who "received multiple month over month shipments" from Linden Care. T. 199.

Roberts testified that Express Scripts did not give Linden Care advance notice of the

termination because it "felt that finding that they had broken the law and shipped to a state where

they were not properly licensed was egregious enough to warrant an immediate termination." T.

204. Roberts explained that when there is a termination:

> There is always concern for patients . . . and it's not something that we take
> lightly. But, you know, given the information that we learned regarding Linden
> Care, there was a gap of trust and . . . we felt we needed to act swiftly. There is
> always a concern about the patients. The patients have an 800 number that they
> can call 24/7 365 days. They can always call their health plan if they have
> concerns, they can go to their doctor. So there are many means for patients to
> provide to discover where they can provide alternate care.

T. 171-72. Roberts stated that Express Scripts no longer wants to do business with Linden Care.

T. 207.

On November 10, 2015, Linden Care "received via overnight courier a letter from

[Express Scripts] dated November 9, 2015 stating that [it] was terminating Linden Care from its

pharmacy network effective immediately." Dkt. No. 5-2, ¶ 17. In the letter, Express Scripts

explained that it had recently reviewed Linden Care's claim activity and concluded that Linden

Care was "primarily operating  a mail order business," which was "contrary to the terms of the

---

to let it know that Express Scripts had an internal guideline regarding the amount of delivery that would be tolerated.
T. 152. Roberts stated that Express Scripts has "different standards for mail order pharmacies versus retail
pharmacies," that it wants "to make sure that we have pharmacies that are appropriately contracted in our network,"
and that "[i]f a pharmacy is going to act as a mail order pharmacy, they can apply to Express Scripts to be a mail
order pharmacy." T. 153-54.

. . . Agreement," which defined "Retail Provider" to "explicitly exclude[] 'mail order pharmacies.'" Dkt. No. 10-1, p. 1. Express Scripts stated that "[b]eing a retail pharmacy is a standard term and condition for participation in Express Scripts' retail network(s)" and that Linden Care's operation of a mail order business "directly contradict[ed]" the "representations and warranties" Linden Care made "during the credentialing process." *Id*. Express Scripts also asserted that Linden Care violated section 2.7 of the Agreement, requiring it to  "comply with . . . all applicable laws, rules and regulations," when it mailed drugs "to members" in Maryland and California although it did not have "the appropriate licensure" to do so. *Id*. Express Scripts cited this alleged violation of section 2.7 as a basis for immediate termination. *Id*.

On November 11, 2015, Express Scripts issued a press release regarding Linden Care, stating: "We have removed the Linden Care pharmacy from our network. In our research we found that it predominantly dispensed Horizon prescriptions drugs and did not fulfill key components of our pharmacy network agreements." Dkt. No. 11-2, p. 5. In the same press release, Express Scripts stated that it had "filed a complaint seeking to recover approximately $140 million from Horizon Pharma USA, Inc. . . .which has refused to honor certain contractual obligations it owes under a pharmaceutical manufacturer rebate agreement with Express Scripts." *Id*.

In an affidavit in opposition to Linden Care's motion for a temporary restraining order and preliminary injunction, Express Scripts cited Linden Care's alleged failure to inform Express Scripts—despite its obligation to update information submitted in the provider certification—that Alberto Lopez had replaced Jordan Fogel as its pharmacist in charge as another basis for immediate termination. Dkt. No. 9-3, ¶¶ 30-31

### D.   *Alleged Irreparable Harm Following Termination*

Linden Care claims that it (as a business and pharmacy) and its patients have suffered irreparable harm in the wake of the Express Scripts' termination without notice. Express Scripts members constitute approximately twenty-five percent of Linden Care's business. T. 40. Wiener states that Linden Care "currently dispenses millions of dollars in drugs under the [Express Scripts] pharmacy network" and "[i]f that revenue stream were suddenly stopped," Linden Care would have to "eliminate jobs throughout its departments." Dkt. No. 5-2, ¶ 45.

According to Wiener, Linden Care is "well-known as a reliable and efficient provider of [pain] medications in the medical community." Dkt. No. 5-2, ¶ 37. Wiener stated that Linden Care "has strong ongoing relationships with prescribing physicians" and is "a trusted partner with drug manufacturers." T. 5-2, ¶ 42. Wiener believes that sudden termination from Express Scripts' network will jeopardize those relationships and lead "some prescribing physicians" to "stop referring patients to Linden Care" and the drug manufacturers to "stop using Linden Care as a dispensing pharmacy for their drugs." Dkt. No. 5-2, ¶ 41-43.

Wiener stated that he believes that Express Scripts "covers about 30 to 35 percent of the lives . . . in our country." T. 249. Wiener testified that it is "critical" to be a part of the Express Scripts network and that "[y]ou can't conduct pharmacy without being in the Express Scripts network." T. 250. Wiener stated that Linden Care has "already received two other termination notices because of false information that's been in the news." T. 250. Wiener testified that one of the PBMs alleged that Linden Care was dispensing prescriptions into states in which it was not licensed—though it did not mention California, and that the other PBM was terminating Linden Care because it was engaging in "mail order versus retail services." T. 276.

14

Wiener states that because of the specialized nature of the pain medications it dispenses, following Linden Care's termination from the Express Scripts network, its patients may be unable to obtain their medications elsewhere:

> Many of the medications dispensed by Linden Care, such as narcotics, most pharmacies do not stock, as they cannot afford to keep these medications on hand. Many of the drugs contain Fentanyl and are used to manage breakthrough pain in adults with cancer who are opioid tolerant. As with all opioids, these drugs have addictive qualities, and patients who suddenly withdraw can become sick with withdrawal symptoms in addition to being overwhelmed with untreated pain.

Dkt. No. 11-5, ¶ 6.

Between the termination and at least the first day of the evidentiary hearing on November 20, 2015, Linden Care provided its patients with medications to "hold them over" until this dispute "was resolved." T. 31. Fogel testified that the impact of the termination "was pretty severe," explaining that Linden Care "deal[s] with very critically ill patients who are in pain from several different diseases, and when they heard they couldn't get their medicine, they didn't know where to turn to." T. 31. Fogel stated that Linden Care has held its patients over because "the pharmacist has a . . . responsibility to treat the patients, these patients are suffering, and it's [the] just moral, legal, ethical thing to do." T. 32. Fogel testified that although he was not on "the financial side" of Linden Care's operations and could not provide "a direct answer," he estimated that Linden Care has had to spend "hundreds of thousands of dollars" to bridge the gap between the termination and the evidentiary hearing. T. 32.

