UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-------------------------------------------x
LINDEN CARE, LLC,

                         Plaintiff,

vs.                                    1:15-CV-1335

EXPRESS SCRIPTS, INC.,

                         Defendant.
-------------------------------------------x


*Evidentiary Hearing* – November 20, 2015

James Hanley Federal Building, Syracuse, New York

HONORABLE BRENDA K. SANNES

United States District Judge, Presiding


*Eileen McDonough, RPR, CRR*
*Official United States Court Reporter*
*P.O. Box 7367*
*Syracuse, New York 13261*
*(315)234-8546*

A P P E A R A N C E S

For Plaintiff:        BARCLAY DAMON LLP
                      Attorneys at Law
                      80 State Street
                      Albany, New York 12207
                        BY:  LINDA J. CLARK, ESQ.
                             DAVID COST, ESQ.
                             JOSEPH MURPHY, ESQ.

                      BOIES, SCHILLER & FLEXNER, LLP
                      Attorneys at Law
                      5301 Wisonsini Ave, NW
                      Washington, DC 20015
                        BY:  LAWRENCE V. ASHE, ESQ.
                             NICHOLAS A. WIDNELL, ESQ.

For Defendant:        HUSCH BLACKWELL
                      Attorneys at Law
                      190 Carondelet Plaza
                      St. Louis, MO 63033
                        BY:  SARAH C. HELLMANN, ESQ.
                             CHRISTOPHER A. SMITH, ESQ.
                             URMILA PARANJPE BAUMANN, ESQ.

                      COZEN, O'CONNOR LAW FIRM
                      Attorneys at Law
                      277 Park Avenue
                      New York, NY 10172
                        BY:  JOHN SULLIVAN, ESQ.

*Eileen McDonough, RPR, CRR*
*Official United States Court Reporter*
*P.O. Box 7367*
*Syracuse, New York 13261*
*(315)234-8546*

1                    (Court convenes at 10:14.)

2              THE CLERK:  Case is Linden Care versus Express

3    Scripts, 15-cv-1335.  Counsel, please note your appearance

4    for the record.

5              MS. CLARK:  Your Honor, Linda Clark for the

6    plaintiff Linden Care, from Barclay Damon.

7              MR. COST:  Good morning, Your Honor.  David Cost on

8    behalf of Linden Care, also from Barclay Damon.

9              MR. ASHE:  Lawrence Ashe from Boise Schiller for

10   the plaintiff.

11             MR. WIDNELL:  Nicholas Widnell, Boise Schiller, for

12   the plaintiff.

13             MR. MURPHY:  Joseph Murphy with Barclay Damon on

14   behalf of the plaintiff Linden Care.

15             MS. HELLMAN:  Good morning, Your Honor.  Sarah

16   Hellman from Husch Blackwell on behalf of Express Scripts.

17             MR. SMITH:  Good morning, Your Honor.  Christopher

18   Smith from Husch Blackwell on behalf of Express Scripts.

19             MR. SULLIVAN:  John Sullivan from Cozen O'Connor

20   for Express Scripts.

21             MS. BAUMANN:  Urmila Paranjpe Baumann for Express

22   Scripts.

23             THE COURT:  Good morning, Counsel.  We're here on

24   the pending motions.  And at the outset let me just clarify

25   which motions are pending.  Ms. Hellman, I know that in our

1    oral telephone conference you withdrew a motion to transfer

2    based upon the forum selection agreement, is that correct?

3             MS. HELLMAN:  That is correct, Your Honor.

4             THE COURT:  And are you also withdrawing your

5    request for sanctions related to that forum selection

6    agreement?

7             MS. HELLMAN:  Yes, Your Honor.

8             THE COURT:  And are you also withdrawing your

9    motion to dismiss the complaint in light of the amended

10   complaint?

11            MS. HELLMAN:  Yes, Your Honor.  I'm sorry, I was

12   just thinking back to that motion.  Yes, Your Honor.

13            THE COURT:  So pending for the defendant is the

14   motion to transfer this case to Missouri based upon the

15   argument that the parties agreed to arbitrate in Missouri?

16            MS. HELLMAN:  That is correct, Your Honor.

17            THE COURT:  And for the plaintiff's pending we have

18   the motion for a temporary restraining order and a

19   preliminary injunction?

20            MS. CLARK:  That's correct, Your Honor.

21            THE COURT:  And I should note that we have

22   received, the Court has obviously received the affidavits and

23   the exhibits filed in support of the parties' positions, so

24   we have that before the Court.  Do the parties wish to

25   present any evidence with respect to the motions that are

1  pending.  Ms. Clark?

2       MS. CLARK:  Yes, Your Honor.

3       THE COURT:  And Ms. Hellman?

4       MS. HELLMAN:  Yes, Your Honor.

5       THE COURT:  So why don't I let, Ms. Clark, you

6  proceed with your first witness.

7       MS. CLARK:  Your Honor, I have a brief opening

8  statement, if I may.

9       THE COURT:  Yes.

10       MS. CLARK:  Would that be appropriate?

11       THE COURT:  Yes.

12       MS. CLARK:  Your Honor, is it okay if I stay here

13  rather than go to the podium since I have all my documents

14  here?

15       THE COURT:  That's fine.

16       MS. CLARK:  Good morning, Your Honor.  We're here

17  today at what at first blush might be viewed as a rather

18  routine and simple type of breach of contract case.  But

19  we're here today really because this is not a case involving

20  a breach of contract over the sale of widgets or anything

21  like that.  Rather, this is a breach of contract case that

22  has far reaching implications both for New Yorkers and the

23  managed care system in New York, the rights of pharmacies and

24  pharmacists in New York.

25       More immediately, it's a case that immediately and

1   has impacted even over the last few days the lives of the

2   thousands of people that are currently under Linden Care's

3   care.  This is very important.  Linden Care has over 100,000

4   patients a year that it is responsible for.  Today with

5   respect to ESI alone it has the care of thousands of

6   individuals that are currently expecting their medications to

7   come from Linden Care.  So this is an issue of great moment

8   not just for the parties but for many people out there.

9           Now, I want to start just briefly giving a little

10  bit of an overview.  We've gone back and forth, we've had a

11  lot of briefing, but I wanted to set forth the context that

12  we have here with respect to Linden Care specifically.  The

13  Court has heard a lot about Linden Care as a specialty

14  pharmacy.  And I think we need to start by talking a little

15  bit about what that is.

16          Linden Care is a licensed pharmacy in Woodbury,

17  New York.  It has a retail pharmacy, you can walk in and hand

18  in your prescriptions.  There are eight pharmacists there

19  that work to dispense medications.  But more particularly for

20  the facts of this case, Linden Care specializes in the

21  provision of pain management medications.  This is an

22  important fact.  Because pain management medications in this

23  day and age are very highly regulated.  They're very

24  carefully provided and shipped by manufacturers.  They're not

25  readily available.  They require a very high level of care,

1    both with respect to interacting with patients because of the

2    very high risks that are involved.

3            The patients are special.  The patients are special

4    because they're suffering from extreme pain conditions.  Your

5    Honor, we're not talking about a headache, the types of

6    conditions that you and I might encounter on a daily basis

7    with our family members.  We're talking about patients in

8    extremis.  We're talking about end of life care for, for

9    example, some of the affidavits that we provided just

10   yesterday or the last few days, who are suffering from stage

11   4 lymphoma, stage 4 throat cancer.  These are the types of

12   medications that are keeping these people pain free in these

13   very difficult circumstances.

14           This is important because we're talking about

15   breakthrough pain, pain that in many cases, I'm not saying

16   this is all of Linden Care's patients, but it's not atypical,

17   that can't be managed through over-the-counter prescriptions

18   and sometimes not even through traditional narcotics.  Many

19   of these patients need to go to Linden Care because Linden

20   Care has a very specialized federally approved program to

21   dispense very, very potent TIRF REMS type of medications.

22   They're very effective.  They have an immediate impact on

23   breakthrough pain, however, they're extremely potent and they

24   can be very dangerous.

25           You're going to hear about this.  This is very

1    important because patients, for example, can't just go out

2    and take TIRF REMS drugs, they could die from that.  There

3    has to be a very gradual escalation in dosage and very close

4    coordination with the physician and the patient to make sure

5    that someone becomes tolerant, their system can tolerate that

6    drug.  Once they're on it, they can't be immediately -- they

7    can't immediately cease taking that medication or they suffer

8    from potentially not only the immediate return of this

9    extreme pain condition, but also from potentially life

10   threatening consequences such as tachycardia, heart

11   arhythmia, all kinds of serious withdrawal symptoms,

12   sweating, anxiety.  These people are not in a position to be

13   put through that.  So that's a very important part of this

14   case is the nature of Linden Care's responsibilities.

15          Now the drugs are special, as I said, because

16   they're difficult to get and they're difficult to get from

17   manufacturers.  You can't go to your local pharmacy and get

18   the typical class of narcotics or highly regulated TIRF REMS

19   drugs that are provided by Linden Care to their population,

20   they're just not available.  You're going to hear about that.

21   You're going to hear from Dr. Weingarten, who is a physician

22   with expertise specifically in this area.  You're going to

23   hear from Mr. Fogel, who is a pharmacist at Linden Care,

24   about why there is this difficulty for prescribers finding a

25   pharmacy that has all these qualifications and the resources

1    to effectively manage these medications safely.

2           The other part of it, Your Honor, is the regulatory

3    backdrop.  We have the ISoP program in New York that you

4    might be familiar with.  The ISoP program very carefully

5    controls now the availability of narcotics, both for patients

6    so they don't overdose, but also so they don't end up on the

7    street as an effort by New York State to control the epidemic

8    of narcotics on the street.  You'll hear more about that.

9           Linden Care is regulated through the FDA, the TIRF

10   REMS program.  And you'll hear about the alphabet soup;

11   they're regulated by the DEA, they're regulated by the New

12   York State Bureau of Narcotic Enforcement, the BNE.  You'll

13   hear about this very complex web of regulation that makes

14   Linden Care special and specially situated to take care of

15   these patients with these unique problems.

16           Now, one of the things that we have to know here

17   when we're talking about Linden Care's specialty in pain

18   management is also that these drugs may be expensive, and so

19   it constantly puts Linden Care in working with its patients,

20   in working with prescribers in establishing a flow of

21   products from manufacturers in the position of advocating for

22   its patients.  The patients come to Linden Care with a

23   prescription from a prescriber.  It's the prescriber that

24   decides if the patient can get plain old Ibuprofen, something

25   over-the-counter, or should they be getting something that is

1  more unique and specialized for their condition?  Should they

2  be getting a narcotic?  Do they qualify for these TIRF REMS

3  products?  That's uniquely a physician determination.

4         Then the patient has to be evaluated with respect

5  to their formulary.  The doctor doesn't decide what the

6  patient actually gets; the doctor writes the prescription.

7  And, frankly, the pharmacy benefit manager doesn't decide

8  what the patient gets; it's the patient's plan.  For you or

9  for me in upstate New York that might be MVP or CDPHP.  Every

10  plan has its own menu of drugs that it is approved through

11  its own clinical determination, perhaps in consultation with

12  the pharmacy benefit manager.  But every plan has its own

13  menu of drugs that are available.  And it's part of Linden

14  Care's function and part of this full service that it

15  provides to assist and coordinate, help the patient navigate

16  what can be a complicated process with the pharmacy benefit

17  manager to ensure or prepare to help them get the approvals

18  they need in order to get the drug that their doctor has said

19  is what they need.  Okay.  The doctor can prescribe generics

20  or not, that's not a Linden Care decision.

21         So Linden Care is constantly in this position of

22  potential conflict with its pharmacy benefit manager because

23  of its role as an advocate for the patients working with the

24  prescribers to get the drugs that they're entitled to under

25  their formulary, that they paid for in their monthly

1    premiums.

2            Why is that important here?  Okay.  It's important

3    here because what we're talking about is the disregard, ESI's

4    position that it is not bound by state laws generally and,

5    more specifically, that it's not bound by New York State laws

6    that protect patients, that protect prescribers for exactly

7    the reasons that are in play here.  So sometimes in cases we

8    have a technical violation of a state regulation or a rule

9    but it's not terribly relevant to the case at hand.

10           I always think about the bar exam that I took where

11   there was a question about somebody speeding through a school

12   area when the school was not in session.  They violated the

13   speed limit but school wasn't in session, so how relevant is

14   that.  That's not what we have here.  Here we have statutes,

15   4406-d, which is the provider rights statute; 4406-c, which

16   specifically promotes and preserves the provider's ability to

17   advocate for the patient.  We have these statutes in play in

18   New York precisely because of this fundamental conflict of

19   interest that exists in the managed care system.

20           The pharmacy benefit manager is smack dab in the

21   middle of that equation.  They're the ones that have the

22   spigot to determine if the patient is going to get that drug

23   or not based upon the plan's formulary.  So you have this

24   tension, and it's very important in this case to recognize

25   that because this is not an ancillary issue whether or not a

1    PBM can terminate without cause for technical noncompliance

2    with certain aspects of a 200 page Provider Manual.  That is

3    not a free-standing issue.  That issue has to be looked at

4    through the lens of New York's patient and provider

5    protection laws.

6            And why do we have these laws?  Well, we have these

7    laws in New York, Rhode Island.  I provided the Court with a

8    sampling of the fifty states, not an exhaustive treatment.

9    We have these laws precisely to protect patients and

10   providers, to free them up to advocate for the patients so

11   that the patients can get the drugs that they're entitled to

12   that they paid for from their plans.  And that's really what

13   we're here about today.

14           Now in this case the PBM issue is even more central

15   to the quandary, and it's because the pharmacy benefit

16   manager, in this case Express Scripts, has multiple conflicts

17   of interest.  It has this fiduciary responsibility to act in

18   the best interest of the plan it represents.  Okay.  PBM

19   doesn't decide what drugs the patients get, the plan does.

20   And the plan decides what they want pay for for the

21   formulary.  But the PBM has a conflict of interest because

22   they get paid based upon a utilization compensation model.  I

23   don't think there is going to be any dispute about this.

24   It's in the *Paduano* case, and I can provide plenty of

25   resources for the Court if there is any issue on that.

1          So if they are able to keep the cost down for the

2   plan and dispense from the lower end of the formulary, the

3   less expensive drugs, they make more money.  That's a

4   problem.  In addition, the pharmacy benefit manager makes

5   money on rebates.  And that's really important here.  So if

6   the pharmacy benefit manager is able to steer patients to

7   drugs where they have a favorable rebate relationship, they

8   make money that way too.

9          Now why is that relevant here?  Well, we have the

10  back story here, okay, of the real reason why Linden Care was

11  terminated with no notice last Tuesday, with no notice to

12  patients, with no notice to the plans.  The real reason they

13  were terminated, according to Express Scripts' own press

14  release, was because Express Scripts was upset that Linden

15  Care was too close to a particular manufacturer that was

16  dispensing, that involved the dispensing of expensive

17  medications.  And the same day or about the same time that

18  Linden Care was terminated Express Scripts sued that

19  manufacturer, Horizon, you're going to hear quite a bit about

20  Horizon, for $140 million for rebates that Express Scripts

21  felt that Horizon should have paid it.

22          So these conflicts of interest that are at the

23  heart of this case and are at the center, the very purpose of

24  New York's provider and patient protection laws, are a very

25  compelling reason to take a very careful look at the recited

1    bases for the termination that was issued last Tuesday.  We

2    have the reasons that were cited in the termination letter

3    that we're going to talk about through our witnesses, and we

4    have the reasons that Express Scripts is citing to the media.

5    And we have this $140 million rebate squabble between

6    Horizon, the manufacturer, and Express Scripts.  So we have

7    every reason to take a hard look at this issue.  Not to

8    mention the patient ramifications.

9         There is another conflict of interest here as if

10   there weren't enough.  The other conflict of interest is that

11   in addition to being the administrator of the plan, that

12   conflict of interest because of the plan arrangement, in

13   addition to having the conflict of interest because they want

14   to get the best rebate arrangement possible, they're fighting

15   with Horizon about it now, they're also a major competitor.

16   They have -- they are talking about captive pharmacies.

17   Well, let's be very clear by the way, Linden Care is not

18   captive of anyone.  There is no manufacture or anyone else

19   that owns any part of Linden Care.  This situation has

20   absolutely nothing to do with other situations that the Court

21   may have heard about, and we're willing to establish that.

22   The problem, however, is that Express Scripts with all those

23   other hats puts one more hat on top as a major competitor of

24   Linden Care.

25         They do have a captive pharmacy.  They have their

1   own captive pharmacy called Accredo, along with others by the

2   way.  That's one.  Accredo is one of the biggest pharmacies

3   in the country.  And so they have another incentive, well, if

4   we have to prescribe these expensive medications on the top

5   end of the formulary, which is going to hurt our bottom line

6   because of our compensation arrangements, and maybe it's not

7   the greatest rebate situation for us, at least if it's going

8   to be prescribed, let's send it to Accredo, then at least we

9   get the profit and potentially the rebate consequences.

10          So we have this situation on so many levels that is

11  fraught with conflicts of interest.  And when you look at the

12  termination letter issued by Express Scripts, we're talking

13  about highly debatable technical noncompliance with

14  provisions of this massive Provider Manual.  Let's remember,

15  Your Honor, this Provider Manual has a provision to deal with

16  noncompliance.  Okay.  And that provision is Section 4.2(b)

17  of the Provider Manual, which we cite in our papers.  And

18  that has the usual process for these kinds of things.  Tell

19  us what we did wrong, okay, and we will come up with a plan

20  of correction, we have thirty days to cure the problem, and

21  that's how these issues get resolved.

22          That's not what Express Scripts did.  Instead they

23  issued an instant termination without regard for the

24  provisions of 4.2(b) saying somehow that our violation was so

25  utterly egregious that it justified an immediate termination

1    in all of the consequences that we've seen over the last week

2    for patients.

3            Your Honor, we've been able to show, number one,

4    that they're just wrong, we were licensed in Maryland.  We've

5    been able to show that, in fact, we have a sister pharmacy in

6    California that properly dispenses in California.  What

7    they're really talking about, Your Honor, is an occasional

8    and very rare accommodation to a patient who happens to be in

9    California who needs an emergency or urgent refill of their

10   medication.  I can't tell you today how that stacks up in

11   terms of a technical possible noncompliance in California,

12   but I can tell you in New York, for example, there would be

13   no action, there would be no enforcement or prosecution based

14   upon that good faith accommodation.

15           Lastly, we have the mail order issue.  Well, Your

16   Honor, we're going to hear from our witnesses, experts and

17   Linden Care folks alike, who will tell you that in the

18   pharmacy world mail order means a very specific thing.  Mail

19   order means Accredo.  Okay.  A massive central distribution

20   center without a retail brick and mortar pharmacy front that

21   involves long term prescriptions for chronic maintenance

22   drugs, like diabetes and things like that.  That is the

23   traditional notion of mail order.  And we did not breach

24   that.  We were brought into the network as a retail pharmacy.

25   We disclosed that we do home delivery, okay, by overnight

1   mail.  It's not necessarily the definition of mail order,

2   there is no definition really.  There's no prohibition

3   against mail order in the contract.  It doesn't say you can't

4   mail order.

5          THE COURT:  Ms. Clark, why don't we proceed with

6   the witnesses.  I do have a number of questions for both

7   counsel, but I think it would be helpful to the Court to

8   proceed with witnesses first and then argument and question

9   by the Court.

10         MS. CLARK:  I was very close to being done.  I

11  appreciate your indulgence.  The only other issue that I did

12  not address and you may or may not want to hear about at this

13  point is my colleague Mr. Cost is prepared to deal with the

14  arbitration issues.  Should we just dive into the evidence or

15  would you like to hear about that at all?

16         THE COURT:  Let's dive into the evidence and we can

17  argue at the end.

18         MS. CLARK:  Thank you, Your Honor.

19         THE COURT:  Also I would just note for both parties

20  that the Court has read all of the affidavits that have been

21  submitted and the exhibits, so to the extent we need not kind

22  of retread everything, things that have been filed, that

23  would be helpful.  And to the extent you could keep the

24  evidence tailored to the issues which are before the Court,

25  which are likelihood of success and irreparable harm and the

1    arbitration provisions, that would be very helpful.

2             MS. HELLMAN:  Your Honor, if I could just before we

3    start, we saw their exhibit list and I'm to the sure how

4    they're planning to deal with that.  There are some

5    confidential documents.  The Provider Agreement, the Provider

6    Manual, the parties have agreed for it to be confidential.  I

7    know there are certain provisions that are at issue here and

8    their exhibit list I think it's the complete copy unredacted.

9    So just before we get too far down this process, I would like

10   to just be able to address our concerns with the entire

11   Provider Agreement with the rate schedules, the entire

12   Provider Manual being admitted into the record.

13            THE COURT:  I do have the redacted copies that were

14   provided that were filed with the Court, and I'm happy to

15   proceed with those unless there are other provisions that

16   need to be admitted into evidence.

17            MS. CLARK:  Your Honor, I think we should proceed

18   on that basis.  If there is another provision that comes up

19   that that's relevant, I think we can deal with that in real

20   time, that's fine with us.

21            MS. HELLMAN:  Thank you.

22            THE COURT:  Ms. Clark, would you call your first

23   witness?

24            MS. CLARK:  Yes.  Your Honor, plaintiff calls

25   Jordan Fogel.

*Jordan Fogel – Direct – Ms. Clark*                          19

1          THE CLERK:  State and spell your full name for the

2     record.

3          THE WITNESS:  Jordan Fogel; J-O-R-D-A-N, F-O-G-E-L.

4          ***JORDAN FOGEL***, called as a witness and being

5     duly sworn, testifies as follows:

6     *DIRECT EXAMINATION BY MS. CLARK:*

7     Q    Good morning, Mr. Fogel.

8     A    Good morning.

9     Q    Can you state your name and where you work for the

10    record?

11    A    My name is Jordan Fogel and I work at Linden Care

12    Pharmacy and I'm one of the pharmacists.

13    Q    Where is Linden Care Pharmacy?

14    A    Woodbury, New York.

15    Q    And how long have you worked there?

16    A    I've been there since day one.

17    Q    And when was Linden Care founded?

18    A    2007.

19    Q    And were you one of the founders?

20    A    Yes, I am.

21    Q    Mr. Fogel, can you give the Court just a very brief

22    recitation of your background as a pharmacist, in very

23    general terms?

24    A    I went to Brooklyn College of Pharmacy, LIU College Of

25    Pharmacy, from 1978 to 1983.

*Jordan Fogel - Direct - Ms. Clark*                         20

1   Q    And since then have you practiced as a pharmacist?

2   A    Yes, I've been a pharmacist.  I run several pharmacies

3   in Brooklyn.  I actually bought my own pharmacy.  And I

4   consulted to CVS and I worked for a couple different chain

5   stores.

6   Q    And have you been at Linden Care since it opened, is

7   that correct?

8   A    That's correct.

9   Q    Can you tell us a little bit about Linden Care's

10  business and what kind of pharmacy it is?

11  A    Linden Care is a specialty pharmacy, it is specialized

12  in pain management.  We do controls, narcotics that are

13  highly regulated by different agencies.  We do non-controls

14  also.

15  Q    What is special about those kinds of drugs in terms of a

16  specialty pharmacy?

17  A    Narcotics and controls are highly potent, some of them

18  belong to the TIRF REMS program, which we are in.  It's

19  regulated by the FDA.  Also all the other controls and

20  narcotics that we deal with are regulated by other agencies,

21  the DEA, Board of Pharmacy, the Drug and Narcotics

22  Enforcement, so they're very highly regulated.

23  Q    We've heard a lot about the TIRF REMS program.  Can you

24  just very briefly explain what that is?

25  A    The TIRF REMS is a federal program run by the FDA where

1   the doctor has to sign a patient/prescriber agreement.  It's

2   an agreement between a doctor and a patient that the drugs

3   will be properly stored.  They're very dangerous.  They can

4   only be prescribed for patients over 18 years old.  They have

5   to follow directions accordingly.

6        The TIRF REMS is also a part of the pharmacy on our end

7   where we have to take a test to get into the program and we

8   have certain guidelines that we have to face.  The patients

9   have to be opiate tolerant, the dosages have to be titrated

10  very slowly before we are able to start the drugs.  The drugs

11  in the TIRF REMS program are all fentanyl products.  The

12  fentanyl products are extremely potent and they're about 100

13  times more potent than morphine.

14  Q    Are there a lot of pharmacies in your area or in

15  New York that have that program?

16  A    There are some, not many.  Many pharmacists shy away

17  from ordering these drugs because of their higher regulations

18  and all the administrative work that goes behind it, the

19  ordering, the stocking of the medications, the security of

20  the medication, and also cost, it's also very expensive.

21  Q    When we're talking about costs, what would your order

22  for these kind of drugs or pain medications be on a weekly

23  basis at Linden Care?

24  A    Well, I can tell you, I actually do the ordering for

25  these drugs and I'm not talking weekly, on a daily basis I

*Jordan Fogel – Direct – Ms. Clark*

1  can order at least a million dollars a day, up to $2 million

2  per day, and I keep about 2 to $3 million in stock on hand

3  just in case there is a shortage.

4  Q    So there is a huge investment involved?

5  A    That is correct.

6  Q    And can local pharmacies typically manage that kind of

7  investment?

8  A    I don't believe so.  Most pharmacies can't afford to do

9  it.

10  Q    What kinds of patients does Linden Care serve?

11  A    We serve oncology patients, different disease states,

12  multiple sclerosis, arthritis, any type of pain that's

13  secondary to a certain disease, could be trauma, could be a

14  vet, Armed Services.

15  Q    And how many patients does Linden Care serve?

16  A    Thousands.

17  Q    On an annual basis could be hundreds of thousands?

18  A    Hundreds of thousand, yes.

19  Q    Today about how many patients from Express Scripts

20  specifically would be under Linden Care's care now?

21  A    We have about 25 percent of Express Scripts' patients.

22  Q    So that would be in the thousands?

23  A    Yes.

24  Q    And how many staff members are there at Linden Care?

25  A    Well over a hundred.

*Jordan Fogel – Direct – Ms. Clark*

1  Q     And of those how many pharmacists are there?

2  A     Eight.

3  Q     And are all those pharmacists licensed in New York?

4  A     Yes.  Some are licensed in other states also.

5  Q     And do they all live in New York?

6  A     Yes.

7  Q     One of the programs that Linden Care has to comply with

8  is the ISoP program.  Are you familiar with that?

9  A     Yes.

10 Q     Tell the Court just very briefly what the ISoP program

11 is and how that impacts the way that Linden Care does

12 business?

13 A     It prevents patients from doctor shopping so they can't

14 go from one pharmacy to another and get very potent narcotics

15 and sell them on the street, prevent street drugs.  I,

16 myself, was actually one of the pharmacists involved in the

17 ISoP in 2012.  I worked with the Attorney General's Office in

18 implementing the system.  ISoP is also in several other

19 states but they have different names.  Every state has their

20 own name for their ISoP.  So it's an online tracking system

21 which you can see within 24 hours of where prescriptions are

22 filled, what pharmacy, and it also has the doctors also.  It

23 is mandatory in New York State for doctors to check the ISoP

24 system; however, it is voluntary for pharmacists to check.

25 But in Linden Care we check every patient.

*Jordan Fogel – Direct – Ms. Clark*                    24

1   Q    And in every state where you have access, correct?

2   A    I, myself, actually have access in about 43 different

3   states, because we are licensed in 49 states, so I can access

4   all the different states and check.  Some states or more, are

5   better than other states and you can check your toxicology

6   reports, you can check MRIs, you can check X-rays.  Depends

7   on the state; every state has different levels of access.

8   Q    So if I went to New Jersey and filled a prescription for

9   narcotics and then I went to New York and got a prescription

10  for narcotics, you would be able to see that in the ISoP

11  program?

12  A    Yes.  Sometimes I just check bordering states.  If I see

13  a prescription isn't filled in New York and someone lives in

14  Staten Island, it's very easy to just drive over the bridge.

15  Q    And is the voluntary compliance of Linden Care with the

16  ISoP program an important feature?

17  A    Yes.  Well, actually, I met with the Attorney General's

18  Office, we had a roundtable discussion, and it was my

19  intention to make it mandatory for pharmacists to check, and

20  I got a lot of backlash from the AMA, and actually my own

21  pharmacy organizations called me and gave me a hard time.

22  Q    Now, when Linden Care fills a prescription, where does

23  the prescription come from?  How does it come to Linden Care?

24  A    It comes different ways.  A patient can just walk in to

25  our retail pharmacy.  The doctor can e-prescribe it,

1  electronically send it.  New York passed the ISoP law, part

2  of the ISoP law they can electronically send a prescription

3  from any other state in the country and New York can accept

4  it.  The doctor can mail it in.  Those are the different

5  ways.

6  Q    And what happens then to the prescription once it gets

7  to Linden Care?

8  A    Then we start to process it.

9  Q    When you say start to process it, do you have to

10 interact with the payer in any way to determine if there is

11 coverage?

12 A    Yes.  We have to enter all the patient information, all

13 the demographics.  We enter the insurance information.  We

14 adjudicate the claim and then electronically it will tell you

15 if it's paid, if it's not paid, what the copay is, if it

16 requires prior authorization.

17 Q    And explain to the Court what prior authorization is.

18 A    Prior authorization is when the insurance company will

19 hold on the claim and they would want some administrative

20 work done behind the scenes, so Linden Care would assist in

21 administrative work.  We would have to fill out some

22 paperwork, send it to the insurance company and send it to

23 the doctor and then wait for approval.  The approval usually

24 takes 24 to 72 hours.  If it is approved, sometimes it's not.

25 Q    And is that part of the services that Linden Care offers

*Jordan Fogel – Direct – Ms. Clark*                    26

1    to prescribers and patients to help them advocate for

2    themselves to get the drugs that the doctor has recommended?

3    A    Yes.  It's a free service that we do.  That's why

4    doctors use us, they like that service, because doctors are

5    treating the patients and they don't have time to do the

6    prior authorizations.

7    Q    And what about the patients, are they in need of that

8    kind of coordination of their medical benefits?

9    A    Yes.  Patients also appreciate the prior authorization

10   process that we do.

11   Q    Is that sometimes the pain medication patients that have

12   to do with their condition?

13   A    Yes, of course.

14   Q    And so does Linden Care regularly have to interact with

15   the pharmacy benefit manager in connection with determining

16   whether or not there is coverage for a given drug?

17   A    They interact different ways.  They interact through the

18   computer, interact through telephone, could be through fax,

19   but there is constant communication with the PBM.

20   Q    And the PBM, does it also conduct audits of Linden Care?

21   A    Yes.  Very often.

22   Q    About how many audits a year does Linden Care field?

23   A    It's hard a question to answer because there are fax

24   audits, there are telephone audits, there are in-house

25   audits, but I would say total per month could be three, four

*Jordan Fogel – Direct – Ms. Clark*

1    per month.

2    Q    So we're talking about dozens of audits every year by

3    the pharmacy benefit managers to make sure that Linden Care

4    is in compliance, correct?

5    A    That is correct.

6    Q    And all the documentation is provided during the audit

7    to the pharmacy benefit manager, right?

8    A    Yes.  It could be fax ordered, just have to fax it right

9    back.  Could be verbal, answer some questions.  Could be on

10   site.  Or they can just send us a list and they just want all

11   documentation on a certain date and they'll come in-house and

12   check all documentation and verify it.

13   Q    And look at all aspects of compliance with their plan

14   requirement, their contract requirements, correct?

15   A    Yes.

16   Q    And one of the items that they look at, do they look at

17   delivery information?

18   A    All the time.

19   Q    Explain to the Court what they're looking at when

20   they're asking for delivery information?

21   A    Well, when we get an audit, they want to make sure that

22   the doctor write the exact amount, the dosing is correct, and

23   they're also going to ask for proof of delivery and

24   signature.  And since we use FedEx, we just have a copy of

25   the FedEx signature along with the date that it was received.

*Jordan Fogel – Direct – Ms. Clark*

1  Q    So many times every year Linden Care is providing

2  Express Scripts as a PBM with a steady stream of information

3  about where the customers are located, where the patients are

4  located?

5            MR. SMITH:  I'm going to object to leading the

6  witness.  She's been doing it while, we've been letting it

7  pass, but this is getting a little bit extreme.

8            THE COURT:  Overruled.

9  Q    So Linden Care many times every year provides Express

10  Scripts with a stream of information about the patients,

11  where they're located and how they got the drugs in terms of

12  how they were delivered, correct?

13  A    That's correct.  It's Express Scripts and any other

14  order that we have.

15  Q    And many of the ones that you're talking about would

16  have been Express Scripts, correct?

17  A    That's correct.

18  Q    About how much percentage of your business, do you know?

19  A    Express Scripts I think is 25 percent.

20  Q    So 25 percent of all those audits you described would

21  have been Express Scripts specifically?

22  A    Yes.

23  Q    And have you interacted in the past with the Express

24  Scripts auditors that come in to determine compliance?

25  A    Not me.  We have someone else in the company that deals

*Jordan Fogel – Direct – Ms. Clark*                    29

1   with the orders.

2   Q    You've done that in the past?

3   A    I used to do it in the beginning but I don't do it now,

4   in compliance.

5   Q    And have you as part of your job at Linden Care, have

6   you heard about any complaints or audit findings at all

7   relating to a complaint by Express Scripts about the delivery

8   of prescriptions?

9   A    No, not to my knowledge.

10  Q    And Express Scripts can take back money, right, if they

11  feel that you've prescribed medication in error, right?