Fogel testified that following the termination, he spoke with the owner and a pharmacist at Village Pharmacy, which is approximately three miles from Linden Care. T. 32. Linden Care introduced a recording of that conversation. Plf's Exh. 17. During the conversation, Fogel and Mark Bortnick, Linden Care's Chief Operating Officer, T. 290, explained that Linden Care was

15

having difficulty processing prescriptions though Express Scripts' network and asked if Village

Pharmacy could take on approximately thirty of their patients. Fogel and Bortnick explained that

these patients were part of the TIRF REMS program and asked if Village Pharmacy could fill

their prescriptions. The representatives from Village Pharmacy responded that they were also

part of the TIRF REMS program and if they did not have the medications in stock, they could get

them from their suppliers within five or six hours. The Village Pharmacy representatives told

Fogel and Bortnick that they would not ship the medications, however, because Village

Pharmacy was only licensed in New York.

     Arthur Kersey, Linden Care's Chief Compliance Officer, testified that because of the

level of regulation[13] applicable to narcotic and controlled medications, "[A] large percentage of

pharmacies simply won't stock some of these medications, especially medications like

oxycodone" and "some of the fentanyl medications." T. 76-77. Kersey explained that patients

have told him that "they've been to five pharmacies to try and find medication like oxycodone"

and OxyContin, but that "[a] lot of the pharmacies . . . don't want to carry it" without the

security[14] or "inventory controls" that Linden Care has in place. T. 83.

     In addition to affidavits and copies of emails from its patients, who are concerned about

whether they will be able to obtain their medications elsewhere, *see, e.g.*, Dkt. Nos. 11-7 to 11-

12, Linden Care presented the testimony of two of its patients: K.P., who lives in New York and

---

[13] Kersey explained that Linden Care is subject to regulation by the DEA, the Bureau of Narcotics Enforcement, and the New York State Pharmacy Board. T. 78.

[14] Linden Care has an armed security guard at its premises at all times. T. 279.

R.G., who lives in Washington. T. 99, 111. K.P. testified that Linden Care has handled her

medication since 2009, T. 99, and that it is "a patient advocate" for her, "helping when

prescriptions aren't being put through for . . . prior approval," and delivering her medications "on

Christmas Eve." T. 102. K.P. stated that if she could no longer get her medications from Linden

Care, it would be upsetting, T. 105; that the closest alternative pharmacy was "at least an hour"

from her residence, T. 104; and that because of the severity of her multiple conditions, if she did

not get her medications, she "could die." T. 105.

    R.G. testified that he and his wife are Linden Care patients. T. 112. R.G. stated that it is

"near impossible" to find the medications that he and his wife are on at "a local pharmacy." T.

113. R.G. testified that:

> Linden Care has been fabulous to me. And I'm sorry I don't mean to sound like
> that, but I have so much experience as a patient and as a caretaker for my wife,
> that Linden Care really honestly is a godsend. Their inventory, their staff, their
> knowledge, their commitment to filling prescriptions on time, sending out
> shipments. It's by far the best independent pharmacy that I've worked with.

T. 116.

    Roberts stated when Express Scripts terminated Linden Care, it immediately notified "all

of the health plan clients." T. 204-205. Roberts testified that, at the time of the hearing, ninety-

three percent of the members "seeking care from Linden Care have been issued a notice"

regarding the termination and have been advised "to call Express Scripts or to go online and use

the pharmacy locater or talk with their doctor." T. 170, 204-205.

    Wiener testified that the letter Express Scripts sent to Linden Care's patients was

"troublesome" because it suggested that patients could take their prescription bottles to new

pharmacies, and that the new pharmacy would contact Linden Care to transfer the prescription.

17

T. 253-54. Wiener explained that if a patient's prescription is for narcotics, he or she would "need a new prescription every time" because pharmacies cannot "transfer a prescription for controlled medication." T. 254.

### E.      *Evidence Regarding Express Scripts' Grounds for Termination*

In its termination letter, Express Scripts cited: (1) its determination that Linden Care "is primarily operating a mail order business," which it explained contradicted the "representations and warranties" Linden Care made during the credentialing process; and (2) its determination that Linden Care was "mailing drugs to members" in Maryland and California "without the appropriate licensure." Dkt. No. 10-1, p. 1. Following termination, Express Scripts also cited: (3) Linden Care's alleged failure to inform Express Scripts—despite its obligation to update information submitted in the provider certification—that Alberto Lopez, not Jordan Fogel, was now its pharmacist in charge, Dkt. No. 9-3, ¶¶ 30-31; and (4) Linden Care's dispensation of "a disproportionately high number of prescriptions manufactured by Horizon." Dkt. No. 9-3, ¶ 38.

### 1.      **Mail Order**

Linden Care argues that Express Scripts knew that Linden Care was "dispensing drugs out of state via FedEx due to the fact it audited Linden Care's prescription dispensing as its PBM." Dkt. No. 5-2, ¶ 26. Linden Care asserts that Express Scripts did not object to that practice or inform Linden Care "that it considered 'mail' to mean anything other than delivery service by or through the USPS." *Id.*  Wiener explained that Linden Care's home delivery does not fit his definition "or the traditional industry definition of a mail order pharmacy," which "is a pharmacy that's going to provide a ninety day supply of maintenance medications . . . for high blood pressure, cholesterol, diabetes, people who are on these medications for life." T. 257. Linden

Care, however, does not dispute that approximately seventy percent of its business involves shipping medications to other states.

### 2. Maryland and California Licensing

Upon receipt of the termination letter, Linden Care provided Express Scripts with evidence of its current license in Maryland. Dkt. No. 10-3, p. 1. It is undisputed, however, that Linden Care is not licensed in California. At the evidentiary hearing Express Scripts referred to a spreadsheet containing claims data and a list of approximately thirty-three members whose addresses were in California and to whom Linden Care allegedly shipped medication. Def. Ex. 6.[15] Roberts testified that she when she reviewed Linden Care's claims data, she saw "that there were more than a dozen patients that had addresses in California and received multiple month over month shipments." T. 199. Roberts testified that Express Scripts believed that Linden Care was shipping prescriptions into the State of California based on the residential address and shipping address provided by the members who received shipments from Linden Care. T. 200. Roberts, however, did not have evidence that Linden Care shipped medicine to California.