12  A    Yes.  It's called a charge back.

13  Q    Charge back.  If they think you violated their terms or

14  their contract provisions, they can take back the whole cost

15  of the prescription, right?

16  A    Entire amount.

17  Q    So the patient gets the drug, ingests the drug, and they

18  can still take it back.  But they didn't do that with respect

19  to Linden Care's delivery of drugs to their patients at any

20  time?

21  A    Not to my knowledge.

22  Q    Now one of the aspects of Linden Care's specialty

23  pharmacy, does that involve communicating or counseling

24  patients?

25  A    Yes.

*Jordan Fogel – Direct – Ms. Clark*                    30

1   Q    And can you explain that function?

2   A    We have eight pharmacists on staff, so if anyone has a

3   question, they will call and ask for a pharmacist, including

4   myself, and we'll talk to that patient and explain the safety

5   and side effects of different drugs that we're dispensing.

6   We have a separate consultation area.

7   Q    And why is that important?

8   A    It's part of the role of a pharmacist.

9   Q    Does it have to do with patient safety?

10  A    Patient safety, correct.

11  Q    Is there something about the patients that Linden Care

12  serves that makes home delivery important?

13  A    I'm not sure what you mean.

14  Q    Well, you mentioned that these patients are critically

15  ill in many cases.  Does that make home delivery especially

16  important in the pain management scenario?

17  A    Yes.  There are many patients that have debilitating

18  diseases and are bedridden.  Some people have no limbs, so we

19  have to deliver prescriptions to them.

20  Q    And last Tuesday did Linden Care receive a letter from

21  Express Scripts?

22  A    Yes, they did.

23  Q    And what did that letter say?

24  A    We were terminated from the contract so we couldn't

25  process prescriptions.

*Jordan Fogel - Direct - Ms. Clark*

1  Q    And did that letter indicate that there was going to be

2  any notice provided to Linden Care so it could take care of

3  the patients that were processed?

4  A    Not to my knowledge.

5  Q    Did the letter indicate that there was going to be --

6  there had been any effort to communicate with patients that

7  Linden Care would be terminated?

8  A    Not to my knowledge, no.

9  Q    What was the impact on Linden Care's patients and upon

10  your relationship as a pharmacist with these patients when

11  that termination came through?

12  A    The impact was pretty severe.  We deal with very

13  critically ill patients who are in pain from several

14  different diseases, and when they heard they couldn't get

15  their medicine, they didn't know where to turn to.  But we

16  stepped in and we supplied them with I'd say a seven day

17  supply of medications to hold them over until this was

18  resolved.

19  Q    So until we got here today?

20  A    Until today.

21  Q    Those patients have had emergency fills?

22  A    We have, yes.  We call it culling over, we hold them

23  over for seven days because the pharmacist has a

24  corresponding responsibility to treat the patients, these

25  patients are suffering, and it's just moral, legal, ethical

*Jordan Fogel – Direct – Ms. Clark*

1    thing to do.

2    Q    And how much of its own funds has Linden Care had to

3    expend to bridge that gap between last Tuesday and today?

4    A    I'm not on the financial side so I can't give you a

5    direct answer, but it has to be hundreds of thousands of

6    dollars.

7    Q    Did you have any communication with providers?  Did

8    Linden Care have communication with providers as a result of

9    this sudden termination?  I'm sorry, prescribers.

10   A    Oh, prescribers?

11   Q    Right.

12   A    Actually prescribers have called me, they were trying to

13   find out if they can use another pharmacy.  There weren't

14   many pharmacies in the area that can accommodate patients.

15   Q    Did you do any investigation about alternative

16   pharmacies that might be able to do what Linden Care does?

17   A    Yes.  There was a pharmacy, it was in the TIRF REMS

18   program, who wasn't too far away, it was called Village

19   Pharmacy.  I think they were in Syosset or Plainview.  I

20   called the pharmacy.  I spoke to the owner and I spoke to the

21   pharmacist.  I explained the situation.  I asked him if he

22   could take on our patients and the Express Scripts patients,

23   and he said currently he only has two patients in the TIRF

24   REMS program, he would like to accommodate them but he

25   couldn't because he is not licensed in all the other states

*Jordan Fogel – Direct – Ms. Clark*                    33

1   we were.  He couldn't afford to order the TIRF REMS drugs

2   from his wholesaler either, and, frankly, he just didn't want

3   to stock it for safety and security.

4   Q    And did you record that call?

5   A    Yes.

6           MS. CLARK:  And, Your Honor, that's in the docket.

7   I could play it, if you like.  But there's a recording of

8   that call with Village Pharmacy in the docket that we have

9   previously submitted.  It's eight minutes, it would take a

10  little bit of time, but I would be happy to put that up.

11          THE COURT:  No, that's fine.  Is that an exhibit

12  that you are admitting, seeking admission of?

13          MS. CLARK:  Yes.

14          THE COURT:  What exhibit number is that?

15          MR. COST:  Your Honor, it's P17.

16          THE COURT:  Any objection?

17          MR. SMITH:  Yes, Your Honor.  We have not received

18  this exhibit or had a chance to listen to it, has not been

19  provided to us.

20          THE COURT:  For the record, the CD is currently

21  being provided to you?

22          MS. CLARK:  That's correct.

23          THE COURT:  And perhaps at a break you could listen

24  to it and you could tell the Court whether you have an

25  objection to the admission of this CD.

*Jordan Fogel - Direct - Ms. Clark*                    34

1          MR. SMITH:  Your Honor, I can't, I don't have a CD

2     player.  Is there a device that I can listen to it on?

3          MR. COST:  I can play it on my computer.

4          MR. SMITH:  Thank you, Your Honor.

5          THE COURT:  Right now P17 is not admitted into

6     evidence, but I'll ask defense counsel if they have any

7     objection at a later point.

8          MS. CLARK:  And, Your Honor, as we go through

9     today, there are numerous exhibits that accompany affidavits

10    that are in the record.  Is it the Court's expectation that

11    we would separately move all those exhibits into this

12    proceeding as evidence?  I would be happy to do that.  I just

13    wasn't sure how we were going to proceed.

14         THE COURT:  Are you referring to exhibits that are

15    already in the record that have already been filed by one of

16    the parties?

17         MS. CLARK:  Yes.

18         THE COURT:  Those do not need to be admitted.

19         MS. CLARK:  Okay.  Thank you, Your Honor.

20    Q    Did you have any discussions with prescribers about

21    whether or not they had been told before Tuesday or even

22    since then that Linden Care was being summarily terminated?

23    A    Prescribers were not aware of the situation.

24    Q    What about patients, did you have discussions with

25    patients about whether or not they were aware that there was

*Jordan Fogel - Direct - Ms. Clark*

1    a termination of Linden Care?

2    A    Patients weren't aware either.

3    Q    And can you describe the concern of the patients that

4    you, that Linden Care heard from?

5    A    Patients were extremely concerned.  I believe they sent

6    in to our compliance department several e-mails.  I didn't

7    read all the e-mails.  I think they were given to my

8    compliance officer, where they cannot get the medications and

9    they just didn't know what to do.

10   Q    And with respect --

11   A    Or where to go.

12   Q    And with respect to e-prescriptions that are frequently

13   used today, can the patient just take those e-prescriptions

14   and bring them to another pharmacy?

15   A    No, when an e-prescription comes into the pharmacy, it

16   is legally our prescription.  If somehow we can't fill the

17   prescription, we have to call the doctor and we have to

18   cancel it out of our software system and the doctor would

19   have to e-prescribe it to a different pharmacy.

20              THE COURT:  Mr. Fogel, what is an e-prescription?

21              THE WITNESS:  E-prescription is an electronic

22   prescription.  New York State passed a law, it's part of the

23   ISoP law, there is going to be no more paper prescriptions in

24   New York State as of March 26, 2016.  That was originally

25   supposed to go into effect March 26, 2015, but it was

*Jordan Fogel - Direct - Ms. Clark*                    36

1   extended because physicians, their EHR systems, electronic

2   health record and electronic medical record systems were not

3   ready, so the governor extended it.  So an e-prescription is

4   a electronic prescription.  You do not have to go to a doctor

5   any more with a handwritten prescription -- I mean, to the

6   pharmacy any more with a handwritten prescription.

7   Everything will be electronic, it's from computer to

8   computer.  Or it can be from your smartphone to the computer.

9   There is recall kinds of regulations around it.

10              THE COURT:  Thank you.

11  Q    So patients would have to actually go back to their

12  doctor, see their doctor again and get a new prescription

13  because they can't use Linden Care for that e-prescription?

14  A    Yes.  The doctor would have to e-prescribe a new

15  prescription.

16  Q    Are you familiar with the company Horizon Drugs?

17  A    Yes.

18  Q    Does Horizon Drugs own any part of Linden Care?

19  A    No.

20  Q    And are there other manufacturers besides Horizon that

21  Linden Care does business with?

22  A    Yes.

23  Q    Is it your expectation that Linden Care can continue to

24  reach into its own pockets to provide emergency bridge

25  refills for the patients that have been impacted by this

*Jordan Fogel - Direct - Ms. Clark*                    37

1  sudden termination?

2  A    I don't know how much longer we can go.  I'm not on the

3  financial side of the equation, but as we're sitting here

4  today, I can tell you we're probably doing the same thing

5  today because today is Friday and patients are running out of

6  their medication over the weekend.  I don't think we can go

7  much longer.

8  Q    And Linden Care as a pharmacy and you as a pharmacist,

9  are you aware that you have an option to seek peer review

10  appeal and hearing of the termination?

11  A    Yes, I am.

12  Q    And is that something you've requested, correct?

13  A    Yes, obviously.

14  Q    And would you be prepared to go to a hearing?

15  A    Without a doubt.

16           MS. CLARK:  That's all I have, Your Honor.

17           THE COURT:  Thank you, Ms. Clark.  Ms. Hellman,

18  cross-examination?

19           MS. HELLMAN:  Mr. Smith.

20  *CROSS-EXAMINATION BY MR. SMITH:*

21  Q    Good morning, Mr. Fogel.

22  A    Good morning.

23  Q    I'd like to start, if we could, with where you ended.

24  You were talking about some concerns about locating

25  alternative pharmacies for some of the Express Scripts

*Jordan Fogel - Cross - Mr. Smith*                    38

1  members served by Linden Care.  Are you aware that Express

2  Scripts has reached out to Linden Care on several occasions

3  to try to get Linden Care's cooperation in identifying who

4  those members are and to the extent there are members that

5  have difficulty assisting and locating alternative

6  pharmacies?

7  A    Not to my knowledge, no.

8  Q    So that has not been provided to you?

9  A    No, not to me.

10  Q    Okay.  Would it surprise you to learn that Express

11  Scripts has actually written several letters to that effect?

12  A    Yes.

13          MR. SMITH:  Your Honor, if I could approach the

14  witness?

15          THE COURT:  Sure.

16  Q    Mr. Fogel, I'm handing you what has been marked as a

17  document filed in this case, document 33.  This is a

18  declaration of Ms. Hellman.  If you could, please, I would

19  like you to turn to the page at the top that says 33-1.

20  A    Okay.

21  Q    Do you see that, sir?

22  A    Yes.

23  Q    It's a letter dated November 13 of 2015?

24  A    No, I don't see that.  I see 11/17/15.

25  Q    It's the document 33-1.  The date is directly below the

1  address line, sir.

2  A    I don't see it.

3  Q    Do you see where it says, Sarah Hellman, partner, 190

4  Carondelet Plaza in the center of the document?

5         THE COURT:  Mr. Smith, let me just interrupt.  The

6  Court has these letters and this witness has said he is not

7  familiar with this.

8         MR. SMITH:  That's fine.

9  A    I don't see it.

10        MR. SMITH:  I agree, it's in the record that we

11  made this outreach, and the witness has said he did not --

12  was not aware of that.

13  Q    Mr. Fogel, you also mentioned harm that you thought

14  would come to Linden Care as a result of this termination,

15  correct?

16  A    I'm sorry, say that again.

17  Q    Harm that you believe will come to Linden Care as a

18  result of the termination of the contract with Express

19  Scripts, correct?

20  A    Correct.

21  Q    And I think in your papers you said that Express Scripts

22  is approximately 20 percent of Linden Care's business, is

23  that accurate?

24  A    I don't know what's accurate.

25        MS. CLARK:  Objection, Your Honor.  Counsel says in

*Jordan Fogel - Cross - Mr. Smith*                    40

1  the papers.  Is he talking about an affidavit of this witness

2  or a different witness?

3              MR. SMITH:  No, I'm talking about your complaint.

4              MS. CLARK:  This is the pharmacist.

5  Q    Sir, your complaint represented that Express Scripts is

6  approximately 20 percent of Linden Care's business.  Would

7  you dispute that?

8  A    I don't know the exact number.  I'm a pharmacist.  I

9  thought it was 25 percent.

10  Q    So when you say you believed that Express Scripts'

11  termination will impact Linden Care, you have no basis for

12  any specific financial impact with Linden Care?

13  A    I'm not in finance.

14  Q    I just want to make sure.  Whether you are or not

15  testifying to that.  Sir, you also stated that Linden Care is

16  a specialty pharmacy, and I think you said that repeatedly in

17  your direct, correct?

18  A    Yes.

19  Q    Is that a significant part of Linden Care's operations?

20  A    Yes.

21  Q    It's part of your core business?

22  A    Correct.

23  Q    Are you familiar, sir, with the provider certification

24  that Linden Care submitted to Express Scripts as part of its

25  contracting?

*Jordan Fogel - Cross - Mr. Smith*                    41

1   A    No.

2   Q    It's not something that you reviewed?

3   A    No.

4   Q    But you believe Linden Care would represent at all times

5   that it was a specialty pharmacy if, in fact, it is a

6   specialty pharmacy?

7   A    Yes, I would imagine.

8   Q    And it would be inaccurate and a misrepresentation to

9   say that Linden Care was not?

10  A    Correct.

11  Q

12          MR. SMITH:  Your Honor, I have no further questions

13  for this witness.

14          THE COURT:  Thank you, Mr. Smith.  Any redirect?

15  *REDIRECT EXAMINATION BY MS. CLARK*:

16  Q    Mr. Fogel, in connection with the information, the

17  information flow back and forth with Express Scripts as the

18  pharmacy benefit manager, would Express Scripts have in its

19  own system the names of the patients?

20  A    Yes.  Every prescription that we fill is adjudicated,

21  it's an electronics submission.

22  Q    And the Express Scripts database would also show who's

23  running out, correct?

24  A    Yes.  We fill prescriptions on the thirty day supply.

25  Q    And that would be in their system, correct?

1    A    Of course.

2    Q    So they would have everything they needed to do a

3    reach-out to patients that were at risk of running out of

4    their drugs in the interim here between the termination last

5    Tuesday and today, right?

6    A    Yes.  Every patient is on a different cycle so they

7    would run out, every day it's a new patient.

8    Q    To your knowledge has Express Scripts done anything to

9    reach out to the prescribers or the patients that you've been

10   in contact with?

11   A    Not to my knowledge.

12            MS. CLARK:  Thank you.

13            MR. SMITH:  If I could just briefly a few

14   questions.

15            THE COURT:  Yes.

16   *RECROSS-EXAMINATION BY MR. SMITH:*

17   Q    I just want to clarify a couple points you made.  You

18   said in Express Scripts systems, Express Scripts would have

19   the information it needed to identify members who had been

20   unable to locate an alternate pharmacy, is that your

21   testimony, sir?

22   A    My testimony is they have all the information to track

23   patients' history of prescription fills.

24   Q    So Express Scripts has claims data on patients?

25   A    They have all the claims data.

*Jordan Fogel - Recross - Mr. Smith*

1  Q    But that claims data, sir, it would not identify to

2  Express Scripts if an anonymous member or a member, I guess,

3  come to Linden Care and had told Linden Care that they were

4  having difficulty locating an alternative pharmacy, would it,

5  sir?

6  A    Are you talking about a new patient?

7  Q    I'm talking about if a patient came to Linden Care and

8  said I'm having trouble locating an alternative pharmacy for

9  this particular drug, isn't it correct, sir, that Express

10  Scripts would not have that information in its claims data?

11  A    I'm not sure I understand what you're saying.

12  Q    You stated that patients came to Linden Care and said

13  they were having difficulty locating an alternate pharmacy,

14  correct?

15  A    Okay.

16  Q    I'm trying to understand from the questions Ms. Clark

17  asked you, I thought you were saying that Express Scripts had

18  information to identify those patients in its system.  And I

19  want to clarify with you, sir, that you agree the information

20  Express Scripts would have would be on historical claims

21  information.  Express Scripts systems would not identify if a

22  member came to Linden Care and told Linden Care that it was

23  having, he or she was having difficulty locating an

24  alternative pharmacy, correct, sir?

25  A    That's correct.

*Jordan Fogel – Recross – Mr. Smith*

44

1    Q    That information would be solely in Linden Care's

2    possession, correct?

3    A    I believe it's in Express Scripts' also, in their

4    database.

5    Q    Sir, I want to make sure I understand.

6         THE COURT:  Mr. Smith, could you ask one question

7    just so the record is clear?

8         MR. SMITH:  Sure.

9    Q    I want to make sure I understand.  If a patient came to

10   Linden Care and said they did not have -- they were having

11   trouble locating an alternate pharmacy, that information

12   would not be in Express Scripts' systems, correct?

13   A    If a patient came in to my pharmacy and they wanted an

14   alternate pharmacy, Express Scripts would have that

15   information in their database or records.

16   Q    Let me make sure I understand.  Your testimony is if a

17   patient told Linden Care that, for example, they couldn't get

18   their prescription at the Village Pharmacy, your testimony is

19   that that would be reflected in Express Scripts' claims data?

20   Is that what you're saying, sir?

21   A    No, I'm not understanding.  I don't understand what

22   you're asking.

23   Q    I'm not trying to confuse you, I'm really not.

24   A    I'm sorry.

25   Q    I'm trying to understand how and if it's your testimony

1  that you believe there is something in Express Scripts'

2  claims data that would indicate, from Linden Care, a

3  communication from Linden Care to Express Scripts, for

4  example, that would indicate that member A came into Linden

5  Care, told Linden Care they were trying to locate an

6  alternative pharmacy and couldn't find one, there is no

7  element like that in the claims data, sir, is there?

8  A    No.

9  Q    So Express Scripts would not have in its systems

10  information on a member if the member came to Linden Care and

11  said they were trying to locate an alternate pharmacy,

12  couldn't locate an alternate pharmacy, that information would

13  not be in Express Scripts' systems, correct?

14  A    No.

15  Q    Thank you, sir.

16  A    Now I understand.

17          MR. SMITH:  No further questions.

18          MS. CLARK:  Nothing more, Your Honor.

19          THE COURT:  Mr. Fogel, you are excused.  Thank you.

20  Ms. Clark, call your next witness.

21          MS. CLARK:  I'm going to yield to my colleague,

22  Mr. Cost.

23          MR. COST:  The plaintiff calls Dr. Alex Weingarten.

24          THE CLERK:  State and spell your name for the

25  record.

*Jordan Fogel - Recross - Mr. Smith*                     46

1          THE WITNESS:  Alexander Eugene Weingarten,

2    W-E-I-N-G-A-R-T-E-N.

3          **ALEXANDER WEINGARTEN**, called as a witness and

4    being duly sworn, testifies as follows:

5    *DIRECT EXAMINATION BY MR. COST:*

6    Q    Could you state your name again for the record?

7    A    Alexander Eugene Weingarten, MD.

8    Q    Dr. Weingarten, where are you based out of?

9    A    I have two offices; one in New Hyde Park and one in

10   Syosset, Long Island.

11   Q    And do you have any specialty as a medical doctor?

12   A    Yes.  I'm a board certified anesthesiologist with a

13   subspecialty certification in pain medicine.

14   Q    Could you just give the Court and again very general

15   list of your credentials?

16   A    Yes.  I went to the City University of New York, Queens

17   College, graduated in 1976.  That was followed by four years

18   of medical school right here in Syracuse actually at the

19   Upstate Medical Center, now known as Upstate Medical

20   University.  That was from 1976 to 1980.  I then did an

21   internship in internal medicine at Long Island Jewish Medical

22   Center, now known as North Shore Long Island Jewish Medical

23   Systems.  That was from '80 to '81.  '81 to '83 I did an

24   anesthesia residency at the same hospital.  '83 to '84 I did

25   a fellowship in pediatric anesthesia at the Children's

1    Hospital National Medical Center in Washington, DC.  '84 I

2    came back to Long Island Jewish to work as an

3    anesthesiologist from '84 to '91.

4         I then opened my pain management practice in 1991 before

5    the specialty of pain management became recognized by the

6    American Medical Association, so we were one of the first

7    medical practices in Long Island to practice pain management

8    outside the hospital system.  So we began that in '91.  I

9    became board certified in pain management in and around 1995

10   through the American Academy of Pain Medicine.  And

11   subsequently in 1996 I became board certified through the

12   American Board of Anesthesiology.  So I have a subspecialty

13   board in pain medicine and I also became board certified in

14   anesthesiologist in 1994, I forgot I mentioned that.

15        Since '91 I've operated my pain management practice.  I

16   still continue to do some anesthesia but most of my focus

17   these days is pain management.  And we eventually opened a

18   second office in Syosset around 2007, 2008, which we continue

19   to operate today.

20        I also do consulting work, besides clinical medicine, I

21   do consulting work for the Drug Enforcement Administration.

22   And I am past president of the New York State Pain Society,

23   which we incorporated I believe around 2011, and we have an

24   annual meeting every year that attracts about 350 doctors.

25   And my focus at these meetings is safety in opioid

1   prescribing.  So that's the section that I generally organize

2   a panel for.  We do a lot of topics at the meeting, it's a

3   weekend meeting.  But my focus is safety in opioid

4   prescribing.  Again, I continued with CMEs, educational,

5   meeting, I give lectures, I teach medical students and some

6   residents, so I continue to engage in academics along with

7   clinical medicine.

8   Q    Have you ever been qualified as an expert in New York

9   State courts?

10  A    Yes, many times.

11  Q    About how many times?

12  A    Well, New York State I can't tell you but probably

13  across the country I've testified between 250 and 300 times,

14  and I've also testified in federal court both on Long Island

15  and also in Florida, and I've been qualified.

16  Q    What kind of patients in your pain management practice

17  are you normally servicing or treating?

18  A    I generally treat patients with chronic pain.  That's

19  the definition being pain that's been present for more than

20  two to three months.  We do see some acute pain but the

21  majority of our practice is chronic pain, pain that's not

22  going to go away unless some intervention, be it an

23  injection, be it medication, is given to the patient.

24  Q    And you mentioned medication.  I take it then you're

25  familiar with what kind of medications are effective and what

1   medication is not effective?

2   A    Yes.  Depending upon the patient, you know, I'll do a

3   history to determine what the patient has tried in the past,

4   what has helped, what has not helped, what medications have

5   given the patient side effects.  So generally, I'll either

6   continue another doctor's medication, assuming the patient

7   has transferred their care to my office, assuming those

8   medications have been successful in helping the patient have

9   a tolerable level of pain, and we have different ways of

10  measuring that, with the minimum amount of side effect.  So

11  every patient is different.

12       We tailor -- or, I tailor my treatment to whatever the

13  patient's disease process is.  And again, different disease

14  processes will signal the need for different types of

15  medications based on, you know, where the either spinal

16  pathology, where the nerve damage is located and what type of

17  nerve damage one is talking about.

18  Q    And in that course, essentially you're saying that you

19  eventually find what kind of pain medication works and what

20  doesn't?

21  A    Yes.

22  Q    And you prescribe your patients the pain medication that

23  works, because that's the primary goal is to eliminate the

24  pain, is that right?

25  A    Right.  The primary goal, and again this dates back to

1    1999 or so when the World Health Organization came out with

2    an edict that we have the technology now such that no patient

3    should suffer with intolerable pain.  There is technology

4    available for every disease process or almost every disease

5    process and it's a basic human right that every patient has

6    the right for pain relief.

7    Q    As part of that are there certain pain medications which

8    are known as specialty drugs?

9    A    Yes.

10   Q    Can you just give a brief definition of a specialty

11   drug.

12   A    Specialty drugs are drugs that are tailored to one

13   disease, one area of disease.  In my case it's pain

14   management.  And these are drugs that are not going to be

15   found easily at your chain pharmacies, at your Walgreens,

16   your CVSs, these pharmacies are not going to stock these

17   drugs on a regular basis because of the fear of diversion of

18   the drugs in a large building with a lot of employees that

19   may not be the most trustworthy of people, and for cost

20   reasons.

21        So specialty drugs are drugs that are generally branded,

22   generally they're relatively expensive, but they come with

23   technologies that almost guarantee that assuming the

24   appropriate patient is given these drugs, that they will work

25   a lot better than previous treatments that the patient has

*Alexander Weingarten – Direct – Ms. Cost*

1    tried in terms of medications and they're reliable to help

2    the patient on almost every single dose that they take.

3    Q    So it's fair to say that it takes a special kind of

4    pharmacy to have specialty drugs, is that right?

5    A    Yes.  It requires a lot of capital.  It requires a lot

6    of inventory.  But again, and it requires a lot of monitoring

7    as we heard earlier.  But specialty pharmacies know how to,

8    you know, advise the patient about the drugs, monitor the

9    patients for abuse and diversion, just like we as physicians

10   try to monitor the patient, but they're a second line in

11   defense to make sure that, A, the right patient it getting

12   the medicine; B, the side effect profile is such like many

13   times I'll get calls from pharmacies like Linden Care, well,

14   did you know the patient is on drug X, which maybe the

15   patient didn't tell me about and then maybe some adverse

16   interaction with what you want to prescribe, do you think we

17   should maybe choose a different medication.  So I've had that

18   situation, you know, multiple times over the years because

19   pharmacies, specialty pharmacies take certainly a much more

20   active interest in the patient's well being than you would

21   ever see at a chain pharmacy where you never, you hardly ever

22   get a call from a pharmacist and they will not usually stock

23   those drugs.

24   Q    And you mentioned Linden Care.  Do you have patients

25   that go to Linden Care?

1   A    I have a lot of patients that go to Linden Care.

2   Q    And everything you just said what it takes to be a

3   specialty pharmacy, does Linden Care do all those activities?

4   A    Yes.  It's not unusual for me to get phone calls from a

5   pharmacist like Jordan.  He usually calls me the most, and I

6   know him a long time.  But again, there is a unique concern

7   I'll help him with the prior authorizations, when those forms

8   are sent to me we'll –– you know, we'll try –– they'll

9   process it and they'll stay to all hours of the night on some

10  of these.  Some of the pharmaceutical managers have up until

11  midnight 800 numbers that we can call and we sometimes stay

12  10, 11 clock at night on the phone for a patient that needs

13  an emergency supply because they either changed their

14  insurance or all of a sudden their insurance carrier decided

15  not to cover a medication that they've been getting for the

16  last two years, but because it's a new year for the patient,

17  all of a sudden they send the patient a letter, well, we will

18  no longer cover this drug and they leave the patient, you

19  know, high and dry without any medications.  And it's again

20  not unusual for Linden Care to bridge the gap on these

21  patients until that paperwork is completed and until the

22  authorization is received.

23  Q    Is that level of service important to you as a

24  physician?

25  A    Yes.

*Alexander Weingarten – Direct – Ms. Cost*

1   Q    And why is that?

2   A    Well, because, again, we have a common goal, we want to

3   help the patient, because the patient is the one that's

4   suffering.  And many times it's not the patient's fault that

5   they get involved with paperwork that either denies them the

6   proper medicine or cuts them off abruptly because the

7   pharmacy, the health care providers, it doesn't seem to

8   bother them that if a patient has been on a heavy dose of

9   opioid for many months and years that they're going to go

10  into withdrawal.  The carriers never care about those things.

11      But it's the people like Linden Care and myself that

12  hear the cries of the patient, what am I going to do if I

13  can't get this medicine, I'm going to wind up in the

14  emergency room.  That's the common fear that most patients on

15  long term controlled substances have, and we have to deal

16  with this at midnight, at whatever time of day it is well

17  after the health care providers' offices for customer service

18  are closed.  And if it wouldn't be for, you know, pharmacies

19  like Linden Care, these patients would be in dire straits

20  because, again, there are very few choices that they have in

21  order to be able to get these drugs.  And the cost of many

22  them of prohibitive for most people on fixed incomes.

23  Q    And you mentioned carriers.  Also in your years of

24  practice known as PBMs?

25  A    Yes.

*Alexander Weingarten – Direct – Ms. Cost*

1    Q    And you dealt with Express Scripts?

2    A    Yes.

3    Q    And do you find Express Scripts, again given the

4    recitation about carriers not caring about the withdrawal

5    symptoms, do you find that to be true about PBMs?

6    A    PBMs will never worry about whether the patient is going

7    into withdrawal.  With them it's just business, okay.  The

8    drug, the pharmacy, dispensing is a business and they have --

9    they decide whether they're going to pay for it, whether

10   they're not going to pay for it with total disregard for the

11   patient.

12        And again it's a neat world out there but they control

13   what I do.  You know, if I want the patient to have, let's

14   say, a medicine like Duexis, which I think is part of our

15   discussion today, they'll decide whether the patient gets it,

16   even though I can prove that the samples that the patient

17   used did a great job in helping their pain.  They don't care

18   about things like that.

19        Although I will indicate on some of their questionnaires

20   that the patient had a good result, we gave them a few days

21   supply of samples, they did fine, whereas the other

22   alternatives didn't work.  But again, as far as abrupt

23   discontinuation of medicines, I have never seen anybody ever

24   help me with a patient that wasn't approved for a drug from

25   Express Scripts or any other PBM get an emergency supply of

1   medicine on their account.  Okay.  Linden Care goes out on a

2   limb to help those patients, but Express Scripts has never

3   allowed me to give a patient an emergency amount until the

4   dispute is resolved or whatever the problem is is resolved.

5   They have never come to the patient's aid.  And it's not just

6   Express Scripts, it's any PBM.

7   Q    And that would be included in this situation, is that

8   right?

9   A    Yes.

10  Q    Now, you also mentioned -- first, have you been in

11  Linden Care's physical location?

12  A    I'm sorry?

13  Q    Linden Care is a retail pharmacy, right?

14  A    Yes.

15  Q    It's got a store front?

16  A    It has a store front.  It has a parking lot.  Patients

17  go there from my office.  I'm in Syosset, they're close by in

18  Woodbury.  I know their hours so I know which patients have

19  to come in early in order for them to get to Linden Care

20  before they close at 7:00 at night.

21  Q    Are there any other specialty pharmacies in your area

22  that are like Linden Care?

23  A    There are none.

24  Q    You also mentioned -- are you also familiar with mail

25  order pharmacies?

*Alexander Weingarten – Direct – Ms. Cost*

1    A    Yes.

2    Q    Is that in your mind different than what Linden Care is?

3    A    Yes.

4    Q    And why is that?

5    A    Well, again, even for myself I get letters from Oxford

6    or you United Health Care, you can save on your copay if your

7    doctor sends away to a certain 800 number or fax number and

8    you'll get a three month supply of your medicine for a lower

9    copay.  When I get that medicine in the mail, although I

10   hardly ever subscribe to that service, I would rather just

11   walk into a pharmacy because then you're dealing with the

12   mail and there is always delays in that end, but assuming

13   that you go through those type of pharmacies, again you never

14   see a pharmacist, it's just it comes in the mail and you get

15   your three months supply.  And again it could even come in

16   two days, six days.  I have patients that use mail order and

17   they've stopped using it because the mail is so unreliable

18   that if you're dealing with anything more than simple

19   medicines, you know, they cry to the carrier, well, I haven't

20   received the drug.  I'm sorry, it was sent out, we can't help

21   you.  And they can take days on end to get it.  So many

22   patients stopped using mail order pharmacies just because of

23   the fact that the mail is unreliable.

24   Q    Are you familiar with the pharmacy named Accredo?

25   A    I have heard of it.

*Alexander Weingarten – Direct – Ms. Cost*

1    Q    Is that in your mind a mail order pharmacy?

2    A    Yes.

3    Q    And that would be different than what Linden Care is?

4    A    Right.  Linden Care is a full service retail.  And you

5    know, again, for patients that live a distance, a mail order

6    pharmacy.

7    Q    When you say mail order, you have patients who are in

8    pain that physically can't get out of bed?

9    A    Correct.

10   Q    Therefore, they can't go to a retail pharmacy to pick up

11   their medications, right?

12   A    Correct.

13   Q    So Linden Care delivering medications is an important

14   part of your pain management process that does not

15   necessarily fall under mail order?

16   A    Correct.  And Linden Care actually I think was one of

17   the first pharmacies to ever have this I call it a concierge

18   service which saves the patient the trouble of getting to

19   Linden Care, especially people that don't drive or are using

20   public transportation to my office, it's a good thing that

21   Linden Care exists because, A, they have drugs that nobody

22   else has; and, B, the patient doesn't have to take

23   transportation just to go pick up a medication but instead

24   they'll have the luxury of arranging a time and place with

25   Linden Care to have it delivered.

*Alexander Weingarten – Direct – Ms. Cost*

1   Q    You never had any complaints about Linden Care?

2   A    I don't think any patient has ever complained.  They've

3   only thanked me for referring them to Linden Care.

4   Q    And obviously given your long and distinguished career,

5   you have a lot of contacts in the medical community, is that

6   right?

7   A    Yes.

8   Q    And can you -- what's Linden Care's reputation in the

9   medical community?