In response, Linden Care provided delivery logs for all but twenty-one of those shipments, which showed that the prescriptions at issue were either never shipped or shipped to states other than California. Plf.'s Ex. 30. Wiener testified that he reviewed the allegations that Linden Care had dispensed prescriptions to California and that among the approximately eighty-five claims at issue, approximately thirty-one were related to major league baseball. T. 260. Wiener explained that patients involved in major league baseball traveled extensively, that "all

_____

[15] This exhibit was neither offered nor received into evidence. There is, therefore, no documentary evidence in the record showing Linden Care's alleged shipments of medication to California.

these medications were shipped to stadiums or outside California," and that "[n]one of these medications were shipped to California." T. 261. Wiener stated that Linden Care made this determination after looking at the "proof of delivery" records from Federal Express. *Id.* Wiener further testified that sixteen of the claims "never even left the pharmacy." T. 262. Regarding the remaining thirty-six claims, Wiener stated that except for "five or six" Linden Care was still investigating, Linden Care had verified that none were shipped to California. T. 267, 272. The Court provided Linden Care with an extension of time to complete its investigation of the remaining claims. *See* Text Minute Entry dated Nov. 23, 2015. Linden Care subsequently filed a letter advising the Court that it had "no additional evidence to offer at this time." Dkt. No. 65, p. 2. It further stated that: "if . . . any of the handful of outstanding claims from the list are shown . . . to be California shipments, Linden Care expects that such shipments were for emergency situations to accommodate patients['] unusual needs and circumstances and to avoid to abandonment [sic] its patients' medical needs." *Id.*  Express Scripts did not provide documentary evidence that Linden Care shipped medication to California.

### 3.    Pharmacist in Charge

It is undisputed that Linden Care did not update its provider certification to indicate that Alberto Gonzales, not Jordan Fogel, was its pharmacist in charge.

### 4.    Horizon Drugs

It is undisputed that Linden Care dispenses drugs manufactured by Horizon. While Horizon drugs are not on Express Scripts' national preferred formulary, however, there is no evidence that Linden Care dispensed drugs in contravention of any health plan's formulary.

## III.    CONCLUSIONS OF LAW

### A.    *Temporary Restraining Order and Preliminary Injunction Standard*

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and preliminary injunctions. Fed. Rule Civ. P. 65(a) and (b). In the Second Circuit, the standard for issuance of a temporary restraining order ("TRO") is the same as the standard for a preliminary injunction. *Fairfield Cty. Med. Ass'n v. United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013) *aff'd as modified sub nom. Fairfield Cty. Med. Ass'n v. United Healthcare of New England, Inc.*, 557 F. App'x 53 (2d Cir. 2014); *AFA Dispensing Grp. B .V. v. Anheuser–Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010) ("It is well established that the standard for an entry of a temporary restraining order is the same as for a preliminary injunction."). A party seeking a preliminary injunction must demonstrate "irreparable harm" and "meet[] one of two related standards: either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims[16] to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014).

_____

[16] The Second Circuit has explained that:

> The "serious questions" standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction. Because the moving party must not only show that there are "serious questions" going to the merits, but must additionally establish that "the balance of hardships tips decidedly" in its favor, its overall burden is no lighter than the one it bears under the "likelihood of success" standard.

*Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (internal citation and emphasis omitted) (quoting *Jackson Dairy v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979)).

The moving party must "meet a higher standard where: (i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995). A court can issue a mandatory injunction "only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Id.* at 34.

Linden Care assumes that the relief it seeks is the maintenance of the status quo and thus prohibitive. It does not address whether, because it was terminated from the network before commencing this action, its request for an order requiring Express Scripts "to reinstate Plaintiff to Defendant's pharmacy network" seeks mandatory injunctive relief and is therefore subject to the elevated standard. Dkt. Nos. 5, 11.

The "distinction between mandatory and prohibitory injunctions . . . is not without ambiguities," and "may be particularly elusive in breach of contract cases." *Great Earth Int'l Franchising Corp. v. Milks Developments, Inc.*, 302 F. Supp. 2d 248, 251 (S.D.N.Y. 2004). In *Doherty*, the Second Circuit explained:

> Confusion in breach of contract cases as to whether an injunction is mandatory or prohibitory may stem from the meaning of "status quo." A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued failure to perform as the plaintiff desires. To a breach of contract defendant, any injunction requiring performance may seem mandatory.

60 F.3d at 34. Since Linden Care is seeking to turn back the clock to a time when they were a provider in Express Scripts' network and to force Express Scripts back into a contract that has been terminated, it is seeking mandatory relief. Even assuming, however, that the relief Linden

Care seeks is prohibitory in nature, Linden Care would not prevail because, as discussed below, it failed to meet the lower standard.

### 1.    Irreparable Harm

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks omitted). "To satisfy the irreparable harm requirement, Plaintiffs must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (internal quotation marks omitted).

In support of its contention that it will suffer irreparable harm in the absence of injunctive relief, Linden Care asserts that if it is terminated immediately, it will lose the ability to fill prescriptions for thousands of patients, who will be "at risk for withdrawal symptoms and overwhelming untreated pain." Dkt. No. 11-5, ¶ 41. Wiener stated that if Linden Care is terminated, he believed prescribing physicians who had referred patients to Linden Care for "one stop shopping" will stop referring patients to Linden Care, which will "cripple[]" its business. Dkt. No. 11-5, ¶ 48. Wiener stated that Linden Care's relationship with drug manufacturers with whom it "has become a trusted partner" will be "in jeopardy," *id*. at ¶ 49, and that because it "currently dispenses millions of dollars in drugs under the ESI pharmacy network," the sudden stop of "that revenue stream" will force Linden Care to lay off "more than half" of its approximately 130 employees. Dkt. No. 11-5, ¶¶ 51-52.

Express Scripts argues that all of Linden Care's alleged injuries are addressable through monetary damages and are not, therefore, "irreparable." Dkt. No. 9-1, p. 11. Express Scripts further asserts that "even if Linden Care were correct and Express Scripts could not immediately terminate the Provider Agreement, the contract permits termination without cause with at least 90-days' notice." Dkt. No. 9-1, p. 11 n.4. It therefore argues that, "even if Linden Care could prevail on the merits, all that will accomplish is that its termination from the pharmacy network will be postponed for 90 days." *Id*. At the hearing, Roberts testified that Express Scripts had, by that point, provided notice to ninety-three percent of Express Scripts members who used Linden Care.