10  A    Well, Linden Care is well liked by all my colleagues.

11  We had our meeting, you know, Linden Care's name always comes

12  up when it comes to certain medications that some of the

13  Pharma people talk about at their booths, because, again,

14  there aren't too many pharmacies in New York or especially

15  the New York metropolitan area that will constantly have a

16  supply of multiple different specialty type drugs as Linden

17  Care has.  So again, generally in the medical community their

18  rating is pretty high.

19  Q    You discussed today that Linden Care is part of the

20  actual treatment process to help these patients.  Do you have

21  an opinion as to using a specialty pharmacy like Linden Care

22  rather than a PBM pharmacy as far as patient outcome is

23  concerned?

24  A    Again, over the years when you take care of patients

25  with many different types of chronic devastating disease

*Alexander Weingarten – Direct – Ms. Cost*

1  processes causing severe and devastating pain, you get to

2  know which medicines are going to help them and which

3  medicines not to waste your time on.  And generally the

4  medicines that will help them are the medicines generally

5  carried in the good specialty pharmacy.  If I rely on Express

6  Scripts directly, it's going to be very hard for them to get

7  those specialty drugs and it's going to be a lot of paperwork

8  for me, which I don't have the time to do.  And that's

9  another benefit for Linden Care, they have designated people

10  that work throughout the day and night getting authorizations

11  for the doctors.  They ask us a few questions, we answer the

12  questions to give a little clinical background on the patient

13  and they take it from there.

14      Express Scripts is not going to help me with that

15  paperwork and it's going to be left to me and my staff who

16  are already overwhelmed just in terms of getting

17  authorizations for other things like MRIs, EMGs and things

18  that we have to do in our practice to, you know, to figure

19  out why patients are having the pain that they're having.

20  Q    If Linden Care can't be part of ESI's network and your

21  patients who are in that network, can you still refer them to

22  Linden Care?

23  A    Well, obviously, if they're not going to be able to use

24  their Express Scripts, you know, provider benefits on a long

25  term basis, Linden Care is not going to be able to help them.

1    And again, there aren't, as we heard earlier, too many

2    alternatives in the area of pharmacists that are willing to

3    pick up those patients because there will be a huge volume of

4    them, especially from my practice, and these patients are

5    going to have, it will wind up that they'll have to drive,

6    you know, probably many miles to find other pharmacies that

7    may or may not help them.

8    Q    And some can't drive, right?

9    A    And some can't drive.

10   Q    What about again the argument we hear that, oh, you can

11   always go out of network, is this true for a specialty drug?

12   A    It's really not true for a specialty drug, because

13   unless you're a person of extremely well means, some of these

14   medications can cost between 10 and $20,000 a month, you

15   know, for refills.  So going out of network means that the

16   patient is going to have to pay cash for their medications or

17   some other form of payment, so I don't see that as

18   economically feasible for most of the patients that are seen

19   in practices like myself.

20   Q    Could you give us a specific example of a drug that

21   would be cost prohibitive out of network?

22   A    Yes.  There is -- we talked about the TIRF REMS

23   medications, so just picking one of them, there is a medicine

24   called Subsys.  It's a spray fentanyl medication.  It goes

25   under the tongue.  Fentanyl, as Mr. Fogel mentioned, is 100

1  times more potent than morphine, so the average person

2  usually needs about four of those sprays a day, which would

3  be about four -- so the packaging comes, they come thirty in

4  a box.  So four sprays a day would be 120 sprays, because

5  each package is one dose.  So you would need thirty in a box,

6  four boxes, 120 sprays for the month.  Each box runs about

7  $2,500 or more, so you would be talking $10,000 a month for

8  one particular drug.  And that's just a breakthrough cancer

9  pain medicine, that's not inclusive of the long acting opioid

10 that by law they have to be on in order to be eligible for

11 the REMS medication.

12     So just $10,000 a month for the breakthrough medicine,

13 and that's not including all the other medicines, the

14 anti-inflammatories, the long acting narcotics, probably some

15 neurological medicines like Lyrica, Neurontin or whatever.

16 So again, you would be talking ten plus thousand a month just

17 for a month's supply of medication.

18 Q    And if you can no longer refer your patients to Linden

19 Care, obviously, then simple economics, Linden Care doesn't

20 get paid for the prescriptions, right?

21 A    Right.  Well, if you can't refer them to Linden Care,

22 they're not going to have another alternative in an easy way

23 to find because, again, they're certainly not going to get

24 help from their pharmacy manager because I don't think it's

25 in their best interest to try to steer patients to high cost

1   medications.

2   Q    And again, would other doctors that you know of who

3   refer patients to Linden Care be in the same position as you?

4   A    Yes.

5   Q    Let's talk, you mentioned authorizations being burdens.

6   What other kinds of administrative burdens would this cause

7   on you if Linden Care's removed from the network?

8   A    Well, the reason why the specialty pharmacy and their

9   medications work is because it would take a lot more less

10  potent medications to accomplish the same purpose; namely,

11  bringing pain down to a tolerable level.  So if you take a

12  drug like Subsys, which is 100 times more potent than

13  morphine, and the patient can't get that because of poor

14  access to a specialty pharmacy, so then we have to use

15  whatever is available locally from small pharmacies and

16  possibly even the chains, and that will generally be the

17  generic opioids such as oxycodone, hydrocodone, morphine

18  based medicines.  And generally to make up the difference, if

19  you want to use that word, these patients can be on fifteen

20  to twenty pills a day when they would have been on four to

21  five pills a day because of the lower potency of those

22  alternatives.

23       And then the doctor runs into the problem, all of a

24  sudden, you know, he is giving out big numbers of medicines,

25  twenty pills a day of opioid, times thirty, that's 600 pills

1    a month, and that's being recorded at the state level in

2    Albany.  So now Dr. X with no bad intentions is having to

3    give out twenty pills a month at 600 pills a month -- some

4    twenty pills a day, 600 pills a month, when he was giving out

5    maybe four to six pills a day of opioid between the short and

6    long acting, at 180 pills a month.  All of a sudden it would

7    not surprise me if a DEA agent knocks on your door, why all

8    of a sudden are our numbers showing that you're dispensing so

9    much medication.  So the doctor has exposure, again nothing

10   of his fault, because of the fact that he can't get ahold of

11   those better medicines that would, A, do better for the

12   patient, and, B, not imply that he is a candy store for

13   opioids.

14        And for the patient many of these medications are

15   Tylenol based, so you give patients fifteen to twenty pills a

16   day, some of which had a lot of Tylenol in it, they're going

17   to run the risk of toxicity to the kidneys and liver, and you

18   don't want that to happen.  So there is restrictions based on

19   the Tylenol content on some of these medicines so that keeps

20   the patient from getting what's going to be needed for his or

21   her pain.  There is restrictions on the doctor's level

22   because of the numbers that it's now going to entail that

23   make up the difference now that we're not using specialty

24   drugs.  So nobody wins from this.  Everybody loses.

25        But more importantly, with all that, the patient still

1   doesn't get good pain relief because these medications over

2   time have been proven to be not as good, they're old

3   fashioned drugs that have been around twenty, thirty years.

4   And just like new cars, the newer drugs are a lot safer when

5   used properly than the older drugs which patients tend to

6   take too much of.

7   Q    Doctor, are you concerned about your patients' health

8   given this situation?

9   A    I'm always concerned about my patient's health.

10   Q    And particularly in this situation if they can't use

11   Linden Care?

12   A    Very much so, yes.

13   Q    Have patients come to you saying that their

14   prescriptions have run out?

15   A    I've gotten phone calls already from the fact that they

16   were worried about what they read in the newspaper.  But

17   knowing from when I had spoken to the people at Linden Care,

18   I told them just keep going there, they're going to continue

19   getting you your medicine, don't worry about Express Scripts

20   right now, it's more important that you don't run out of your

21   medicine and run the risk of going into withdrawal.

22   Q    And you know it has to end at some point?

23   A    What's that?

24   Q    Linden Care, they can't keep just filling scripts?

25   A    That's correct.

*Alexander Weingarten – Direct – Ms. Cost*                    65

1   Q    What are the potential consequences to your patients if

2   they can't get their medications?

3   A    Well, many of them will certainly run a high risk of

4   going into withdrawal just because they're physically

5   dependent on these opioids based on long term use.  Again,

6   they're not addicts.  Addiction is defined as the improper

7   use of controlled substances for no medical purpose, that's

8   the definition of addiction.  They have a medical purpose,

9   they need the medicine.  So by nature they will be physically

10  dependent, but that's a natural process of being on opioids

11  for a long time.

12       So they are physically dependent.  As a result they

13  will, many of them will go into withdrawal.  And eventually

14  obviously the withdrawals will be treated in a hospital, but

15  eventually they'll be switched to alternative medicines that

16  will not be as good and their level of pain on a daily basis

17  has to rise because it's not being adequately treated with

18  the good medicines that we were giving before which they used

19  to receive at Linden Care.

20  Q    And is that a remote possibility or something that in

21  your experience is fairly certain going to happen?

22  A    This is a very, very realistic possibility based on what

23  happens when you switch from more potent opioids to less

24  potent opioids.

25            MR. COST:  No further questions at this time.

*Alexander Weingarten – Direct – Ms. Cost*

1   Thank you.

2           THE COURT:  Thank you, Mr. Cost.

3   Cross-examination.

4   *CROSS-EXAMINATION BY MS. HELLMAN:*

5   Q     Good morning, Doctor.

6   A     Good morning.

7   Q     You've testified here for a while, and clearly I think

8   you have a high opinion of Linden Care, correct?

9   A     Yes.

10  Q     Your office, are you guys office right next door to each

11  other?

12  A     They used to be our tenant several years ago but they

13  needed to expand to a bigger space so they're now in

14  Woodbury.

15  Q     Linden Care is growing a lot so they have a much bigger

16  space, right?

17  A     Yes.

18  Q     As a physician who obviously has a high regard of Linden

19  Care, would it concern you if Linden Care was shipping

20  prescriptions into a state that it wasn't licensed in?

21  A     Again, it would concern me, but again, I would also want

22  to know all the facts and see if there were any technical

23  reasons from their point to dispute that.

24  Q     If Linden Care -- well, strike that.

25          If Linden Care was shipping prescriptions, let's say,

1   into the State of California where a license is required to a

2   person that resided in California multiple times, would that

3   concern you?

4   A    Again, from a medical basis if the patient needed the

5   medicine, I'm not sure if it would concern me.  Because again

6   from a legal basis again that may be of concern, but if there

7   was a medical reason for that patient to get the medicine,

8   I'd probably be less concerned about it.

9   Q    Do you practice in the states that you're not licensed?

10  A    No.

11  Q    Now, conversely, the opinion that you hold of Linden

12  Care, you clearly have some opinions about insurers and PBMs

13  and you shared those general opinions today.  But I want to

14  drill down a little bit and make sure I understand exactly

15  what you're saying and what you're telling this Court.  Is it

16  your testimony -- back up a minute.  The prescriptions that

17  you write, those are for New York residents, correct?

18  A    Yes.

19  Q    And we know that Linden Care does in excess of

20  70 percent out of state business, you're aware of that,

21  correct?

22  A    Yes.

23           MR. COST:  Objection, Your Honor.  Foundation.

24           MS. HELLMAN:  I believe he testified in answer to

25  the question that he understood that.

*Alexander Weingarten - Cross - Ms. Hellman*                    68

1          THE COURT:  Do you know that?

2   A    I don't know if it's 70 percent.  I know they do

3   business in multiple states.  I will correct my answer by

4   saying I'm not sure if it's 70 percent or what percent it

5   actually is, but I know they are licensed in, you know, many

6   states other than New York.

7   Q    Thank you.  So let's talk about the patients that you're

8   writing prescriptions for to be filled at Linden Care.  Is it

9   your testimony, are you telling this Court that there is not

10  another New York pharmacy that they can get these

11  prescriptions filled at?  Is that your testimony?

12  A    No.

13  Q    You would agree that there are several, numerous other

14  New York pharmacies that your patients can get their

15  prescriptions filled at, correct?

16  A    I don't think it's numerous but certainly several, yes.

17  Q    Have you called any of those pharmacies?

18  A    Yes.  I use them on occasion, yes.

19  Q    And since last Tuesday or whenever you were notified

20  that Linden Care was terminated from the Express Scripts

21  network, have you worked with any of those pharmacies to

22  transition your patients?

23  A    There hasn't been a reason to because they're still

24  getting their medicine at Linden Care.

25  Q    And you mentioned a lot about PBMs and what they do and

1   what they don't do.  If Express Scripts had offered to assist

2   in finding an alternative location for members that could not

3   find one, would you want to know that for your patients?

4   A    Again, assuming that Linden Care could no longer take

5   care of them, the answer is yes.

6   Q    But as of today Linden Care can still take care of them,

7   is that right?

8   A    Well, they're taking care of them by virtue of their

9   moral obligation, but theoretically they don't have to take

10  care of them.

11  Q    And are you considering now trying to find an

12  alternative pharmacy that can take care of your patients?

13  A    I'm hoping that's not going to have to be an issue.

14  Q    But you certainly know there is alternative pharmacies

15  in the State of New York?

16  A    Yes.

17  Q    You mentioned earlier that you were asked a little bit

18  about Accredo.  Do you remember that testimony?

19  A    Yes.

20  Q    And I think you testified that Accredo is different than

21  Linden Care, correct?

22  A    I believe so, yes.

23  Q    And one of the drugs that you testified to that you

24  prescribed that's filled at Linden Care is fentanyl, correct?

25  A    Yes.

1   Q    And then you also -- do you also prescribe non-narcotic

2   medications, non-narcotic medications that are filled at

3   Linden Care?

4   A    Yes, many.

5   Q    I think you mentioned Duexis is one of those, correct?

6   A    Yes.

7   Q    Rayos is another one?

8   A    I'm sorry?

9   Q    Rayos, do you know that drug?

10  A    I'm not familiar with it.

11  Q    What about Vimovo, is that a drug that you prescribe?

12  A    Yes.

13  Q    That's a drug that's filled at Linden Care?

14  A    Yes.

15  Q    Those two drugs, Duexis and Vimovo, those aren't

16  narcotic drugs, correct?

17  A    Correct.  They're anti-inflammatories.

18  Q    They can be filled at any number of pharmacies, correct?

19  A    Yes.  But again, they can be filled at any number of

20  pharmacies but many of the patients will not get the medicine

21  unless it's filled at Linden Care.

22  Q    Okay.  You can write a prescription for, let's say,

23  Vimovo, correct, for one of your patients, correct?

24  A    Correct.

25  Q    And I know now normally you send them to Linden Care,

*Alexander Weingarten – Cross – Ms. Hellman*

1    correct?

2    A    Correct.

3    Q    You can send them to another pharmacy in the State of

4    New York to get that prescription filled, can't you?

5    A    If it's a specialty pharmacy that deals with those

6    drugs, yes, but certainly the chain pharmacies, most of them

7    will not give the patients those two medications.

8    Q    And I understand that.  But there are other pharmacies

9    in the State of New York that can fill a prescription for,

10   say, Vimovo, correct?

11   A    Sure, yes.

12   Q    And the same for the fentanyl, correct?

13   A    The fentanyl?

14   Q    Yes.

15   A    I guess if the patient wants to travel between thirty

16   and fifty miles, I'm sure you'll find a pharmacy willing to

17   do that.

18   Q    Do you know if those pharmacies will ship the

19   prescriptions to the patient?

20   A    Some of them will.

21              MS. HELLMAN:  I have no further questions.

22              THE COURT:  Mr. Cost.

23              MR. COST:  Briefly, Your Honor.

24   *REDIRECT EXAMINATION BY MR. COST:*

25   Q    Doctor, Ms. Hellman asked if it would concern you if

*Alexander Weingarten – Redirect – Mr. Cost*

1   Linden Care shipped into a state such as California where

2   someone resided, right?  What if that was a New York resident

3   who just moved to California and their prescription ran out,

4   would that concern you?

5   A    It would not concern me, assuming that they were a

6   New York resident who happened to be residing in California.

7   Q    What about or if it were another state they were

8   licensed in and recently moved to California, would that

9   situation concern you?

10  A    Again, assuming that there is medical indication for the

11  drug, the answer is no.

12  Q    What if someone was on vacation and forgot to take their

13  medications with them, would that concern you?

14  A    No.

15  Q    Are you aware of anything ESI has done to reach out to

16  your patients about this termination?

17  A    They haven't notified me at all.

18  Q    They haven't notified you at all?

19  A    Correct.

20  Q    And what about your patients, are you aware anything

21  they've done to notify them?

22  A    The only thing that comes close to it is a patient

23  yesterday who I saw, of all days to see a patient

24  coincidentally, who told me that they had gotten and received

25  a sort of strange letter from Express Scripts indicating all

*Alexander Weingarten – Redirect – Mr. Cost*

1   the medications that she was on, and they asked her because

2   she is a patient at Linden Care, did Linden Care give you all

3   these medications.  And she found it strange because she's

4   been using Express Scripts for a long time, never received

5   the medicine like -- a letter like this.  And I found also a

6   little odd.  But that's about the closest that I've heard

7   Express Scripts notify any patient about anything via letter

8   concerning Linden Care.

9   Q    And that letter, was that letter dated November or

10  October, do you know?

11  A    It was a recent letter, yes.

12  Q    Do you know whether it was before or after the

13  termination?

14  A    It was before.

15  Q    Doctor, are you aware that Linden Care itself has

16  reached out to ESI asking them to contact them to discuss

17  patient continuity?

18  A    It would not surprise me that that is so, yes.

19  Q    And with regard to other pharmacies in the State of New

20  York, New York's not the biggest state but it's a fair amount

21  of miles, correct?

22  A    Yes.

23  Q    And you told me that there are patients that simply

24  can't drive, right?

25  A    Correct.

*Alexander Weingarten - Redirect - Mr. Cost*                    74

1  Q    So in certain circumstances it may be impossible for

2  certain patients to get to other specialty pharmacies, is

3  that right?

4  A    Correct.

5           MR. COST:  No further questions.

6           THE COURT:  Thank you, Mr. Cost.  Ms. Hellman?

7           MS. HELLMAN:  I have nothing further.

8           THE COURT:  Dr. Weingarten, you may step down.

9  Thank you.  Ms. Clark, could you call your next witness?

10          MS. CLARK:  Your Honor, would this be an

11 appropriate time for a quick break just to line things up?

12          THE COURT:  Well, I'm a little concerned, it looks

13 like the parties have a fair amount on calendar.  Could we

14 get started with the witness and take a break at 12:15?

15          MS. CLARK:  Yep, that would be fine, Your Honor.

16 Thank you.  At this time we're going to call a couple of the

17 patients who are standing by.  That's one of the logistical

18 issues we were trying to resolve on a break was who is

19 available so we could get to everybody in a time frame when

20 it was convenient for them, especially nonparties.  At this

21 time we're going to call Art Kersey.

22          THE CLERK:  State and spell your name for the

23 record.

24          THE WITNESS:  Arthur Kersey; A-R-T-H-U-R,

25 K-E-R-S-E-Y.

*Alexander Weingarten – Redirect – Mr. Cost*

1

2

3          **ARTHUR KERSEY**, called as a witness and being

4  duly sworn, testifies as follows:

5  *DIRECT EXAMINATION BY MS. CLARK:*

6  Q    Good afternoon, Mr. Kersey.  Could you state for the

7  record where you currently work?

8  A    Yes.  I'm currently employed at Linden Care Pharmacy.

9  Q    And what is your title?

10  A    I am a chief compliance officer.

11  Q    And what is your role as chief compliance officer?

12  A    As a chief compliance officer I'm charged with several

13  things; vetting physicians, doing research on backgrounds of

14  both physicians and patients through various processes we

15  use, verification of prescribers' ability to prescribe

16  through DEA, state licenses, and also notification of board

17  certifications, et cetera, for some of the prescribers.

18  Q    Could you give the Court just a brief description of

19  your background as it relates to compliance?

20  A    Yes.  I'm a qualified attorney and member of the bar in

21  the State of New York.  I was admitted in 1984.  I went, then

22  almost immediately went to work for the Drug Enforcement

23  Administration.  I spent thirty years with DEA in a variety

24  of assignments, both foreign and domestic, and I retired in

25  March 2014 as the associate special agent in charge for the

1   New York division of DEA, and then went to work at Linden

2   Care.

3   Q    How did your role at DEA assist you in your role as

4   chief compliance officer at Linden Care?

5   A    Well, through my years of experience in DEA of course

6   I'm familiar with the problem of those medications that are

7   of a concern to both law enforcement, the medical community,

8   their potential to be abused, which would be controlled

9   narcotics.  I have some experience in my background doing

10  investigations that would be considered diversion

11  investigations but I was mostly really on enforcement side of

12  the house.

13  Q    And can you describe the level of regulation of the

14  medications that Linden Care dispenses?

15  A    The narcotic and controlled medications are tightly

16  regulated.  We go through audits, both by law enforcement,

17  which would be DEA doing surprise audits, they just show up

18  one day at the pharmacy and they go through all of your

19  records to determine how much you've dispensed versus how

20  much you've ordered.  They use their own formulas to

21  determine the ratio that they're looking for and confirm that

22  your dispensing is in line with what you're ordering and what

23  you have on hand.

24  Q    Is that level of regulation something that's difficult

25  for local retail community pharmacies to manage?

*Arthur Kersey – Direct – Ms. Clark*                           77

1   A    It is and as a result a vast -- well, not a vast

2   majority, a large percentage of pharmacies simply won't stock

3   some of these medications, especially medications like

4   oxycodone, some of the fentanyl medications.

5   Q    And fentanyl medications, are those medications that are

6   subject to the TIRF REMS program?

7   A    Right, the medications we're talking about are in the

8   TIRF REMS program.

9   Q    As part of your role in compliance, did you also get

10  involved in making sure that Linden Care complies with the

11  aspects of the TIRF REMS program?

12  A    Yes.  We confirm the patient's enrollment in the TIRF

13  REMS program, the prescribers' enrollment in the TIRF REMS

14  program.  I'm on the phone, either myself or Jordan Fogel is

15  on the phone with TIRF REMS almost every day just checking on

16  the status of patients, status of prescribers, and confirming

17  that we have accurate information in order to make sure that

18  we're dispensing properly.

19  Q    Will Linden Care dispense medications for just any

20  prescriber?

21  A    No.  We as a specialty pharmacy we are interested in,

22  you know, taking care of those patients that, as prior

23  witnesses said, they're chronic pain patients.  We try to

24  target our prescriber base, the prescribers that we want to

25  have a relationship with and want to work with to

1    anesthesiologists and pain medicine physicians, orthopedic

2    surgeons, physical medicine and rehabilitation.  We don't

3    like to deal with or take prescriptions from internal

4    medicine doctors for, as an example, who want to dabble in

5    pain, that's not what we're in the business for.

6    Q    What would happen if, for example, my primary care

7    physician prescribed fentanyl for a headache condition or

8    something like that?

9    A    A primary care physician is probably not going to be

10   enrolled in TIRF REMS.  A primary care physician may not know

11   that, you know, those medications are not -- it's

12   contraindicated for that condition.  And these are the type

13   of things, the conversations that especially Mr. Fogel will

14   have with some of these prescribers to let them know, Doctor,

15   you wrote this medication but this is not the proper

16   medication for this patient.  There is a lot of back and

17   forth, that type of conversation that goes on.

18   Q    And ultimately does Linden Care sometimes reject those

19   prescriptions?

20   A    We do.

21   Q    And with this web of regulation of pain medicines, are

22   there state laws that apply?

23   A    Of course.  We're subject to not only DEA regulation,

24   we're subject to the Bureau of Narcotics Enforcement, the New

25   York State Pharmacy Board, they can make unannounced visits

*Arthur Kersey – Direct – Ms. Clark* 79

1   at any time, and we also have to go through audits and

2   reviews by the suppliers that we buy from.

3   Q    So you're not only audited by the PBMs, you're audited

4   by the suppliers as well?

5   A    Exactly.

6   Q    What is the relevance of the ISoP program to the way

7   Linden Care does business?

8   A    Well, the ISoP program is targeted towards New York.

9   Mr. Fogel has access through I believe it's 43 states in

10  their version of ISoP.  They go by different acronyms in

11  different states.  But the premise is basically the same,

12  it's a way to monitor what the patient is being prescribed

13  and what medications they're filling at various pharmacies

14  and from various prescribers.  We use the New York ISoP

15  program to monitor the New York patients that we serve.

16  Q    You heard a lot about the term TIRF REMS program, the

17  ISoP program.  How are all those programs relevant to patient

18  safety?  What is the risk here?

19  A    Well, there are several risks.  The big one, of course,

20  is diversion.  You can have a new patient show up and you

21  will run the ISoP program, and especially to keep from a

22  physician that we know and dealt with before, it could be a

23  new physician, it's for a narcotic and controlled medication,

24  and we run ISoP and see that this patient filled a similar

25  medication ten days ago from a different prescriber at a

1   different pharmacy.  A patient like that we're not going to

2   accept.

3   Q    What about the risk to the patients?

4   A    There is always the risk of patient overdose, too much

5   medication.  The New York State law requires us to make sure

6   that the patients don't have excess medication on hand.

7   Q    What part of Linden Care's business helps mitigate that

8   risk?

9   A    The fact that we do the ISoP checks, the fact that we

10  have patient/prescriber contracts, an agreement that we would

11  make a patient sign that when they're getting narcotic and

12  controlled medications, they're going to get them through

13  Linden Care or they're going to advise us if an emergent

14  situation came up and they had to go to a different pharmacy

15  for something, they're going to let us know.

16  Q    And is accidental overdosing in pain patients a big

17  issue in New York and other states right now?

18  A    It is.

19  Q    And why is that?

20  A    Well, it's not just the patient safety, it's also other

21  family members.  You have, you know, countless incidents

22  where an elderly patient is prescribed a narcotic and

23  controlled medication and you come to find out down the road

24  that the medication is being syphoned off by grandchildren,

25  children, other family relations.  So that's a safety for the

1   entire community.  And that's one of the things that we try

2   to control –– and not control, but assist in the control of

3   by monitoring exactly how much medication the patients are

4   getting.

5   Q    And is there a risk of sudden cessation?

6   A    Yes, of course.  They'll go into withdrawals.

7   Q    And last Tuesday did Linden Care receive a termination

8   notice?

9   A    Yes, it did.

10  Q    And was there any –– was there any communication with

11  Linden Care before that termination notice to put patients on

12  notice that there might be a cessation in their coverage?

13  A    Not that I'm aware of.

14  Q    Were you involved in the response to that situation that

15  was created?

16  A    Yes, I was.

17  Q    And why don't you explain to the Court what your

18  involvement was and what the response was from the patients?

19  A    Well, for the walk-in patients it was more a case of

20  them coming into the pharmacy to fill their medication and

21  having to be informed by members of our staff that we had

22  been summarily cut out of their, the Express Scripts system,

23  which meant that we could no longer take their insurance.

24  The patients were frantic.  We explained to them that they

25  had the choice to go to another pharmacy if they wanted to

*Arthur Kersey – Direct – Ms. Clark*                    82

1  use their insurance, we would try to accommodate them, and we

2  would not, basically we would not hold it against them if

3  they used another pharmacy for that month, we would allow

4  them to come back as patients in the future if that was

5  possible.

6       We encouraged them to call the PBM.  Several of them

7  did.  I was present for some of these phone calls where the

8  patient would call Express Scripts and they were told various

9  things.  In one particular instance the patient was told it's

10 not a problem with Express Scripts, it's Linden Care's

11 processing is wrong, and the patient was given a 1-800 number

12 to call and there would be an override code to provide.

13      So we tried that several times and finally got to be

14 about the tenth time and I'm standing there talking to the

15 patient, and I finally told the patient they're lying to you,

16 there is no override code.  We're being shut out of the

17 system and there is nothing you can do.  So I think Express

18 Scripts is aware because these patients are literally

19 standing in our waiting room screaming at Express Scripts'

20 employees on the phone.  And this went on as recently as

21 Tuesday when I was in the office.

22 Q   And can you give us a sense of how many times Linden

23 Care has received reports from patients that they've tried to

24 reach ESI about this but have had no effective response?

25 A   We've had numerous phone calls.  I've dealt with

1   numerous patients on this issue.  Patients have told me that

2   they've been to five pharmacies to try and find medication

3   like oxycodone, oxycontin.  A lot of the pharmacies they

4   don't want to carry it.  If they don't have the security in

5   place that we have, if they don't have the inventory controls

6   in place that we have, the pharmacies open themselves up to

7   diversion unfortunately sometimes from unqualified employees

8   and they also open themselves up to robberies that occur.

9   There was a famous case in Suffolk County in which several

10  people were killed at a pharmacy, and what they were looking

11  for was oxycodone.

12          MS. CLARK:  That's all I have.  Thank you.

13          THE COURT:  Cross-examination, Mr. Smith.

14  *CROSS-EXAMINATION BY MR. SMITH:*

15  Q    I'm going to stand over here because I may have a few

16  documents on this machine or at least attempt to do so.  You

17  spoke a little bit, sir, about the TIRF REMS.  Do you know

18  how many pharmacies are enrolled in TIRF REMS?

19  A    No, I don't.

20  Q    Would it surprise you to know that there are over 500

21  such pharmacies across the country?

22  A    Doesn't surprise me.

23  Q    Would it surprise you to learn that Accredo is actually

24  not a TIRF REMS pharmacy?

25  A    I honestly don't know that much about Accredo.

*Arthur Kersey – Cross – Mr. Smith*

1   Q    So you have no opinion one way or the other?

2   A    I'm not sure what, what opinion you were asking me.

3   Q    Sir, you mentioned your role as compliance officer at

4   Linden Care.  Are you familiar with the role of a pharmacist

5   in charge?

6   A    Supervising pharmacist and pharmacist in charge, yes.

7   Q    So supervising pharmacist and pharmacist in charge,

8   that's basically the same thing?

9   A    Yes.

10  Q    So different state laws call that position something

11  different?

12  A    I believe that's how it works out, yes.

13  Q    And also managing pharmacist, is that another name for

14  it?

15  A    I've never heard that term but I guess that's probably

16  the equivalent.

17  Q    Okay.  Who is the pharmacist in charge at Linden Care?

18  A    Today it's Alberto Lopez.

19  Q    I'm sorry?

20  A    Alberto Lopez.

21  Q    Would it surprise you to learn that Linden Care told

22  Express Scripts that Jordan Fogel was the pharmacist in

23  charge?

24  A    At one time he was, so it would depend when this was,

25  that information was asked of Linden Care.

*Arthur Kersey - Cross - Mr. Smith*                    85

1  Q    Sir, you understand that information that Linden Care

2  provided to Express Scripts about who it is, including its

3  pharmacist in charge, that Linden Care had a continuing

4  obligation to update that information.  Did you understand

5  that, sir?

6  A    Yes.

7        MS. CLARK:  Objection, Your Honor.  I think we're

8  getting into legal issues that are beyond the scope of the

9  witness's role at Linden Care.

10       THE COURT:  Overruled at this time.  But if you

11  could keep the questioning to something within this witness's

12  scope of employment.

13  Q    Sir, is your role as compliance officer at Linden Care,

14  are you responsible for licensure and representations

15  concerning pharmacists in charge of your operation?

16  A    We have a regulatory coordinator who handles all the

17  licensing notifications to the various states and he uses a

18  company called License Logics to assist him in that.

19  Q    So, sir, are you involved in that process at all?

20  A    Well, not really on a day-to-day basis, no.

21  Q    Do you know if Linden Care is licensed as a mail order

22  pharmacy?

23  A    In New York we're licensed as a retail pharmacy.

24  Q    And ask my question broader, do you know if Linden Care

25  identifies itself as a mail order pharmacy to other states?

*Arthur Kersey – Cross – Mr. Smith*                    86

1    A    I can't give you an answer because I don't know what the

2    other states' parameters are in terms of what designations

3    they accept.

4    Q    Sir, I would like to hand you a document.

5              MR. SMITH:  May I approach, Your Honor?

6              THE COURT:  Yes.

7              MS. CLARK:  Counsel, may I see it as well?

8              MR. SMITH:  Yes.

9    Q    Sir, I've handed you a document.  I'll represent to you

10   that I have marked in the bottom right-hand corner numbers so

11   that we can be on the same page as we walk this document.

12   A    Okay.

13             MS. CLARK:  Your Honor, just so I can follow along.

14   Where is this on the exhibit list?

15             MR. SMITH:  This is material for cross-examination

16   impeachment.

17             MS. CLARK:  Your Honor, I object.  This is not

18   something that was unanticipated, clearly should have been on

19   the list.

20             THE COURT:  Mr. Smith, do you intend to seek the

21   admission of this document?

22             MR. SMITH:  I may, Your Honor.  It has to do with

23   some of the representations he made about what Linden Care

24   was and their practices and compliance.

25             THE COURT:  Can you proceed with the question?

*Arthur Kersey – Cross – Mr. Smith*                    87

1              MR. SMITH:  Sure.

2    Q    Sir, the first page do you see where it says New York

3    State Office of Professions, and it identifies the name

4    Linden Care?

5    A    Yes.

6    Q    And it says supervisor, Lopez Alberto?

7    A    Right.

8    Q    That's the individual you identified as the pharmacist

9    in charge of Linden Care today, correct?

10   A    That's correct.

11             MS. CLARK:  Your Honor, if that's the question,

12   then I do have an objection, if I may?