The Court has considered Linden Care's assertions that it will suffer great harm to its reputation, relationships with prescribers and drug manufacturers, and its business, all of which may constitute irreparable harm. *See, e.g.*, *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004) (noting that it has found injunctive relief "appropriate where it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come" and concluding that "the district court did not abuse its discretion in finding that, unless specific relief were granted, Verio's actions would cause Register irreparable harm through loss of reputation, good will, and business opportunities"). Linden Care, however, does not dispute that under the Agreement and Addenda, Express Scripts may terminate it "without cause" on ninety-

days' notice,[17] and it has not argued or presented evidence that a ninety-day restoration will render Linden Care viable for a longer term or "place it in a materially different position that it is in now." *Trilogy Health Care, LLC v. Medco Health Solutions, Inc.*, Civil Action No. 13-550 (SRC), 2013 WL 4832708, at \*4, 2013 U.S. Dist. LEXIS 129385, at \*11 (D.N.J. Sept. 10, 2013). Thus, the Court concludes that Linden Care has failed to establish irreparable harm. *See Alt. Med. & Pharmacy, Inc. v. Express Scripts, Inc.*, No. 4:14 CV 1469 CDP, 2014 WL 4988199, at \* 7, 2014 U.S. Dist. LEXIS 142424, at \*19-20 (E.D. Mo. Oct. 7, 2014) (finding no irreparable harm where "under the best care scenario, OmniPlus would be entitled to no more than 90 additional days of membership in Express Scripts' network and a non-binding advisory review process which Express Scripts would remain free to disregard"); *Trilogy*, 2013 WL 4832708, at \*3, 2013 U.S. Dist. LEXIS 129385, at \*10-11 ("[O]n this record, money damages seem readily ascertainable and like a better remedy than a forced 60-day restoration of Plaintiff's provider status"); *Med-Care Diabetic & Med. Supplies, Inc. v. Strategic Health All. II, Inc.*, No. 2:14-CV-082, 2014 WL 325663, at \*5-6, 2014 U.S. Dist. LEXIS 10881, at \*15-16 (S.D. Ohio Jan. 29, 2014) (finding no irreparable harm when the defendant "exercis[ed] its rights under the express terms of the . . . Agreement" to terminate the provider on thirty days' notice).

_____

[17] Although counsel argued at the evidentiary hearing, that if Linden Care was provided with notice and the opportunity for a peer review hearing prior to termination, it would be able to establish that it was terminated for advocating for its patients, an impermissible reason under N.Y. Ins. Law § 4803 and N.Y. Pub. Health Law § 4406-d, and Express Scripts would be required to reinstate it to its network, it has presented no evidence indicating that patient advocacy was the sole reason for its termination. *See, e.g.*, N.Y. Pub. Health Law § 4406-d (5)(a) ("No health care plan shall terminate a contract . . . *solely because* a health care provider has . . . .advocated on behalf of an enrollee.") (emphasis added).

Even assuming that the interests of and alleged harm to third parties—in this case, Linden Care's patients—could establish irreparable harm,[18] in view of the ninety-day no-cause termination provision, the patients will be in the same position in ninety days regardless of whether the Court grants the preliminary injunction. Moreover, it is undisputed that the narcotic drugs and controlled substances that Linden Care dispenses require new prescriptions every thirty days. Its patients therefore will, in any event, need to contact their medical care provider, who may be able to help them find a new pharmacy. There is evidence in the record that Village Pharmacy, which is approximately three miles from Linden Care, is part of the TIRF REMS program and Wiener acknowledged that there are 500 pharmacies in the country that are also part of the TIRF REMS program. T. 294. Finally, Linden Care has successfully bridged the gap for its critically ill patients, and may continue to do so, and seek reimbursement for those prescriptions if it prevails on the merits.

### 2.   *Likelihood of Success*

As predicates for injunctive relief, Linden Care advances its claims that Express Scripts has violated New York Insurance Law § 4803 and New York Public Health Law § 4406-d by terminating it without notice and an opportunity to be heard, as well as its breach of contract, tortious interference with contract, and Sherman Act claims.

---

[18] *See Conestoga Wood Specialties Corp. v. Sec'y of U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 394 (3d Cir.) ("[I]n a situation where factors of irreparable harm, interests of third parties and public considerations strongly favor the moving party, an injunction might be appropriate") *rev'd and remanded on other grounds sub nom. Burwell v. Hobby Lobby Stores, Inc.*, ___U.S. ___, 134 S. Ct. 2751 (2014)); *John E. Andrus Mem'l, Inc. v. Daines*, 600 F. Supp.2d 563, 572-73 (S.D.N.Y. 2009) (considering trauma to nursing home patients who would be forced to relocate in evaluating irreparable harm in connection with a nursing facility's motion for a preliminary injunction).

### a.      N.Y. Ins. Law § 4803 and N.Y. Pub. Health Law § 4406-d

Linden Care asserts that it is entitled to notice and a hearing prior to termination under

N.Y. Ins. Law § 4803 and N.Y. Pub. Health Law § 4406-d. Express Scripts argues that while

these provisions may govern insurers, managed care providers, health care plans, or Independent

Practice Associations ("IPA"), they are inapplicable to it as a pharmacy benefits manager.

New York Insurance Law, section 4803, entitled, "Health care professional applications

and terminations," applies to "[a]n insurer which offers a managed care product." N.Y. Ins. Law

§ 4803(a). It prohibits such an insurer from:

> terminat[ing] a contract with a health care professional for participation in the in-
> network benefits portion of the insurer's network for a managed care product
> unless the insurer provides to the health care professional a written explanation of
> the reasons for the proposed contract termination and an opportunity for review or
> hearing as hereinafter provided.

*Id.* at § 4803(b)(1). The "health care professional has the right to request a hearing or review, at

the professional's discretion, before a panel appointed by the insurer." *Id.* at § 4803(b)(2)(ii). The

"health care professional" has thirty days to request a hearing, and any hearing must be held

within thirty days "after the date of receipt of a request for a hearing." *Id* at § 4803(b)(2)(iii)-(iv).

The hearing panel's decision must be in writing and shall include reinstatement of the health care

professional by the insurer, provisional reinstatement . . . or termination." *Id.* at § 4803(b)(4). A

decision "to terminate a health care professional shall be effective not less than thirty days after

the receipt by the health care professional of the hearing panel's decision" and "[i]n no event

shall termination be effective earlier than sixty days from the receipt of the notice of

termination." *Id.* at § 4803(b)(5)-(6).