13             THE COURT:  Yes.

14             MS. CLARK:  The witness testified about the scope

15   of his employment and that this is not -- the state licensing

16   regulatory issues are handled by somebody else in conjunction

17   with I think a service or a consultant, so we're getting

18   further and further beyond the scope of this witness's

19   involvement in these issues.

20             THE COURT:  Overruled at this point.  Mr. Smith,

21   can you ask your next question, please?

22             MR. SMITH:  Yes, Your Honor.

23   Q    Sir, has Linden Care ever been disciplined or had its

24   license suspended or otherwise action taken against it by any

25   state board or pharmacy that you're aware of?

*Arthur Kersey – Cross – Mr. Smith*

1          MS. CLARK:  Same objection, Your Honor.

2          THE COURT:  Overruled.

3  A    The only one that I'm aware of was, and I can't recall

4  the exact time frame that it occurred, I believe it was

5  during 2014.  We had sent I believe it was a product called

6  Enlyte, which is like vitamin, some kind of vitamin

7  supplement, to the State of Oregon inadvertently when I

8  believe the license had lapsed.  That's the only time, that's

9  the only incident I'm aware of where Linden Care was fined.

10 Q    And that was Linden Care mail order pharmacy that was

11 shipping Enlyte?

12 A    If you're -- if that's how Oregon refers to Linden Care,

13 then maybe that's the known designation that they gave in the

14 State of Oregon.  I'm not sure.

15          MR. SMITH:  Your Honor, may I approach?

16          THE COURT:  Yes.

17 Q    Sir, do you recognize this document?

18 A    No.

19 Q    Do you see in the top left corner it says Linden Care?

20 A    Yes.

21 Q    Also refers to Enlyte?

22 A    Yes.

23 Q    And do you see about halfway down it says, Linden Care

24 mail order pharmacy also offers a cash pay program?

25 A    Yes.

*Arthur Kersey – Cross – Mr. Smith*                    89

1   Q    Sir, do you know, you're not testifying that this is not

2   a Linden Care document?

3   A    No.

4          MS. CLARK:  Objection.  Objection to form.  And

5   also objection to scope of witness.  But also objection

6   because this isn't anything that's relevant to the

7   termination.

8          THE COURT:  Sustained.  And I move to strike his

9   answer.  He said he is not familiar with this form.

10  Mr. Smith, would this be a good time to take a break for

11  lunch?

12         MR. SMITH:  Sure.

13         THE COURT:  Let me just ask Ms. Clark, how much

14  more testimony timewise do you anticipate?

15         MS. CLARK:  I have one short witness and then there

16  is several patients that would like to be heard.  Those will

17  be very short.  And so I anticipate that we would be done,

18  I'm guessing, but maybe thirty to forty minutes.

19         THE COURT:  And Ms. Hellman, do you anticipate

20  introducing evidence, and how much time do you expect your

21  evidence will take?

22         MS. HELLMAN:  Your Honor, we do.  I would expect

23  about 45 minutes to an hour.  I'm not sure how long cross is

24  going to be, but I would guess 45 minutes.

25         THE COURT:  Thank you, Counsel.  Why don't we

*Arthur Kersey – Cross – Mr. Smith*

90

1  return at 1:15, that gives us an hour or lunch.  And in that

2  time, Ms. Hellman and Mr. Smith, could you decide if you have

3  any objection to the recorded telephone conversation?

4  　　　　MS. HELLMAN:  Yes.

5  　　　　THE COURT:  Thank you.

6  　　　　(Recess at 12:15.)

7  　　　　(Reconvene at 1:20.)

8  　　　　THE COURT:  Let me ask defense counsel, have you

9  had an opportunity to listen to P17?

10  　　　　MS. HELLMAN:  We have, and we have no objection.

11  　　　　THE COURT:  P17 then will be admitted into

12  evidence.

13  　　　　(Plaintiff's Exhibit 17 received in evidence.)

14  　　　　MR. COST:  May I?  Defense counsel indicated they

15  had some trouble playing the DVD.  It could be a bad copy.

16  If the Court has the same problem, let me know and we'll get

17  you a copy right away.

18  　　　　THE COURT:  Yes, thank you very much.

19  　　　　MS. CLARK:  Your Honor, will we be playing that in

20  the courtroom?

21  　　　　THE COURT:  I don't think we need to play it in the

22  courtroom.

23  　　　　MS. CLARK:  That's fine with me.

24  　　　　THE COURT:  And was it Mr. Kersey who was on the

25  witness stand.  Mr. Kersey, could you step up?  Mr. Kersey,

*Arthur Kersey – Cross – Mr. Smith*                    91

1   you understand you're still under oath.

2              THE WITNESS:  Yes, Your Honor.

3              THE COURT:  You may proceed, Mr. Smith.

4   *BY MR. SMITH:*

5   Q    Mr. Kersey, you're the chief compliance officer at

6   Linden Care, correct?

7   A    Yes, sir.

8   Q    And as chief compliance officer, compliance with state

9   and federal law, with respect to those issues, the buck

10  ultimately stops with you at Linden Care, correct?

11  A    Yes.

12  Q    And you mentioned several people before that do some

13  subsidiary compliance issues.  Those people report to you?

14  A    Yes, that's right.

15  Q    Sir, would it concern you as chief compliance officer of

16  Linden Care if Linden Care was sending drugs into states

17  where it was not licensed?

18  A    Would it concern me, yes.

19  Q    And Linden Care is not licensed in the State of

20  California, is it, sir?

21  A    No, it's not.

22  Q    Sir, you're aware that Express Scripts terminated Linden

23  Care in part because it was sending prescriptions into the

24  State of California where it was not licensed, correct?

25  A    I have been made aware of that, yes.

*Arthur Kersey – Cross – Mr. Smith*

1    Q    And as chief compliance officer, after you were made

2    aware of the fact that Express Scripts terminated its

3    contract with Linden Care because Linden Care was sending

4    prescriptions into a state that it was not licensed in, did

5    you do any investigation?

6    A    I haven't had the opportunity to investigate the

7    incidents.  No one has yet told me the name of the patient or

8    the incident that supposedly happened.

9    Q    So it's your understanding there was a single incident,

10   single shipment?

11   A    I honestly don't know if there was a single shipment or

12   not.

13   Q    Is it your understanding or are you aware that your

14   company has taken the position in this litigation that any

15   shipments were diminimus and were for members who were

16   vacationing in California?

17   A    That's my understanding, yes.

18   Q    Sir, would you agree with me that someone whose

19   insurance carrier is the California Association of Highway

20   Patrolmen and lists as his or her residence Escondido,

21   California probably isn't vacationing?

22           MS. CLARK:  Objection, Your Honor.  I don't know

23   how this witness can understand and respond to that question.

24           THE COURT:  Sustained.

25           MR. SMITH:  Your Honor, I have a exhibit that I can

*Arthur Kersey – Cross – Mr. Smith*                    93

1   show the witness if I can approach the Court before I present

2   it, if that's okay.

3            THE COURT:  Yes.

4            MR. SMITH:  Counsel, I may want to approach as

5   well.

6            THE COURT:  Can you hand it to my courtroom deputy,

7   please?

8            MR. SMITH:  Sure.

9            THE COURT:  Let me just ask, Mr. Smith, is this the

10  first time that Linden Care is seeing this evidence?

11           MR. SMITH:  It's Linden Care claims data, it's from

12  our system but they should have the information, Your Honor.

13           MS. CLARK:  Your Honor, it's not on the exhibit

14  list.  But even more importantly, you know, we asked when we

15  got the notice of termination, we inquired about what are you

16  talking about, what are the claims you're talking about.

17  They never gave us any of this information.  This does not

18  look like it is anything from Linden Care.  This is ESI data.

19           So, you know, it's particularly unfortunate that

20  they didn't give us this information at the time that we

21  asked for it.  They certainly shouldn't be able to spring it

22  on us in this hearing, especially when it's not our document,

23  I don't think that's a correct statement.

24           THE COURT:  Mr. Smith, is this the Court's copy or

25  is this the copy you need?

*Arthur Kersey - Cross - Mr. Smith*

1        MR. SMITH:  Yes, but I wanted to explain something

2   about it.  Your Honor, what I wanted to explain about this

3   data is that it has some sensitive patient information on it.

4   We have redacted to protect patient identifications under

5   HIPAA.  We've redacted some information about the member's

6   first name and last name but we've left in address, carrier,

7   the pharmacy and other identifying information.  Out of an

8   abundance of caution we would ask that this exhibit still be

9   treated as confidential.  And that's just a concern that it

10  could be potentially used to identify somebody's, a member's

11  health information.

12        THE COURT:  And has this witness seen this exhibit

13  before?

14        MR. SMITH:  I do not believe so, Your Honor.

15        THE COURT:  I'm not sure what you want to ask this

16  witness about a document that Express Scripts has prepared.

17  It seems to me that this may be evidence that Express Scripts

18  seeks to introduce as it presents its case, but I'm not sure

19  what this witness can tell you regarding this exhibit that is

20  prepared by Express Scripts.

21        MR. SMITH:  So I was simply wanting to cross the

22  witness or establish, I mean these are scripts that were sent

23  to California.  These are records of Linden Care scripts, and

24  I believe they contradict representations that Linden Care

25  has made in this litigation about the nature of the

*Arthur Kersey – Cross – Mr. Smith*

95

1   shipments, and I think this witness has testified he believed

2   it was a shipment.  There has been statements by counsel and

3   statements by declarants in the case that any shipments were

4   diminimus and vacation.

5           My purpose with this exhibit is solely to establish

6   that there are numerous examples in here to establish that

7   these were not -- there were numerous shipments, shipments

8   over multiple months, and therefore every one of these

9   residents has California as their residency.

10          THE COURT:  Mr. Kersey, do you have any information

11  about any drugs that Linden Care shipped to California?

12          THE WITNESS:  No, Your Honor.

13          THE COURT:  The objection is sustained.

14          MR. SMITH:  Okay.

15  Q   Mr. Kersey, at the end of the day as chief compliance

16  officer for Linden Care, would you be concerned if there was

17  information showing that Linden Care had shipped numerous

18  prescriptions to California residents during periods when it

19  was not licensed?

20  A   I can't say that I would be concerned because you say

21  California residents, because the first thought that comes to

22  my mind is that we have multiple patients that have more than

23  one residence.  They live part of the year, for example, in

24  New York and part of the year in Florida.  So we take care of

25  their medication all year-round.  Sometimes their doctor in

*Arthur Kersey – Cross – Mr. Smith*                    96

1    New York sends us a prescription, sometimes their doctor in

2    Florida sends us prescriptions.  We have other patients from

3    the New York area that have vacation homes in other states.

4    And the facts that you've given me about a California

5    insurance plan, I don't know where the patient lives.  I

6    don't have enough information to decide whether I would be

7    concerned or not.

8    Q    Is it your testimony today that California exempts

9    pharmacies from licensure if they are shipping to someone's

10   vacation home?

11   A    No, that's not my testimony.

12             MR. SMITH:  I have no further questions, Your

13   Honor.

14             THE COURT:  Anything further, Ms. Clark?

15             MS. CLARK:  Just a quick follow-up on those last

16   few questions.

17   *REDIRECT EXAMINATION BY MS. CLARK:*

18   Q    When Express Scripts terminated Linden Care last Tuesday

19   citing the shipment of drugs to California, did they indicate

20   what patients or claims those related to?

21   A    No.

22   Q    Did they give Linden Care any information that would

23   help it respond in any way?

24   A    No.

25   Q    In a meaningful way to those claims?

*Arthur Kersey - Cross - Mr. Smith*

1   A      No.

2   Q      Did it conduct an audit or investigation with Linden

3   Care of those accusations?

4   A      Not that I'm aware of.

5   Q      It just terminated Linden Care, that's right?

6   A      Yes, ma'am.

7               MS. CLARK:  Thank you.

8               THE COURT:  Anything further, Mr. Smith?

9               MR. SMITH:  No, Your Honor.

10              THE COURT:  Thank you, Mr. Kersey.  You may step

11   down.  Ms. Clark, you may call your next witness.

12              MS. CLARK:  At this time I'm going to yield to

13   Mr. Cost.

14              MR. COST:  We have -- this goes on our witness

15   sheet several patients.  We're not intending to call all of

16   them, there are some we would like to hear from.  I have

17   protect their identities, we put them as their initials.  I

18   have their names and addresses that I will give to counsel so

19   that they know who is on there.  I have the phone numbers for

20   the Court to contact as well.  And I'll just go one at a

21   time, if that's okay.

22              THE COURT:  Yes.

23              MR. COST:  I passed up a copy to the Court of their

24   names and addresses.

25              THE COURT:  Mr. Cost, at this time are you asking

*Arthur Kersey – Cross – Mr. Smith*

1    the courtroom deputy to contact the first witness on the

2    list?

3              MR. COST:  Actually, Your Honor, if you give me one

4    second I'm going to -- I believe we're going to contact

5    Ms. P███ first.

6              THE CLERK:  Is it P████?

7              MR. COST:  P████.

8              THE CLERK:  Ms. P████.  This is Renata with Judge

9    Sannes' chambers.  We're in Court and the judge is going to

10   speak now.

11             THE WITNESS:  The judge's chambers?  I just didn't

12   catch the last part of what you said.

13             THE COURT:  Ms. P████?

14             THE WITNESS:  I just didn't capture the last part

15   that you said.

16             THE COURT:  Ms. P████, this is Judge Sannes.  And

17   the attorneys for Linden Care have asked that you testify via

18   telephone in a proceeding that we have right now.

19             THE WITNESS:  Yes.  Yes.  Yes, I'm aware of that.

20   Let me just get.  I just had surgery so let me just get my

21   other position and I can talk to you, in the other area, hold

22   on one minute.  Okay?  Can you hear me?

23             THE COURT:  Ms. P████, before we proceed, my

24   courtroom deputy is going to place you under oath.

25             THE WITNESS:  Okay.  I just want to say that you

1  sound like you're echoing.  Can you just come a little

2  closer?  Are you on speaker?  You can swear me in, it's just

3  you're echoing.

4           ***K_____  P_____***, called as a witness and being

5  duly sworn, testifies as follows:

6  *DIRECT EXAMINATION BY MR. COST:*

7  Q    Ms. P_____, this is David Cost.  I'm an attorney for

8  Linden Care.  Can you hear me?

9  A    Yes, that's fine.

10 Q    Could you state your full name for the record, please?

11 A    K_____ A. P_____.

12 Q    And K_____, where do you live?

13 A    _____, Lake Grove, New York 11755.

14 Q    Ms. P_____, are you currently a patient that uses Linden

15 Care Pharmacy?

16 A    Yes, I am.

17 Q    And how long have you used Linden Care?

18 A    Since, continually since '09 with no one else.

19 Q    Can you please just give the Court the current

20 conditions that you have, either diseases or injuries?

21 A    Yes.  I have a arachnoiditis in my lumbar area after a

22 spinal fusion that went wrong and I had severe.

23 Q    Ms. P_____, I'm going to stop you for a second because

24 the court reporter is having trouble keeping up with you.

25 A    Okay.  That's no problem.  I'll go slower hold on a

K█████ P█████  – Direct – Mr. Cost

1    moment.  Now I can hear.

2    Q    Ms. P████, if you can speak slowly, and if it's a big

3    word, if you would spell it out for the reporter, I'm sure

4    she would appreciate that.

5    A    Where do you want me to start from at this point?

6    Q    After the failed spinal fusion.

7    A    After the failed spinal fusion, I was diagnosed with

8    arachnoiditis, which is A-R-A-C-H-N-O-I-D-I-T-I-S.  And also

9    with swelling in all of the nerve roots in the lumbar area.

10   Q    Ms. P████, did you recently have an accident?

11   A    Yes.  On July 11th in 2015, in the morning on that

12   morning I was hit, rear-ended in a vehicle as a passenger in

13   the front seat.  And we were hit from behind and going

14   approximately 55 miles an hour, and I had a fracture to my

15   neck cervical area with my spinal cord bruised, a third of

16   the spinal cord was bruised.

17   Q    Are you currently immobile, bedridden?

18   A    Could you just repeat that?

19   Q    Are you currently bedridden?

20   A    Yes.  I mean, I'm in bed in my home in the hospital bed.

21   Q    And do these conditions that you have cause you pain?

22   A    Severe pain.  I went through a surgery, just I'm

23   recovering from a decompression surgery of the C2 to C5 and

24   they just done on September 16th, where they put rods and

25   screws as well as took apart the axim, A-X-I-M, bone to use

K█████ P█████ - Direct - Mr. Cost

1   for my neck as well as cadaver bones.

2   Q    And Ms. P█████, what medications do you get from Linden

3   Care for your pain conditions?

4   A    Okay.  I am receiving MS contin.  Do you need the doses?

5   Q    No, we don't need the doses.

6   A    MS contin extended relief.  I have Actiq, A-C-T-I-Q,

7   which is a fentanyl base.  I have Dilaudid, D-I-L-A-U-D-I-D.

8   I have Neurontin.  Actually, I'm sorry, excuse me.  There is

9   a newer brand so I'm going to tell you what they're giving me

10  now.  It's called Horizant, H-O-R-I-Z-A-N-T.  I'm on

11  Klonopin, K-L-O-N-O-P-I-N.  I'm also on Cymbalta,

12  C-Y-M-B-A-L-T-A.  Baclofen, B-A-C-L-O-F-E-N.

13  Q    Ms. P█████, I think you've given us enough of the list

14  for the Court.

15  A    Okay.  And I have other.

16  Q    And that's fine.  Ms. P█████, have you ever had any

17  complaints about Linden Care service?

18  A    Absolutely not.

19  Q    Have you had -- does your doctor recommend Linden Care?

20  A    Actually, they have moved there, but I actually grew up

21  in the town that they originally had.  They were in Delmar,

22  New York, and I had used them just for a regular pharmacy

23  when I was growing up.  And then coincidentally later on in

24  my life when this happened, they have moved next to my pain

25  management office, Dr. Weingarten, and I started using them

K███████ P█████  – Direct – Mr. Cost

1   at the time they moved over there.

2   Q    So you used Linden Care even before Dr. Weingarten

3   because they were your neighborhood pharmacy, is that right?

4   A    Yes.  Because I grew up in Delmar and they were in the

5   Delmar area.

6   Q    Does Linden Care besides prescribing your drugs do any

7   other services for you?

8   A    Yes.  I don't know what I would do without them.

9   They're a patient advocate for me for helping when

10  prescriptions aren't being put through for, you know, for

11  prior approval.  They will work the entire day, if not days,

12  to get the medication for me approved.  And they have gone

13  above and beyond to get medications.  They have come out to

14  me on Christmas Eve and given me my medications because they

15  weren't going to be open.  And I can honestly say that they

16  are -- they are the liaison that helps me with everything

17  when I can't move.  And they do everything for me.

18  Q    Ms. P█████, have you ever been notified by Express

19  Scripts about Linden Care being terminated from their

20  network?

21  A    I received -- can you hold on one moment?  I'm going to

22  get the actual thing.  They're right here, hold on one

23  moment.  First let me just tell you what I have received.

24  Like I said, because I can't move, my husband is getting the

25  other documents.  I can reach a document here on

K█████ P█████ – Direct – Mr. Cost

1  October 25th.  It says, Express Scripts, your pharmacy

2  benefit manager, has worked with your health plan to manage

3  our prescription drug benefits, fashion prescriptions that

4  we –– that were submitted on behalf for payment.  Please

5  review the attachment for accuracy.  And something about

6  returning the form.

7  Q    Let me, I understand.  So let me just see if I can, you

8  received a letter dated in October.  Let me ask you, does

9  that letter say anything that Express Scripts is terminating

10  Linden Care?

11  A    This one does not say anything about Linden Care, not

12  using Linden Care.  This is actually about all the

13  medications and did I receive them or not.  And now my

14  husband gave me the other documents that we received.  This

15  is the one he just handed me.

16  Q    What are you looking at now?

17  A    My husband just handed them to me.  They sent a letter

18  that states in summary about the medication and what

19  medications can be sent directly to them.  I mean, I'm

20  summing it up at this point.

21  Q    And does that letter say anything about ––

22  A    It doesn't say Linden Care.  It's just –– it's

23  basically, I mean, to me I would interpret it as to be I

24  would be using them through my plan or through whatever not

25  knowing that they are who they are.  I don't know who they

K█████ P█████ – Direct – Mr. Cost

1  are, you know what I'm saying.  I never heard of them outside
2  of this before.
3  Q    And Ms. P█████, again, do either of those documents say
4  that they're terminating Linden Care and you can't use them
5  as a pharmacy?
6  A    No.  They haven't said that I can't use them but I was
7  told yesterday I couldn't, when I went to fill my medications
8  I was told it was terminated.
9  Q    And --
10  A    And I was not able to.  But they said that they were
11  willing to fill my scripts for me and, you know, do whatever
12  to help me out and so that I wouldn't be without medication.
13  I wasn't made aware of the issue with this until yesterday.
14  As far as, you know, taking care of my medications for me.
15  Q    And Ms. P█████, are there any other pharmacies you know
16  to your knowledge in your area where you can get your
17  medications?
18  A    Okay.  I want to say, I want to say that unlike the
19  chain pharmacies, the chain pharmacies, for lack of a better
20  term, but like a CVS or a Rite Aid or Walgreens, they cannot
21  fill or carry at least in our area any of these.  They will
22  not order them or get them for me if I bring them in a week
23  before.  So if there are some that are, they're very far away
24  from me.  I mean, I would say that the closest one for me has
25  got to be at least, I would say at least an hour.  It would

K███ P███ – Direct – Mr. Cost

1   be an hour to get there and get back.  Well, an hour there

2   and an hour back, which I wouldn't be able to do.

3       You know, Linden Care takes care of all of that for me.

4   You know, Linden Care not only takes in my scripts with my

5   physicians, I use no other pharmacy for anything, for

6   anything at all.  I use them strictly for 100 percent of my

7   medication for everything.  So they deliver to me, they ship

8   it to me, you know, they deal with any problem.  They call me

9   to check on me.  I mean, I don't know what I would do without

10  them, to be honest with you.

11  Q    Ms. P███, let me ask, if you couldn't get your

12  medications from Linden Care, I think you said you don't know

13  what you're going to do, is that right?

14  A    Actually, honestly, the thought of it even yesterday had

15  me upset because I don't know.  I am not in a position to

16  even think about it with what I've just learned from now.

17  Like I said, I barely can use my arms.  I barely can use my

18  legs.  I'm in a full brace and I --

19  Q    Ms. P███ --

20  A    And they take care of everything.

21  Q    Ms. P███, if you don't get your medications, what kind

22  of conditions will you suffer?

23  A    Not to sound dramatic, I could die.  It could be fatal.

24  It could be fatal.

25  Q    Ms. P███, thank you.  I don't have any further

K▌▌▌ P▌▌▌ – Direct – Mr. Cost

1   questions for you.  Another attorney in the room might have

2   some questions.

3   A    Thank you.

4   *CROSS-EXAMINATION BY MS. HELLMAN:*

5   Q    Ms. P▌▌▌?

6   A    Yes.

7   Q    Hi.  My name is Sarah Hellman.  I'm an attorney

8   representing Express Scripts.  Can you hear me okay?

9   A    Yeah, I can.  Yes, I can.

10  Q    Thank you.  First of all, I want to thank you for your

11  time today and taking the time to testify.  It doesn't sound

12  like you're feeling very well.

13      I just have a couple of questions for you, Ms. P▌▌▌.

14  It sounds like the first time that you learned that Linden

15  Care was no longer an in-network pharmacy provider, was that

16  yesterday when you went to Linden Care?

17  A    Yes.  I had a doctor's appointment, my physician

18  appointment, and on the way back my husband brought in the

19  scripts to them and he came out and told me about there was a

20  problem.  And then Linden Care, the people that work there,

21  came out and spoke to me about what was going on, but that I

22  shouldn't worry, that they would take care of it until they

23  knew what was going to be going on.  And I didn't know what

24  was happening at that point.

25  Q    And when you said Linden Care told you what was going

1   on, what did Linden Care tell you?

2   A    That at this point that they just were -- my husband is

3   repeating it.  He said that because my Medicare provider uses

4   Express Scripts to manage my medicines and due to a legal

5   issue, that's all they said, they didn't give any specifics,

6   that they were unable to fill my medications under my plan.

7   But would give a seven day supply of anything that I needed

8   and by then hoped that they would have it rectified or would

9   do whatever they could do to help me figure something out, to

10  work with me.

11  Q    Thank you.  And did Linden Care tell you that you may

12  have to find an alternative in-network pharmacy?

13  A    Not at that point they didn't say anything at all.

14  Q    Did Linden Care tell you that Express Scripts had

15  requested the names of people that were having difficulty

16  getting their prescriptions?

17  A    Just repeat that one.

18  Q    Sure.  Did Linden Care tell you that Express Scripts had

19  requested the names of any members that were having

20  difficulty getting their prescriptions?

21  A    No.  No.  Nothing other than just the fact that there

22  was some issue.  I didn't even actually know what the issue

23  was.  You know, I didn't -- they didn't fully tell me what

24  they were.  It was between them in particular, them being

25  Linden Care, with the company, and I didn't know if it was --

1   you know, I don't know how much they would divulge to us, to

2   a patient that comes there, that's their business.  So, no,

3   it just, it really was directed toward my plan, my situation,

4   and that at this time they were not able to fill it and they

5   were -- they would let me know.  They would give me a week's

6   worth, like I say, seven day supply of anything, and actually

7   not even charge me for it at that point.  And I don't want to

8   jump to this, that's another thing that I don't know what I

9   would do.  Is the other attorney there that I can say

10  something to finish with to go back, I just want to say

11  something.  But that's all I was really told yesterday and

12  then I was asked if I could just tell them what my

13  relationship was with Linden Care, so I was asked yesterday

14  afternoon.  So that's all, I mean, that's really all, that's

15  all I really know about it.

16  Q    And Ms. P█████, it sounds like you've used Linden Care

17  for several years, is that correct?

18  A    Yes.

19  Q    And it sounds like typically, I know you're in the State

20  of New York, they ship there, your prescriptions to you?

21  A    They deliver them to my home, they overnight them when

22  they're for a weekend, Friday to Friday, and it's overnight

23  by coming the next morning.

24  Q    And Ms. P█████, I guess since you haven't used any other

25  pharmacies, you don't know if other pharmacies can offer you

1    those same services, is that true?

2    A    No, I actually do.  You know, I actually when I had this

3    happen was researching, and I couldn't find.  I was trying to

4    originally look for someone that was close to the home,

5    closer, you know, for us to get stuff, and they wouldn't even

6    discuss the medications with me.  It was an absolute we won't

7    even order them for you and get them in, get them in for you

8    five days or so that they would take to deliver.

9         The closest other pharmacy, like I said, that I knew was

10   in about an hour, an hour or so drive.  Yeah, about an hour

11   or so drive one way.  Don't even know if they would even

12   carry the medication.  And I also had a medication that I was

13   on that they filled directly, which was Subsys, which was on

14   November 15th will stop.  You know, they were dealing with

15   this directly and letting me, you know, even with my other

16   medications, they weren't letting me hold $10,000 if it

17   wasn't covered, they would go up to $10,000 and let me pay

18   them off.  I mean, I don't know anybody that could do that

19   for me.  You know, it's not covered under Medicare part D.

20   Q    Ms. P█████, have you called Express Scripts and inquired

21   about any other possible pharmacies for you?

22   A    No.  I actually -- like I said, I only, you know, have

23   the information as far as this happening as of late yesterday

24   afternoon.

25             MS. HELLMAN:  I have no further questions.  Thank

1   you.

2          THE COURT:  Anything further, Mr. Cost?

3          MR. COST:  No, Your Honor.  Thank you, Ms. P████.

4          THE COURT:  Thank you very much, Ms. P████.

5          THE WITNESS:  Thank you very much.  If you need

6   anything else, please don't hesitate to call.

7          THE COURT:  Thank you.

8          THE WITNESS:  Thank you.  Have a good day.

9          MR. COST:  Your Honor, plaintiffs call next R███

10  G███.

11         THE CLERK:  Mr. G████?

12         THE WITNESS:  Yes, it is.

13         THE CLERK:  This is Renata with Judge Sannes'

14  chambers.

15         THE COURT:  Mr. G████, the attorneys for Linden

16  Care have indicated that you would testify as a witness today

17  by telephone.

18         THE WITNESS:  Absolutely, yes.  It's a little hard

19  to hear you.  If you're on speaker phone, if you could get

20  closer to the speaker.

21         THE COURT:  Yes.  Right now my courtroom deputy

22  will place you under oath.

23         THE CLERK:  Mr. G████, I'm going to place you under

24  oath now.  Okay.

25         THE WITNESS:  Okay.  This is much better.

K███ P███ - Cross - Ms. Hellman

1

2

3                         R████ G███, called as a witness and being

4    duly sworn, testifies as follows:

5    *DIRECT EXAMINATION BY MR. COST:*

6    Q    Mr. G███, this is David Cost.  I'm an attorney for

7    Linden Care.  How are you today?

8    A    I'm okay.  A little bit of back pain, Mr. Cost, but it's

9    all right, I'm happy to help.

10   Q    Mr. G███, could you state your full name for the

11   record?

12   A    Sure.  R███ W. G███.

13   Q    And Mr. G███, where do you live?

14   A    I'm in Kirkland, Washington.  The address is ████

15   ████████████████████

16   Q    Going forward, we have a stenographer who is trying to

17   take down your testimony and the connection is okay.  If you

18   could please speak slowly, and if there is any big words, if

19   you could spell it for the stenographer, we would appreciate

20   it.

21   A    That would be fine, yes.  You can also if you want you

22   can call maybe on my land line, it might be a little bit

23   better than my cell phone.  It's up to you.

24   Q    Let's try this and we'll try that if we get to it.

25   A    All right.  I apologize.

R██████ G█████  - Direct - Mr. Cost

1   Q    Mr. G█████, are you currently a patient of Linden Care?

2   A    Yes.  Both my wife and I use Linden Care to fill the

3   medications.

4   Q    And how long have you been a patient of Linden Care?

5   A    For almost two years now.  January of 2014 when we

6   started.

7   Q    What current conditions do you and your wife have that

8   cause you pain?

9   A    Well, for myself it is severe lower back pain, and also

10  I have something wrong with my gut that causes me extreme

11  nausea, and diagnosed ADHD.  For my wife it is very severe of

12  chronic abdominal pain and caused by other issues, and she

13  also does take an ADHD medication.

14  Q    Mr. G█████, do you receive controlled medications for

15  these conditions?

16  A    Yes, that's right.  For myself it's oxycodone, and for

17  my wife it's a variety of sort of baseline pain medication

18  and what they call breakthrough pain medication.  And in

19  particular one medication is called Fentora, is quite unique

20  for her serious issues.

21  Q    Mr. G█████, did your doctor recommend Linden Care?

22  A    Yes.  I believe we did get the reference to Linden Care

23  from our doctor in Scottsdale, Arizona.

24  Q    If you don't have these medications, what conditions

25  would you and your wife sustain if you don't have your

*R████ G████  – Direct – Mr. Cost*                    113

1   medications?

2   A    Well, for me it would be, you know, basically

3   dis-functionality and being quite disabled because the lower

4   back pain, and probably the nausea would be so severe that I

5   really couldn't function very well.  For my wife it would be

6   she would be in the emergency room within a week, and that's

7   based on previous history of eight, nine years.

8   Q    Mr. G████, have you ever had any complaints about Linden

9   Care?

10  A    I think only once.  And I think Linden Care is really a

11  very unique pharmacy based on what they do and a lot of other

12  reasons, I have nothing but praise.  But, yes, they missed a

13  medication and it slipped through the cracks, and that's the

14  only time I've been upset with anyone at Linden Care because

15  of the severity of missing medications.

16  Q    And did they rectify that when you brought it to their

17  attention?

18  A    Oh, yes.  Oh, yes, absolutely.  They, you know, in this

19  particular case they said, oops, we goofed, and we'll get it

20  to you.  And one of the unique things about Linden Care, they

21  will FedEx overnight priority, which means you can get it as

22  fast as is possible.  And finding it at a local pharmacy,

23  some of the drugs is near impossible.

24  Q    So you've looked at other pharmacies to where you can

25  get these drugs and haven't found any, is that right?

R██████ G████ - Direct - Mr. Cost

1    A    That's correct.  Over the years, over eight, nine years

2    we have found that the larger pharmacies have their benefits,

3    but they do not understand in particular pain management.

4    And I feel that they're controlled substances, and I

5    understand all of that and I appreciate all of that and I

6    support all of that, but it causes a movement of unfortunate

7    people like us for our needs to go toward the independent

8    pharmacies who are smaller and who can develop this expertise

9    and develop the inventory and develop the knowledge of what

10   patients like us need and go through.

11   Q    And besides filling your prescriptions, does Linden Care

12   provide additional services that you value?

13   A    No.  The only thing that Linden Care does is fills the

14   prescriptions and ships them out to us as prescribed by our

15   doctor.

16   Q    And again, do they take care of your authorizations?

17   A    They do.  Some pharmacies won't even touch insurance,

18   but Linden Care does as much as possible dealing with the

19   insurance company.

20   Q    Have you ever -- have you had any contact from Express

21   Scripts about Linden Care being terminated from its network?

22   A    None whatsoever.  I hear from Express Scripts every once

23   in a while.  I don't directly deal with them.  Sometimes I'll

24   get a note that says, Mr. G████, did you get controlled

25   prescriptions through the mail order process.  They'll say

1    it's not due yet, and, you know, basically keeping scripts up

2    to date.  They never said a word about Linden Care.