27

Like § 4803, § 4406-d of New York Public Health Law is also entitled "Health care professional applications and terminations." The statutes' provisions regarding notice and a hearing are nearly identical; § 4406-d, however, applies to "health care plan[s]," a term that the is defined as "a health maintenance organization[19] licensed pursuant to article forty-three of the insurance law or certified pursuant to this article or an independent practice association ["IPA"] certified or recognized pursuant to this article." N.Y. Pub. Health Law § 4406-d(8).

Both statutory provisions define "health care professional" as "licensed, registered or certified pursuant to title eight of the education law."  N.Y. Ins. Law § 4803(h); N.Y. Public Health Law § 4406-d(9). Title VIII of New York Education Law governs "The Professions" and includes, among others, pharmacists. N.Y. Educ. Law § 6800 et seq.

Linden Care cites to the text of § 4406-d, and caselaw holding that this provision creates an implied right of action. *Foong v. Empire Blue Cross & Blue Shield*, 305 A.D.2d 330, 762 N.Y.S.2d 348 (2003) (finding "an implied right of action under Public Health Law § 4406-d, which gives health care providers a measure of due process, in the form of peer review, against the arbitrary termination of health care plan contracts, but does not provide for any means of enforcement"). While § 4406-d regulates terminations by "a health care plan," Linden Care argues that this provision applies to Express Scripts because the provision also applies to IPAs,

---

[19] A "'[h]ealth maintenance organization' . . . means any person, natural or corporate, or any groups of such persons who enter into an arrangement, agreement or plan or any combination of arrangements or plans which propose to provide or offer, or which do provide or offer, a comprehensive health services plan." N.Y. Pub. Health Law § 4401(1).

*see* N.Y. Pub. Health Law § 4406-d(8), and Express Scripts is an IPA. In support of its argument,

Linden Care refers to a document captioned "New York State Department of Health Provider

Contract Guidelines for MCOS and IPAs," which includes a provision stating that "4406-d

prohibits termination of a health care professional contract by an MCO or IPA without notice

and the opportunity for a hearing." Dkt. 25-4, p. 12. Linden Care also cites N.Y. Comp. Codes R.

& Regs. tit. 10, § 98-1.18(b), which states that: "[t]he requirements of article 44 of the Public

Health Law and this Subpart shall apply to an IPA and all physicians, other IPAs, health care

providers and suppliers contracting with an IPA to the same extent they apply to all other health

care providers participating with an MCO in a comprehensive health services plan." Linden Care

argues that Express Scripts is an IPA because it meets the definition of that term. Express

Scripts, however, argues that it is not an IPA; Express Scripts notes that it does not have IPA in

its name and that it does not meet the requirements of an IPA. *See* N.Y. Comp. Codes R. & Regs.

tit. 10, § 98-1.5(b)(6)(vii).[20]

Express Scripts does not appear to be an IPA under these provisions.[21] Moreover, it is not

clear that Linden Care has a cause of action against an IPA under the termination provisions. In

*New York Health Plan Ass'n, Inc. v. Levin*, 187 Misc. 2d 527, 531, 723 N.Y.S.2d 819 (Sup. Ct.

2001), a New York Supreme Court interpreted the regulation on which Linden Care relies, N.Y.

Comp. Codes R. & Regs. tit. 10, § 98-1.5(b)(6)(vii), in a manner contrary to Linden Care's

---

[20] Under N.Y. Comp. Codes R. & Regs. tit. 10, § 98-1.5(b)(6)(vii)(a): "[a]n MCO shall not enter into a contract with a . . . business corporation . . . which proposes to provide the services of an (IPA) unless, inter alia, the entity's name includes 'Independent Practice Association,' or 'IPA.'"

[21] Although it claims that Express Scripts is an IPA, the only evidence Linden Care has presented is the October 3, 2011 amendment to add "Diversified NY, IPA, Inc." as a party to the Agreement. Dkt. No. 29-2, p. 2.

interpretation. In *Levin*, the court concluded that this regulation means that the requirements in Article 44 of the Public Health law apply to an IPA "to the same extent that they apply to all other health care providers" but that "[t]he regulation does not provide that the requirements of Article 44 of the Public Health Law shall apply to an IPA to the same extent that they apply to HMOs." *Levin*, 187 Misc. 2d at 531 (finding that IPAs cannot be sanctioned "directly" for violations of the prompt pay law; the HMOs are liable).

Alternatively, Linden Care argues that even if Express Scripts is not an IPA, § 4803 and § 4406-d are nevertheless applicable because Express Scripts is an agent of its "MCO and insurer principals." Dkt. No. 31, pp. 7-11. Linden Care presents no case law, nor is the Court aware of any, extending the application of these statutory provisions on the basis of agency. Moreover, there is no evidence that Express Scripts was acting at the behest of an MCO or HMO. The Court therefore concludes that Linden Care has failed to establish a likelihood of success under § 4803 and § 4406-d.

### b.        Breach of Contract

Linden Care claims that Express Scripts breached the Agreement by failing to comply with its notice of termination requirements. Express Scripts contends that because Linden Care "was improperly shipping prescriptions to California, where it was not licensed," Dkt. No. 30, p. 5, and "made multiple misrepresentations in its Provider Certification regarding the scope of its business, including where it ships prescriptions, how much of it[s] business is mail order, and the identity of the pharmacist in charge," Dkt. No. 9-1, p. 13, the Agreement allows for immediate termination.

Under New York law,[22] in order to recover for breach of contract, a plaintiff must establish "(1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011). "[A] duty of good faith and fair dealing is implied in every contract;" this "duty comprises 'any promises which a reasonable person in the position of the promisee would be justified in understanding were included [in the contract].'" *Nat'l Mkt. Share, Inc. v. Sterling Nat. Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (quoting *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389, 639 N.Y.S.2d 977, 663 N.E.2d 289 (1995)).

The parties dispute the third element: Linden Care claims that Express Scripts breached the Agreement and the Addenda by (1) failing to comply with the notice of termination requirements and (2) terminating Linden Care for "anticompetitive reasons," in violation of "the implied duty of good faith and fair dealing." Dkt. No. 5-3, p. 13.