3    Q    Are you aware of any 1-800 numbers you can call at

4    Express Scripts?

5    A    Could you repeat that?

6    Q    Are you aware of any 1-800 numbers you can call at

7    Express Scripts for inquiries?

8    A    Oh, yeah.  Yeah.  I couldn't tell you what they are, but

9    whenever I need to, and one of the benefits of the big

10   companies is I can get drug history and all that kind of

11   stuff, and there is customer service, just like anything, you

12   dial the 800 numbers and you get voice activated response

13   system that take you, you know, forever to find somebody.

14   But yeah, I'm sure, I'm aware that they have them.

15   Q    Have you tried contacting Express Scripts with regard to

16   Linden Care's termination?

17   A    No, not at all.  No.  Express Scripts to me is not

18   really part of the picture other than other medications and

19   monitoring our medication history.  I don't really deal with

20   them direct at all.

21   Q    Is Linden Care continuing to fill your prescriptions?

22   A    Yes.  Last Monday they filled the prescription and I

23   have sent them some scripts that will be going out today and

24   I expect them to be able to -- I see no reason that they

25   won't fill those medications.

1    Q    Is part of the reason why you haven't contacted Express

2    Scripts because you're still getting your prescriptions

3    filled?

4    A    I haven't talked with Express Scripts at all for about a

5    year.

6    Q    My question is, is that reason because you're getting

7    your prescriptions still filled and there is still

8    continuity?

9    A    Yes, absolutely.  Linden Care has been fabulous to me.

10   And I'm sorry I don't mean to sound like that, but I have so

11   much experience as a patient and as a caretaker for my wife,

12   that Linden Care really honestly is a godsend.  Their

13   inventory, their staff, their knowledge, their commitment to

14   filling prescriptions on time, sending out shipments.  It's

15   by far the best independent pharmacy that I've worked with,

16   and I've probably worked with four of them over the last

17   eight years.

18   Q    If you can't use Linden Care any more, do you know what

19   you're going to do?

20   A    Well, probably, honestly suffer.  I'll watch my wife

21   suffer.  Take my wife to the ER within the next week or two

22   and go on the search for an independent pharmacy, going back

23   to my doctor's office or some other source to see if I can

24   find any pharmacy which will meet our needs.  I'm hoping it

25   doesn't happen.

R█████ G█████ – Direct – Mr. Cost                           117

1        MR. COST:  Thank you.  I have no more questions for

2   you.

3        THE COURT:  Ms. Hellman.

4   *CROSS-EXAMINATION BY MS. HELLMAN:*

5   Q    Mr. G█████?

6   A    Yes.

7   Q    Hello.  My name is Sarah Hellman.  I'm one of the

8   attorneys representing Express Scripts.  Can you hear me

9   okay?

10  A    Oh, yeah.  Absolutely Sarah, thank you.

11  Q    I just have a few questions for you today.

12  A    Sure.

13  Q    Mr. G████, it sounds like the last time you had a

14  prescription filled at Linden Care was last Monday, is that

15  correct?

16  A    I believe I said that's the date actually received it,

17  so it was probably filled the previous Friday.  I think.  I

18  would have to go back and look at my records, but that's I

19  think so.

20  Q    And I just want to be sure I'm clear.  When you say last

21  Monday, you're talking about almost two weeks ago, is that

22  right?

23  A    Actually, Tuesday, Friday.  No, actually last Monday.

24  Q    As in four days ago?

25  A    Yes.

R████ G████ - Cross - Ms. Hellman

1    Q    Okay.  That's what I was trying to understand.  And --

2    A    I'm sorry, unfortunately a lot of times we get some of

3    these medications on demand and that's one of the things

4    about Linden Care, and because of that I kind of lose track.

5    Q    And Mr. G████, how did you learn that Linden Care had

6    been terminated from the Express Scripts pharmacy network?

7    A    I learned about -- I was filling a prescription, maybe

8    it was the last one, maybe it was the previous week, things

9    got kind of strange with Linden Care.  There seems to be an

10   insurance problem.  There is always insurance problems so I

11   didn't think too much about it.  And then they were asking me

12   if I might contribute to something like an affidavit or

13   whatever, and I didn't really know what it was about.  And

14   then I talked with Mark Schumer about this request for the

15   written document, and he said I'm sure you've heard about

16   this, and I said, no, I haven't heard a thing.  So we went on

17   and talked about the document.  And I did that.  And then I

18   just searched on the web for Linden Care and Express Scripts

19   and I found it.  It was, well, more than one lawsuit at that

20   point.  So I found out about it after the fact of filing of

21   the Express Scripts lawsuit.

22   Q    Mr. P████ --

23   A    I found out about it from the VP of Linden Care.  I

24   found it from the web.  I went out and searched the web after

25   Mark said something.

R█████ G█████ - *Cross* - *Ms. Hellman*

1  Q    Mr. P█████, the VP of Linden Care reached out and asked

2  for you to I think you said give an affidavit, correct?

3  A    Well, Mindy, I forgot her right name, had asked me

4  questions about it.  I've been getting feedback from Linden

5  Care for I don't know about six months via surveys, via

6  requests, direct requests from some of the people there, and

7  I've always said, you know, I think you guys are great, if

8  there is anything I can do ever to help you to pay you back

9  in a way, not pay them, but to help them, I've been saying

10 that.  And then it came up, so I just said I'm glad you asked

11 me to do it because I've been asking how I can help for a

12 long time.

13 Q    And Mr. G█████, you did submit a typed written

14 declaration in this case, correct?

15 A    I had it notarized here in the State of Washington sent

16 to the office of Linden Care.

17 Q    And Mr. G█████, in that declaration you indicated that

18 after speaking with your doctor, you want to keep using

19 Linden Care, correct?

20 A    Yeah.  After speaking with my doctor I continued to use

21 Linden Care, that is correct.

22 Q    And I think --

23 A    I didn't quite hear what you said.

24 Q    I think you testified you wanted to keep using Linden

25 Care after speaking with your doctor because you like this

1  pharmacy, correct?

2  A    Yes.  Absolutely.  I can't life without Linden Care.  I

3  don't mean to be -- I'm passionate about it.

4  Q    And Mr. G████, do you know if there is any other -- the

5  smaller pharmacies that you talked about, do you know if

6  there is any smaller pharmacies in the country that can mail

7  these prescriptions to you?

8  A    I do not know of the name of a pharmacy that can do

9  this.  As I said over the last eight, nine years, I've gone

10 through a couple different independent pharmacies but

11 something always comes up, and because of the severe, rightly

12 so severe regulations on a lot of these medications, that

13 prescriptions, shipping medications across state just even

14 filling these sort of prescriptions in the quantity that my

15 wife needs, it's just I don't know where I would go.  I would

16 have no idea.  I would have to go back to the doctor's

17 office.  Drug representatives, you know, from different drugs

18 because it's not a question of pharmacy, it's a question of

19 what are the effective drugs especially for my wife.

20 Q    And Mr. G████, I think you've testified that you haven't

21 gone on Express Scripts' website or called them, correct?

22 A    I'm sorry, Sarah.

23 Q    Let me talk louder.  You testified that you haven't gone

24 on the Express Scripts' website or called Express Scripts,

25 correct?

R███  G███ – Cross – Ms. Hellman

1   A    I haven't done what with Express Scripts?

2   Q    Mr. G███, have you gone on the Express Scripts'

3   website, the one that you talked about earlier?

4   A    I'm sorry.  Yes.  I go on the website for Express

5   Scripts probably, probably once a week, if not every other

6   week, because being a big company, they have a marvelous

7   resource on the website, and it allows me to track our

8   medication and history and our costs al all that stuff.  So

9   it's actually, it's a tremendous resource for me.  And it's a

10  type of resource that independent pharmacies because of their

11  size I think that they can't provide.

12  Q    And have you gone on that website specifically to see

13  about an alternative pharmacy?

14  A    Not within, not within the time I've been using Linden

15  Care.  When my previously independent pharmacy, called

16  Evergreen Pharmacy, were going to close, and they weren't

17  sure how they were going to deal with closing, I did search

18  for alternate pharmacies.  I did not find -- I didn't find

19  anything that sounded right through the website of Express

20  Scripts, so at that point I said to my doctor, I said, look,

21  we pay you a lot of money to do stuff for us and I think you

22  need to do it.  It had to be done really honestly within a

23  week or to two.

24  Q    And Mr. G███, I'm just about done.  It sounds like

25  you've had some communications with the people at Linden

R████ G████ – Cross – Ms. Hellman                    122

1  Care.  Have they told you at any time in the past two weeks

2  that you may need to find an alternative pharmacy?

3  A    No, not at all.  Actually it's the opposite.  They have

4  committed to fill our medication needs and I've said to them,

5  look, if you need to tell me to find another way of filling

6  some or all of these medications, tell me as soon as possible

7  because of the urgency and severity of dropping care and the

8  time it takes to find.  They're a unique resource but

9  absolutely did not.

10           MS. HELLMAN:  Thank you, I have no further

11  questions.

12           THE COURT:  Mr. Cost.

13           MR. COST:  Nothing further, Your Honor.

14           THE COURT:  Thank you very much, Mr. G████.

15           THE WITNESS:  My pleasure.  Take care.

16           THE COURT:  Let me ask Ms. Clark and Mr. Cost, I

17  have read the affidavits from the patients.  This is taking a

18  little bit longer than I think we anticipated.  Unless there

19  is anything new from the patient.

20           Let me just ask Ms. Hellman, does Express Scripts

21  admit or stipulate that they've done nothing to notify

22  patients regarding the termination of Linden Care?

23           MS. HELLMAN:  We don't.  And Ms. Roberts is going

24  to testify to that exactly what steps have been taken.

25           MR. COST:  Your Honor, again, I would call these

R█████ G█████ – Cross – Ms. Hellman

1    other witnesses who I think would give that testimony.  I

2    believe some of them have submitted affidavits and

3    statements.  Again, Your Honor, I'm happy to elicit that

4    testimony.  But it's going to be the same thing each time, so

5    unless the Court desires to hear that same testimony four

6    more times, we would rest on our submissions.

7             THE COURT:  Thank you, Mr. Cost.  Any further

8    evidence or testimony for Linden Care?

9             MS. CLARK:  Yes, Your Honor.  I did name Bonnie

10   Roberts as a witness for Linden Care and so I'm going to call

11   her at this time.

12            THE COURT:  Ms. Roberts, could you come up and my

13   courtroom deputy will place you under oath.

14            THE CLERK:  Please state and spell your full name

15   for the record.

16            THE WITNESS:  Bonnie Roberts.

17            **BONNIE ROBERTS**, called as a witness and being

18   duly sworn, testifies as follows:

19   *DIRECT EXAMINATION BY MS. CLARK:*

20   Q    Good afternoon, Ms. Roberts.

21   A    Good afternoon.

22   Q    Ms. Roberts, can you please tell us what your current

23   position is at Express Scripts?

24   A    Yes, I'm the director of provider credentialing.

25   Q    And is there a particular network that you oversee in

*Bonnie Roberts - Direct - Ms. Clark*

1    that capacity?

2    A    It's primarily the retail provider network.

3    Q    Express Scripts has a number of different networks, is

4    that right?

5    A    Yes, there are a number of different networks.

6    Q    Can you just give us an overview of the different

7    networks?

8    A    Sure.  There are custom networks for specific clients.

9    There are general networks are going to contain 65,000 or so

10   retail pharmacies, and those may be chain drugstores, they

11   may be grocery stores, independent pharmacies as well.  It's

12   going to -- we have long term care networks, we have home

13   infusion networks, we have specific specialty Medicare

14   networks as well.

15   Q    Are there any general specialty networks?

16   A    General specialty?

17   Q    Right.

18   A    No.

19   Q    And Express Scripts is a large corporation, correct?

20   A    Yes, we are.

21   Q    I think it's about the 20th biggest corporation in the

22   country, is that about right?

23   A    Yes.

24   Q    Multi-billion dollar entity, right?

25   A    Yes, that's correct.

*Bonnie Roberts - Direct - Ms. Clark*

1   Q     How many employees?

2   A     Approximately 30,000 employees.

3   Q     Including quite a hub here in Troy, New York, correct?

4   A     Yes, that's correct.

5   Q     And how many clients does Express Scripts serve?

6   A     I don't have the exact number.  There are thousands of

7   clients that we service, though.

8   Q     And the clients are HMOs and payers of all sorts, is

9   that fair to say?

10   A     That is correct, payers of all sorts.  The managed

11   health care organizations, health plans, independent

12   businesses, as well as government entities such as the

13   Department of Defense.

14   Q     And is it Express Scripts' role to serve those clients

15   by assembling a network of pharmacies to serve their members?

16   A     That is one of the benefits that we bring to our

17   clients, yes.

18   Q     And does Express Scripts function in all states?

19   A     Yes.  Could I ask a question?

20   Q     Sure.

21   A     When you say function in all states, could you clarify?

22   Q     Operate.

23   A     Do we operate in all states?  Yes, I believe so.

24   Q     And does every state have its own set of laws that apply

25   to managed care networks?

*Bonnie Roberts - Direct - Ms. Clark*

1   A    I can't answer that question.  I don't know.

2   Q    You're just the wrong person?

3   A    I'm the wrong person.

4   Q    Who would be at Express Scripts that could come tell us

5   under oath what the network of state laws are that govern the

6   provision of Express Scripts services as part of a managed

7   care network?

8   A    I'm not sure.  I'm sure that there is someone in our

9   legal department or compliance department that could talk to

10  you about that, but I'm not the right person.

11  Q    So you have a compliance department and that compliance

12  department would deal with state regulatory and compliance

13  issues, is that fair to say?

14  A    That sounds right.

15  Q    Generally speaking, am I right that Express Scripts

16  deals with clients that have their own formularies?

17  A    Some clients have their own formularies, we would call

18  them custom formularies.  We also have the national preferred

19  formulary that we introduce to clients.

20  Q    How do clients decide what their formulary is going to

21  be?

22  A    They make those decisions, and I'm sure they make them

23  in a variety of different ways based on who their

24  beneficiaries are.  I couldn't tell you how those clients

25  make those decisions.

*Bonnie Roberts – Direct – Ms. Clark*

1      THE COURT:  Could you describe what a formulary is?

2      THE WITNESS:  Sure.  A formulary is a list of

3  preferred prescription medications that either a client or

4  somebody like Express Scripts benefit manager has documented.

5      THE COURT:  Thank you.

6  Q    A menu basically of the drugs that are covered by the

7  plan?

8  A    That's correct.

9  Q    And so the members of the plan pay a premium of some

10 kind typically, unless it's Medicaid or Medicare, right?

11 A    Typically, yes.

12 Q    In exchange they bargain for, among other things,

13 prescription drugs that are on that menu or formulary, right?

14 A    In its simplest form, yes.

15 Q    And then it's up to Express Scripts to find a way to get

16 the patients the drugs that are on the formulary, right?

17 A    I'm not sure I understand your question.

18 Q    Well, is it Express Scripts' responsibility to make

19 arrangements with the creation of a pharmacy network so that

20 patients have access to the drugs that they're entitled to on

21 the formulary that applies to their plan?

22 A    Yes.  Express Scripts puts together a network of

23 pharmacies that patients can use.  Patients can choose to,

24 they can choose preferred or non-preferred items, that is up

25 to them.  They may pay a little bit more for a non-preferred

*Bonnie Roberts - Direct - Ms. Clark*

1    item.  It is really a patient choice.

2    Q    And what is prior authorization?

3    A    Again I'm not the right person to speak to you about

4    prior authorization.  I've worked at the company long enough

5    that I know a little bit.  And, in general, a prior

6    authorization is going to be permission to use a

7    non-formulary item.

8    Q    And how does one go about getting prior authorization?

9    A    Again, that's not my department.

10   Q    Well, you're aware that there is some kind of

11   administrative process that needs to be accomplished,

12   correct?

13   A    Yes.

14   Q    And it involves communication with the doctor, sometimes

15   communication with the pharmacy to figure out if that patient

16   is appropriate and eligible for the drug in question that the

17   doctor wants the patient to have, right?

18   A    You've described it as generally as I can.

19   Q    Okay.  How does Express Scripts get paid?

20   A    I'm not in the finance department and I can't speak to

21   you how Express Scripts gets paid.

22   Q    How many years have you been at Express Scripts?

23   A    Twenty years.

24   Q    Have you held any other positions besides director of

25   credentialing?

*Bonnie Roberts – Direct – Ms. Clark*

1    A     Yes, I have.

2    Q     And what are those other positions?

3    A     I was the -- well, for about 11 years I worked at a

4    department that managed and administered patient assistance

5    programs for pharmaceutical manufacturers.

6    Q     And what company was that?

7    A     It was with Express Scripts, subsidiary of Express

8    Scripts.

9    Q     What's a patient assistance program?

10   A     Those are programs that manufacturers of pharmaceuticals

11   generally have in place for the uninsured population.

12   Q     It's basically a program that helps patients, assists

13   patients in getting their medications, is that right?

14   A     It is a program that would -- that a particular

15   manufacturer would have, and the subsidiary I worked for as

16   part of Express Scripts managed those programs.  For example,

17   Pfizer, if they had a list of medications that they felt were

18   appropriate that they wanted to offer for free to uninsured

19   members, uninsured patients, then the programs I worked for

20   would administer the program.  We would have call centers

21   and, you know, applications that patients would have to fill

22   out to show that they were eligible would come through us.

23   Q     Have you had any other positions with Express Scripts?

24   A     When I first started I was a nurse liaison in the home

25   infusion area.

*Bonnie Roberts – Direct – Ms. Clark*

1    Q    So do you have nursing background?

2    A    I do.

3    Q    And what is your degree?

4    A    I just have a –– I'm a registered nurse.

5    Q    And in what state were you?

6    A    I was registered in Texas, Massachusetts and in

7    Missouri.

8    Q    So are you telling us that you don't have any

9    information about how Express Scripts gets paid by its

10   clients?

11   A    I'm telling you that I don't work in the finance

12   department of Express Scripts and I would not be able to tell

13   you with any type of accuracy how that payment system works.

14   Q    You're aware that there is a number of different

15   compensation arrangements, right?

16   A    Yes.

17   Q    And you're aware that one of the compensation

18   arrangements involves Express Scripts benefiting in some way,

19   whether it's a percentage or something else, when they bring

20   in drug costs for the plan at a certain level?

21   A    I can tell you that the mission of Express Scripts, what

22   it has always been, is to make prescription drugs safer and

23   more affordable to the members of our clients.

24   Q    Well, that's an answer to a different question.  Can we

25   please read back?

*Bonnie Roberts – Direct – Ms. Clark*                    131

1              (Whereupon the record was read back by the court

2                 reporter.)

3   A    I don't work with directly with the clients.  I don't

4   work in the finance department and I'm unable to answer your

5   question.

6   Q    So you're not aware that that's a component of Express

7   Scripts compensation arrangement?

8   A    No, I am not.  It's outside of my scope.

9   Q    Are you aware or would you have any basis to disagree

10  with the fact that Express Scripts also benefits from rebate

11  arrangements with manufacturers?

12  A    Yes, I believe they do, but I believe many of those

13  benefits are also passed on to clients.

14  Q    Many but not all, correct?

15  A    I can't answer that question.  I don't know.

16  Q    Are you aware that Express Scripts has been investigated

17  and has reached settlements with prosecutorial authorities as

18  a result of improper diversion of rebates?

19  A    No, I'm not personally aware of that.

20  Q    Does Express Scripts benefit financially in any way from

21  sending patients to its own captive pharmacies?

22  A    Express Scripts has pharmacies that are subsidiaries of

23  the larger corporation.  You've called them a captive

24  pharmacy and I don't know that I would agree with that term.

25  Q    They're wholly owned pharmacies, right?

*Bonnie Roberts – Direct – Ms. Clark*

1  A    That's my understanding.  But again, you know, I have a

2  scope of work that I do within my job and I really don't want

3  to guess at any of the answers that you're looking for.

4  Q    Well, certainly you understand that Express Scripts is

5  not only managing the benefits for the members of the plan

6  but that it also has subsidiaries that compete with the

7  pharmacies that it's managing, fair enough?

8  A    No, we really don't have any pharmacies that compete

9  with a retail pharmacy.

10 Q    Do you have any pharmacies that provide the same drugs

11 that retail pharmacies provide?

12 A    We have, yes, we have mail order facilities that would

13 provide the same types of products, yes.

14 Q    And these mail order facilities, these are large

15 distribution centers, correct?

16 A    Yes, in general.

17 Q    I can't walk in there and hand in a prescription, can I?

18 A    No.

19 Q    And they have robotics and very sophisticated means of

20 packaging and shipping via mail or otherwise drugs, right?

21 A    Yes.

22 Q    And do those mail order pharmacies compete in the same

23 market as retail pharmacies and other independent pharmacies?

24       MS. HELLMAN:  Objection, Your Honor.  This has been

25 going on, I mean it's 2:30 today, and we're getting way

1   outside the scope of their complaint and what we're here on

2   today.

3          MS. CLARK:  May I, Your Honor?

4          THE COURT:  Yes.

5          MS. CLARK:  This is a central issue, conflict of

6   interest that implicate Section 4406-d, the mandatory clause

7   to the Public Health Law and the addenda that are part of the

8   Express Scripts' contract are there to deal with this

9   conflict of interest that I'm establishing, and we have

10   antitrust claims which are highly relevant here.

11          THE COURT:  I understand, but I don't think this

12   witness is the proper person with respect to the questions

13   you're asking.

14          MS. CLARK:  Okay.

15          THE COURT:  Sustained.

16   Q    Who's in charge of reviewing information provided by

17   pharmacies to ensure compliance?  Would that be you?

18   A    What type of compliance are you referring to?

19   Q    Let's talk about compliance.  Is there a department at

20   Express Scripts that looks at compliance with Express

21   Scripts' requirements and standards?

22   A    In order to contract with Express Scripts?

23   Q    No.  In order to monitor compliance.

24   A    That would be the audit department.

25   Q    Okay.  Does your department have any responsibility for

1   monitoring compliance with Express Scripts standards that

2   apply to pharmacies?

3   A    My department reviews the provider certifications that

4   pharmacies submit upon application to become a network

5   pharmacy within Express Scripts, and we also review

6   credentialing on an ongoing basis of pharmacies to ensure

7   that they are appropriately licensed and have not been

8   federally or state excluded.

9   Q    And in terms of the credentialing process, do you

10  communicate with the audit department regarding the results

11  of any audits?

12  A    On rare occasions.

13  Q    So if there is an audit that revealed a problem of some

14  kind, that could be communicated to the credentialing

15  department and they would deal with that through the

16  credentialing process, right?

17  A    On occasion the audit department will ask for

18  information that we may have obtained through the

19  credentialing process, such as licensure.

20  Q    And does the credentialing department in determining

21  which pharmacies are going to stay in the network and what

22  pharmacies are going to be terminated have access to the

23  information that is developed by the audit department?

24  A    We have access to limited information from the audit

25  department.

*Bonnie Roberts – Direct – Ms. Clark*

1  Q    So let's say the auditors find fraud during an audit.

2  That's something that would be relevant to the credentialing,

3  correct?

4  A    No, that would not be my department.  It would go to the

5  fraud, waste and abuse department.

6  Q    If they uncovered a practice that did not meet Express

7  Scripts' credentialing standards, that would be communicated

8  to the credentialing department, right?

9  A    Yes.

10  Q    And you would have files of some kind, right, with that

11  information, if you had any, from the audit department

12  showing some significant departure in terms of compliance

13  with Express Scripts' standards, right?

14  A    Yes.

15  Q    Is it a written file or an electronic file?

16  A    Maybe we could talk about what audit does in general.

17  Q    Well, your attorney will have plenty of time to ask you

18  questions.  I'm going to ask my questions.

19       So this credentialing file that you developed to look at

20  the credentials of a provider, is this a written file or an

21  electronic file?

22  A    We have electronic files.

23  Q    What would be in that file besides anything from the

24  audit department that was an indicator of some significant

25  departure from compliance standards?

*Bonnie Roberts – Direct – Ms. Clark*

1   A     I'm not aware of any information that is in any of the

2   credentialing files that would have been submitted from the

3   audit department that would speak to significant departures

4   from our contracts.  What is in those files is the due

5   diligence that we do, the proof that we checked the OAG, the

6   proof that we checked the GSA, the proof that we checked the

7   state Medicaid license, the proof that we looked at the Board

8   of Pharmacy license for the pharmacy and for the pharmacist

9   in charge for each of the states that the pharmacy may have

10  indicated they hold license.  It also includes insurance

11  information and the provider certification that they have

12  signed and sworn to.

13  Q     Let's take a specific scenario.  If the auditors come in

14  to determine compliance with Express Scripts standards,

15  everything from form of prescriptions to verifying delivery,

16  right, those are the kind of things that Express Scripts

17  requires providers to do and comply with to submit claims,

18  right?

19  A     Yes.

20  Q     And let's say they find that there is a problem, there's

21  a pharmacy that is shipping into a state on a significant

22  scale without a license.  Would the audit department report

23  that to the credentialing department?

24  A     No, would probably report it to the fraud, waste and

25  abuse.

*Bonnie Roberts - Direct - Ms. Clark*                    137

1  Q    Would they also report it to the credentialing

2  committee, so it could be taken into consideration when the

3  credentialing department looks at the status of the provider

4  and makes a determination of whether or not they want them to

5  stay in their network?

6  A    If the situation is found, it would probably be

7  addressed right away by the appropriate departments within

8  Express Scripts.

9  Q    Would that kind of information be part of the limited

10 information that the people in your department get to make a

11 decision about whether or not to keep a pharmacy in your

12 network?

13 A    No.

14 Q    Okay.  So you have the auditors out there interpreting

15 the Express Scripts' Provider Manual, guidelines, billing

16 requirements, right, and providing feedback to the pharmacy.

17 But that information is not communicated to the credentialing

18 department, is that what you're saying?

19 A    Credentialing is separate and apart from the audit team.

20 Q    Right.  So they don't communicate?

21 A    On a rare occasion we may communicate.

22 Q    Would something like shipping out of state be the kind

23 of thing that would be communicated?

24 A    I believe I've already answered that question.  It would

25 not come to my department.

*Bonnie Roberts – Direct – Ms. Clark*

1   Q    What if you had a pharmacy that upon audit that under

2   one view of things was using home delivery in violation of

3   Express Scripts' standards, would that be the type of thing

4   that would be reported to the credentialing department to

5   determine if they wanted them in the network?

6   A    The audit department does not usually at whether or not

7   a pharmacy is shipping into another state that I'm aware of.

8   Q    Well, the audit department looks at whether or not

9   they're shipping, correct?

10  A    I don't know.

11  Q    Do you know one way?  You were in the courtroom earlier,

12  right, when the witnesses were talking about the Express

13  Scripts audits and everything they looked at.  Do you have

14  any reason to disagree with the testimony earlier that

15  Express Scripts audits regularly the delivery documentation

16  of a pharmacy to verify that the person got the drugs?  Are

17  you disagreeing with that?

18  A    No, I am not disagreeing with what Express Scripts does,

19  the audit department does check to ensure that the patients

20  have received the medications that are shown on the claim.

21  Q    Right.  And the auditors are responsible for

22  interpreting and applying all of the standards that are

23  incorporated into the Express Scripts Provider Manual,

24  correct?  Those are the standards they use for auditing,

25  right?

*Bonnie Roberts - Direct - Ms. Clark*

1   A     I don't know what the standards are that the auditors

2   use.

3   Q     Well, certainly if the credentialing department is using

4   the same Provider Manual as the auditing department, they

5   should be applying the same interpretation of standards,

6   right?  We shouldn't have the credentialing department having

7   a different interpretation of a term than the auditing

8   department, right?

9   A     Ms. Clark, I'm not in the audit department so I can't

10  speak to their policies and procedures.

11  Q     Right.  But you would agree with me that you would want

12  those two departments using the same interpretation of

13  standards, right?  You wouldn't want a different standard

14  used for credentialing than the standard that was used for

15  auditing, right?

16  A     They're really two different things in my opinion.

17  Q     So it would be okay with you if the auditing department

18  was interpreting, for example, the term mail order pharmacy

19  differently than the credentialing department?  That would be

20  acceptable from your perspective?

21  A     Again, I don't know policies and procedures of the audit

22  department.  I'm not sure what their checklist of things

23  looks like that they're looking for and how they're matching

24  that with the contracts that are held with each individual

25  pharmacy, so I can't speak to your question.

*Bonnie Roberts – Direct – Ms. Clark*                    140

1        THE COURT:  Counsel, let's move on to what this

2    witness does within the scope of her job.

3        MS. CLARK:  Okay.

4    Q    What investigation did Express Scripts do before they

5    decided to terminate without notice Linden Care from its

6    network?

7    A    I'm not an investigator.

8    Q    Well, you're responsible for the credentialing, right?

9    A    Yes.

10   Q    And you were responsible for, in part for making this

11   decision to kick Linden Care out of the network with no

12   notice to Linden Care, right?

13   A    Yes.  I was part of the discussions.

14   Q    Part of discussions.  Who was involved in those

15   discussions?

16   A    There were a number of people involved in the

17   discussions, a number of departments.  Our fraud, waste and

18   abuse team was involved in looking at the claims data.  We

19   had our retail contracting team look at the contract that is

20   held with Linden Care.  My team pulled the credentialing

21   documents to look at information we had directly from Linden

22   Care.

23   Q    And you say claims data.  Are we talking about data that

24   would indicate Linden Care's prescription dispensing habits?

25   A    Yes.

*Bonnie Roberts - Direct - Ms. Clark*                    141

1    Q    And when we're talking about claims data, are we talking

2    about claims data that might indicate how much business that

3    Linden Care was doing with a particular manufacturer?

4    A    Well, when we would see the types of medications that

5    were dispensed and it could easily be tied back to which

6    manufacturers those products come from.

7    Q    Right.  So you can look at what's being prescribed and

8    who the manufacturer is, right?

9    A    Yes.

10   Q    And one of the significant concerns with respect to

11   Linden Care in review of the claims data was that Linden Care

12   was doing a lot of business with a manufacturer named

13   Horizon.  That was a significant concern, wasn't it?

14   A    Yes.  It came to our attention, yes.

15   Q    Is there anything in the Provider Manual that

16   specifically would tell a pharmacy that there is only a

17   certain amount percentage of business that they can have with

18   a particular manufacturer?

19   A    I'm not that familiar with the Provider Manual to be

20   able to speak to every aspect of it.

21   Q    You don't know of any, do you?

22   A    I do not know of any, but there are many things in the

23   Provider Manual that I am not familiar with.

24   Q    Let's talk about what you do know and we'll move on from

25   there.  So this was a concern that Linden Care was doing a

*Bonnie Roberts – Direct – Ms. Clark*

1    lot of business with Horizon, right, and that played a part

2    in determining whether or not they were going to be

3    terminated from the network, correct?

4    A    The termination notice that we issued to Linden Care was

5    based on the fact that we learned they were shipping into a

6    state that they were unlicensed in and that they were

7    primarily acting as a mail order pharmacy and not a retail

8    pharmacy, under which they were contracted as a retail

9    pharmacy.

10   Q    Well, we have the termination letter and we know what

11   was in there.  I think you acknowledged that a separate

12   concern was the fact that Linden Care was doing too much

13   business with Horizon.  Is that correct or not?

14   A    It was information that we found as we looked further

15   into the data.

16   Q    Why were you concerned about that?

17   A    It gives us pause.  I mean we read an article in the New

18   York Times in October that specifically mentioned Linden Care

19   and potential relationship with Horizon Pharma.

20   Q    And what relationship were you concerned about?  Did you

21   have information that Horizon owned any part of Linden Care?

22   A    No, not that I'm aware of.

23   Q    And we know that Express Scripts owns its pharmacies,

24   right?

25   A    Yes.

*Bonnie Roberts – Direct – Ms. Clark*                 143

1   Q     There is no information that Horizon had any interest at

2   all in Linden Care, correct?

3   A     Not that I'm aware of.

4   Q     And is there any standard anywhere in the Provider

5   Manual or in the Provider Agreement that limits the amount of

6   business that a pharmacy can do with a particular

7   manufacturer before it is termed a captive?

8   A     The term captive is new to me and so I don't think that

9   there is anything in the Provider Manual that speaks to a

10  captive pharmacy.  But again, I'll go back to there are many

11  things in the Provider Manual that I'm not familiar with.

12            THE COURT:  Ms. Roberts, you said there was a

13  concern about Linden Care and Horizon based upon the New York

14  Times article.  What was that concern?

15            THE WITNESS:  We wanted to make sure that there

16  wasn't an ownership relationship with Horizon Pharma and

17  Linden Care Pharmacy because that would be inappropriate.

18  Q     And how did you go about finding out or investigating

19  whether or not there was a relationship, an ownership

20  relationship?

21  A     That wasn't something I participated in.

22  Q     Did you participate in those discussions?

23  A     No.

24  Q     Do you know what the outcome was of those discussions?

25  A     My understanding is that there was not an ownership

1    relationship found.

2    Q    Okay.  Are you familiar with the statements that Express

3    Scripts has made in its releases to the media regarding the

4    fact that Linden Care was terminated because, quote, "It

5    predominantly dispensed Horizon prescription drugs and did

6    not fulfill key components of the pharmacy network

7    agreements"?

8    A    I'm familiar with what is stated.

9    Q    And is there anything in the Provider Agreement or in

10   the manual that you know of, and I know you don't know every

11   word of that 200 plus page single-spaced document any more

12   than anyone could, but is there anything in that manual that

13   says that pharmacies that predominantly dispense a given

14   manufacturer's drugs are committing some kind of improper

15   practice?