### i.      Agreement

The Agreement allows either party to terminate the Agreement "without cause upon ninety [90] days written notice," Dkt. No. 10-2, § 4.2.a. It also provides Express Scripts the right to "immediately terminate th[e] Agreement upon written notice to Provider in the event that . . . any representation to [Express Scripts] or any response to a question set forth on the Provider Certification is untrue or becomes untrue;" Express Scripts "determines that the Provider is

---

[22] The parties assume New York law applies to the pendent state claims in this case.

dispensing Covered Medication in violation of any applicable law, rule and/or regulation;" or the "Provider breaches any of its representations and warranties set forth in this Agreement or the Provider Certification." *Id*. at § 4.2.c. The Agreement contains a provision for allowing a "Non-Defaulting Party" to give written notice to a party that "defaults in the performance of any of its obligations under this Agreement" and thirty days to cure "such breach," *id*. at § 4.2.b. Linden Care argues that Express Scripts breached the Agreement by failing to utilize § 4.2.b and provide it with time to cure the alleged breach. That provision, however, is not mandatory, but permissive: the "Non-Defaulting Party" "may give written notice . . . of such breach." *Id*. Thus, it provides no avenue for relief to Linden Care.

Linden Care successfully established at the hearing that, contrary to Express Scripts' allegations, it is licensed in Maryland and that there is no evidence that it dispensed Horizon drugs in violation of any plan's formulary. While these allegations may have been unfounded, and may be evidence of pretext, Linden Care has failed to show a likelihood of success with respect to its claim that Linden Care's increased, but unreported, mail order business, was not a breach of the Agreement.

The immediate termination provision in the Agreement allows Express Scripts to immediately terminate the Agreement if, *inter alia*, "any response to a question set forth on the Provider Certification is untrue or becomes untrue." Dkt. No. 10-2, § 4.2.c. Express Scripts cited Linden Care's failure to notify it that its mail order business increased from thirty-nine percent "local and out of state," the amount it noted on its provider certification, to seventy percent out of state as grounds for immediate termination. After terminating Linden Care, Express Scripts also discovered that Linden Care had failed to report that Alberto Lopez had replaced Jordan

Fogel, whom Linden Care had identified on its provider certification as its pharmacist in charge. Linden Care does not dispute Express Scripts' contentions or that these actions fall within the actions for which immediate termination is warranted, rather, it argues that that Express Scripts knew a portion of its business was mail order, and that the individual it identified as its pharmacist in charge is still in its employ, though in a different capacity. Thus, Linden Care has failed to meet its burden of establishing the merits of its claim, for the purposes of preliminary injunctive relief, that Express Scripts breached the termination provision in the provider agreement with respect to the provider certification.

With respect to shipments of medications to California, Linden Care presented some evidence refuting Express Scripts' claim that Linden Care had shipped medication to California, where it was not licensed. It demonstrated that while many of the patients about whom Express Scripts was concerned had California addresses, the medications were shipped to those patients in other states: not California. There is, however, no evidence regarding where shipments were made to five or six of the California patients. Linden Care asserts that, in any event, immediate termination was not warranted because if these were shipments to California they were "*de minimis*" and that "Linden Care expects that such shipments were for emergency situations to accommodate patients' unusual needs and circumstances and to avoid to abandonment [of] its patients' medical needs." Dkt. No. 65, p. 2.

Citing Cal. Health & Saf. Code §§ 11167 and 11164.1, Linden Care asserts that "[t]here are . . . legal bases in California that can be relied upon to justify Linden Care's dispensing of prescriptions in emergency situations on rare occasion." Dkt. No. 65, p. 2. It further asserts that "research of the actual interpretation and enforcement of California licensure standards does not

reveal any indication that the California Board of Pharmacy would view *de minimis* fills of prescriptions as an actionable violation of California pharmacy law." *Id*. The regulations on which Linden Care relies allow: (1) for the dispensation of a controlled substance "on an oral order" in an emergency, Cal. Health & Safety Code § 11167; and (2) a California pharmacy to dispense "a prescription for a controlled substance issued by a prescriber in another state for delivery to a patient in another state." Cal. Health & Safety Code § 11164.1. The prescriptions at issue, however, were neither dispensed "on an oral order" nor by "a California pharmacy," but were allegedly filled by a New York pharmacy and shipped to patients in California. Thus, they do not lend support to Linden Care's argument that any emergency dispensations to California were excusable. If, in fact, Linden Care shipped medications to California, it unlikely to succeed on the merits of its claim that Express Scripts breached the Agreement by utilizing the immediate termination provision.

### ii.     New York Addendum

Linden Care next argues that the termination provision of the "New York Addendum to the Participating Provider Agreement," Dkt. No. 32-4, pp. 5-6, required that Express Scripts give Linden Care notice and an opportunity to be heard prior to termination. The termination provisions to which Linden Care refers are contained in Section 5 of the New York Addendum in the Provider Manual. Dkt. No. 32-4, p. 6, § 5. Those provisions govern the termination of an agreement between: (1) a "M[anaged] C[are] O[rganization] and an IPA, institutional network provider, or medical group provider that serves five percent or more of the enrolled population of a county;" (2) an "IPA and an institutional Provider or medical group Provider that serves five percent or more of the enrolled population of a county," or (3) an "MCO and a health care

34

professional." Dkt. No. 32-4, p. 6 §§ 5.1, 5.2.[23] There was no evidence regarding what percentage of the enrolled population Linden Care serves. Although there is evidence that Express Scripts has a subsidiary that is an IPA (*see* Dkt. No. 29-2, p. 2 ("Diversified NY, IPA, Inc.")), that subsidiary is not a party to this action, nor is there any basis for holding the subsidiary liable. Although Linden Care argues that Express Scripts is an "agent" of an MCO, and may be held liable as an agent, there is no evidence that it was acting at the behest of an MCO, and it has presented no caselaw that would allow the Court to extend the New York Addendum in this manner. Thus, Linden Care has failed to meet its burden of establishing the merits of its claim, for the purposes of preliminary injunctive relief, that Express Scripts breached the termination provisions of the New York Addendum.

### iii.    New York Medicaid Addendum

Linden Care has succeeded in showing a likelihood of success with respect to its claim that Express Scripts violated the New York Medicaid Addendum in the Provider Manual when it terminated Linden Care with less than thirty days written notice and a hearing. Dkt. No. 32-4, p. 8, § 13. Indeed, counsel for Express Scripts all but conceded liability on this claim at the hearing. T. 315-16. The New York Medicaid Addendum, which applies to members enrolled in Medicaid, allows for termination without cause "no earlier than sixty (60) days from the receipt of the notice of termination." Dkt. No. 32-4, p. 8, § 13. It is undisputed that some of Linden Care's patients are New York Medicaid members. Wiener testified that Linden Care provides medications to "thousands of managed New York State Medicaid patients," T. 258, but could not

---

[23] The same termination provision was included in the Standard Clauses for Managed Care Provider/IPA Contracts, which was incorporated into the provider agreement. Dkt. No. 29-2, p. 10.

estimate the percentage of Linden Care's business that is attributable to New York Medicaid. T.
273. Express Scripts submitted an affidavit from Amber Compton, Vice President of Retail
Strategy and Contracting for Express Scripts, who states that Express Scripts' "internal records
reflect approximately 100 New York Medicaid members that have filled prescriptions at Linden
Care in 2015." Dkt. No. 63-2, ¶ 5. Regardless of the number of New York Medicaid members,
the evidence indicates that Linden Care was entitled to notice and a hearing prior to termination,
and that Express Scripts terminated the Agreement without notice. Thus, Linden Care has
established a likelihood of success with respect to its claim that Express Scripts breached the
New York Medicaid Addendum.