16   A    Well, if the products are formulary items and, you know,

17   the pharmacy is using its best practices to adhere to the

18   formulary of a patient, then I don't think that there is

19   anything wrong with that.  But we have found that those best

20   practices may have been used in trying to adhere to patient

21   formulary.

22   Q    Now you're saying that there was some departure from

23   formulary standards that caused Linden Care at least in part

24   to be terminated, is that right?

25   A    No.  What I'm saying is that would be one of the

*Bonnie Roberts - Direct - Ms. Clark*

1    concerns.

2    Q    And did anybody investigate that concern as it related

3    to Linden Care?

4    A    I don't know.

5    Q    Did the termination letter to Linden Care include the

6    concern that Express Scripts put in its press releases that

7    Linden Care was terminated because it predominantly dispensed

8    Horizon prescription drugs, was that in the termination

9    letter?

10   A    No, it was not.  It was additional information I believe

11   that was learned after the termination letter was issued.

12   Q    And more specifically, is there anything in the Provider

13   Agreement or the Provider Manual saying that a provider can't

14   predominantly dispense a given manufacturer's drug?

15   A    Not that I'm aware of.

16   Q    That doesn't exist, does it?

17   A    Not that I'm aware of.

18   Q    Did Express Scripts reach out in any way to Linden Care

19   to get information about its relationship with Horizon and

20   their conclusion that Linden Care was functioning as a,

21   quote, "captive pharmacy"?

22   A    I don't know if there were discussions held.  I don't

23   know if anyone reached out to Linden Care to speak to them.

24   I'm not aware of anyone speaking to Linden Care personnel.

25   Q    You have no reason to believe that there was any

1   communication with Linden Care at all on that issue that

2   became a subject of the press releases issued by Express

3   Scripts, correct?

4   A    I'm not aware of the communication.  I'm aware of the

5   data that we saw, you know, in the number and the percentage

6   of patient prescriptions that were filled that were for a

7   single manufacturer.

8   Q    And in the Provider Agreement there is actual a process

9   that is identified for resolving issues of concern, correct?

10  They can be raised with the provider and even notice can be

11  given to the provider of the concern, the provider comes back

12  provides information and has an opportunity to cure the

13  issue, correct?

14  A    Those do exist, yes.

15  Q    And those are right in the Provider Agreement, and

16  that's a process that's ongoing between Express Scripts and

17  the members of their pharmacy networks, correct?

18  A    Could you repeat the question?

19  Q    That notice and opportunity to address and cure is a

20  common occurrence between Express Scripts and its pharmacies,

21  correct?

22  A    I believe it depends on the severity of the findings.

23  Q    Okay.  Had there been other pharmacies where there has

24  been a concern about, for example, out of state shipping

25  where there has been an attempt to communicate with the

*Bonnie Roberts – Direct – Ms. Clark*

1  pharmacy regarding the circumstances of those findings before

2  they were terminated?

3  A    I don't know.  I'm in one department.

4  Q    And so isn't it true that under the Provider Agreement

5  most issues are subject to the provision, most issues of

6  concern that can come up in your department can be resolved

7  through this provision of the Provider Agreement where the

8  provider gets notice of the problem and an opportunity to

9  cure.  Can you tell me the kinds of things that are resolved

10 that way?

11 A    We might issue a cease and desist order if we find that

12 a pharmacy is taking an action that they are not supposed to.

13 If they fail to comply with that then they would be

14 immediately terminated.

15 Q    And in this case did Linden Care get a cease and desist

16 order with respect to the Maryland issue?

17 A    I don't think there was a Maryland issue that we

18 discovered.

19 Q    Okay, let me step back a little bit.  I'm probably

20 getting a little ahead of myself here.  One of the issues in

21 the termination agreement was that there was a -- there was

22 no license in Maryland for Linden Care?

23 A    Correct.

24 Q    And was there any opportunity to respond or cure

25 provided to Linden Care for that item?

*Bonnie Roberts - Direct - Ms. Clark*                   148

1  A    No.  What we found was that Linden Care did not have a

2  license in California, that they had -- they were breaking

3  the law in California and we felt that severe enough to take

4  action.

5  Q    That's really not my question.  One of the items in the

6  termination letter said that Linden Care doesn't have a

7  license in Maryland and that's one of the reasons it's being

8  terminated, am I right?

9  A    Yes, you're right.

10 Q    As it turned out, Express Scripts was wrong about that,

11 weren't they?

12 A    Yes, we were wrong.

13 Q    There is item number one.  Item number two, the

14 California shipments, did Express Scripts reach out in any

15 way to Linden Care to communicate with them regarding why and

16 how those prescriptions went to California?

17 A    Not that I'm aware of.

18 Q    Are you aware that Linden Care has a sister pharmacy in

19 California?

20 A    Yes.

21 Q    Was there any effort to determine whether or not there

22 might have been an error made in Express Scripts' records

23 regarding those shipments that Express Scripts thinks were to

24 California residents from a New York pharmacy?

25 A    I'm not aware of any communication.

*Bonnie Roberts – Direct – Ms. Clark*

1   Q    They just terminated, right?

2   A    Yes.

3   Q    Okay.  And the third issue was the mail order issue,

4   right?

5   A    Yes.

6   Q    And in Linden Care's case they had a retail pharmacy

7   contract, right?

8   A    Correct.

9   Q    Can you tell me how it came about that Linden Care

10  received a retail pharmacy contract?

11  A    That is the contract they applied for.

12  Q    Were you involved in that process?

13  A    No, not in 2009.

14  Q    So you can't tell us in any way what Linden Care's

15  discussions might have been with Express Scripts about which

16  of all of these pharmacy networks you've talked about they

17  might best fit into?  You can't tell us anything about that,

18  can you?

19  A    I can tell you what they submitted on their provider

20  application in 2009.

21  Q    Yes.  That is not my question.  My question is, you

22  can't tell us what the interaction was between Express

23  Scripts and Linden Care at the time that they were provided

24  with and supplied an application for the retail network, can

25  you?

*Bonnie Roberts - Direct - Ms. Clark*

1          MS. HELLMAN:  Objection, Your Honor.

2   Q    No information about that?

3   A    In 2009, no.

4          THE COURT:  Overruled.

5          MS. HELLMAN:  Thank you.

6   Q    And in the provider -- in the Provider Manual, is there

7   any prohibition against using home delivery as a means of

8   getting prescriptions to patients?

9   A    In the Provider Manual?

10  Q    Right.

11  A    There is not that I can think of in the Provider Manual,

12  but there is in the Provider Agreement.

13  Q    And does it say in the Provider Agreement that a retail

14  network pharmacy can never send by overnight mail or other

15  means a prescription for home delivery?  Doesn't say that,

16  does it?

17  A    It does not say that.  What it does --

18  Q    Thank you.  Really what we're talking about is that in

19  the Provider Agreement there is a definition of retail

20  pharmacy, correct?  That's what you're talking about?

21  A    Yes, there is a definition.

22  Q    Right.  But however, beyond that definition there is no

23  prohibition regarding the means -- or direction regarding the

24  means of delivery to a patient, right?

25  A    Not that I'm aware of.

*Bonnie Roberts – Direct – Ms. Clark*                    151

1   Q     And am I right that many retail pharmacies in the

2   Express Scripts network use routinely overnight delivery or

3   courier and other means to get their prescriptions to their

4   patients?

5   A     I'm sure that they do, yes.

6   Q     Is there anywhere in the agreement that sets, for

7   example, a threshold percentage of the amount of home

8   delivery that a provider can use and still be in the retail

9   network?

10  A     There is not a percentage indicated.

11  Q     Do you know what that percentage is?  Did your

12  department have one in mind?  Is it 50 percent, 40 percent,

13  60 percent, or is it more you know it when you see it?

14  A     My department upon with pharmacies applying to be in our

15  network, if a pharmacy indicates that they are 10 percent or

16  more mail order, they would not qualify to be a retail

17  pharmacy or qualify for a retail contract.

18  Q     Well, in the Linden Care credentialing document that

19  Express Scripts provided, which is an exhibit, there was a

20  disclosure of 39 percent mail order.  You're aware of that,

21  right?

22  A     It was in a re-credentialing document yes.

23  Q     Yet they were re-credentialed and approved for the

24  retail network, right?

25  A     They were 39 percent local and out of state.

*Bonnie Roberts - Direct - Ms. Clark*                                  152

1    Q    And that's almost 400 times more than the 10 percent

2    threshold that your department has unpublished internally as

3    a guideline, is that right?

4    A    It is more, yes.

5    Q    When you were re-credentialing them a few years ago when

6    they were at 39 percent, did anybody reach out to Linden Care

7    and communicate to them that Express Scripts had this

8    internal guideline regarding the amount of overnight delivery

9    that would be tolerated with a retail network pharmacy?

10   A    Not that I'm aware of.

11   Q    Is that threshold published anywhere on the Express

12   Scripts' website in the provider area where there is guidance

13   to providers?

14   A    It is not published.

15   Q    And in large metropolitan areas like downstate New York,

16   there are a lot of retail pharmacies that predominantly use

17   delivery services to get their drugs to their patients,

18   aren't there?

19   A    Well, I consider delivery services very different than

20   mail order.

21   Q    Well, Linden Care didn't use U.S. mail, did it?

22   A    I don't know.

23   Q    Well, as part of your investigation before you

24   terminated Linden Care with no notice, was there any effort

25   made to determine how Linden Care was delivering?

*Bonnie Roberts - Direct - Ms. Clark*                    153

1   A    I personally did not have any investigation into how

2   they were delivering.

3   Q    So you don't have that information and you didn't know

4   it when you made the determination to terminate Linden Care,

5   did you?

6   A    I'm not sure that there is a distinction between using

7   the mail and using U.S. Postal Service and using other

8   delivery services if you're shipping outside of the state.

9   Q    So in your mind it's the shipping outside of the state

10  that's the important factor in this determination of whether

11  or not someone's properly using home delivery in a retail

12  network?

13  A    That's a significant part of it, yes.

14  Q    And where is that published?  Is that in the Provider

15  Manual?

16  A    It is not in the Provider Manual.

17  Q    Is it on the website anywhere?

18  A    It's in the definition of a retail provider that is in

19  the Provider Agreement.

20  Q    Now Express Scripts doesn't have a problem with mail

21  order, right?  I mean, Express Scripts does a tremendous

22  business through its mail order pharmacies, right?

23  A    That's exactly right, yes.  We have different standards

24  for mail order pharmacies versus retail pharmacies.

25  Q    So it's not that -- it's not that Express Scripts

*Bonnie Roberts – Direct – Ms. Clark*                    154

1  doesn't want drugs, quote, unquote, "mail ordered," it's that

2  Express Scripts wants to be the entity that does the mail

3  ordering, right?

4  A    No.  We want to make sure that we have pharmacies that

5  are appropriately contracted in our network.  If a pharmacy

6  is going to act as a mail order pharmacy, they can apply to

7  Express Scripts to be a mail order pharmacy.

8  Q    Well, wouldn't it make sense to tell the provider if

9  they disclosed to you that they have 40 percent home

10  delivery, wouldn't it make sense when your auditors come in

11  and receive the files of FedEx delivery documentation clearly

12  disclosing that they're using home delivery, to give them

13  that information about these internal standards and

14  thresholds so they can decide if they want to apply to the

15  mail order network?

16  A    If an auditor was looking at the information or the data

17  of the dispensing patterns of the pharmacy in the aggregate,

18  yes, that makes sense.  But an auditor usually has a select

19  list of claims that they're looking at and they are not

20  looking at the data in the aggregate.

21  Q    So are you saying that auditors do not -- are not

22  familiar with the standard that you've articulated for the

23  threshold of home delivery that is tolerated by Express

24  Scripts in the retail network?

25  A    I'm saying that auditors audit one claim at a time.

1  They don't look at the aggregate data of, you know, the

2  dispensing patterns of a pharmacy, so an auditor if on site

3  at Linden Care or looking at claims coming through the

4  system, they're looking at one claim at a time and they do

5  not audit 100 percent of the claims.  They have algorithms

6  that they use to identify if a claim might look odd, if there

7  is -- it looks like there is an extra zero on the end of it.

8  Those are the types of things that the audit department does,

9  as I understand it.

10  Q    Does the audit department look at whether or not

11  someone's violating a requirement of the Provider Agreement

12  or the Provider Manual with respect to improper delivery

13  methods?

14  A    The audit department looks at -- they are auditing

15  claims for appropriateness of the claim and they are not

16  auditing against the contract.

17  Q    So auditors, for example, wouldn't pick up if someone

18  was shipping out of state?

19  A    Again, they may see a claim that is out of state.  They

20  are not looking at the aggregate information.

21          MS. HELLMAN:  Your Honor, I'm sorry to interrupt, I

22  just looked at the time, it's 3:00.  I just want some sense,

23  it's been five hours, we haven't started our case.  I know

24  there was some questions that the Court wanted to address, so

25  just a sense of when we stop today.  I'm just getting -- I

*Bonnie Roberts - Direct - Ms. Clark*                    156

1    want to have a chance to be able to put on our case as well.

2         THE COURT:  Let me just say that the Court has to

3    end today at 5:00.  I'm happy to continue this into Monday

4    morning, but I did have a number of questions and I think we

5    need to give the court reporter a break.  So let me ask how

6    much more time do you need, Ms. Clark, and how much time do

7    you anticipate that you need, Ms. Hellman?

8         MS. CLARK:  I have about a half an hour, give or

9    take, but it depends on how it goes.

10        MS. HELLMAN:  And probably at least an hour, at

11   least an hour and a half, yeah, I would say.  That just given

12   I think some that has some out, so I think there is a couple

13   of issues that we have to address.  Ms. Clark took 35 minutes

14   for an opening statement.  I don't need that long.  I would

15   like five minutes before we start our case to have a chance

16   to talk on a few points, and certainly we are prepared to

17   address the four questions that you sent yesterday.

18        THE COURT:  With that it seems to me we'll need to

19   continue into Monday.  I think there is -- I anticipated some

20   time for argument.  The Court has a number of questions about

21   the briefing and questions about the case, so I anticipate

22   then we would end today at five and continue Monday morning,

23   unless the parties have another proposal.

24        MS. CLARK:  Your Honor, may I confer with my

25   clients briefly?

 1          THE COURT:  Yes.  Why don't we take a short break,

 2   five minutes perhaps.

 3               (Recess at 3:10.)

 4               (Reconvene at 3:20.)

 5          THE COURT:  Counsel, with respect to scheduling,

 6   have you had an opportunity to speak to your clients?

 7          MS. CLARK:  I have, Your Honor.  We've just taken a

 8   look at where we are, and we agree that it's not realistic we

 9   think to conclude today, and my client would rather have us

10   go over to Monday than risk the Court not having a full

11   record.

12          THE COURT:  Thank you, Counsel.

13          MS. HELLMAN:  And Your Honor, just a couple from

14   our end.  We agree that I think it's going to be very

15   difficult to finish today.  Ms. Roberts is on vacation next

16   week, so if we can push to get through.  And I will tell you

17   that the last flight out is 5:30, so we're kind of dealing

18   with a couple different things.

19          The other thing that I would request is that,

20   frankly, we're very surprised that Linden Care did not call

21   Mr. Weiner, even though he has given all the declarations in

22   this case, and we intend to call him in our case as long as

23   he is going to be here on Monday.

24          MS. CLARK:  He is not intending to be here on

25   Monday.  I was actually thinking I would be here probably on

1    my own.  Everybody is here.  He wasn't on the list.  We

2    provided plenty of witnesses today that could have been asked

3    any question.  These are all officers of the corporation.  We

4    would not be inclined to do that.

5            THE COURT:  Could he testify by telephone on Monday

6    perhaps?

7            MS. CLARK:  Well, Your Honor, I'm a little

8    hamstrung.  I have a witness that doesn't know anything about

9    compensation, conflicts of interest and some of the key

10   pieces of my case.  If we're going to have me at this point

11   bring witnesses here, then I would like ESI to give me a

12   suitable witness who can speak to the antitrust issues that

13   are at the heart of this and the conflict of interest issues.

14   I would be satisfied with that.

15           THE COURT:  Ms. Hellman.

16           MS. HELLMAN:  Your Honor, we're here today on a

17   motion for to talk about the merits of the case and

18   irreparable harm.  We have brought the witness to talk about

19   why this pharmacy was terminated.  They wanted to talk about

20   for lots of hours lots of other issues, but that's what we're

21   here on, in addition to the motions we haven't gotten to yet.

22   Mr. Weiner gave a declaration.  He was on their exhibit list.

23   He was on their witness list.  We cross identified him.  When

24   I heard they had one witness left, that's who I thought that

25   witness was going to be, was the person who has given

*Bonnie Roberts - Direct - Ms. Clark*                    159

1    declaration after declaration in this case.

2            So we do want a chance to talk to him.  I mean, we

3    didn't bring witnesses that are dealing with conflicts of

4    interest when I look at their complaint and I don't see where

5    that is relevant at all where we are today.  Perhaps when we

6    get to maybe the merits of the case and where it should be in

7    arbitration, but we are here on a motion for a TRO and a PI.

8    So I do want the opportunity to ask Mr. Weiner.

9            THE COURT:  Since Ms. Roberts has a plane that

10   leaves at 5:30, so why don't we get Ms. Roberts on the stand

11   and finish her testimony so she can get to the airport and

12   then we can discuss this further.

13           MS. CLARK:  Thank you, Your Honor.

14           THE COURT:  Ms. Clark, you may proceed.

15           MS. CLARK:  May I approach, Your Honor?

16           THE COURT:  Yes.

17   *BY MS. CLARK:*

18   Q    This is already in the docket so I'm not going to -- is

19   this the Provider Agreement that you've been referring to?

20   It's redacted at the request of Express Scripts, but is that

21   the Provider Agreement we're talking about?

22   A    Yes, it appears to be the definitions.

23   Q    And we left off on, perhaps you misspoke, you mentioned

24   that there is a provision in there that prohibits out of

25   state filling of prescriptions.  Can you show me where that

*Bonnie Roberts – Direct – Ms. Clark*

1   is?

2   A    If I said that, that was not what I meant to say.

3   Q    So there's no such prohibition as far as you know

4   anywhere else, right?

5   A    Not that I'm aware, no.

6   Q    So looking at the definition of retail pharmacy, do you

7   see that?

8   A    I do.

9   Q    That's the definition that you've been referring to,

10  right?

11  A    Yes.

12  Q    And that's the provision that Express Scripts thinks

13  Linden Care violated in such a way that it justified an

14  immediate termination without notice or an opportunity to be

15  heard, right?

16  A    Yes.

17  Q    So let's take a look at that definition.  And it says,

18  "A retail pharmacy is defined as a pharmacy that primarily

19  fills and sells prescriptions via a retail store front

20  location."  Do you see that?

21  A    Yes.

22  Q    And Linden Care has a retail store front location,

23  right, you're aware of that?

24  A    That's what I've heard today, yes.

25  Q    And all the prescriptions that Linden Care fills are

*Bonnie Roberts - Direct - Ms. Clark*

1    filled at that retail store front location, correct?

2    A    They're not dispensed at that store front.

3    Q    Do you have information?

4    A    I'm sorry, they're not -- they're not dispensed to the

5    patient at that retail location.

6    Q    Right.  And we already discussed that especially in

7    downstate New York many, many prescriptions are not delivered

8    within the store, correct?  There is all kinds of delivery

9    services, right?

10   A    Yes.

11   Q    Courier, overnight, there's a lot of different ways to

12   get patients their prescriptions?

13   A    Yes.

14   Q    This doesn't mean when it says a pharmacy that fills and

15   sells prescriptions via retail store front location, it

16   doesn't say there that the drug has to be handed over

17   personally to the patient, does it?

18   A    No, it does not.

19   Q    And it talks about such other criteria established by

20   Express Scripts from time to time, do you see that?

21   A    Yes.

22   Q    Where is that criteria, that other criteria?  Is there

23   any?

24   A    I'm not sure what you mean.  Other criteria regarding?

25   Q    Regarding what Express Scripts thinks a retail pharmacy

1    is.  Is there any other criteria that you're aware of or is

2    this it?

3    A    This is the definition of it, of a retail pharmacy.

4    Q    Is there any other –– this refers to other criteria to

5    be established by Express Scripts.  Do you know of any other

6    written criteria?

7    A    Within the Provider Agreement, no.

8    Q    How about outside the Provider Agreement, that you know?

9    A    I'm not sure.

10   Q    Okay.  But you can't tell me of any as you sit here

11   today, right?  You don't know of any?

12   A    Not completely familiar with the full manual.

13   Q    Well, certainly when you're making a decision about a

14   sudden termination of Linden Care, which takes care of a

15   hundred thousand patients across the country, you would have

16   looked at all the provisions of the Provider Agreement and

17   the Provider Manual that bear upon whether or not Linden Care

18   was a retail pharmacy or not, right?  You would have looked

19   at all of them, right?

20   A    Yes.  And we determined that 70 percent of their

21   prescriptions were going out of state.

22   Q    So you did look at all of them, right?

23   A    Yes.

24   Q    All.  And you can't tell us today that there is any

25   other written criteria other than this definition.  I just

*Bonnie Roberts - Direct - Ms. Clark*

1   want to be sure that when you terminated Linden Care, there

2   is not some other written criteria or an internal memo or

3   something else in writing that you relied upon in addition to

4   this definition.  Is there any other document that you relied

5   upon besides this definition?  Yes or no?

6   A    I'm not an attorney and I did not sign or create the

7   termination letter, so I'm sorry that I'm, you know,

8   stumbling on your question, but the criteria used to draft

9   the termination letter and the person who signed the

10  termination letter, that's not me.  But so the criteria that

11  you're asking me about, Express Scripts looked at the

12  situation in whole and we found that it was in the best

13  interest of our business and for our clients to immediately

14  terminate the pharmacy.

15  Q    But as you sit here today, that's the criteria as you

16  understand it was used for purposes of deciding to terminate

17  Linden Care, right?

18  A    The criteria we used was based on the information that

19  Linden Care had given us.

20  Q    I'm talking about -- let's be clear.  I'm talking about

21  what Express Scripts' standard was for determining if a

22  pharmacy is a retail provider or not.  Is there any other

23  document that you know of, or standard, or criteria that was

24  relied upon by Express Scripts to determine that Linden Care

25  was not a retail pharmacy?  Are there any other documents

*Bonnie Roberts - Direct - Ms. Clark*

1    that.  Were relied upon?

2    A    Not that I'm aware of.

3    Q    Okay.  Thank you.  Now you mentioned earlier that the

4    mission of Express Scripts is to make prescription drugs

5    safer and more affordable for clients.  Did I get that right?

6    A    Yes.

7    Q    Let's talk about the safer part of the equation for a

8    moment.  Before Express Scripts terminated -- withdrawn.

9         First of all, when did Express Scripts make the decision

10   to terminate Linden Care?

11   A    The date of the letter, is that November 7th, I believe.

12   Q    And was that a committee that met or how did that

13   decision get made?

14   A    The decision was made by Express Scripts leadership, and

15   I cannot tell you who all was involved in that discussion, I

16   don't know.

17   Q    You don't know the people that made that decision?

18        MS. HELLMAN:  Objection, Your Honor.  She answered

19   this question earlier regarding the different departments

20   that were involved.

21        THE COURT:  Overruled.

22   Q    Who were the members of the Express Scripts leadership

23   that made the decision last Tuesday to terminate and sent a

24   letter the same day?

25   A    I wasn't involved in the -- I was not involved in the

*Bonnie Roberts - Direct - Ms. Clark*                    165

1    discussions, but I understand that Everett Nevel, who is the

2    vice president and general manager of our supply chain

3    division, brought forward information that we should

4    terminate the pharmacy.

5    Q    Did anyone else make that decision?

6    A    I don't know.

7    Q    Was there a discussion about any sort of communication

8    with Linden Care on these issues?

9    A    Not that I was involved in.

10   Q    And did, I lost track of the name there, is it Nevel,

11   the last name?

12   A    Yes.

13   Q    Did Mr. Nevel discuss with you his concern that Linden

14   Care was doing too much business with a particular

15   manufacturer?

16   A    I was not involved in the discussions.

17   Q    He was the one that told you they were being terminated?

18   A    Not me.  He did not tell me.

19   Q    Did he tell your department?

20   A    He told -- yeah.  I heard it from my vice president.

21   Q    And who is your vice president?

22   A    Amber Compton.

23   Q    And what did she tell you about the termination as it

24   related to this issue of Linden Care doing too much business

25   with Horizon?  Is that something she discussed with you?

1    A    It was discussed that there was -- that we were looking

2    into that situation.

3    Q    And that was one of the reasons that Linden Care was

4    terminated pursuant to the press release that Express Scripts

5    issued, right?

6    A    That's what the press release says, yes.

7    Q    And you don't disagree with the press release that

8    Express Scripts put out, do you?  You have no reason to

9    disagree with that, right?

10   A    No.

11   Q    Was there any discussion with your superior or the

12   executive leadership about the impact of an instant

13   termination decided last Tuesday, I think it was the 12th,

14   and implemented last Tuesday and what that decision and its

15   impact would have on patients?

16   A    I was not involved in those discussions.

17   Q    Do you know if those discussions even happened?

18   A    I don't know.

19   Q    Did you raise the issue?

20   A    I did not.

21   Q    Did you say to the executive leadership what's going to

22   happen to the tens of thousands of people who are under the

23   care of this pharmacy in pain management?  Did you ask that

24   question?

25   A    I did not.

*Bonnie Roberts – Direct – Ms. Clark*

1    Q    Do you know if anybody asked that question?

2    A    I don't know.

3    Q    Before there was a determination to terminate without

4    notice, did anybody look at your clause to determine if

5    Express Scripts and its clients had any obligations to

6    provide notice?

7    A    I don't know.  I'm not an attorney.

8    Q    I'm not asking that.  I'm asking do you know if any part

9    of the team that you communicated with, when they gave you

10   the decision to terminate Linden Care, did they tell you that

11   they had investigated and looked at what New York State law

12   required of them before they terminated a health care

13   provider like Linden Care?

14   A    I did not have that discussion.

15   Q    Do you know if that discussion occurred?

16   A    I don't know.

17   Q    Are you personally familiar with New York laws as it

18   relates to provider termination?

19   A    I am not.

20   Q    When you're involved in the termination of a pharmacy,

21   is that something you would look at, the provider termination

22   requirements of a given state?

23   A    I would not look at that.  I would depend on my

24   attorneys to look at that.

25   Q    Did the attorneys review this?

*Bonnie Roberts - Direct - Ms. Clark*

1          MS. HELLMAN:  Objection, Your Honor.

2          MS. CLARK:  I can ask that question.

3          THE COURT:  To your knowledge.

4   A    To my knowledge, I didn't see them.  They didn't tell me

5   they reviewed the laws and I didn't see them review the laws.

6   I would expect them to review the laws.

7   Q    But my question is without asking what the lawyers said

8   or any communication, were the lawyers involved in the

9   structuring this termination?

10  A    Yes.

11  Q    And was there any discussion about the fact that the

12  Provider Agreement refers to New York law and provisions

13  relating to provider termination?

14          MS. HELLMAN:  Objection, Your Honor.  Ms. Roberts

15  just testified that counsel was involved in this discussion

16  and now she's asking about what was talked about.

17  Q    Apart from any discussions with counsel, did anyone from

18  the executive leadership that you talked to have any

19  discussion about whether or not this provider was entitled to

20  notice of termination and an opportunity to be heard in a

21  hearing?

22  A    I was not involved in any discussions like that.

23  Q    And, in fact, the Express Scripts contract and Provider

24  Manual has a long series of addenda, correct?

25  A    Yes.

*Bonnie Roberts – Direct – Ms. Clark*                           169

1    Q    And is that because Express Scripts has to use the

2    addenda to comply with state laws?

3    A    Many of the addenda do address state laws, whether it's

4    Medicaid laws or state laws.

5    Q    And the addenda are there to ensure that the contracts

6    are in compliance with state law?

7         MS. HELLMAN:  Objection.  She just talked about she

8    doesn't know what the addenda is.  We're now 35 more minutes

9    into this.

10        THE COURT:  Sustained.  I think it speaks for

11   itself and she's not the interpreter of the addenda.

12   Q    But certainly the structure of a termination should

13   honor provider rights that are specifically referenced in the

14   Express Scripts Provider Manual, correct?

15        MS. HELLMAN:  Same objection, Your Honor.  We're

16   still talking about the addenda.

17        THE COURT:  Sustained.

18   Q    Does the New York State Department of Health review the

19   Express Scripts Provider Agreement and Manual, to your

20   knowledge?

21   A    I don't know.

22   Q    Is it Express Scripts' position that it does not have to

23   provide notice of termination and an opportunity to be heard

24   by health care providers like Linden Care?

25   A    There are provisions for immediate termination in the

1    Provider Agreement.

2    Q    Does Express Scripts take the position that it is not

3    bound by state law with respect to provider terminations?

4             MS. HELLMAN:  Same objection, Your Honor.

5             THE COURT:  Sustained.

6    Q    When Express Scripts terminated Linden Care, did Linden

7    Care immediately write a letter raising the issue of provider

8    termination rights?

9    A    I don't know.

10   Q    You don't know, okay.  Did Express Scripts before it

11   terminated Linden Care formulate any sort of transition or

12   patient notification plan to let the patients know that

13   Linden Care was going to be turned off in the Express Scripts

14   system?

15   A    Any time a provider is terminated, we provide notice to

16   members as quickly as possible.  I can tell you that as of

17   today 93 percent of the members that were seeking care from

18   Linden Care have been issued a notice.  Whether they've

19   received those notices or not, I cannot tell you, but those

20   have gone out.

21   Q    So before the termination occurred, there was no notice

22   provided to the patients, right?

23   A    That's correct.

24   Q    And that was the 12th, and today's the 20th, right?

25   A    Today's the 20th.

*Bonnie Roberts – Direct – Ms. Clark*

1   Q    Okay.  Was there any plan implemented to make sure that

2   prescribers got notice of Linden Care's termination before

3   the termination occurred?

4   A    Generally private notification is not issued that I'm

5   aware of.

6   Q    Is there any -- was there any effort to let the clients

7   know, the plans know and give them notice of the termination

8   of Linden Care?

9   A    Information was facilitated to the client facing teams

10  immediately.

11  Q    And is that done via e-mail or something else, some kind

12  of communication?

13  A    It's done through a communication, yes.

14  Q    Was there any notice given to the Department of Health?

15  A    Not that I'm aware of.  I don't know.

16  Q    Did you have any concern yourself being the person

17  involved in providing the termination letter to Linden Care

18  that these patients would have a gap in their coverage?

19  A    There is always concern for patients when we terminate a

20  pharmacy, and it's not something that we take lightly.  But,

21  you know, given the information that we learned regarding

22  Linden Care, there was a gap of trust and, you know, we felt

23  that we needed to act swiftly.  There is always a concern

24  about the patients.  The patients have an 800 number that

25  they can call 24/7 365 days.  They can always call their

*Bonnie Roberts – Direct – Ms. Clark*     172

1    health plan if they have concerns, they can go to their

2    doctor.  So there are many means for patients to provide to

3    discover where they can provide alternate care.

4    Q    There's the self help option for patients.  My question

5    is, did you give any consideration to what would happen to

6    these patients from the time that Linden Care was turned off

7    last Tuesday morning until eventually they received

8    notification and started making arrangements for a different

9    pharmacy?

10   A    Did I make any arrangements for the patients?  Did I

11   give any consideration?

12   Q    No.  Did you consider that?

13   A    Yes, it was a consideration.

14   Q    And were you aware of the nature of the Linden Care

15   patient population and how sick and vulnerable they are?

16   A    I have no knowledge of the individual patients seeking

17   care from Linden Care.

18   Q    Did you know it was a pain ridden population?

19   A    No.

20   Q    Did you do any investigation before there was an

21   immediate termination of Linden Care about who the patients

22   were and how they might be impacted by sudden termination

23   without notice?

24   A    That's not part of my scope of my responsibilities.

25   Q    Whose responsibility is that?

*Bonnie Roberts – Direct – Ms. Clark*                    173

1    A    I don't know.

2    Q    Does anybody have that responsibility?

3    A    I don't know.  I would say that the health plans under

4    which the beneficiaries are covered, that is part of their

5    responsibility.

6    Q    The patient's responsibility even if they didn't know

7    that their pharmacy had been terminated?

8    A    I didn't say it was the patient's responsibility.

9    Q    I might have misheard you.  Did patients start calling

10   expressing concern and complaining about the sudden

11   termination of Linden Care?

12   A    I was made aware of one escalated issue.

13   Q    So to your knowledge there was only one call?

14   A    I was made aware of one escalated issue.

15   Q    And what was involved in that escalated issue?

16   A    A member stated that he wanted to continue to go to

17   Linden Care for his oxycodone.

18   Q    And Express Scripts records its calls with patients,

19   right?

20   A    I think so.

21   Q    Was there any notification that went out to the call

22   center so the call centers would have accurate information

23   about what was going on with Linden Care?

24   A    I don't know.  Not on the member facing side of the

25   house, I don't know what activities take place there.

*Bonnie Roberts – Direct – Ms. Clark*

1  Q    So you don't know of any such notification, right?

2  A    I do not know.

3  Q    And you heard testimony here today that patients were

4  calling Express Scripts and the Express Scripts people were

5  telling the patients that it's a problem on Linden Care's

6  end, they're not putting in the right code?  Did you hear

7  that testimony?