In view of Express Scripts' unequivocal statement that its relationship with Linden Care
is at an end, at most, Linden Care would be entitled to sixty more days in Express Scripts'
network solely with respect to its New York Medicaid patients. The damages, therefore, are
quantifiable. If Linden Care continues to dispense medication to New York Medicaid patients for
the sixty days between November 9, 2015 and January 8, 2016, it may recover the portion for
which Express Scripts is responsible under the terms and rates contained in the Agreement in the
form of a monetary judgment. *See Register.com*, 356 F.3d at 404 ("If an injury can be
appropriately compensated by an award of money damages, then an adequate remedy at law
exists, and no irreparable injury may be found to justify specific relief.").

To the extent Linden Care argues that Express Scripts terminated it on the ground that it
advocated for its patients, which is an impermissible ground for termination and a protected
activity under the New York Medicaid Addendum, Dkt. No. 32-4, p. 8, § 14 ("PBM shall not
terminate . . . the Provider Agreement . . . solely because Provider has . . . advocated for an

36

Enrollee"), and that it should be restored indefinitely to the Express Scripts network, it has failed to show a likelihood of success on this argument. First, the New York Medicaid Addendum, as stated, allows for termination without cause upon sixty days written notice. Express Scripts presented evidence at the hearing that it no longer trusts Linden Care and its contractual relationship is at an end. Second, even assuming Linden Care's patient advocacy factored into Express Scripts' decision to terminate it from its network, it is uncontroverted that patient advocacy was not the sole reason for that decision; Express Scripts also cited Linden Care's failure to apprise Express Scripts that its mail order business had grown to seventy percent of its operation and Linden Care's alleged shipments to California, where it is not licensed.

### iv.     Good Faith and Fair Dealing

Linden Care argues that Express Scripts breached its duty of good faith and fair dealing "by terminating for anticompetitive reasons, Linden Care after making no objection to its dispensing and delivery practices for years. To now terminate Linden Care solely to ga[in] a prospective advantage in the pharmacy market for its own financial benefit is by definition, 'unfair dealing.'" Dkt. No. 11-15, pp. 13-14. "Under New York law, claims [for breach of contract and breach of the implied covenant of good faith and fair dealing] are duplicative when both 'arise from the same facts and seek the identical damages for each alleged breach.'" *Deutsche Bank Nat. Trust Co. v. Quicken Loans Inc.*, __F.3d __, No. 14-3373-CV, 2015 WL 7146515, at *6, 2015 U.S. App. LEXIS 19874, at *18 (2d Cir. Nov. 16, 2015) (quoting *Amcan Holdings, Inc. v. Canadian Imperial Bank of Commerce*, 70 A.D.3d 423, 426 (1st Dep't 2010)). To the extent Linden Care's claims arise from the same facts, they are duplicative. Moreover, there is no evidence that Express Scripts knew that Linden Care's certification regarding its mail

order business had become untrue, i.e., that its mail order business had increased from thirty-nine to seventy percent, until recently. While Express Scripts regularly audited Linden Care, Roberts explained that the audit department audits "claims for appropriateness of the claim and they are not auditing against the [Provider] contract," to ensure, for example "that the patients have received the medications that are shown on the claim,"; they did not "usually [look] at whether or not a pharmacy is shipping into another state." T. 138. Finally, for the reasons discussed in connection with Linden Care's Sherman Act claims, the Court finds Linden Care has failed to meet its burden, for the purposes of preliminary injunctive relief, of establishing the merits of its claim that Express Scripts engaged in anticompetitive conduct.

### c.        Tortious Interference

Linden Care claims that Express Scripts knew that Linden Care "had robust business relationships with thousands of patients, as well as physicians and manufacturers," Dkt. No. 11-15, p. 14, and intentionally terminated it from the network in order to steer prescriptions drug orders to its "own mail-order pharmacy." Dkt. No. 10, ¶ 94. To prevail on a claim for tortious interference with business relations[24] under New York law, "a plaintiff must show that (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship." *Casa Duse, LLC v. Merkin*, 791 F.3d 247, 261 (2d Cir. 2015) (internal quotation mark omitted).

---

[24] This tort is also known as tortious interference with prospective economic advantage. *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 132 (2d Cir. 2008).

While Linden Care questions Express Scripts' motives for terminating the Agreement, for the reasons discussed above, in the absence of evidence demonstrating that Express Scripts' termination of the Agreement was improper, the Court concludes that Linden Care has failed to meet its burden, for the purposes of preliminary injunctive relief, of establishing the merits of its tortious interference claim. *See Coca-Cola N. Am. v. Crawley Juice, Inc.*, No. 09 CV 3259 JG RML, 2011 WL 1882845, at *8, 2011 U.S. Dist. LEXIS 52813, at *24 (E.D.N.Y. May 17, 2011) (dismissing the defendant's counterclaim for tortious interference on the basis that "it was not wrongful or improper for Coca–Cola to terminate the Distributor Agreements, as they were contractually permitted to do so without cause on thirty days' notice."). Even assuming Linden Care could show a likelihood of success with respect to Express Scripts' conduct in connection with the New York Medicaid Addendum, as discussed above, it has failed to show irreparable harm.

### d.     Sherman Act - Antitrust Claims

Linden Care alleges that Express Scripts engaged in unlawful monopolization, or, alternatively, attempted unlawful monopolization, in violation of the Sherman Act, 15 U.S.C. § 2.[25] "Section 16 of the Clayton Act entitles a party to obtain injunctive relief "against threatened loss or damage by a violation of the antitrust laws." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (quoting *California v. Am. Stores Co.*, 495 U.S. 271, 280 (1990)).

-----

[25] Although Linden Care alleges violations of sections 1 and 2 of the Sherman Act, it seeks injunctive relief with respect to section 2 only.