8  A    I heard that testimony.

9  Q    Do you have any information suggesting that that didn't

10  occur?

11  A    I don't.

12  Q    Are you familiar with the statistics on Express Scripts

13  call line for how long patients have to wait?

14  A    I don't know those stats, no.

15  Q    Did patients send e-mails to Express Scripts expressing

16  concern about the sudden termination of Linden Care?

17  A    I'm not aware of any e-mails that were sent.

18  Q    And you're aware generally that one of the issues in

19  this case involves antitrust law, correct?

20  A    Yes, I've heard that.

21  Q    And am I correct that there is this industry association

22  that is comprised of pharmacy benefit managers?

23  A    Yes, there is.

24  Q    What's the name of that association?

25  A    I'm sorry, I don't have the name of that.

*Bonnie Roberts - Direct - Ms. Clark*

1   Q    Could it be PCMA?

2   A    It could be, yes.

3   Q    And you've been to PCMA events before?

4   A    I've never been to a PCMA event.

5   Q    Did you go to a webinar at which the pharmacy benefit

6   managers discussed the plan for dealing with specialty

7   pharmacies?

8            MS. HELLMAN:  Objection, Your Honor.  What is the

9   relevance of this?

10           MS. CLARK:  It's directly relevant to the antitrust

11  claim.

12           MS. HELLMAN:  I understand how the antitrust claim

13  is and how it is -- I mean, we're talking about reasonable

14  likelihood of success on the meris and we can talk about how

15  they pled their antitrust claims, but we're getting way

16  beyond.  There is nothing in any allegations, allegations

17  stated in antitrust about any of this stuff in their

18  complaint.

19           THE COURT:  Overruled.

20  Q    I'm going to show you a document that's already been --

21  P18.  Is this already filed?

22           MR. COST:  This is not.  I have a copy for the

23  Court as well.

24           MS. CLARK:  So we're going to mark this one, if

25  that's okay.

*Bonnie Roberts - Direct - Ms. Clark*

1          MR. COST:  Your Honor, may I approach?

2          THE COURT:  Yes.  And this is P18?

3          MS. CLARK:  P18.

4   Q    Do you recognize that document?

5   A    Yes, I do.

6          MS. CLARK:  One moment, Your Honor, there is

7   technology involved here.

8          MR. COST:  The part of the printing got cut off

9   some of the pages, so we have a digital copy we would like to

10  refer to, if it's okay with the Court.

11         THE COURT:  Yes.

12         MR. COST:  It's the same presentation, but the text

13  is cut off.

14  Q    And is this document a publication that is associated

15  with the meeting that you attended?

16  A    It was a webinar that I attended, yes.

17  Q    And were you attending the webinar on behalf of Express

18  Scripts?

19  A    As an employee of Express Scripts, yes.

20  Q    It was part of your job right?

21  A    Yes.

22  Q    And who else was in attendance?

23  A    Well, you're asking me about something that was more

24  than a year ago.  There were people on the phone and there

25  were a couple of people in the room with me.  I can think of

*Bonnie Roberts - Direct - Ms. Clark*

1  a couple of people in the room, Shawn Davis, John Gavin.

2  Q    And were these representatives of Express Scripts or

3  other pharmacy benefit managers?

4  A    They were employees of Express Scripts.

5  Q    And were there representatives of other pharmacy benefit

6  managers on the phone?

7  A    I don't know.  It was -- it was a webinar open to many

8  people.

9  Q    You see on the front page it says Optum?

10 A    Yes.

11 Q    What's Optum?  That's another pharmacy benefit manager?

12 A    Yes.

13 Q    This was a webinar that was being offered to employees

14 of pharmacy benefit managers, is that right?

15 A    I don't know.  It was beyond pharmacy benefit managers,

16 I believe.

17 Q    And the topic was controlling the cost of compounded

18 medications, health plan/employer strategies, is that right?

19 A    Yes.

20        MS. HELLMAN:  I'm going to object.  This is about

21 compounded medications.

22        THE COURT:  What is the relevance of a webinar on

23 compound medications?

24        MS. CLARK:  I'm going to go to the appropriate

25 page.

*Bonnie Roberts - Direct - Ms. Clark*                    178

1   Q    And on page 50, there is an indication of a strategy

2   that was going to be used by the group of pharmacy benefit

3   managers to deal with the perceived problem with this group

4   of pharmacies, right?

5           MS. HELLMAN:  Objection, Your Honor.  She is

6   testifying about a page and talking about a group of

7   pharmacies and pharmacy benefit managers when this witness

8   just said the meeting was open to more people.

9           THE COURT:  Overruled.

10  Q    Is that right?

11  A    Could you repeat it?

12          (Whereupon the record was read back by the court

13              reporter.)

14  A    So I would not say that this was a strategy that

15  everybody was going to use.  It was -- this webinar was the

16  people listed as the presenters giving their opinions about

17  possible solutions.

18  Q    And this is a proposed solution here, correct?

19  A    That's what it looks like, yes.

20  Q    So the pharmacy benefit managers including Optum and

21  Express Scripts had this webinar which identify a strategy

22  for removing pharmacies from the retail network, do you see

23  that?

24  A    I see that.

25  Q    And was there also in addition to the presentation in

*Bonnie Roberts – Direct – Ms. Clark*

1   this document, was there also discussion of that issue?

2   A   I don't recall.

3   Q   After this webinar were, in fact, pharmacies removed

4   from the network?

5           MS. HELLMAN:   Objection, Your Honor.   What does

6   this have to do with Linden Care, who is a specialty pharmacy

7   and the termination?  There is nothing in this document about

8   specialty pharmacies.

9           THE COURT:   Overruled.

10  A   No, not that I recall.  Are you speaking specifically to

11  compound pharmacies?

12  Q   Well, no.  There is a lot of different pharmacies,

13  right, in the world, and this is a strategy for dealing with

14  compound pharmacies specifically, right?

15  A   The strategy was about controlling the costs of

16  compounded medications because they had become completely out

17  of control.

18  Q   How many pharmacies were terminated as a result of this

19  meeting with the other pharmacy benefit managers?

20  A   I'm not aware that we terminated any as a result of this

21  meeting.

22  Q   Are you familiar with HM Compounding?

23  A   Yes.

24  Q   HM Compounding was terminated, correct?

25  A   Yes, they were.

*Bonnie Roberts – Direct – Ms. Clark*

1   Q    Was HM Compounding targeted as a result of this meeting?

2          MS. HELLMAN:  Objection, Your Honor.

3   A    No.

4          MS. HELLMAN:  Now we're talking about different

5   pharmacies that were terminated prior to this date.  We're

6   getting so outside the scope of this.

7          THE COURT:  Sustained.

8          MS. CLARK:  I understand.  The HM Compound case is

9   the *Paduano* case that is featured by Express Scripts in some

10  of their memorandum and discussed in ours, so it's not, you

11  know, an irrelevant issue, but I understand.

12  Q    Did PCMA ever have meetings where the issues relating to

13  specialty pharmacies were discussed?

14  A    I've never been to a PCMA event.

15  Q    Were there other events like this one that we're looking

16  at in this exhibit where there was a webinar talking about

17  how to deal with specialty pharmacies?

18  A    I'm sorry, one more time.

19  Q    Well, you went to a webinar about problems with

20  compounding pharmacies, including strategies for removal of

21  pharmacies from the network, right?  It's one of the things

22  that was discussed here, right?

23  A    It was controlling the cost of compounded medications,

24  yes.

25  Q    And one of the ways to do that was to remove the

*Bonnie Roberts - Direct - Ms. Clark*

1    pharmacies from the network, right?

2    A    That is what was recommended on the slides.

3    Q    And it also says that you can do extra auditing as

4    needed, right?

5    A    Yes.

6    Q    Did the pharmacy benefit managers have a similar

7    get-together or webinar relating to strategies for dealing

8    with perceived problems with specialty pharmacies?

9    A    I've never attended one.

10   Q    Are you aware of any?

11   A    No.

12   Q    And it's your testimony that you have never been to a

13   PCMA meeting?

14   A    That's correct.

15   Q    Have you ever seen the agendas for PCMA meetings?

16   A    No.

17   Q    What are plan design controls termed in this webinar?

18   Do you know what that term means?

19   A    I have a general understanding of it, but again, it's

20   outside of my responsibilities and I'm not on the plan design

21   side of Express Scripts.

22   Q    Going back to Express Scripts' function as a pharmacy

23   benefit manager.  We talked about the formulary and the

24   recipe or the menu of drugs that are available to members in

25   a particular.  Do you remember that testimony?

*Bonnie Roberts – Direct – Ms. Clark*

1    A    Regarding formulary?

2    Q    Right.

3    A    Yes.

4    Q    Isn't it right that the plan can at any time decide to

5    change its formulary?

6    A    Yeah.

7    Q    And if there is drugs that are too expensive or not

8    effective, the plan can just take them off the formulary,

9    right?

10   A    Yes.  And by plan you mean the health plan?

11   Q    The health plan.

12   A    Okay, yes.

13        MS. CLARK:  I need just a moment, Your Honor, to

14   check my notes.

15        THE COURT:  Yes.

16   Q    And this is a true and correct copy of webinar materials

17   from the webinar that you attended that we just talked about?

18   A    I can't say.  It appears to be.  I can't say from more

19   than a year ago.

20   Q    And is this a document that you brought back to your

21   office and filed somewhere?

22   A    Yes.  I think I had it electronically, yes.

23   Q    Did it become part of Express Scripts' records, business

24   records, at that point once you downloaded it?

25        MS. HELLMAN:  Objection.  I don't know if she knows

1    what it means to be become part of Express Scripts' business

2    records.

3                 THE WITNESS:  I don't.

4                 THE COURT:  Sustained.

5    Q    Did this document become part of your records as an

6    employee of Express Scripts?

7    A    Yes.

8    Q    And it was downloaded into the system and became part of

9    the Express Scripts body of records and information, right?

10                MS. HELLMAN:  Same objection, Your Honor.

11                THE COURT:  Well, I think -- overruled.

12   A    It's on my computer but it's probably on my personal

13   drive not some shared drive.

14   Q    But it's also in your file in your office, right?

15   A    Yes.

16   Q    Okay.

17                MS. CLARK:  Your Honor, I'm going to ask that this

18   be admitted into evidence as a business record.

19                THE COURT:  Any objection?

20                MS. HELLMAN:  Well, Your Honor, this is marked

21   confidential.  I don't know for proprietary and confidential,

22   I have no idea how they obtained it.  I can tell you it was

23   produced by Express Scripts subject to a protective order in

24   a different case.  So I do.  And also, Your Honor, it simply

25   has no relevance to this case.  This case is about Linden

1    Care, it is not about this.

2            MR. COST:  Your Honor, I actually went to the AIS

3    website and they had a link and I paid the fee and I was able

4    to download it.  I have the e-mail, I can show you.

5            THE COURT:  Objection overruled and the Court will

6    admit P18.  Thank you.  My copy does not say confidential on

7    it.

8            MS. CLARK:  Nor does mine.

9            MS. HELLMAN:  The one I'm looking at, the one right

10   here, I mean that's why some of it's redacted off the bottom,

11   proprietary and confidential.  I'm looking at the copy of

12   this one right now on the computer.

13           MS. CLARK:  I am too.

14           MR. COST:  I see where she's saying.  That's what I

15   was sent by AIS.

16           MS. CLARK:  Publicly available on the web.

17           MS. HELLMAN:  If you see, if you look at the pages

18   down at Optum, some of it's redacted but it starts with

19   confidential property of Optum, do not distribute or

20   reproduce without express permission of Optum.

21           MS. CLARK:  It's in the public domain.  We

22   downloaded it from the public website, so it couldn't be that

23   confidential.

24           THE COURT:  Mr. Cost, is this a website that anyone

25   can go to, Atlantic Information Services, Inc?

*Bonnie Roberts – Direct – Ms. Clark*                    185

1         MR. COST:  Yes, it's a website, Your Honor.

2         THE COURT:  The Court will admit P18.

3         (Plaintiff's Exhibit 18 received in evidence.)

4         MS. CLARK:  I have no more questions.

5         MS. HELLMAN:  Are you done with your case?

6         MS. CLARK:  Depending on your cross-examination, I

7  may have Mr. Kantor.

8         MS. HELLMAN:  If I could, I think we're moving into

9  our case, just reserve some time to give a brief opening

10 statement.

11        THE COURT:  Yes.

12        MS. HELLMAN:  Thank you.

13 *CROSS-EXAMINATION BY MS. HELLMAN:*

14 Q    I'm going to work as quickly as I can to get you out of

15 here.  Mrs. Roberts, we've talked a lot about Express Scripts

16 today, and the Court's heard a lot about, but I want to take

17 a step back to pharmacy benefit manager.  What is a pharmacy

18 benefit manager?

19 A    It is an entity that works with third-party payers to

20 facilitate benefit design and provide a network of pharmacies

21 to members of those third-party payers.

22 Q    And as part of that service, does Express Scripts have a

23 pharmacy network?

24 A    Yes, we have a pharmacy network of, as I stated earlier,

25 about probably 70,000 pharmacies in total, 65,000 retail

*Bonnie Roberts – Cross – Ms. Hellman*

1   pharmacies, home infusion, long term care.

2   Q    And then you indicated that Express Scripts contracts

3   with payers.  Pre the PBM world was pharmacies contracting

4   directly with insurers, payors?

5   A    Yes, that's my understanding, yes.  If a pharmacy wanted

6   to service the members of Blue Cross/Blue Shield of Alabama,

7   then they would have had to contract directly with that

8   entity.

9   Q    So if they wanted to serve members from 1,500 different

10  insurers or plans, it would have 1,500 different contracts,

11  is that right?

12  A    That's correct.

13  Q    And the contract between in this case Linden Care and

14  Express Scripts does then as part of that contract Express

15  Scripts reimburse Linden Care directly for their prescription

16  claims?

17  A    Correct.  We would, yes, we facilitate that on behalf of

18  all of those health plans.

19  Q    So, in other words, instead of having 1,500 or 2,000

20  different contracts, there is one contract for a pharmacy, is

21  that correct?

22  A    That's correct.

23  Q    And similarly is there one contract for Blue Cross/Blue

24  Shield?

25  A    Correct.

Bonnie Roberts - Cross - Ms. Hellman

1  Q    You talked a little bit about the contractual

2  relationship, and I think you mentioned there was 70,000

3  pharmacies in the network, is that correct?

4  A    Yes.

5  Q    Why would a pharmacy want to be under a contract with

6  Express Scripts?

7  A    Primarily to have access to the more than 60 million

8  members, beneficiaries that are under the Express Scripts

9  umbrella of clients.

10 Q    And what does Express Scripts require of its pharmacies

11 to be in this contract, to have the access to the 90 million

12 members -- or 60 million members?

13 A    Sixty.  Well, we require the first and foremost to

14 comply with the terms and conditions of their contract with

15 Express Scripts, to comply with the laws of the states where

16 they are licensed, to have the appropriate documentation and

17 insurance that is required.

18 Q    And we've heard a lot about Linden Care Pharmacy.

19 That's a pharmacy that you're familiar with?

20 A    Yes.

21 Q    And I want to talk a little bit about the agreement

22 between Express Scripts and Linden Care.

23        MS. HELLMAN:  Your Honor, may I approach her just

24 to give her a copy?

25        THE COURT:  Yes.

*Bonnie Roberts – Cross – Ms. Hellman*

1          MS. HELLMAN:  I know everybody else has a copy.

2     Q    And Ms. Roberts, I've handed you the Provider Agreement

3     between Linden Care and Express Scripts, do you see that?

4     A    I do.

5     Q    And are you also familiar with the Express Scripts

6     Provider Manual?

7     A    Yes.

8     Q    And does the prior agreement that's in front of you and

9     the Provider Manual constitute the agreement between Express

10    Scripts and Linden Care?

11    A    Yes, the two together.

12    Q    If you could turn to Section 7.15 of this agreement,

13    please?

14    A    Okay.

15    Q    And does this agreement have an arbitration provision?

16    A    Binding arbitration.

17    Q    And according to this agreement, where is that

18    arbitration supposed to take place?

19          MR. COST:  Objection, Your Honor.

20          THE COURT:  Sustained.

21    Q    Ms. Roberts, there has been some testimony that Linden

22    Care is a, quote, unquote, "specialty pharmacy."  You've

23    heard that testimony?

24    A    I did hear that testimony.

25    Q    What is a specialty pharmacy?

*Bonnie Roberts - Cross - Ms. Hellman*

1   A    Well, my definition of a specialty pharmacy is a

2   pharmacy that primarily manages and dispenses medications for

3   particular disease states, very high touch disease states

4   such as hemophelia or HIV, and medications that, you know,

5   there is very specific medications that are related to those

6   disease states.

7   Q    And as somebody familiar with a specialty pharmacy, do

8   you consider Linden Care to be a specialty pharmacy?

9   A    No.  They don't really fall into the definition of a

10  specialty pharmacy that I have and they didn't contract as a

11  specialty pharmacy.

12  Q    And you testified earlier questions from Ms. Clark that,

13  in fact, Linden Care contracted with you as a retail

14  pharmacy, is that correct?

15  A    Correct.

16  Q    And I want to go back, if you could for a second, to

17  Section 1.14, which is the definition of retail provider?

18  A    Yes.

19  Q    And Ms. Clark talked you to about this definition but I

20  want to look at that very first sentence.  As a retail

21  provider defined as somebody who primarily fills

22  prescriptions at a store front?

23  A    Fills and sells prescriptions via retail store front

24  location, yes.

25  Q    And does the definition of retail provider in this

*Bonnie Roberts - Cross - Ms. Hellman*            190

1   agreement, does it exclude mail order pharmacies?

2   A    It does exclude mail order pharmacies.

3   Q    And Ms. Roberts, if you could turn to Section 7.16 of

4   the agreement.

5   A    Yes.

6   Q    And this section is entitled Representations and

7   Warranties, is that correct?

8   A    Correct.

9   Q    And Section 7.16(b), is Linden Care representing a

10  warranty to Express Scripts that it is -- 7.16(a), is Linden

11  Care representing a warranty to Express Scripts that it meets

12  the definition of a retail provider?

13  A    Yes, that's correct.

14  Q    And let's go on and go down to the next representation,

15  specifically 7.16(b).  Here is Linden Care representing a

16  warranty to Express Scripts that it's appropriately licensed?

17  A    That's correct.

18  Q    And then going down one more, 7.16(c), here is Linden

19  Care representing that the questions contained on the

20  provider certification are true and accurate and Linden Care

21  will notify Express Scripts of any changes?

22  A    That's correct.

23  Q    And were these representations made by Linden Care to

24  become part of the Express Scripts network?

25  A    Yes, they were.

*Bonnie Roberts - Cross - Ms. Hellman*

1  Q    If you could briefly just go to Section 4.2, please.  Is

2  4.2 the termination section?

3  A    Immediate termination, yes.

4  Q    And are you at section 4.2(c)?

5  A    Yes, I am.

6  Q    We've heard a lot of testimony about right to cure and

7  notice period.  Does 4.2(c) provide grounds that the pharmacy

8  may be immediately terminated upon written notice?

9          MR. COST:  Objection, Your Honor.  The document

10  speaks for itself.

11          THE COURT:  Sustained.

12  Q    Let's talk a little bit about Linden Care's provider

13  certification.  What was the pharmacy do to become a pharmacy

14  in the network, in the Express Scripts' network?

15  A    Must complete a provider certification, answer a host of

16  questions.  They must give us all of their demographic and

17  license information, describe their practice type, and

18  produce their licensure and proof that it's in good standing,

19  not be excluded by any state or federal agencies and, you

20  know, hold the appropriate insurance.

21  Q    Once a provider has been admitted into the Express

22  Scripts network, are they subject to re-credentialing?

23  A    Yes, we re-credential, we can re-credential as often as

24  we need to, but routinely every three years.

25  Q    And what's the importance of the provider certification

*Bonnie Roberts – Cross – Ms. Hellman*                    192

1   that a pharmacy submits in connection with this credentialing

2   or re-credentialing process?  Why is it important to Express

3   Scripts?

4   A    Well, it tells us about the pharmacy.  It tells us about

5   their business practices.  It helps us to understand the

6   types of medications they may dispense.  It helps us to

7   understand the patient population that they might service

8   such as Medicare, Medicaid, Workers' Compensation, so it's

9   important for us to understand what kind of pharmacy they are

10  so they are able to be contracting.

11  Q    If Express Scripts has an audit department and someone

12  from the audit department audits Linden Care, why do you need

13  a provider certification?

14  A    The provider certification, you know, it states that the

15  information is true and accurate.  And, you know, the

16  provider certification, we're not going to go out to every

17  state Board of Pharmacy just to check to see if the pharmacy

18  has a license.  We need them to tell us that they have a

19  license in that state so then we can go check to see if

20  they're appropriately licensed.

21  Q    When an audit is done, I think you mentioned this

22  earlier and I want to make sure it's clear for the Court, you

23  said when an audit happens, it's an audit of claims.  What

24  does that mean?

25  A    Well, Express Scripts through its retail pharmacies

1    adjudicates probably about 3 million claims a day and so the

2    audit department on a daily basis looks, we call them a desk

3    audit, they're looking at claims to see if they paid

4    appropriately, if paid under the right benefit for the

5    member, if the quantity is appropriate.  When they do field

6    audits then they are going a little bit deeper, they're

7    looking at, they pick a random sampling of claims for that

8    particular pharmacy and they look to see if the pharmacy has

9    appropriate inventory, they check to see if signature logs

10   are appropriate and that a patient has picked up the

11   medication, or if it has been delivered then there is a type

12   of signature for delivery.

13   Q    Do audits provide the type of information to Express

14   Scripts that the information contained in the provider

15   certification provides to Express Scripts?

16   A    No, they're very different.

17            MS. HELLMAN:  Your Honor, may I approach?

18            THE COURT:  Yes.

19            MS. HELLMAN:  I have just handed the witness the

20   provider certification, which is also part of the record.

21            MR. COST:  Identification of it, the document

22   number?

23            MS. HELLMAN:  Yes.  It was Exhibit 4 of Bonnie's

24   declaration, document 9-3.

25   Q    Ms. Roberts, is this the provider certification

1  submitted by Linden Care pharmacy?

2  A    It appears to be from December of 2013, so it was a

3  re-credentialing verification form.

4  Q    If you could go to page 4 at the bottom, the second page

5  of the document.  And is this the type of information that

6  Express Scripts includes on its provider certification, the

7  type of practice, the business information, are these the

8  questions it's looking for answers?

9  A    That's right, yes.

10  Q    And I want to focus on the type of practice that that

11  logs.  Did Linden Care provide Express Scripts with what

12  types of different pharmacy practices it was engaged in?

13  A    Yes.  They indicated they were 50 percent open door

14  retail community, indicated 39 percent for local and out of

15  state mail order, Workers' Comp. is 10 percent, and 1 percent

16  compound.

17  Q    And if you add up those numbers, does that equal

18  100 percent?

19  A    It equals 100 percent.

20  Q    I'm looking at the different types of practices on here.

21  How much specialty did Linden Care indicate they do?

22  A    They didn't indicate that they do any specialty,

23  0 percent.

24  Q    If you could turn back to the first page of this

25  document.  Who did Linden Care indicate was their pharmacist

*Bonnie Roberts - Cross - Ms. Hellman*

1    in charge?

2    A    Jordan Fogel.

3    Q    Why does Express Scripts ask a pharmacy who their

4    pharmacist in charge is?

5    A    Well, pharmacist in charge is the managing person at the

6    pharmacy.  They're responsible for all aspects of the

7    pharmacy.  We are obligated to do our due diligence on the

8    pharmacist in charge.  Again, to ensure they're appropriately

9    licensed into any of the states that they may be dispensing

10   medications, and again if they ensure that they're not

11   excluded, and we even have to check the Social Security

12   master file to ensure that they're not an impostor of some

13   kind.

14   Q    And Ms. Roberts, the provider certification that I

15   handed you, is that signed on page 6?

16   A    Yes, by Mark Trimmer.

17   Q    And is there a verification right above his signature

18   about all the answers being true and accurate?

19   A    Yes.

20   Q    And does Express Scripts also require its pharmacies to

21   update Express Scripts if something changes?

22   A    Yes, that is an ongoing requirement.

23   Q    And why does Express Scripts want to know if the

24   information is changed?

25   A    Well, again, we need to understand if the pharmacy is

*Bonnie Roberts - Cross - Ms. Hellman*

1   appropriately licensed.  Importantly, we need to know if they

2   have been disciplined in some way, either the pharmacy

3   itself, the owner or the pharmacist in charge.  We need to

4   understand if there are any patient safety issues at hand.

5   Q    If a pharmacy's business has changed, does Express

6   Scripts want to know it?

7   A    Yes.  Again, it goes back to are they appropriately

8   licensed.

9        MS. CLARK:  Your Honor, I have an objection at this

10   point.  I mean, the issues thus far have been framed by the

11   termination letter.  This termination letter never said

12   anything about these issues related to the certification,

13   other than potentially the mail order issue, so I think we're

14   getting off on tangents that can't possibly be the basis for

15   termination.

16        THE COURT:  I believe it's included in her

17   declaration, though, that she filed in connection with this

18   case.

19        MS. HELLMAN:  Thank you, Your Honor.

20   Q    Subsequent to Linden Care providing this provider

21   certification on December 20, 2013, did Express Scripts learn

22   that some misrepresentations had been made?

23   A    Yes.

24   Q    And I want to turn back to the type of practice

25   specifically on page 2 of this document.  You testified or

1   the provider certification indicates that Linden Care does

2   39 percent mail order, local and out of state, do you see

3   that?

4   A     Yes, I do.

5   Q     Was that an accurate representation of its business?

6   A     Not -- no.  We found that it has 70 percent out of state

7   alone.

8   Q     And does that not include what ships in state?

9   A     Correct.

10  Q     And I want to go back for a second to the Provider

11  Agreement, specifically section 1.14.  Would you consider a

12  pharmacy that does 70 percent mail order just out of state to

13  be a retail provider?

14  A     No.  We would consider that to be a mail order provider.

15  Q     And is that because they're not primarily dispensing

16  prescriptions from their retail?

17  A     Yes, that's correct.

18  Q     And if you could stay with the Provider Agreement and

19  look at Section 7.16(a), was Linden Care's representation and

20  warranty that it was a retail provider false?

21  A     Yes.

22  Q     If we could go back to the provider certification again.

23  And you indicated earlier that Linden Care stated nothing of

24  the specialty percentage.  If you could flip to the next page

25  of provider certification, page 5?

Bonnie Roberts - Cross - Ms. Hellman

1   A    Okay.

2   Q    Skip that question for a minute.  In addition to

3   shipping 70 percent of its prescriptions out of state, did

4   Express Scripts also learn that Linden Care was shipping to a

5   state in which it did not hold a license?

6   A    Yes.  We found that there were claims being shipped to

7   California where it did not hold a license.

8   Q    Now does every state require a license within which to

9   ship?

10  A    There are few exceptions.  California requires a

11  license.

12  Q    And does Express Scripts make this requirement?

13  A    No.  It's the state Board of Pharmacy that makes that

14  requirement.

15  Q    Are you familiar with a requirement that requires a

16  license to ship into state?

17  A    I'm sorry?

18  Q    Let me ask a better question.  Do you know if the

19  California Board of Pharmacy has a diminimus exception?

20  A    It does not.

21  Q    And have you had a chance to look at the claims that

22  Linden Care was shipping into the State of California?

23  A    Yes, I did review those claims.

24  Q    And there has been some testimony in this case that

25  those were shipped for emergency basis for people on

Bonnie Roberts – Cross – Ms. Hellman                199

1   vacation.  Did you hear that?

2   A    I did hear that.

3   Q    And in reviewing the claims data, did it indicate to you

4   that these prescriptions were sent on an emergency basis or a

5   one-off basis?

6   A    Well, what I saw was that there were more than a dozen

7   patients that had addresses in California and received

8   multiple month over month shipments.

9        MS. CLARK:  Your Honor, I just have an objection.

10  This is really hearsay, testifying about a document that was

11  never identified, that we have never been provided with, that

12  we've asked for repeatedly.

13       THE COURT:  Ms. Hellman, do you have some evidence

14  that you're going to put in on this issue?

15       MS. HELLMAN:  Yes.  Yes.  And Your Honor, I mean,

16  just to Ms. Clark's points, hearsay has been most of what

17  I've been hearing today in terms of not knowing who

18  declarants are or witnesses are, so we just ask a little

19  leeway on the hearsay because we've heard a lot of it today.

20       THE COURT:  Why don't we get to the evidence.

21       MS. CLARK:  Your Honor, we previously objected to

22  this document.  Our objection was sustained.  I raise the

23  same objection for the same reason.  We don't have it.  We

24  weren't provided with it.  We asked for it.  They declined to

25  provide it.  And it would be very difficult for us at this

*Bonnie Roberts – Cross – Ms. Hellman*

1  point to be seeing this document for the first time in the

2  middle of this proceeding.

3          THE COURT:  Do you have it now, Ms. Clark?

4          MS. CLARK:  It was provided a short time ago during

5  this proceeding.

6          THE COURT:  Overruled.

7          MS. HELLMAN:  Thank you, Your Honor.

8  Q    Ms. Roberts, handing you what's marked Defendant's

9  Exhibit 6 and ask if this is the claims data that you

10 reviewed?

11 A    This is the claims data I reviewed, yes.

12 Q    And certain columns have been redacted for HIPAA

13 reasons.  Can you explain to the Court what this claims data

14 is, what does it represent?

15 A    Well, it represents that we received a claim submitted

16 by the NCPP or NAPP number, which is column A, that that

17 column tells us who the pharmacy is, and then of course the

18 name of the pharmacy is listed there as well as Linden Care.

19 We have prescription numbers, dates of service, the fill

20 quantity, the carrier name, being who the member was insured

21 through, and then there are member addresses that are listed.

22      So to me what it says to me is that there were claims

23 shipped from Linden Care on a specific date to a member at

24 this address.

25 Q    And Mrs. Roberts, I don't want to spend much more time

*Bonnie Roberts - Cross - Ms. Hellman*

1  on this, I just want to look at this one.  If you could go

2  about three-quarters of the way down, do you see the carrier

3  Anthem Blue Cross of Cal?

4  A    Yes.

5  Q    Are you aware of an Anthem Blue Cross of California

6  plan?

7  A    Yes.

8  Q    Is that a client of Express Scripts?

9  A    Yes, it is.

10  Q    And if you go over a little further to the right, do you

11  see the initials JM?

12  A    Yes, I see those initials.

13  Q    Does this claim statement at least reveal a number of

14  prescriptions to JM over a period of many months being

15  shipped into California?

16  A    Yes, it does.

17  Q    And if you flip through this document, Ms. Roberts, is

18  there any address on here other than an address in the State

19  of California?

20  A    All the addresses are in California.

21  Q    Thank you.  I want to go back to the provider

22  certification again.  You testified about the PIC, the

23  pharmacist in charge, that was identified by Linden Care.  At

24  some point did Express Scripts learn that that was no longer

25  accurate?

*Bonnie Roberts - Cross - Ms. Hellman*

1    A    Yes.  We learned most recently that that's not accurate.

2    Q    And was that another misrepresentation by Linden Care?

3    A    Yes, because they did not submit an update to Express

4    Scripts.

5    Q    And that's a good point.  Does Express Scripts view a

6    breach of the agreement whether it's something was inaccurate

7    when you made it or you failed to update it?

8    A    Correct.

9              MS. CLARK:  Your Honor, I just have the same

10   objection.  I don't know how this can be relevant to the

11   termination when it was never even cited or raised as a basis

12   for termination.  This is all post hoc.

13             THE COURT:  It is post hoc but it was in

14   Ms. Roberts' affidavit.

15   Q    Ms. Roberts, we talked about some of the claims data

16   that Express Scripts and the visibility.  If Express Scripts

17   has visibility into every claim submitted by a pharmacy,

18   wouldn't Express Scripts know that Linden Care was shipping

19   scripts into the State of California without a license?

20   A    Well, we may have that information in our system but

21   we're not -- we're not looking at the information in the

22   aggregate.  Again, that's why we depend on the provider

23   certification for the providers to tell us if they have a

24   license in other states and if they plan to be shipping

25   there.

*Bonnie Roberts - Cross - Ms. Hellman*

1   Q    Would it be possible for Express Scripts to look at each

2   claim submitted by the 70,000 pharmacies in its network?

3   A    It would be impractical and with 3 million claims coming

4   through on a daily basis.

5   Q    Does Express Scripts have to trust the pharmacies that

6   are in its network are following its rules and laws?

7   A    Right.  We have to trust the information that's

8   presented to us by the pharmacy and we have to rely on them

9   to be truthful and accurate in the information that they're

10  presenting.

11  Q    Does a pharmacy such as Linden Care, and earlier you

12  talked about what a formulary is, do they agree to use best

13  efforts of formulary compliance?

14  A    Yes, that's part of the agreement.

15  Q    And Ms. Clark asked you a lot of questions about Horizon

16  and I want to step back for a minute.  Are the Horizon Drugs

17  on the Express Scripts' national preferred formulary?

18  A    Horizon Drugs are not on the Express Scripts national

19  preferred formulary.

20  Q    And did it concern Express Scripts a high number of

21  drugs being dispensed by Linden Care that were not on the

22  national formulary?