"Section 2 of the Sherman Act makes it an offense to 'monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States.'" *New York ex rel. Schneiderman*, 787 F.3d at 651(quoting 15 U.S.C. § 2). To establish unlawful monopolization, "a plaintiff must prove not only that the defendant possessed monopoly power in the relevant market, but that it willfully acquired or maintained that power 'as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" *Id.* (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)). The Second Circuit has explained that in order "[t]o safeguard the incentive to innovate, the possession of monopoly power will not be found unlawful unless it is accompanied by an element of anticompetitive conduct." *Id.* (internal quotation marks omitted).

To show attempted monopolization, a plaintiff must prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). "Attempted monopolization, unlike monopolization, requires a finding of specific intent." *New York ex rel. Schneiderman*, 787 F.3d at 651.

According to Linden Care, the relevant product market "is the market for specialty pharmacy services to [Express Scripts] members nationwide." Dkt. No. 11-15, p. 16. Linden Care also asserts that Express Scripts' "ability to exclude pharmacies from providing mail-order pharmacy services altogether and thus decide which pharmacies can receive reimbursement for prescription sales to [its] members" gives it "total control over the relevant market." Dkt. No. 11-15, p. 16. Linden Care claims that Express Scripts' sole reason for terminating Linden Care from its network "is to eliminate Linden Care as a competitor to [Express Scripts'] owned-specialty

40

pharmacy, with specific intent to monopolize the relevant market." *Id.* At the hearing, however, Roberts testified that Express Scripts' specialty pharmacy – Accredo  – does not dispense the specialized pain medications Linden Care provides to its patients. T. 219. Nor is there any evidence that Accredo is part of the TIRF REMS program.

The alleged injuries to the relevant market, according to Linden Care, are the substantial decrease in "the output of pharmaceutical services and prescription drugs in the relevant market," the increased administrative burdens to physicians, who will have "to split their referrals among Linden Care and other pharmacies," and Express Scripts members' loss of "meaningful choice and access to pharmaceutical services and prescription drugs in the relevant market." *Id.* at 17. Linden Care, however, contracted with Express Scripts as a retail provider, not a mail-order provider. Further, Linden Care has provided no evidence that Express Scripts possesses monopoly power over the specialty pharmacy services or mail order market. Nor is there evidence that Express Scripts terminated Linden Care from its network with the specific intent to monopolize specialty pharmacy services or the mail order market. At this early stage of the case,[26] Linden Care has failed to establish that it has a likelihood of success on its Sherman Act claims.

### 3.    Balance of Hardships

"The balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co. v. Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (quoting

---

[26] Counsel for Linden Care stated at the evidentiary hearing that Linden Care intended to amend the complaint to plead conspiracy by PBMs in violation of the antitrust laws. T. 364.

*Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)) (internal quotation marks omitted). Express Scripts asserts that if a preliminary injunction is granted, it will be forced into a contractual relationship with a provider it no longer trusts. Linden Care has adduced evidence that Express Scripts constitutes twenty-five percent of its business and that Express Scripts' termination of the Agreement threatens to leave Linden Care's patients without access to the prescription medications they need and puts Linden Care in danger of having to lay-off a number of its employees. The Court therefore concludes that the balance of the hardships tips in Linden Care's favor. However, without a showing of a likelihood of success on the merits, or even a sufficiently serious question going to the merits with respect to any claim except the New York Medicaid Addendum, this factor, alone, is insufficient to warrant injunctive relief.

### 4. Public Interest

"The court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). A preliminary injunction shall not issue in this case, thus the Court need not consider the public interest. *U.S. S.E.C. v. Citigroup Glob. Markets Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) ("[W]hen a court orders injunctive relief, it should ensure that injunction does not cause harm to the public interest.").

### B. <u>*Motion to Transfer – Arbitration*</u>

Express Scripts moved to transfer this action to Missouri, where the court could compel arbitration. Dkt. Nos. 9, 30. Linden Care opposed the motion to transfer, arguing, *inter alia*, that the arbitration provision is unenforceable and, to the extent the Agreement requires binding

arbitration, it should be venued in New York.[27] Following the evidentiary hearing, Express

Scripts filed a letter stating:

> In order to avoid a further dispute regarding venue, Express Scripts is agreeable to
> proceeding with arbitration in New York City, and to requesting that the
> proceedings be scheduled on an expedited basis. Express Scripts communicated
> this offer to Linden Care and Linden Care has indicated that it is in agreement that
> the arbitration proceedings be held in New York City.

Dkt. No. 63, p. 4. Accordingly, Express Scripts' motion to transfer is denied as moot, and the

Court has not considered Linden Care's challenges to the arbitration clause.

**IV.     CONCLUSION**

This constitutes the Court's findings of fact and conclusions of law in accordance with

Rule 52(a)(2). Accordingly, it is

---

[27] The Agreement contains a "Binding Arbitration" provision, which states:

> Any claim or controversy ("Claim"), whether under federal or state statutory or common law,
> brought by either ESI or the Pharmacy against the other . . . arising from or relating in any way to
> the Interpretation or performance of this Agreement . . . including Claims regarding the validity of
> this arbitration provision, shall be resolved by binding arbitration . . . . Venue for the arbitration
> shall be in St. Louis County, Missouri. The substantive laws of the State of Missouri (without
> regard to its choice of law rules) shall apply to claims and defenses of the parties and to the
> Interpretation of this agreement to arbitrate.

Dkt. No. 10-2, § 7.15. The arbitration provisions in the New York Addenda to the Provider Manual state:

> To the extent that arbitration . . . is authorized elsewhere in this Agreement, the parties to this
> Agreement acknowledge that the Commissioner of Health is not bound by arbitration . . . .
> Arbitration . . . shall occur within New York State, and the Commissioner of Health will be given
> notice of all issues going to arbitration . . . and copies of all decisions.

Dkt. No. 32-4, p. 6, § 6.1, p. 8, § 19; Dkt. No. 29-2, p. 11.

**ORDERED** that Plaintiff's motion for a temporary restraining order and preliminary injunction (Dkt. Nos. 5, 11) is **DENIED**; and it is further

**ORDERED** that Defendant's cross-motion to dismiss, or, in the alternative to transfer this case to the United States District Court for the Eastern District of Missouri (Dkt. No. 9) is **DENIED as moot.**

**IT IS SO ORDERED.**

Dated:  December 7, 2015

Brenda K. Sannes
U.S. District Judge