23  A    Yes.  It made us stop and take a look.

24  Q    I'm going to go back again to misrepresentations that

25  were made and that you testified to and the failure to update

*Bonnie Roberts - Cross - Ms. Hellman*

1   the provider certification.  Did these actions violate Linden

2   Care's contract with Express Scripts?

3   A    Yes.  It violated the contract and it caused us an

4   enormous amount of mistrust.

5   Q    Express Scripts ultimately terminated Linden Care,

6   correct?

7   A    Yes.

8   Q    Why didn't Express Scripts give notice to Linden Care of

9   the termination?

10  A    So notice was provided on the day of the letter delivery

11  that they would be terminated.

12  Q    I'm sorry, advanced notice of the termination?

13  A    We felt that finding that they had broken the law and

14  shipped to a state where they were not properly licensed was

15  egregious enough to warrant an immediate termination.

16  Q    And there has been a lot of testimony today about Linden

17  Care's patients, the Express Scripts' members, and some

18  insinuation that Express Scripts doesn't take this into

19  account at all.  And my question to you is, does Express

20  Scripts take into account its members in terminating a

21  pharmacy?

22  A    Yes.  They are a consideration, but again, the

23  consideration, it goes to is it a pharmacy that we can trust.

24  If we can't trust the pharmacy and what they tell us, can we

25  trust them with our members.  And so, you know, we're looking

*Bonnie Roberts - Cross - Ms. Hellman*

1    at the integrity of our network and who we're sending our

2    members to for care.

3    Q    And you touched on it briefly, but I want to go back for

4    a minute and I want to talk about what Express Scripts has

5    done sitting here today from ten days ago, what has Express

6    Scripts done with respect to its members?

7    A    So, all of the health plan clients, all of the clients

8    were notified immediately that termination had been made of

9    this pharmacy and because of the, you know, number of clients

10   and members involved, it took some coordination to get member

11   letters out.  But, you know, as I stated earlier, we have

12   93 percent of those letters that have gone out.

13   Q    I want to back up for a minute.  You talked about the

14   clients.  When does Express Scripts tell its clients that

15   this pharmacy is going to be terminated from the network?

16   A    That information was made available immediately.

17   Q    And do you know approximately how many letters Express

18   Scripts has sent out to the members?

19   A    Approximately 6,200.  I'm not sure of the exact number.

20   I would like to just add that sometimes our clients control

21   when those letters can go out.  You know, many times the

22   clients will want to review a letter before it goes to its

23   members, they will want to have it customized with their logo

24   and they want it to look like it comes from them, so that can

25   take a little bit longer in the process.

*Bonnie Roberts - Cross - Ms. Hellman*

1  Q    But today your testimony that 93 percent of that number

2  is over 6,000 letters that have gone out, is that correct?

3  A    Yes.

4         MR. COST:  Objection.

5  Q    And do those letters advise the members what to do in

6  light of this termination?

7  A    Yes.  It advises them to call Express Scripts or to go

8  online and use the pharmacy locater or talk with their

9  doctor.

10  Q    And Ms. Roberts, since this termination happened ten

11  days ago, has Express Scripts been willing to work with any

12  individual member who was unable to locate a pharmacy?

13  A    Absolutely.  We're always willing to work directly with

14  the members.

15  Q    And does Express Scripts today still remain willing and

16  ready to help any identified member that cannot find an

17  alternative pharmacy?

18  A    Yes, absolutely.  I would like to, you know, know the

19  list of members that are having difficulty so that we can

20  facilitate on their behalf.

21  Q    You mentioned that you told clients.  Did any clients

22  complain about this termination?

23  A    I have not heard of any client complaints.

24  Q    And we've talked a lot about the pharmacies that are

25  available in the State of New York.  But at least with those

*Bonnie Roberts - Cross - Ms. Hellman*

1  members that reside outside of New York, 70 plus percent

2  that's being shipped to, are they able to get their

3  medications at any pharmacy that are around them or that can

4  ship it to them?

5  A    Yes.

6  Q    So, in other words, we're not limited to New York

7  pharmacies, is that fair?

8  A    That's fair, we're not limited to New York pharmacies.

9  Q    And Ms. Roberts, if this Court orders Express Scripts to

10  get back into a contractual relationship with Linden Care,

11  what's the harm to Express Scripts?

12  A    Well, I mean, we want a network of pharmacies that we

13  can depend on.  It's an integrity issue.  You know, we don't

14  trust the pharmacy any longer and it would be, I think,

15  difficult to trust them going forward.  We would -- I think

16  it would cause confusion and, you know, could be harmful to

17  our reputation overall.

18  Q    Does Express Scripts want to continue or not continue --

19  does Express Scripts want to do business with Linden Care?

20  A    No, not at this point, no.

21       MS. HELLMAN:  That's all the questions I have.

22       THE COURT:  Thank you.  Ms. Roberts, are you aware

23  of any other situations where Express Scripts discovered that

24  a provider shipped out of state without a license?

25       THE WITNESS:  I am aware.  It has come to our

*Bonnie Roberts – Cross – Ms. Hellman*                    208

1   attention on occasion.  It is not a frequent incident.

2              THE COURT:  On other occasions when it came to your

3   attention, what happened?

4              THE WITNESS:  The provider would have been

5   terminated.

6              THE COURT:  Are you aware of other situations where

7   a provider was terminated?

8              THE WITNESS:  Yes.

9              THE COURT:  And are you aware of any other

10  situations where a provider was terminated effective

11  immediately?

12             THE WITNESS:  Yes.

13             THE COURT:  In what situations has Express Scripts

14  done that?

15             THE WITNESS:  Most recently we made an immediate

16  termination of several pharmacies that were found to be

17  directly linked to a pharmaceutical manufacturer.

18             THE COURT:  Thank you, Ms. Roberts.

19  *REDIRECT EXAMINATION BY MS. CLARK*:

20  Q    Which manufacturer is that?

21  A    Valeant Pharmaceutical.

22  Q    Valeant Pharmaceutical.  That was the Philidor

23  situation?

24  A    Yes.

25  Q    And Philidor was involved and found guilty of criminal

Bonnie Roberts – Redirect – Ms. Clark                    209

1   responsibility, correct, for all kinds of --

2   A    I haven't really kept up with the news, I'm sorry.

3   Q    So in that situation, the Philidor/Valeant situation,

4   there was an investigation and a settlement with the

5   authorities, correct, you're aware of that?

6   A    I'm sorry.

7   Q    So there was a plea of guilty that triggered a

8   termination.  And there is other things that can trigger an

9   immediate termination too, right, like an indictment?

10  A    Yes.

11  Q    Exclusion from Medicaid?

12  A    Yes.

13  Q    Can be a situation under certain circumstances?

14  A    Yes.

15  Q    Right.  And a conviction can trigger an immediate

16  termination?

17  A    Yes.

18  Q    But none of those extreme circumstances existed here,

19  did they?

20  A    Not that I'm aware of, no.

21  Q    Otherwise, it was primarily a suspicion that Linden Care

22  was shipping to California based upon the data that you just

23  looked at, correct?

24  A    Yes.

25  Q    And you would agree it would be important to make sure

1    your data is correct when you're using it to immediately

2    terminate a pharmacy that's taking care of thousands of

3    people?

4    A    There aren't thousands of people on this list.

5    Q    I'm talking about the pharmacies taking care of

6    thousands of Express Scripts members, right?

7    A    Correct.

8    Q    And it's important to make sure your data is accurate,

9    right?

10   A    Yes.

11   Q    So the data you have here indicates what the permanent

12   residence might be of the member, correct, that's what that

13   field says?

14   A    That's right.

15   Q    That field doesn't indicate where the person was when

16   the medication was shipped, does it?

17   A    It does not.

18   Q    No.  And do you know what percentage of Express Scripts

19   members in California are snowbirds or Arizona birds or

20   people that travel for part of the year?

21   A    No, I wouldn't know that.

22   Q    And there would be absolutely nothing wrong with Linden

23   Care sending a prescription to a snowbird in Florida, right?

24   A    As long as they have a Florida license.

25   Q    That's exactly right.  And Linden Care has licenses in

*Bonnie Roberts - Redirect - Ms. Clark*

1    49 states, right?

2    A    Yes.

3    Q    And Express Scripts audited Linden Care many times

4    during this 2014-2015 time period, correct?

5    A    I don't know.

6    Q    You heard that.  Do you have any reason to disagree with

7    the Linden Care executives who said that they were regularly

8    audited by Express Scripts?

9    A    I don't have any reason to disagree with that.

10   Q    And those audit materials, they're at Express Scripts'

11   offices, aren't they?

12   A    Yes.

13   Q    Okay.  And you could go over there and look at those

14   audit materials if you so wished, couldn't you?

15   A    I guess I could.

16   Q    And those materials would include the actual delivery

17   tickets for the actual prescriptions that are referenced on

18   this chart, including the address to which they were actually

19   delivered, isn't that right?

20   A    If there had been an onsite audit that included any of

21   those prescriptions.

22   Q    On site or fax or desk audit, if the delivery

23   information was provided by Linden Care as Linden Care

24   executives have testified, it would be in Express Scripts'

25   files and it would tell you where the prescription was

1    delivered to, correct?

2    A    Yes.

3    Q    Did you give any consideration to the fact that this may

4    be a list of California residents who travel and need

5    prescriptions when they're traveling in other states where

6    Linden Care does have a license?

7    A    I would say that is a possibility.

8    Q    Did you consider that before today, about handing this

9    information to the Court?

10   A    Did I?  I didn't hand it to the Court.

11   Q    No, did you consider that fact before you relied upon

12   this information here today in court?

13   A    It is a consideration, Ms. Clark.

14   Q    And you knew that before today, correct?

15   A    I reviewed the -- I knew what before today?

16   Q    You had that consideration before today, before you came

17   into court today?

18   A    I reviewed these documents today.

19   Q    Is there any reason you didn't tell the Court in

20   response to your questions that a simple explanation for this

21   problem might be the mobility of these Express Scripts

22   members and that should be something that should be looked

23   into and that you have the documents in your office?

24        MS. HELLMAN:  Objection, Your Honor.  She never

25   said she had the documents in her office.  She is being very

1    argumentative with the witness.

2              THE COURT:  Overruled.

3    Q    Those documents are in Express Scripts' offices, right?

4    A    I can't say any of these claims would have been subject

5    to an audit where we would have the label information.

6    Q    Did you look and see?

7    A    I did not look and see.

8    Q    Thank you.  Let's turn for a moment to the Provider

9    Agreement that we've been talking about.  You said that there

10   is a provision in the Provider Agreement that puts a burden

11   on the pharmacy with respect to formulary management.  Do you

12   remember that testimony?

13   A    In the Provider Manual, I believe.

14   Q    Do you know where that is in the Provider Manual?

15   A    I would need to look at it.  I cannot cite where it is.

16   Q    Would you be able to look at the index of the Provider

17   Manual and see if you could find that provision?

18   A    Section 4 is formulary review.  Section 4.1 under

19   overview formularies in bold type.

20   Q    Can you give me a page number so I can follow along?

21   A    Sure.  31.

22   Q    And this document says that, "Network provider

23   pharmacists should make the best efforts to dispense the

24   formulary drug and/or product and except for generic

25   substitution or reasons of medical necessity should never

*Bonnie Roberts – Redirect – Ms. Clark*

1  switch a member from the formulary drug and/or product to a

2  non-formulary drug or product."  Do you have some evidence

3  that Linden Care violated this provision of the Provider

4  Agreement?

5  A    I do not.  But what I spoke to earlier was that Horizon

6  Pharmaceutical Drugs are not on the national preferred

7  formulary, and so that was a reason for us to look a little

8  bit closer.

9  Q    Well, this provision doesn't refer to the national

10  formulary, does it?

11  A    It refers to formularies.

12  Q    Right.

13  A    In general.

14  Q    And each member has their own formulary, right?

15  A    Well, the national preferred formulary is probably the

16  most widely used.

17  Q    Well, but that's true.  But the patients we're talking

18  about with Linden Care, they were following the formulary for

19  their plan, right?  Correct?

20  A    I hope so, yes.

21  Q    Linden Care wasn't prescribing, was not filling

22  prescriptions for drugs that were not on the formulary?  Am I

23  correct about that?  You have no evidence that that happened?

24  A    I have no evidence of that, no.

25  Q    Why would you come into court and suggest that as a

1   basis for termination of Linden Care even after the fact?

2   That would be inaccurate, wouldn't it?

3   A    What I said was that because Horizon Drugs are not on

4   the national formulary, that gave us pause to look a little

5   closer.

6   Q    But Horizon Drugs are on the formulary of the patients

7   who got the drugs at Linden Care, right?

8   A    I'm assuming so.

9   Q    Let's take a look at the provider contract for a minute.

10  I'm going to show you a document that's already marked.  It's

11  Exhibit (b)(2)?

12        MR. COST:  To the supplemental declaration of

13  Mr. Weiner.

14  Q    Do you recognize that document?

15  A    No, I don't.

16  Q    So you recognize that Provider Agreement but not this

17  2011 amendment to the Provider Agreement?

18  A    I'm not familiar with all of the amendments to the

19  Provider Agreement, I'm sorry.  The general Provider

20  Agreement I am much more familiar with.

21  Q    Do you think it's important when you're terminating a

22  provider to look at the Provider Agreement that applies to

23  the state where the provider is?

24  A    I would say that, yes.

25  Q    And did you look at the 2011 amendments, New York

Bonnie Roberts - Redirect - Ms. Clark                    216

1   amendment to the Provider Agreement before you terminated --

2   A    Ms. Clark, it would not be my responsibility.

3   Q    Let me finish my question because we have to get it on

4   the record.  Did you look at the 2011 Provider Agreement as

5   amended by this document before you terminated Linden Care

6   without notice or an opportunity to be heard?

7   A    I did not personally look at this document.

8   Q    Do you know if anybody at Express Scripts looked at this

9   document?

10  A    I don't have any personal knowledge of that.

11  Q    And looking at this document, looking at the letter

12  attaching the document, it says, this amendment expressly

13  incorporates DOH's updated standard clauses for managed care

14  provider contracts, which supersede the existing version,

15  preexisting version of such standard clauses, et cetera.  Do

16  you see that?

17  A    In the second paragraph, yes.

18  Q    Right.  So this amendment supersedes and controls over

19  what is in the master Provider Agreement, isn't that what it

20  says?

21         MS. HELLMAN:  Objection, Your Honor.  We're talking

22  about the New York amendment, talking about something

23  supersedes a prior agreement I think is a legal conclusion.

24         THE COURT:  Sustained.

25  Q    Does Express Scripts have any way of determining if it's

*Bonnie Roberts – Redirect – Ms. Clark*                    217

1   termination plan for a provider is in accordance with state

2   law?  Is that something you look at?

3   A    Could you repeat the question?

4   Q    Well, let me back up.  In your department you look at

5   California law, right, with respect to licensing

6   requirements, right, as part of your credentialing?

7   A    With respect to licensing requirements, yes.

8   Q    And when you're looking at terminations, do you look at

9   the state law termination requirements?

10         MS. HELLMAN:  Objection, Your Honor.  She asked

11   this question on her.

12         MS. CLARK:  They opened the door with this witness.

13         THE COURT:  Overruled.

14   A    Since I'm not an attorney and it would not be within my

15   scope to review documents, I personally would not review.

16   Q    Do you think it's important for Express Scripts to

17   follow state laws?

18   A    Yes.

19   Q    Have you since reviewed this document since Linden Care

20   was terminated?

21   A    This document you just handed me?

22   Q    Right.

23   A    I have not.

24   Q    Do you see on Section 3, page 3, this document says,

25   "The Provider Agreement shall be amended by adding the

*Bonnie Roberts - Redirect - Ms. Clark*

1    following language as a new section immediately following the

2    last section of the Provider Agreement."  Do you see where it

3    says that?

4    A    I'm sorry, where?

5         MS. HELLMAN:  Objection, Your Honor.  The document

6    speaks for itself.  She said she has never seen this.

7         THE COURT:  Sustained.

8         MS. CLARK:  Withdrawn.

9    Q    Let's turn to the definition of specialty pharmacy.

10   Remember you testified earlier that in your mind Linden Care

11   was not really a specialty pharmacy, is that right?

12   A    By my definition.

13   Q    Where is your definition found?

14   A    I didn't indicate that it was documented.

15   Q    So that's just a definition that you have in your mind,

16   not one that's a matter of policy of Express Scripts?

17   A    Not a matter of policy but more of -- I can't think of

18   the term I want to use.

19   Q    Opinion?

20   A    It is more of an industry opinion.

21   Q    I'm going to turn to a document that's been filed.

22        MR. COST:  Document 11-2.

23   Q    Now, Accredo --

24        MS. CLARK:  May I approach, Your Honor?

25        THE COURT:  Yes.

*Bonnie Roberts - Redirect - Ms. Clark*

1   Q    Accredo is a specialty pharmacy, is that right?

2   A    Yes.

3   Q    And a specialty pharmacy that's wholly owned by Express

4   Scripts, is that correct?

5   A    Correct.

6   Q    Does Accredo provide any of the same drugs that Linden

7   Care provides?

8   A    Not that I'm aware of, no.

9   Q    They don't provide any of the non-narcotic pain

10  relievers that Linden Care provides, there is no overlap?

11  A    I'm not aware that they do.

12  Q    I'm going to show you this document and I'm going to ask

13  you to read the third paragraph, if you will?

14            MS. HELLMAN:  I'm still trying to find --

15            MR. COST:  Here.

16            THE COURT:  Ms. Clark, for the record what are you

17  showing the witness?

18            MS. CLARK:  Unfortunately, the top of the bar where

19  it has the docket number is obscured.

20            MR. COST:  Attachment to affidavit filed on 11/12.

21  Q    Do you see that this is an Express Scripts' press

22  release?

23  A    Yes.  I'm sorry, referring to the highlighted sections?

24  Q    First I'm looking just at the document.  Is that an

25  Express Scripts' press release, do you see that?

1   A    Yes, I do see it.

2   Q    Dated November 11th, 2015?

3   A    Yes.

4   Q    And it announces that they terminated Linden Care.  Do

5   you see that on the top?

6   A    Yes.

7   Q    And once again, it recites the fact that they

8   predominantly dispensed Horizon Drugs.  Do you see that on

9   top?

10  A    It says, "We are also evaluating several other

11  pharmacies that appear to predominantly dispense Horizon

12  prescription drugs."

13  Q    And then it says, "In addition, we are reviewing and

14  evaluating all similar captive pharmacy arrangements that we

15  know of and will work to identify others.  By captive

16  pharmacies we mean those pharmacies that derive the vast

17  majority of their prescription volume from one manufacturer

18  or one product."

19  A    I see that.

20  Q    Is there a definition of captive pharmacy anywhere in

21  the Provider Agreement or in the manual?

22  A    No.  As I told you earlier, it's a new term for me.

23  Q    So being a captive pharmacy wouldn't be a basis for

24  terminating the contract, would it?

25  A    If it's not a defined term, it's what you're saying.

1    Q    And looking at Express Scripts' definition of specialty

2    pharmacy in the next paragraph, it says, "It is important to

3    clarify the difference between niche pharmacies that are

4    designated by manufacturers to push a particular product.

5    And, two, specialty pharmacies like Accredo that deliver a

6    superior level of specialized care for patients living with

7    complex specialty conditions."  Do you agree with that

8    definition of specialty pharmacy in Express Scripts' press

9    release?

10   A    I do.

11   Q    You were here today for the testimony of Dr. Weingarten,

12   right?

13   A    Yes.

14   Q    Do you disagree that Linden Care provides specialized

15   care for patients living with pain conditions?

16   A    No, I don't disagree with that.

17   Q    And turning to the certification which you might already

18   have in front of you?

19   A    The provider certification?

20   Q    Right.  My copy is redacted so I hope you have the same

21   copy.  It's exhibit, docket 16-4 in the record.  Do you have

22   any evidence that at the time this document was filled out,

23   that Linden Care's representation about mail order, local,

24   out of state was inaccurate?

25   A    I don't, but I do have -- I do know that they --

1    Q    You don't have that information, do you?

2    A    I don't have that information.

3    Q    And that percentage would change every day if you looked

4    at it, right?

5    A    It speaks more to the --

6    Q    Excuse me, if you can answer my question.  The

7    percentage of mail order that a pharmacy does could change on

8    a daily basis, couldn't it?

9    A    We're asking about practice types, so, yes, the

10   percentage could change on a daily basis.

11   Q    Thank you.  And Express Scripts doesn't expect --

12            MS. HELLMAN:  Your Honor, let her finish her

13   answer, please.

14            MS. CLARK:  Fair enough.

15   Q    Express Scripts doesn't expect a pharmacy every day to

16   fax in changes in this, these percentages that are offered,

17   right?

18   A    No.  But we would expect a pharmacy to tell us if their

19   general practice type changes.

20   Q    So there is some standard for when there needs to be a

21   unilateral update or change between credentialing cycles, but

22   is there any sort of standard or definition of when that

23   needs to occur?

24   A    There is a -- the Provider Manual states that they

25   should update us upon any change in practice.

*Bonnie Roberts - Redirect - Ms. Clark*

1   Q    Well, actually, the agreement itself says that if there

2   is a change in the information, that makes the verification

3   untrue or inaccurate.  This representation on this date never

4   became untrue or inaccurate.  It stated 39 percent.  There

5   was no information from Linden Care that that was inaccurate

6   or untrue when that statement was made.  Do you have

7   information to the contrary?

8   A    I do not.  But I do know that they list one out of state

9   licensure at the time of this certification and that

10  information obviously changed if they are licensed in 49

11  states.

12  Q    The --

13        MS. CLARK:  Move to strike as nonresponsive.

14  Q    The form has a bunch of check boxes with various terms

15  such as mail order, local, out of state.  Is there any

16  definitions of those terms?

17  A    There are not, other than retail.

18  Q    And do you know if there is any instructions that would

19  tell somebody if these are mutually exclusive and should add

20  up to 100 or any sort of instructions like that?

21  A    If a pharmacy or provider has questions regarding this

22  application or this certification, we have an 800 number

23  where they can call and seek information.

24        MS. CLARK:  Move to strike as nonresponsive, Your

25  Honor.

1          THE COURT:  Denied.

2   Q    I'm asking you, is there any instructions that come with

3   the form that say your percentages should add up to 100 or,

4   for example, you could certainly have 30 percent Medicaid and

5   50 percent open door retail community, correct?

6   A    Yes.

7   Q    So you could have more than 100 percent add up here

8   given all these different boxes?

9   A    That's exactly right.

10  Q    Is there a definition given for self administered

11  injectable specialty anywhere?

12  A    There are no definitions on this document.

13  Q    Now, you mention that there was a lack of trust that was

14  at the heart of the decision to make an immediate

15  termination.  Do you remember that term you used?

16  A    Yes, I did.

17  Q    Was part of that mistrust because Linden Care was doing

18  a large part of its business with Horizon?

19  A    That would be part of it, yes.

20  Q    And Horizon and Express Scripts are in a legal battle

21  which also began on November 11th over $140 million in

22  rebates, is that right?

23  A    That's what I've read.

24  Q    Did that battle with Horizon over $140 million in

25  rebates and all the press contribute to the mistrust of

Bonnie Roberts - Redirect - Ms. Clark

1  Linden Care?

2  A    I don't have any knowledge about the rebate battle.

3  Q    You were asked a lot of questions about what efforts

4  Linden Care made to feed to Express Scripts information about

5  patients that were complaining about having lost their

6  pharmacy with no notice.  Do you remember that testimony?

7  A    Yes.

8  Q    Are you aware that Express Scripts represented in

9  affidavits to this Court that it wasn't a big deal because

10 the pharmacy tool would lead patients right to Village

11 Pharmacy in Syosset?

12         MS. HELLMAN:  Objection, Your Honor.  She is

13 mischaracterizing the testimonying that's before this Court.

14         MS. CLARK:  I don't think so, Your Honor, but

15 I'll --

16         THE COURT:  Sustained.

17 Q    Are you aware that Express Scripts suggested that

18 patients don't have a problem by virtue of losing their

19 pharmacy because they could always go to Village Pharmacy in

20 Syosset?

21 A    I don't think we ever mentioned Village Pharmacy in

22 Syosset.

23 Q    Does Express Scripts follow any patient abandonment

24 standards when it decides to summarily terminate a pharmacy

25 without making any other arrangements beforehand for

1   patients?

2   A    I'm not familiar with patient abandonment standards.

3   Q    Does Express Scripts have a pharmacy that could

4   prescribe narcotics and some of the highly regulated drugs

5   we've been talking about today, like fentanyls?

6   A    Yes.  Yes, Express Scripts mail order pharmacies can

7   dispense those types of medications.

8   Q    Do you know how many patients that were Linden Care

9   patients had been shifted over to the Express Scripts mail

10  order pharmacy as a result of the termination of Linden Care?

11  A    Not, I do not.

12  Q    Would you be able to find that information out if you

13  wanted to?

14  A    I suppose there could be some research done on that.

15  Q    Do you know if there was any outreach to the Linden Care

16  patients trying to get them to go over to the Express Scripts

17  mail order service?

18  A    I'm not aware of any.

19           THE COURT:  Are we close to wrapping up, Ms. Clark?

20           MS. CLARK:  Yes, Your Honor.  As a matter of fact,

21  Your Honor, I have nothing more.

22           THE COURT:  Ms. Roberts, with respect to the

23  exhibit that's been submitted about individuals in

24  California, I want to make sure I understand the exhibit.  Is

25  there any evidence regarding where the shipments were made

1    to?

2              THE WITNESS:  I don't know that we would have that

3    information.  Linden Care would have that information.

4              THE COURT:  So these were drugs that were provided

5    to members who had residence in California but there is no

6    evidence that you have regarding where the shipments were

7    made to?

8              THE WITNESS:  Yes, ma'am.

9              THE COURT:  And does Express Scripts have any

10   evidence that Linden Care was not making the best effort to

11   dispense the formulary drugs?

12             THE WITNESS:  No, we do not have any evidence that

13   I'm aware of.

14             THE COURT:  Thank you, Ms. Roberts.  Anything

15   further, Ms. Hellman?

16             MS. HELLMAN:  No, Your Honor.  Thank you.

17             THE COURT:  Thank you, Ms. Roberts.  At this point

18   I assume we will continue Monday morning.  The Court has to

19   be completed by noon on Monday, so I can start at 9:00.  And

20   what do counsel intend to do on Monday?  Do you have any

21   additional evidence?

22             MS. HELLMAN:  Well, Your Honor, as we mentioned, we

23   would like an opportunity to question Mr. Weiner.

24             MS. CLARK:  And, Your Honor, we would like an

25   opportunity to question somebody with Express Scripts with

1    knowledge regarding the issues here.  I don't think I should

2    be forced to put up a third witness when Express Scripts have

3    come in with one witness, with a relevant range of knowledge,

4    but certainly not a complete range of knowledge.  That

5    doesn't seem fair under the circumstances.

6           So, you know, I'm willing to -- I'm willing to rest

7    with the exception of Mr. Kantor, with a very narrow set of

8    issues, but unless this Court directs us otherwise, we would

9    not be bringing Mr. Weiner back to Court without some kind of

10   additional participation by witnesses with knowledge.

11          THE COURT:  He did submit a declaration, so it

12   seems only fair that defense counsel should have an

13   opportunity to cross-examine him.  We can check to see

14   whether we can do that by videotape.  Make him available.

15   This Court has videotape facilities, if he was available to

16   testify by videotape, we could perhaps to do that on Monday

17   morning.

18          MS. HELLMAN:  We would be open to that, Your Honor.

19   Thank you.

20          MS. CLARK:  I'll have to talk to my clients about

21   that and see if they're comfortable with the videotape idea

22   but we appreciate that.

23          THE COURT:  Video conference.  My deputy corrected

24   me.

25          MS. HELLMAN:  Is he here in New York?  I mean, is

1   he in New York?

2          MS. CLARK:  Not up here.  He is in Manhattan.  He

3   spent the whole -- he is not local, that's for sure.  He is

4   not within 100 miles of the court, Your Honor.

5          MS. HELLMAN:  I understand that.  It's a pharmacy,

6   nobody's up here.

7          MR. SMITH:  He chose his venue.

8          MS. CLARK:  We're not complaining.  We brought our

9   executives here.  They testified in good faith about the

10   issues.  They did not deny knowledge about everything that

11   Mr. Weiner put in his affidavit.  They could have testified

12   about all those issues that were there.  We just wanted to

13   provide the people with the information that was relevant to

14   the Court.  And now they want somebody else who has really

15   got the same range of information.  So I think that's --

16          MS. HELLMAN:  Your Honor, I think the witnesses

17   that testified today actually have very little information as

18   evidenced by the compliance officer.  It is their burden

19   here.  So I don't think each party has to bring the same

20   number of witnesses.  As long as it's by videotape, we're

21   agreeable to that, and I appreciate it, Your Honor.

22          THE COURT:  I'm not sure exactly how we can do it

23   by video conferencing, now that it's after five, to arrange

24   for it.  I'm wondering if perhaps we should continue it on

25   Tuesday and have it so that we have time to arrange for video

1   conferencing of Mr. Weiner, and then Ms. Clark can request a

2   witness from Express Scripts to testify.

3        MS. CLARK:  Your Honor, I'm going to see if I can

4   get my client here on Monday.  We are in a very difficult

5   situation with hundreds of thousands of dollars per day being

6   used to support patients.

7        Your Honor, I hate to indulge any more, but with

8   the testimony that we just heard regarding the basis for the

9   California issue and the testimony today, I really have no

10  choice but to ask that Your Honor consider a very narrow TRO.

11  We're happy to come back Monday, Tuesday, whenever you want,

12  but at this point, Your Honor, we feel like we've met the

13  burden that the Court has set for us and gone above and

14  beyond, and there is so much at stake for the patients, so we

15  are asking that the Court consider a very narrow TRO over the

16  weekend until we come back here.

17       THE COURT:  I understand.  And at this point that's

18  denied because I don't have enough information before me to

19  establish likelihood of success and irreparable harm to make

20  a ruling in favor of the TRO.

21       Let me ask, Ms. Hellman, is there some evidence

22  that shipments were sent to California?

23       MS. HELLMAN:  I believe that, and I was somewhat

24  surprised, yeah, I can sure that up and we'll present that

25  evidence.  So, yes, I do believe there is evidence of that.

 1   The converse to say that they were on vacation, which I don't

 2   believe that to be the case.  Yes, I can do that and come

 3   back here and if necessary we'll address that.

 4        MS. CLARK:  I believe the testimony was that people

 5   that are on vacation, people that are recently relocated.

 6   There was a couple different things there, it wasn't quite as

 7   simple as vacationers.  We just got hit with this information

 8   today.  Looks like a very logical explanation.  But certainly

 9   something that Express Scripts should have chased down before

10   they terminated us without notice, that's the point.

11        MS. HELLMAN:  And, Your Honor, again, I would just

12   reiterate about whether it would be Monday morning or

13   whatever, I mean, again, we have heard so much evidence

14   today, but what we haven't heard is about the standard and

15   the burden that the plaintiff has, so if you would just again

16   indulge me a little bit to have some time to kind of go

17   through what the standards are and kind of address some

18   questions on irreparable harm.

19        THE COURT:  Yes.  Should we continue starting at

20   9 a.m. on Monday?  Will Mr. Weiner be here?

21        MS. CLARK:  I have to talk to him just for a

22   moment.  May I?

23        THE COURT:  Yes.

24        MS. CLARK:  Your Honor, I did consult with my

25   client, and if we could, we don't think there is a lot of

1    testimony left, but the earliest flights won't get in here

2    before ten, even if he leaves at like pretty early in the

3    morning.  So we can start then, that would be fine.

4              MS. HELLMAN:  I know, I sympathize with flights.

5    We fly in the night before to be here.  Again, the plaintiff

6    chose this venue, they chose to be here in the Northern

7    District of New York.  So starting at ten, if you need to be

8    done by noon, Your Honor, I just feel we could be in the same

9    predicament we're in now.

10             THE COURT:  Is there any other witness that the

11   either counsel intend to present on Monday?

12             MS. CLARK:  I think what I'm going to be able to do

13   is cancel Mr. Kantor and substitute Mr. Weiner and have one

14   witness, because they have similar information.  So I'm going

15   to try to do that and have one witness.

16             MS. HELLMAN:  Are you reopening your case or have

17   you closed your case?

18             MS. CLARK:  I did not close my case.

19             THE COURT:  Perhaps we could meet at nine and have

20   some discussion on the legal issues that are before the

21   Court, and then following the testimony have argument about

22   the case.  But I have some questions about the different

23   provisions that are before the Court and the state law.  So

24   perhaps we could meet at 9:00 for that discussion.  And then

25   if Mr. Weiner is here by ten, he could be the witness at

1   10:00.

2            MS. CLARK:  That's fine, Your Honor.

3            MS. HELLMAN:  That's fine.

4            THE COURT:  Thank you, Counsel.  See you Monday

5   morning.

6                    *              *            *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T I O N

            I, EILEEN MCDONOUGH, RPR, CRR, Federal Official

Realtime Court Reporter, in and for the United States

District Court for the Northern District of New York,

do hereby certify that pursuant to Section 753, Title 28,

United States Code, that the foregoing is a true and correct

transcript of the stenographically reported proceedings held

in the above-entitled matter and that the transcript page

format is in conformance with the regulations of the

Judicial Conference of the United States.


_____

EILEEN MCDONOUGH, RPR, CRR
Federal Official Court Reporter