UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
--------------------------------------------x
LINDEN CARE, LLC,

                        Plaintiff,

vs.                                   1:15-CV-1335

EXPRESS SCRIPTS, INC.,

                        Defendant.
--------------------------------------------x


*Evidentiary Hearing* – November 23, 2015

James Hanley Federal Building, Syracuse, New York

HONORABLE BRENDA K. SANNES

United States District Judge, Presiding


*Eileen McDonough, RPR, CRR*
*Official United States Court Reporter*
*P.O. Box 7367*
*Syracuse, New York 13261*
*(315)234-8546*

A P P E A R A N C E S

For Plaintiff:        BARCLAY DAMON LLP
                      Attorneys at Law
                      80 State Street
                      Albany, New York 12207
                         BY:  LINDA J. CLARK, ESQ.
                              DAVID COST, ESQ.
                              JOSEPH MURPHY, ESQ.

                      BOIES, SCHILLER & FLEXNER, LLP
                      Attorneys at Law
                      5301 Wisonsini Ave, NW
                      Washington, DC 20015
                         BY:  LAWRENCE V. ASHE, ESQ.
                              NICHOLAS A. WIDNELL, ESQ.

For Defendant:        HUSCH BLACKWELL
                      Attorneys at Law
                      190 Carondelet Plaza
                      St. Louis, MO 63033
                         BY:  SARAH C. HELLMANN, ESQ.
                              CHRISTOPHER A. SMITH, ESQ.
                              URMILA PARANJPE BAUMANN, ESQ.

                      COZEN, O'CONNOR LAW FIRM
                      Attorneys at Law
                      277 Park Avenue
                      New York, NY 10172
                         BY:  JOHN SULLIVAN, ESQ.

*Eileen McDonough, RPR, CRR*
*Official United States Court Reporter*
*P.O. Box 7367*
*Syracuse, New York 13261*
*(315)234-8546*

1          (Court convenes at 9:00.)

2          THE COURT:  Good morning, Counsel.  And I know that

3     Mr. Weiner was planning to be here about 10.  Is that still

4     the case?

5          MS. CLARK:  He is here earlier.  He ended up coming

6     in last night, the flights just seemed too tight and

7     unreliable.

8          THE COURT:  Do you want to proceed with Mr. Weiner

9     right now?

10          MS. CLARK:  Sure.

11          MS. HELLMANN:  I know that we're under a very tight

12     time frame.  I know you have a hard stop at noon.  Ms. Clark

13     was ready to close her case until we indicated that we were

14     going to call Mr. Weiner and then she wanted to continue him

15     on her case.  If she is going to continue her case, I would

16     just like to know -- her estimates, in all due respect, have

17     not been accurate in how long witnesses are going to take.  I

18     would like to have some sense and kind of hold her to it of

19     when this is going to stop.  We had seven hours of testimony

20     on Friday.  I have yet to give you an opening statement.  I

21     have yet to do almost anything because of the time that

22     Ms. Clark has taken.  So I just am very concerned that we're

23     going to be in the same position where we were on Friday that

24     I am just not given an opportunity to present our case.

25          THE COURT:  How much time do you anticipate,

1    Ms. Clark?

2          MS. CLARK:  Your Honor, the only stumbling block on

3    Friday was the cross-examination took a lot longer, and that

4    can happen.  But Mr. Weiner has been on my list from the

5    beginning.  And I think when I left on Friday I had not put

6    on Mr. Kantor.  So what I'm trying to do is compress

7    Mr. Kantor and Mr. Weiner and put on one witness.  So I've

8    actually made some significant efforts to streamline the

9    case.  I don't know how long it's going to take.  My guess is

10   we're talking about 40 minutes, 45 minutes.

11         THE COURT:  Okay.  Why don't we get going and you

12   may call your witness, Ms. Clark.

13         MS. CLARK:  Thank you.  Your Honor, the plaintiff

14   calls Mark Weiner.  Your Honor, may I approach for a moment?

15         THE COURT:  Yes.

16         (Sidebar discussion held on the record.)

17         MS. CLARK:  ████████████████████████████

18   ████████████████████████████████████████████████████

19   ████████████████████████████████████████████████████

20   ████████████████████████████████████████████

21   ████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████████████████████████

25         THE COURT:  Okay.  Thank you for letting us know.

*Mark Weiner – Direct – Ms. Clark* 239

1     (Sidebar discussion concluded.)

2          *MARK WEINER*, called as a witness and being

3     duly sworn, testifies as follows:

4     *DIRECT EXAMINATION BY MS. CLARK:*

5          THE COURT: ██████████████████████████

6     ██████████████████████

7          THE WITNESS:  Thank you, Judge.

8     Q    Good morning, Mr. Weiner.  Can you please state for the

9     record your name and current position?

10    A    My name is Mark Weiner.  I'm the CEO of Linden Care.

11    Q    How long have you been the CEO of Linden Care?

12    A    About two and a half, three years.

13    Q    Can you give the Court very briefly an overview of your

14    credentials and educational background?

15    A    I graduated from the St. John's School of Pharmacy and

16    Health Sciences in 1989.  After graduating pharmacy school, I

17    worked a little in the family business.  I'm a third

18    generation pharmacist.  And after working there, I started a

19    company that I sold to a -- a specialty pharmacy that I

20    started, sold it in 2002 to a publicly traded company.  And

21    after that I stayed on with the company, worked in various

22    roles within that company.  Moved on to a multi-disciplinary

23    practice as a consultant and helping them in their oncology

24    program.

25    Q    For how long a period of time you were a practicing

*Mark Weiner – Direct – Ms. Clark*

1  pharmacist?

2  A    Practicing pharmacist I would say from '89 to '95, '96.

3  Q    Are you a practicing pharmacist now?

4  A    No, I am not.

5          THE WITNESS:  Can I move to the right because of

6  this light?

7          THE COURT:  Absolutely.

8  Q    Where do you work at Linden Care physically?

9  A    I work in our Woodbury facility.

10 Q    And how many employees are there in Woodbury?

11 A    Approximately 130.

12 Q    And are there pharmacists?

13 A    Yes.

14 Q    How many are there?

15 A    There are eight pharmacists.

16 Q    The eight pharmacists at Linden Care, are they all in

17 New York?

18 A    They're located in New York, yes.

19 Q    Are they all licensed in New York?

20 A    Yes, they are.

21 Q    Can you describe how it was that Linden Care became

22 involved in the pain medication specialty area?

23 A    It was pain medications is a niche business of our

24 business, specialty business.  We found there was a need for

25 pain control.  Patients have a hard time finding these

*Mark Weiner - Direct - Ms. Clark*

1    medications, patients that are either in automobile

2    accidents, other accidents, a lot these patients have pain

3    due to secondary disease.  There is a fact that the NIH or

4    NIS put out that there is 100 million Americans living with

5    chronic pain in our country now.  So secondary to

6    neurological, orthopedic, rheumatoid diseases, and obviously

7    oncology as well.

8        So we found there was a need for it.  And I would say

9    about five, six years ago or maybe longer the need got even

10   more because there was two just horrific events where

11   multiple people died at pharmacies in our area, so more

12   pharmacies didn't want to carry the medications because they

13   weren't set up properly safety-wise and have the compliance

14   needs to carry these medications.

15   Q    Have there been developments in the Pharma world that

16   have also caused pain management to be part of specialty

17   pharmacy?

18   A    Yes.

19   Q    And can you describe those?

20   A    There's a lot of new technology coming out about these

21   medications to short acting medications, short acting pain

22   relievers and medication that's given that would relieve

23   pain, what they call breakthrough pain.  Breakthrough pain is

24   when patients who are on long acting medications and they're

25   either going for therapy or something that the long acting

*Mark Weiner - Direct - Ms. Clark*

1   just doesn't work, so there is a whole bunch of short acting

2   medications that will help the patient get through their

3   pain.

4   Q    We're going to cover all this again, but you were here

5   in the courtroom when some of our colleagues talked about

6   TIRF REMS drugs.  Do you remember that testimony?

7   A    Yes.

8   Q    Would that be one of the developments in your area?

9   A    Yes, it would be.

10  Q    Have those developments also caused greater regulatory

11  concerns that pharmacies had have to deal with?

12  A    Yes.

13  Q    What are those?

14  A    There is regulatory that pharmacies have to deal with is

15  there is the proper storage of the medications.  You have to

16  make sure that the medications aren't counterfeit, meaning

17  the technology that people have these days with printers and

18  going on to the website, people can easily print out

19  prescriptions, phony prescriptions.  So part of what we do is

20  help keep these pharmaceutical medications off the street.

21  Q    How has that affected pharmacies in particular?

22  A    Pharmacies don't want to carry these medications.  There

23  are safety issues all the time.  I mean, if you go into some

24  chain stores or supermarket stores, they either don't want to

25  carry it because it's real easy for you get somebody who

*Mark Weiner – Direct – Ms. Clark* 243

1   might be an addict, who some of these addicts would do

2   anything to get their medication.  And crazy as it is, some

3   of them would just walk in and put a gun to the young man or

4   the young lady sitting at the counter and say I want your

5   hydrocodone, I want your Vicodin, I want your this, I want

6   your that.

7   Q   What investments has Linden Care had to make in order to

8   meet current modern standards with respect to the management

9   of those controlled substances?

10  A   I would put our compliance department, and Arthur

11  Kersey, he is a former DEA agent who runs our compliance

12  department in which there is eight people in our compliance

13  department because we have to watch, part of our

14  responsibility of watching the patient's back, the doctor's

15  back and the public's back making sure patients what they

16  call aren't doctor shopping.

17      Some of these people would do outrageous things.  They

18  might go to a pain doctor, a board certified doctor with an

19  MRI.  You would be surprised, I'm sure you might not be.  But

20  you can go online and buy an MRI, so people would go on, buy

21  an MRI and bring it to a doctor and say here's my MRI that

22  shows this, and the doctor says, okay, it's an MRI, I see

23  your dislocated disk, and write these medications.

24  Q   With respect to the Woodbury pharmacy, is that a retail

25  location?

*Mark Weiner – Direct – Ms. Clark*

1   A    Yes, it is.

2   Q    And how many patients on a given week would come in and

3   out of the retail location in Woodbury?

4   A    Hundreds.

5   Q    And those patients come into the Linden Care pharmacy,

6   do they sometimes interact with members of the staff?

7   A    Yes, they do.

8   Q    What kind of services do they seek one on one in the

9   pharmacy?

10  A    Besides the counseling about side effects of the

11  medication, they also seek our help in helping them cut

12  through the red tape and jumping through hoops to get through

13  the prior authorizations and get them the medications.

14  Q    Now are all the drugs dispensed by Linden Care dispensed

15  from that location in Woodbury?

16  A    I'm sorry?

17  Q    Are all the drugs that are dispensed from Linden Care

18  New York, are they all dispensed from Woodbury?

19  A    Oh, absolutely.  I'm sorry.

20  Q    Now you mentioned that there is some red tape involved

21  sometimes for patients.  Does this have something to do with

22  the type of illnesses that the patients have or the types of

23  drugs that they take?  What is it that creates the red tape?

24  A    The red tape could be caused by a number of different

25  things.  There could be the cost of the medication, there

*Mark Weiner - Direct - Ms. Clark*                    245

1    could be the quantity of the medication, it could be an

2    increase in dose or frequency.  So, for example, if Mr. X or

3    Ms. X has a medication where they get 120 or they're taking

4    four a day, 120 a day -- I'm sorry.  If a patient is getting

5    four tablets a day and then the next month the dose increases

6    to either higher strength or they're taking more, taking 180,

7    might need a prior auth for that.  You might need a prior

8    authorization because the cost of the medication exceeds a

9    certain limit or the quantity.  And certain medications just

10   itself requires a prior authorization.

11   Q    How does Linden Care interact with the patient and the

12   prescriber when those situations arise?

13   A    The patient, Linden Care will interact with the patient

14   by gathering the information that we need working as part of

15   the health care team with the physician, the patient and the

16   payers who gather all the information, get it to the doctor

17   and work with the doctor to get that prior authorization

18   taken care of.

19   Q    And we're talking about prior authorization, are we

20   talking about authorization of a drug that's on the patient's

21   formulary?

22   A    Yes.

23   Q    We discussed formularies.  I'm not going to go over all

24   that again.  But in each case when there is a prior

25   authorization sought, it's because the drug is offered by the

1    plan, the individual's health plan, and it's on their

2    formulary, correct?

3    A    Yes.  It's on their formulary and when we process the

4    claim, we process or adjudicate the claim, we are doing it

5    through the computer live so we get a response back from our

6    computer right then and there, is the medication paid for,

7    does it need prior auth, so we know realtime if the

8    medication and what's needed.

9    Q    So is Linden Care frequently in a position of having to

10   advocate for the patient to get the drugs that their doctor

11   prescribed that are on their formulary?

12   A    Yes.

13   Q    And is that a daily occurrence?

14   A    Yes.

15   Q    Now how does the pharmacy benefit manager fit into that

16   equation?

17   A    Well, the pharmacy benefit manager, or PBM, is the

18   person that ultimately makes the decision to authorize and

19   pay for the claim.

20   Q    So does Linden Care have to interact with the PBM?

21   A    Yes, we do.

22   Q    What are the types of drugs that require Linden Care to

23   interact with the PBM on a prior authorization or

24   administrative basis?

25   A    All types of medications.

*Mark Weiner – Direct – Ms. Clark*

1   Q    Particularly are we talking about expensive drugs or

2   inexpensive drugs?  What in pain management causes Linden

3   Care to be frequently in contact with the PBM on behalf of a

4   patient?

5   A    It's the cost of these medications and the quantity of

6   these medications.  And in some cases it's just the type of

7   medications they are being narcotic or controlled

8   medications.

9   Q    When you say expensive, what are we talking?  Talking

10  hundreds of dollars or more than that?

11  A    We're talking about hundreds of dollars per dose.

12  Q    Per dose?

13  A    Yes.  Which ultimately comes down to tens of thousands

14  of dollars per month.

15  Q    We heard from Dr. Weingarten and you were here for his

16  testimony?

17  A    Yes.

18  Q    Some of the new classes of drugs that are coming out

19  take different forms, is that right?

20  A    Yes.

21  Q    Some of them are injectable, some of them are pills, is

22  that right?

23  A    Yes.

24  Q    And they frequently require special handling, is that

25  true?

*Mark Weiner - Direct - Ms. Clark*                    248

1   A     Yes.

2   Q     And one of those drugs that you mentioned is the -- is a

3   topical medication.  Can you describe to the Court, for the

4   Court the topical pain medications and how that plays into

5   this whole process?

6   A     There is a topical medications that's it's a Diclofenac

7   Sodium 2 percent.

8   Q     And why would -- is that an expensive medication?

9   A     Yes, it is.

10  Q     How does it apply?

11  A     It's applied topically.

12  Q     And is that an alternative to narcotic?

13  A     Yes.  Yes, it is.  And it's an alternative to narcotic.

14  Q     Why would a physician prescribe that over oxycodone or

15  some other narcotic?

16  A     For multiple reasons.  One reason would be you're

17  applying this medication directly to the area.  ███████████

18  ███████████████████ -- you apply two pumps directly to that

19  area, so it's being absorbed right to that area and it's not

20  a systemic, meaning you're not swallowing the tablet that

21  would cause gastro or GI upset and fewer drug-drug

22  interactions.  When you're taking multiple medications at the

23  same time by mouth or swallowing or ingestion, there's a good

24  chance of drug-drug interactions.

25  Q     And is that one of the reasons that in your experience

1  in working with doctors that they like to prescribe these

2  newer alternatives to addictive opiates?

3  A    Absolutely because Diclofenac is a legend drug.  Let me

4  back up.  In pharmacy there is three classes of drugs; there

5  is narcotics, controls and legends, legend being obviously

6  non-narcotic, non-controlled.  So you have prescribing legend

7  medications, there's no risk of addiction.

8  Q    And does Linden Care sometimes have to advocate with the

9  patient to get that alternative form of products?

10 A    Yes.  We have to advocate with the patient, yes.

11        THE COURT:  Ms. Clark, can could we try to focus on

12 the issues before the Court, which are likely success on the

13 merits and irreparable harm?

14        MS. CLARK:  Absolutely.

15 Q    Let's turn to Linden Care relationship with his pharmacy

16 benefit managers.  Express Scripts is one of Linden Care's

17 pharmacy benefit managers, correct?

18 A    Yes, they are.

19 Q    And about how much of the market is ESI, or Express

20 Scripts, versus other PBMs?

21 A    I believe ESI, or Express Scripts International, covers

22 about 30 to 35 percent of the lives or belly buttons in our

23 country.

24 Q    As a CEO how important is it to be in the Express

25 Scripts' network to be a successful pharmacy?

1    A    It's critical.  You can't conduct pharmacy without being

2    in the Express Scripts network.

3    Q    And can you explain to the Court why that is as a

4    reality?

5    A    It's just a reality because we know if we were --

6    Express Scripts physicians know that if they -- when they

7    mention, especially with pain meds when they say, doc, I

8    can't find medications and everything else, the doctors can't

9    decipher and say we prefer Linden Care.  But you can't take

10   Express Scripts.  But on top of that once, you know, we're

11   seeing in the news, other PBMs are seeing in the news, in the

12   media what Linden Care new was false information about Linden

13   Care, so other PBMs they read this information in the news.

14   And we've already received two other termination notices

15   because of false information that's been in the news.

16   Q    When you say two other termination notices, are those

17   from other PBMs?

18   A    Yes, they are.

19   Q    And can you describe the timing of those termination

20   notices in relation to Express Scripts' notice last week?

21   A    Within five working days of receiving the Express

22   Scripts' termination notice, which we received on

23   November 10th.

24   Q    And does that concern you as a CEO?

25   A    It concerns me as a CEO because it's the livelihood of

*Mark Weiner - Direct - Ms. Clark*

1  our company.

2  Q    Now, Express Scripts in addition to being a PBM is also

3  a competing pharmacy, is that right?

4  A    Yes, they are.  Express Scripts runs several different

5  mail order and specialty pharmacies across the country.

6  Q    And you were here on Friday when Ms. Roberts testified

7  that Accredo, which is Express Scripts' in-house pharmacy,

8  doesn't compete with Linden Care?

9  A    Yes, I was.

10 Q    And what is your understanding of the overlap between

11 Accredo and Linden Care as competitors in the market?

12 A    Well, theres a few things.  We know that Express Scripts

13 sends letters out to patients that we fill prescriptions for

14 saying -- they send different letters.  They'll send one

15 letter verifying the medication, being a PBM management,

16 that's what they're supposed to do.  They'll send a letter to

17 Mr. X saying here is copy of what was dispensed, please

18 verify, which is what they're supposed to do.  But they'll

19 take it one step further sending additional letters, dear

20 patient X, we know you received this medication.  If you like

21 we could provide that as well from one of our mail order

22 pharmacies.

23 Q    So the PBMs actively solicits Linden Care's patients by

24 sending them letters trying to get them to move over to the

25 Express Scripts' pharmacy?

*Mark Weiner – Direct – Ms. Clark*

1   A    Yes.  It's not just Linden Care's patient, it's all

2   patients within the network, not just ones that go to Linden

3   Care.

4   Q    And over the weekend did you inquire as Linden Care

5   about whether or not any patients had begun to receive

6   notifications from Express Scripts that Linden Care had been

7   terminated?

8   A    Yes.

9   Q    What information did you get?

10  A    We determined that some patients received some letter

11  instructing them on what to do.  That we were terminated from

12  the network and what to do to move on to get their

13  medications.

14  Q    What portion of the patients that you've been in touch

15  with got the letter?

16  A    I'm not sure exact of the number.

17          MS. CLARK:  Your Honor, I'm going to mark an

18  exhibit, if I may.

19          THE COURT:  Yes.

20          MS. HELLMANN:  Could I see a copy of it, please?

21          MS. CLARK:  Yes.  I apologize for the copy.  We

22  printed it last night.  Do you know what number we're up to?

23          THE CLERK:  The list is up to 26, so it would be

24  27.

25          MS. CLARK:  That's fine.  Your Honor, with this

*Mark Weiner – Direct – Ms. Clark*                    253

1    document we'll be redacting it at some point because it does

2    have patient information.

3                THE COURT:  Ms. Clark, for the record it's been

4    marked as P27?

5                MS. CLARK:  That's right.

6    Q    Mr. Weiner, P27, do you recognize that document?

7    A    Yes, I do.

8    Q    And where did you obtain this document or where did

9    Linden Care get that document?

10   A    One of our patients had forwarded us on a copy of this

11   letter.

12   Q    Is that a copy of the letter that patients have started

13   to receive?

14   A    Yes.

15   Q    Indicating that Linden Care has been terminated from the

16   Express Scripts network?

17   A    Yes, it is.

18   Q    And you'll see in the first part of the letter it says

19   that changing pharmacies is easy.  Do you see that?

20   A    Finding another pharmacy is easy, yes.  I'm sorry, the

21   next line, changing pharmacies is easy too, yes.

22   Q    And based upon your knowledge of the availability of

23   pain medications, is that a true statement?

24   A    Well, the first line, the first bullet point is a little

25   troublesome to me because it says, quote, "Take your

*Mark Weiner – Direct – Ms. Clark*

1  prescription bottle to your new pharmacy, they're contact

2  your old pharmacy to transfer your prescription."

3  Q    Why is that problematic?

4  A    First of all, they didn't address narcotics, you need a

5  new prescription every time.  So that doesn't address the

6  issue.  And also if people in a pharmacy walking in with a

7  bottle, whether it's methadone, morphine sulfate, fentanyl

8  products, oxycodone products, methadone products, morphine

9  products, patients are hesitant, you would need a new

10  prescription.  For the controlled medications, you can't

11  transfer a prescription for controlled medication.

12  Q    So if a patient walks in with a bottle into a pharmacy,

13  are they going to be able to get their medications?

14  A    Are they going to be able to get, no.

15  Q    What would they have to do?  They would have to get an

16  appointment with their doctor, right?

17  A    Doctors are a little and they should be wary about just

18  patient calling in just writing new prescriptions, because

19  everybody's at risk in the handling of these medications.

20  The administrative assistant is not just going to take a

21  note, oh, Dr. Smith, patient X needs medication, just write a

22  new prescription.  The doctor's going to want to understand

23  the situation and the doctor's also going to be wary where he

24  or she is sending those medications for to what pharmacy.

25  Q    What about the patient population that Linden Care

*Mark Weiner - Direct - Ms. Clark*

1  serves and the suggestion that people can just take their

2  bottle and walk into their corner pharmacy and get their

3  prescription filled?

4  A    Well, not to be cheeky, a lot of our patients it's hard

5  for them to be driving or walking.  If you think about these

6  chronically ill patients on narcotics and controlled

7  medications, so should some of them even be driving.  I don't

8  want to say it's DWI but, you know, if someone's on chronic

9  medications, can they drive with these medications.  That's

10  the first point there.  And just wary of where these

11  medications are going.

12  Q    Does that letter set forth a responsible transition plan

13  that deals with the needs of Linden Care patients?

14  A    I think in my opinion Express Scripts could have had a

15  set up, with the big company they are and the specialty

16  pharmacies they are, they could have set up a special unit to

17  handle the transfer of these narcotic medications, a phone

18  number to get somebody, et cetera, et cetera.

19      We had a patient this week that, although it wasn't pain

20  medication, he has an issue getting his medication and he has

21  got multiple sclerosis.

22  Q    And did that happen over the weekend?

23  A    That happened Friday.

24  Q    Okay.  And what did that patient convey to Linden Care

25  when they reached out to Express Scripts?

*Mark Weiner – Direct – Ms. Clark*

1    MS. HELLMANN:  Your Honor, we've had a lot of

2 hearsay in this case, but we've got to move this case along.

3 I'm going to object.

4    THE COURT:  Overruled.

5 A   When a patient PY reached out to Express Scripts, again

6 he was told there's something wrong with the way Linden Care

7 is processing the claim.  And at that point because based on

8 what we heard, we were very clear to Mr. PY that we should

9 tell him that we were terminated from the network.  That we

10 got two calls back, I believe it was the next day.  One call

11 was from UniCare who said that, and one script was from

12 Express Scripts, and both acknowledge that, the person that

13 called from Express Scripts acknowledged that they weren't

14 allowed to reach out to the patient.

15 Q   So even when Express Scripts had information that there

16 were patients that were having trouble getting their

17 medications filled, they indicated that they would not call

18 the patient, is that right?

19 A   Correct.

20 Q   Now, how is Linden Care classified as a pharmacy in

21 New York?

22 A   Well, Linden Care is licensed, all pharmacies are

23 licensed through the New York State Department of Health

24 through the state Board of Education.  We're licensed as a

25 retail pharmacy.  I don't know if that's the question you're

1    asking.

2    Q     Right.

3    A     Yes, I'm sorry.  We're licensed as a retail pharmacy.

4    Q     Is it unusual based upon your experience particularly in

5    the downstate New York area for retail pharmacies to have

6    various methods to deliver medications to patients' homes?

7    A     It's common practice to deliver to their primary address

8    or their secondary address, yes.

9    Q     Wherever they need to get it, is that right?

10   A     Yes.

11   Q     So just because you use overnight delivery or courier

12   delivery, that doesn't make you a mail order pharmacy?

13   A     No, it does not.  My definition of a mail order pharmacy

14   or the traditional industry definition of a mail order

15   pharmacy is a pharmacy that's going to provide a ninety day

16   supply of maintenance medications, and for those who are not

17   aware, I don't want to -- I apologize if I'm making it --

18   maintenance medications is for high blood pressure,

19   cholesterol, chronic diseases of people with high blood

20   pressure, cholesterol, diabetes, people who are on these

21   medications for life.

22   Q     Now among the plans that Linden Care serves, the plans

23   would be behind the pharmacy benefit manager, are there

24   Medicaid plans that are served?

25   A     Yes.

*Mark Weiner - Direct - Ms. Clark*

1  Q    Would examples of those Medicaid plans be Health
2  Insurance Plan of Greater New York, or HIP?
3  A    Yes.
4  Q    And a Medicaid plan, TotalCare Inc.?
5  A    Correct.
6  Q    And Linden Care provides medication to various patients
7  within the New York State Managed Care Medicaid plans, is
8  that right?
9  A    Yes, we do.
10 Q    We're talking about hundreds of Medicaid members, is
11 that right?
12 A    I would say thousands of managed New York State Medicaid
13 patients, yes.
14 Q    You were here on Friday when there was some discussion
15 about the bases for termination that were offered by Express
16 Scripts in their letter, correct?
17 A    Yes, I was.
18 Q    And not to spend any time on Maryland, because we've
19 dealt with that, but I would like to spend a little bit of
20 time on California?
21 A    Okay.
22 Q    On Friday you were here when Ms. Roberts produced a
23 spreadsheet and indicated that that was the basis for Express
24 Scripts' termination because it showed that there had been
25 very large numbers of prescriptions shipped into California.

*Mark Weiner - Direct - Ms. Clark*

1  Were you here for that?

2  A    I was here for that, Ms. Clark, but I could be wrong but

3  I believe it was Mr. Smith who presented it.

4  Q    Okay.  It was presented to Ms. Roberts, right?

5  A    It was presented to Ms. Roberts, yeah.

6            MS. CLARK:  And I think this is marked in the

7  record, Your Honor.

8            THE COURT:  I'm not sure if it's marked in the

9  record.

10            MS. HELLMANN:  I think it was Defendant's

11  Exhibit 6.

12            MS. CLARK:  Is it marked, Your Honor.

13            THE COURT:  Yes, Defendant's Exhibit 6.

14            MS. CLARK:  So with respect to Exhibit 6, is there

15  one that I can hand the client, Your Honor, or hand the

16  witness?

17            THE COURT:  I do not have an extra copy.

18            MS. CLARK:  Okay.

19  Q    Did Linden Care have an opportunity to consider and

20  review the allegations that were made by Ms. Roberts that

21  Linden Care had dispensed the prescriptions that are shown in

22  this exhibit?

23  A    Absolutely.  It was extremely concerning and alarming to

24  me, so it was addressed Friday afternoon, Saturday and

25  Sunday.

*Mark Weiner – Direct – Ms. Clark*

1    Q    And over the weekend was Linden Care able to evaluate

2    the vast majority of these claims?

3    A    Yes, we were.

4    Q    I'm going to ask you to take a look at the exhibit as it

5    relates to the center column?

6    A    The carrier name?

7         MS. CLARK:  Your Honor, may I approach?

8         THE COURT:  Yes.

9    Q    And do you see in the middle there is an indication

10   where it says carrier name?

11   A    Yes, I do.

12   Q    And just to start with, many of those claims relate to

13   major league baseball, do you see that?

14   A    Yes, I do.

15   Q    And I believe there is 31 of those major league baseball

16   items, is that right?

17   A    I didn't count them, but if you give me a second I could

18   just count them now for you.

19   Q    I don't think we need to.  If you're comfortable with

20   that estimate, we can verify that.  Can you explain for the

21   Court what it was about the major league baseball designation

22   that helps you determine whether or not these drugs were

23   shipped into California to California residents?

24   A    Sure.  A lot of these major league baseball personnel,

25   players, coaches work for, those not aware, there is 162

*Mark Weiner - Direct - Ms. Clark*

1    games if they don't make the playoffs, in the schedule.  Half

2    the time they're on the road.  Before the season starts, I

3    think mid February, they're in either Arizona or Florida for

4    spring training.  But all the major league baseball, because

5    they travel so much and knowing that Linden Care carries the

6    medication, very strict about privacy, like every other

7    pharmacy, but being that these are recognizable names, it was

8    handled by a small unit within Linden Care, all these

9    medications were shipped to stadiums or outside of

10   California.  None of these medications were shipped to

11   California.

12   Q    Not one?

13   A    Not one.

14   Q    And how did you -- how were you able to determine that?

15   A    We have proof of delivery from Federal Express.  And

16   some of these when some of the teams with through either

17   playing at City Field or Yankee Stadium, it would be getting

18   somebody to drive to the Bronx or to Flushing, it was quite

19   easily because everyone thought it was pretty cool to hang

20   out in the visitor's locker room, bring the medication to the

21   place, the locker room.

22   Q    So when the teams were actually playing in the New York

23   metro area, Linden Care would hand deliver?

24   A    We would hand deliver it ourselves because, like I said,

25   people thought it was pretty cool to check out the locker

*Mark Weiner - Direct - Ms. Clark*

1   room.

2   Q    And these delivery tickets, are those the same delivery

3   tickets that we heard about that are produced as part of the

4   ESI regular audit process?

5   A    Yes.

6   Q    And when ESI conducts its cycle of audits, it would get

7   those delivery tickets, is that right?

8   A    They would -- upon an audit an auditor or outside

9   company sometimes would require a proof of delivery or proof

10  of signature that the patient received it.  So we have part

11  of our Pitney Bowes delivery system we're able to show the

12  prescription claim, a signature, and exactly where the

13  medication has gone to.

14       So what we did was we went through the claims here, I

15  believe there is 84, 85 claims.  If you look at the line

16  number on the second page, there is 33, but they start at

17  page 6, and 1 is 64 and that starts, so I think it's in the

18  mid 80s.  But what's more interesting and very disturbing and

19  annoying to me, Judge, was 16 of the claims never even left

20  the pharmacy.

21  Q    We haven't gotten to that yet.

22  A    I apologize, it's just --

23  Q    Mr. Weiner, I'm going to show you a document that's now

24  been marked -- you can put that down for now -- P28.

25            MS. CLARK:  Your Honor, I have a copy for you as

*Mark Weiner - Direct - Ms. Clark*

1    well.

2             THE COURT:  Thank you.

3    Q    Do you recognize that document?

4    A    Yes.  This is what I don't know if it's an industry term

5    or what, at Linden Care we call it a term it's called a desk

6    audit.

7             MS. CLARK:  Before we move on, Your Honor, I don't

8    think I moved into he have the last exhibit.  Is there any

9    objection to the admission of that exhibit?

10            THE COURT:  Is that Defendant's Exhibit 6?

11            MS. CLARK:  Right.  It's an Express Scripts'

12   document.

13            MS. HELLMANN:  I think it was admitted on Friday,

14   Your Honor.

15            THE COURT:  Okay.  I wasn't sure if it was, because

16   I thought there was something that needed to be redacted from

17   D6.

18            MS. HELLMANN:  You're right, we wanted to redact

19   some of the confidential information.

20            MS. CLARK:  I think we're talking about two

21   different exhibits.  I'm referring to the exhibit that we

22   just marked, which is the patient letter, 27.  I don't

23   believe we marked that into evidence.

24            THE COURT:  Any objection?

25            MS. HELLMANN:  No.  It wasn't on their exhibit list

*Mark Weiner - Direct - Ms. Clark*                    264

1    but we have no objection to that.

2              MS. CLARK:  Again, we will redact that at the

3    appropriate time before it goes into the docket, Your Honor.

4              THE COURT:  P27 will be admitted in redacted form.

5              (Plaintiff's Exhibit 27 received in evidence.)

6    Q    And is it P28?

7    A    Yes.

8    Q    P28, is that a document that Linden Care would receive

9    from Express Scripts in connection with these desk audits

10   that you mentioned?

11   A    Yes, it is.

12             MS. CLARK:  Your Honor, I'm going to move into

13   evidence P28 as well.

14             THE COURT:  Any objection?

15             MS. HELLMANN:  Again, it wasn't on their exhibit

16   list.  We have no objection.

17             THE COURT:  P28 is admitted.

18             (Plaintiff's Exhibit 28 received in evidence.)

19   Q    Looking at that document, does that have a list of

20   things that Linden Care has to submit in connection with the

21   Express Scripts audits?

22   A    Yes, it does.

23   Q    Does it indicate that there is a delivery documentation

24   required on the bottom?  Do you see the reference to

25   signature logs on the second page?

*Mark Weiner – Direct – Ms. Clark*

1   A    Yeah.  I'm just reading it.

2   Q    Sure.  All the way down to the bottom.

3   A    On the bottom it says, "Note, please provide signature

4   log copies with the specified fill dates."

5   Q    And does Linden Care provide the delivery slips with the

6   signatures as evidence of the signature log that's required?

7   A    Yes, we do.

8   Q    And when Linden Care reviewed this issue over the

9   weekend, did it discover there were dozens of these letters

10  from Express Scripts during the time frame that's discovered

11  by the spreadsheet that we looked at?

12  A    Yes.

13  Q    So for all those dozens of audits, there would have been

14  delivery information provided to Express Scripts through the

15  audit process that they could have looked at?

16  A    Yes.

17  Q    Okay.  We're going to move next to the category of

18  prescriptions that you started talking about related to

19  reverse scripts.

20        MS. CLARK:  And for the Court.

21  Q    Mr. Weiner, can you identify the exhibit that's been

22  marked P29?

23  A    Yes, I can.

24  Q    And what is that?

25  A    This shows one of the prescription numbers referenced to

*Mark Weiner - Direct - Ms. Clark*

1    the information.  This shows one of the claims on their

2    spreadsheet or claim information as being reversed, meaning

3    it never left the pharmacy.

4    Q    So with respect to those 16 items that were identified

5    as reversals, that means that they never were actually

6    delivered anywhere, right?

7    A    Correct, they never left the pharmacy.

8    Q    And is that a document that's part of Linden Care's

9    regular business records?

10   A    Yes.

11        MS. CLARK:  Your Honor, I move P29 into evidence.

12        THE COURT:  Any objection?

13        MS. HELLMANN:  No objection.

14        THE COURT:  P29 is admitted.

15        (Plaintiff's Exhibit 29 received in evidence.)

16   Q    Now, if Express Scripts in its system wanted to

17   determine whether or not any of the claims in its

18   spreadsheet, which I think is D6, had been reversed and it

19   had in fact never been delivered, could they have seen that

20   in their system?

21   A    Absolutely.  It's just disturbing to me that -- yes.

22   Q    With a click of a few buttons on a computer, they could

23   have seen that, couldn't they?

24   A    Yes.  Yes, they could.

25   Q    Now the balance of the items deal with the remaining

*Mark Weiner - Direct - Ms. Clark*                              267

1    claims.  Out of the 85 items on the spreadsheet, we talked

2    about the 31 major league baseball claims and the 16 reversal

3    claims.  Were there other claims that Linden Care was able to

4    research to determine whether the actually delivery took

5    place?

6    A    Yes.  And to be clear, Ms. Clark, when this was brought

7    up to Ms. Roberts, it was very concerning to the entire

8    Linden Care team figuring we were -- heads were spinning

9    figuring out what was going on here and it's just inaccurate

10   information.  So when we went back, we checked our delivery

11   records and none -- there is a majority of the claims, there

12   is still a small handful that we're still investigating

13   because they're with the old pharmacy system, but we have

14   proof to show that these medications were shipped outside of

15   California.

16          MS. CLARK:  I'm going to mark one more exhibit.

17   And for the Court.

18          THE COURT:  Thank you, Counsel.

19   Q    Mr. Weiner, do you recognize those documents that are

20   P30?

21   A    Yes, I do.

22   Q    Are those part of Linden Care's business records?

23   A    Yes, they are.

24          MS. CLARK:  Your Honor, I'm going to move P30 into

25   evidence at this time.

*Mark Weiner – Direct – Ms. Clark*                        268

1          THE COURT:  Any objection?

2          MS. HELLMANN:  No objection, Your Honor.

3          THE COURT:  P30 will be admitted.

4          (Plaintiff's Exhibit 30 received in evidence.)

5  Q    And with respect to the balance of the claims that could

6  be researched on Linden Care's current software system, was

7  Linden Care able to establish whether or not any of those

8  claims that are part of P30 were delivered into California as

9  stated by Ms. Roberts on Friday?

10 A    No.

11 Q    Not one?

12          MS. HELLMANN:  Objection.  I think she is

13 mischaracterizing Ms. Roberts' testimony, stating that

14 Ms. Roberts testified that all of these went into the State

15 of California, Your Honor.

16          THE WITNESS:  She did.

17          MS. HELLMANN:  I don't think that was the

18 testimony.

19          THE COURT:  Okay, Counsel, the record will reflect

20 what the record reflects.  I think we all have the

21 transcript.  So if you could just ask the factual question.

22          MS. CLARK:  I'm not sure which factual question

23 we're at now.

24          THE COURT:  With respect to P30, the case that none

25 of these shipments were made to California.

*Mark Weiner - Direct - Ms. Clark*

1    THE WITNESS:  Correct, Judge.  Will you look on the

2    bottom, that yellow, each piece of paper, if you look at the

3    yellow tag there, that number that starts with 205, that goes

4    to -- that references the third column.  So if you look at

5    this very first one, 2050778, that goes right to the top, the

6    first one, 20577801.  Yes, the patient does have an address,

7    patient with AM or MA has an address in Los Angeles,

8    California, but we have the documentation from the Federal

9    Express system shows that this prescription was delivered to

10   and again this patient's name here, but was delivered to

11   Bellevue, Washington.

12       THE COURT:  Thank you, Mr. Weiner.

13   Q    And you mentioned -- go ahead.

14   A    I apologize.  It's just we worked so hard to build it

15   and people put information in the media that they could --

16   that affects people's livelihoods, that's just outright wrong

17   and this is the second time.  They were quick to put a press

18   release about it.  But with Maryland you would think that

19   after the thing that they would put some press release that

20   they were wrong about the Maryland information, we're yet to

21   see that in the Times, The Journal, but they were quick to

22   put that information to the Times and The Journal.

23   Q    And this information that's turned out to be inaccurate

24   regarding Linden Care, what are the publications that you've

25   read that information in as a CEO about your company?

*Mark Weiner - Direct - Ms. Clark*

1   A    New York Times, Wall Street Journal, various other

2   online information, et cetera, et cetera.

3   Q    What has been the impact of Express Scripts' publication

4   of this information about licensing violations in California

5   and Maryland?

6   A    Patients are concerned, doctors are concerned, our

7   bankers are concerned that finance us, our suppliers are

8   concerned and manufacturers are concerned.

9   Q    How about your pharmacists?

10  A    Our pharmacists, because they're the ones whose names

11  are on these prescriptions, they are concerned as well.

12  Q    They have concerns about their professional standing?

13  A    Yes, they do.

14  Q    If Express Scripts had at any time come to you as CEO

15  before last Tuesday and presented the spreadsheet and

16  presented the information about Maryland, what would you have

17  done?

18  A    The same way as we done a desk audit or regular audit,

19  we would have shown exactly the work that we've done here,

20  took us Friday, Saturday to do all this work, and we would

21  have done the same thing and presented to them and try to

22  work through, work through these issues.

23  Q    One of the other issues that was not in the termination

24  letter but was addressed in the Express Scripts' press

25  releases was that Linden Care is a captive pharmacy of

*Mark Weiner - Direct - Ms. Clark*

1   Horizon.  Did you see those articles?

2   A    Yes, I did.

3   Q    And I think we've already covered that Horizon owns no

4   part of Linden Care, is that right?

5   A    That is correct.  And in addition to that, from the

6   articles other smaller news agencies like CNBC on

7   November 11th had on their ticker because of the information

8   that was put out there by Express Scripts, on their ticker on

9   their screen provides Pharma owns Linden Care pharmacy.

10  Q    And Express Scripts expressly terminated that they were

11  terminating Linden Care because of their relationship as a

12  captive pharmacy with Horizon, right?

13  A    Yes.

14  Q    What impact did that have on Linden Care?

15  A    Just a trickle down effect.

16  Q    Are you aware of any prohibition or rule in any of the

17  Express Scripts' contracts that says that you can't contract

18  with a particular manufacturer or that there is a certain

19  percentage that you can't exceed or anything like that?

20  A    No.  As a matter of fact, some of the specialty

21  pharmacies have limited distribution programs where they

22  actually work directly with closed networks or medications

23  that only certain pharmacies can carry, and I believe Express

24  Scripts owns some of those pharmacies.

25          MS. CLARK:  Your Honor, I'm going to move things

*Mark Weiner – Direct – Ms. Clark*

1  along, but I'm referring to the articles that the witness is

2  referring to are at ECF number 11-2, ECF number 11-2 and ECF

3  1-3, for the record.  One moment, Your Honor.  Your Honor, in

4  the interest of conserving time, that's all I have right now.

5  Thank you.

6            THE COURT:  Thank you, Ms. Clark.  Mr. Weiner, how

7  many of these claims that are on Defendant's Exhibit 6 are

8  you still investigating?

9            THE WITNESS:  I believe it's five or six, Judge.

10           THE COURT:  And do you have an estimate of how long

11 it will take the company to determine?

12           THE WITNESS:  I'm hoping by day's end that we'll

13 have that information.

14           THE COURT:  And you had mentioned that two other is

15 it PBAs terminated Linden Care?

16           THE WITNESS:  Yes, PBMs.

17           THE COURT:  PBMs, I'm sorry.  What made you believe

18 that it was based on you said false information in the news?

19           THE WITNESS:  Because there would be no other

20 reason.  It's not a coincidence.  They see it in the news and

21 they're protecting their clients, they see these allegations

22 that we're shipping medications and rightfully so.  If we

23 were shipping medications into Maryland, if we were shipping

24 multiple medications into California for nonemergency

25 reasons, it would be concerning, so which is not the case

*Mark Weiner - Direct - Ms. Clark*                                    273

1    here.

2              THE COURT:  And what percentage of your business is

3    the two PBMs who terminated, who since terminated you.

4              THE WITNESS:  I don't have that information

5    offhand.

6              THE COURT:  What percentage of your business is

7    New York Medicaid?

8              THE WITNESS:  I don't know those exact numbers,

9    Judge.

10             THE COURT:  You have thousands of New York Medicaid

11   patients?

12             THE WITNESS:  We have thousands of New York

13   Medicaid or managed New York Medicaid patients, yes.

14             THE COURT:  Thank you, Mr. Weiner.

15             THE COURT:  Mr. Weiner, one other question, what

16   percentage of Linden Care's business is narcotic or

17   controlled medications?

18             THE WITNESS:  Linden Care is probably if not the

19   number one, number one, number two largest dispenser of

20   narcotic and controlled medications in the country, so we are

21   filling a vast need for it.

22             THE COURT:  And do you know what percentage of the

23   company's business it is?

24             THE WITNESS:  Of pain control management?

25             THE COURT:  Yes.

*Mark Weiner – Cross – Ms. Hellmann*                    274

1          THE WITNESS:  I'm going to say that it's greater

2   than 90 percent.

3          THE COURT:  Thank you, Mr. Weiner.

4   *CROSS-EXAMINATION BY MS. HELLMANN:*

5   Q    Mr. Weiner, I want to talk for a minute about these

6   other two PBMs that terminated you, and I understand you

7   believe it's because Express Scripts terminated you, correct?

8   A    I believe it has to do with the information that they're

9   reading in the news from Express Scripts' press releases.

10  Q    And I just notice from your exhibit list that those

11  letters are on your exhibit list.  Is one of those PBM's

12  Humana?

13  A    Yes.

14  Q    And one is Prime Therapeutics, correct?

15  A    Prime Therapeutics, yes.

16  Q    Do they state reasons in those letters for their

17  termination of you?

18  A    Yes.

19  Q    Were those reasons a breach of your agreement with Prime

20  Therapeutics and Humana?

21  A    I don't know the exact wording, but I think so.

22  Q    Did they allege that Linden Care had breached the

23  agreement with Prime Therapeutics and/or Humana in their

24  termination letters to you?

25  A    Yes.

*Mark Weiner - Cross - Ms. Hellmann*

1    Q    Were the reasons for those breach because you were

2    shipping prescriptions into the State of California or did

3    they state another reason for the termination?

4    A    No, it is not because we were shipping them to

5    California.

6    Q    And was the breach because -- what was the breach for?

7    What did Humana allege that you breached?

8    A    Humana alleged that we were shipping medications into a

9    handful states, that was again inaccurate information.

10   Q    And with respect to Prime Therapeutics, what did Prime

11   Therapeutics allege you breached the agreement?

12   A    I don't remember.

13   Q    Would it help if you saw those letters?  I think they're

14   marked on your exhibit list.

15   A    Sure.

16        MS. HELLMANN:  I'm sorry, Your Honor, I haven't

17   seen copies of this, that's why it's taking me just a minute.

18   May I approach, Your Honor?

19        THE COURT:  Yes.

20        MS. HELLMANN:  And I apologize, I just don't have

21   any more copies.

22        MR. COST:  I can get one more copy.

23        THE COURT:  That would be helpful.

24   Q    Mr. Weiner, I'm handing you let's start with the letter

25   from Humana.  Do you see that letter?

*Mark Weiner – Cross – Ms. Hellmann*

1   A    Yes, it does.

2   Q    And I'm looking, it looks like Humana is alleging that

3   Linden Care shipped into a number of states which at the time

4   of the shipment they weren't appropriately licensed.  And is

5   California on here?

6   A    No.

7   Q    And then does Humana also set forth an additional reason

8   for terminating Linden Care regarding the delivery of

9   prescription services at the last paragraph of that letter,

10  the last paragraph on page 1, sir?

11  A    Yes, I just finished reading.

12  Q    And another reason that Humana states that it's

13  terminating Linden Care is that it was engaging in mail order

14  versus retail services?

15  A    That's what it says in the letter, yes.

16          MR. COST:  Your Honor.

17          THE COURT:  Yes, you may approach.  Thank you.

18  Q    And that's another reason Express Scripts terminated

19  Linden Care, correct?

20          MS. CLARK:  Objection, Your Honor.  It's a

21  different contract, different language, the standard's

22  completely different in the two contracts.

23          THE COURT:  Overruled.

24  Q    You can answer that, sir?

25  A    Ask it again.

*Mark Weiner – Cross – Ms. Hellmann*

1  Q    The reason that Express Scripts terminated Linden Care

2  was because it was engaged in mail order pharmacy services

3  versus retail, correct?

4  A    Yes.  That's one of the causes, yes.

5  Q    And then looking at the Prime letter, again here Prime

6  states that one of the reasons it's being terminated is

7  because of dispensing prescriptions into states, correct?

8  A    Yes.

9  Q    And then another reason that -- and again no mention of

10  California, correct?

11  A    There is no mention of California or any other state.

12  Q    And then Prime identifies another reason for terminating

13  Linden Care, correct?

14  A    Correct.

15  Q    Which includes dispensing services without verification

16  of appropriate supporting diagnosis, correct?

17  A    Pursuant to -- yes, that's what they say in the letter,

18  yes.

19  Q    Do either of these letters state that they're

20  terminating Linden Care because of a press release by Express

21  Scripts?

22  A    No.

23  Q    Do either of these letters even mention the State of

24  California or Maryland?

25  A    No, they do not.

*Mark Weiner - Cross - Ms. Hellmann*

1   Q    Wouldn't you agree with me, sir, that these two PBMs

2   were terminating Linden Care because Linden Care breached

3   their agreement with these two PBMs?

4        MS. CLARK:  Objection, Your Honor.  That's their

5   allegation.  She's stating it as a fact that we breached.

6        THE COURT:  Overruled.

7   A    No.

8   Q    You don't agree with that?

9   A    I don't agree with that.

10  Q    You mentioned that each week hundreds of people walk in

11  to Linden Care, correct?

12  A    Yes.

13  Q    And I just want to talk a little bit, we've heard about

14  Linden Care just what it looks like.  It's a huge warehouse,

15  correct?

16  A    It's an office building.

17  Q    How many square feet?

18  A    Probably approximately 15,000, 16,000 square feet.

19  Q    And when someone has a prescription and walks in, they

20  go through one door, correct?

21  A    Yes.

22  Q    And at that point they have to show their license,

23  correct?

24  A    Well, actually, they go through one door and then they

25  go through a second security guard, by the security guard,

*Mark Weiner - Cross - Ms. Hellmann*

1  yes.

2  Q    So to get in, to get in they actually have to show their

3  license and a prescription, correct?

4  A    Well, not to get in.  To get in they just walk into the

5  pharmacy, walk into one door, and then a security guard lets

6  them into the patient waiting area.

7  Q    And the security guard, you have a security guard there

8  with a gun all day long, correct?

9  A    Yes, we do.

10  Q    And they walk into the patient area.  And that's a

11  pretty bare-bones patient area correct?

12  A    It's a typical patient waiting area.

13  Q    There is nothing else they can get there?  They can't

14  get a bottle of water or diapers or Advil, correct?

15  A    Correct, there is nothing in the waiting room, just a

16  television set and some chairs.

17  Q    So you said hundreds of people come in each week to pick

18  up their prescriptions, correct?

19  A    Correct.

20  Q    How many each week are mailed out of state?

21  A    From those people walking in?

22  Q    Well, if the people are walking in, they're not getting

23  theirs mailed out of state, correct?

24  A    Correct.

25  Q    And you said Linden Care dispenses hundreds of

*Mark Weiner - Cross - Ms. Hellmann*

1  prescriptions each week from people that walk in the door?

2  A    Correct.

3  Q    How many prescriptions does Linden Care dispense each

4  week to members out of state?

5  A    Hundreds as well.

6  Q    Thousands?

7  A    Could be thousands.

8  Q    Certainly a significantly higher amount than the people

9  walking in that door, correct?

10  A    It is a higher number.

11  Q    Mr. Weiner, you would agree that Linden Care has shipped

12  some prescriptions into the State of California, correct?

13  A    I do not know that for sure.  There is a possibility

14  that for emergency reasons we have shipped medication into

15  the State of California.

16  Q    Well, Mr. Weiner, you told this Court in a declaration

17  that Linden Care had done an initial review and determined

18  that it had shipped some prescriptions into the State of

19  California, correct?  Would you like to see your declaration,

20  sir?

21  A    Sure.

22          MS. HELLMANN:  May I approach, Your Honor?

23          THE COURT:  Yes.

24          MS. CLARK:  Counsel, which one is it?

25          MS. HELLMANN:  11-5.

*Mark Weiner – Cross – Ms. Hellmann*

1   Q    Mr. Weiner, I'm pointing you to the top of page 6,

2   paragraph 22.  Do you see the statement, Linden Care's

3   Initial Review?

4   A    Correct.

5   Q    Indicates that shipments to California were diminimus.

6   Do you see that?

7   A    Yes.

8   Q    So you did a review, correct?

9   A    If for emergency reasons we had to ship for patient

10  continuity and patient care for emergency reasons, we would

11  ship into California.

12  Q    So after your review, and I'm assuming you looked at

13  these prescription or these delivery logs like you showed us

14  today, correct?

15  A    From the spreadsheet?

16  Q    No.  Whatever you reviewed to make the statement that

17  you only shipped a few prescriptions into California.

18          THE COURT:  Counsel, I think you're misstating the

19  evidence.  It says any shipments to California.

20          MS. HELLMANN:  Right.

21  Q    So what did you review, what did you review to determine

22  that if you shipped to California, it was for vacation or

23  diminimus reasons?

24  A    The only reasons why we would ship into California would

25  be for an emergency reason.

1    Q    So did you actually review any documentation, that's

2    what I'm trying to understand?

3    A    We know it's policy and procedure that we would only

4    ship medications into California for emergency reasons.

5    Q    Mr. Weiner, we've talked a lot about press releases and

6    I would like to hand you a press release from Linden Care.

7    May I approach, Your Honor?

8              THE COURT:  Yes.

9    Q    And this is a press release from Linden Care, correct?

10   A    Yes, it is.

11   Q    And on the back of it I notice it says Belhealth

12   Investment Partners?

13   A    Yes.

14   Q    What's Belhealth Investment Partners?

15   A    Belhealth Investment Partners is a PE firm, or private

16   equity firm.  That is the majority stakeholder in Linden

17   Care.

18   Q    And in this press release Linden Care's responding to

19   the allegations, and do you see where it states, "Linden

20   Care's New York facility has not mailed any prescriptions to

21   patients residing in California other than incidental

22   accommodations for patients on vacation"?  Do you see that

23   statement?

24   A    Yes.

25   Q    And did Linden Care --

*Mark Weiner – Cross – Ms. Hellmann*

1          MS. CLARK:  Objection, Your Honor.  It says or

2    traveling.

3    Q    Or traveling to California.  Do you see that statement,

4    sir?

5    A    Yes.

6    Q    And before Linden Care issued this statement to the

7    press, did it review what, if how many, prescriptions it

8    mailed to California?

9    A    We know our policy is only to ship for emergency reasons

10   to California.  If we shipped to California there was a

11   patient reason or patient care issue at risk.

12   Q    Mr. Weiner, you talked about this audit document, I

13   think it's P28.  Do you still have that in front of you?

14   A    I believe so, Ms. Hellmann.  Just give me a second.

15   Yes.  Yes, P28.

16   Q    And you indicated this is one of the desk audits that

17   Express Scripts conducts, correct?

18   A    That's what we call it, desk audit.

19   Q    This is when they fax you a specific list of

20   prescription claims, correct?

21   A    Usually my experience it's been a specific claim, desk

22   audit.

23   Q    So a desk audit, it looks at one particular claim,

24   correct?

25   A    Yes.

*Mark Weiner - Cross - Ms. Hellmann*                    284

1    Q    How many claims does Linden Care submit to Express

2    Scripts every day?

3    A    It would be two, 300 claims a day.

4    Q    And Express Scripts doesn't send one of these audit

5    requests of on every one of those claims, does it?

6    A    No.

7    Q    You would agree it would be impossible to audit every

8    claim submitted by Linden Care or any other pharmacy,

9    correct?

10   A    Correct.

11   Q    And so when Express Scripts sends these audits, that's

12   the only time it gets the actual delivery information, that

13   FedEx thing, correct?

14   A    A desk audit and also a routine audit.  Meaning we might

15   get an audit that might have several hundred claims on it and

16   they'll ask the same information that they do for their desk

17   audit for those several hundred claims, yes.

18   Q    And that's a good point.  The desk audits usually come

19   by fax, correct?

20   A    They come in fax usually that day that the claim is

21   processed.  I don't know if there is something in the Express

22   Scripts system is that triggers the desk audit, I don't know

23   if it's a quantity, I don't know if it's something with their

24   particular plan, group number, but yes.

25   Q    And then the field audits that you're talking about,

*Mark Weiner – Cross – Ms. Hellmann*                285

1   that's when somebody comes on site, correct?

2   A    Yeah.  We look at a letter from Express Scripts or

3   somebody performing the audit that here's a list of claims,

4   we're going to be performing a field on site or field audit,

5   please have that information available.

6   Q    And again, that's the same information they asked to see

7   that the doctor actually prescribed the claim, correct?

8   A    They want to see -- just to make it faster, they want to

9   see a copy of the original prescription, they want to see a

10  copy of the delivery ticket and signature, yes.

11  Q    And for those particular claims that Express Scripts

12  audit, it has, like you said, the original prescription and

13  the actual signature delivery sheet, correct?

14  A    Correct.

15  Q    Did you see if Express Scripts had previously audited

16  any of the claims on this exhibit list?

17  A    With the time that we had, our first concern was to see

18  that these claims weren't shipped into California.

19  Q    At least with respect to P28, this claim isn't on that

20  list, is it?

21  A    P28.  I wouldn't know.  I don't know if P28 is

22  specifically, you know, on there so I don't know.

23  Q    And you talked a little bit about --

24  A    If you give me two minutes, I can match up the Rx number

25  to the list and let you know.

1    Q    Why don't you go ahead and confirm just for the Court.

2    A    It doesn't seem that Rx number 225240101 from the desk

3    audit doesn't appear, but I'm trying to see the numbers.  It

4    doesn't seem to be on here.

5    Q    Thank you, sir.  I just real quickly want to touch on

6    the reversals.  What was the prescription that was reversed

7    on this reversal document?  Does it show it on there?  Is it

8    the 2023166?

9    A    I'm just trying to match it up to one of the numbers

10   here to see exactly which one it is.  2023166.  Yes, 2023166

11   does appear to be on the spreadsheet and it's also on this

12   document as well.

13   Q    Okay.  And on this spreadsheet is it actually on there

14   twice, one is a negative number?

15   A    Yes, it is.

16   Q    Does that indicate to you that this record is reflecting

17   a reversal as well?

18   A    For that claim for, for that Rx number, yes.

19   Q    This isn't representing that these were not reversed,

20   P6, correct, it's actually showing that this was reversed?

21   A    Yes.

22   Q    Mr. Weiner, Linden Care dispenses millions of dollars a

23   year in prescriptions just for Express Scripts' business

24   correct?

25   A    Absolutely.

1    Q    And Express Scripts represents approximately 20 percent

2    of your business?

3    A    Yes.

4    Q    Linden Care's a billion dollar a year company?

5    A    When a run rate to be a little bit shy of a billion

6    dollar a year company, yes.

7    Q    And I think you testified to the Court that you're the

8    number one or number two largest supplier of narcotic pain

9    medications, correct?

10   A    Yes.

11   Q    And you supply non-narcotic pain medications as well,

12   correct?

13   A    Yes.

14   Q    And with respect to the controlled substances, and you

15   talked about how the member has to bring that prescription

16   in, correct?

17   A    Either bring the prescription in or have it e-prescribed

18   or shipped to us.  They will either ship it to us or have the

19   physician ship it to us, yes.

20   Q    And those controlled medications, every time the member

21   wants to get it filled again, he or she needs a new

22   prescription, correct?

23   A    Depending on whether it's a narcotic, controlled and

24   if -- as you know, take a step back, Ms. Hellmann, narcotics

25   you need a new prescription each time.  Controlled

*Mark Weiner – Cross – Ms. Hellmann*

288

1  medications differs in each state if you can have refills on

2  them, but controlled medications you can have refills, yes.

3  Q    But with respect to the narcotic medications, you talked

4  about the members would have to go back to their doctor?

5  A    Would have to go back to their doctor or call, contact

6  their doctor to get a new prescription.

7  Q    Right.  And that's every time, regardless of whether

8  they're going to a different pharmacy or going to Linden

9  Care, every time a new narcotic prescription is filled, you

10  need a new prescription for it, correct?

11  A    Yes, unless it's an emergency supplied medication.

12  Q    Mr. Weiner, would you agree with me that Linden Care is

13  not the only pharmacy that is accredited in the REMS TIRF

14  business?

15  A    In the TIRF REMS?

16  Q    I'm sorry, the TIRF REMS program.

17  A    Yes, I would agree with you.

18  Q    In your declaration you say there were a few pharmacies,

19  but there is actually quite more than a few, correct?

20  A    Yes.

21  Q    Over 500?

22  A    I don't know the exact number.

23  Q    You've heard of Village Pharmacy, correct?

24  A    Yes, sure, absolutely.

25  Q    And in your declaration you claim, you stated that you

1    didn't believe them to be credentialed in the TIRF REMS

2    program.  Do you remember making that statement?

3    A    I don't remember making that statement.

4    Q    Let's take a look.  It's the same declaration that you

5    have in front of you, sir.

6    A    Okay.

7    Q    You can go to paragraph 43.

8    A    Do you have a page?

9    Q    Sure.  It's page 11, paragraph 43.  Do you see that,

10   sir?  Do you see where it says, "With all due respect to

11   Village Pharmacy, Linden Care has no basis to believe that

12   Village Pharmacy is credentialed to serve the TIRF REMS

13   program or otherwise has the same level of employee training

14   and experience"?  Do you see that statement?

15   A    Yes, I do.

16   Q    Now you understand that Village Pharmacy is an

17   accredited TIRF REMS pharmacy?

18   A    Absolutely.

19   Q    So is that statement wrong in your declaration?

20   A    It's not wrong.  I believe it's being misunderstood.  I

21   didn't say that it's not a TIRF REMS pharmacy.  I feel they

22   don't have the credentials to handle the volume of pain

23   control patients that we have, and we actually verify that by

24   speaking to the people at Village Pharmacy.

25   Q    And I want to talk about that phone call.

1    A    Sure.

2    Q    Have you listened to it?

3    A    No, I did not listen to it.

4    Q    But you understand there was a phone call between Linden

5    Care and Village Pharmacy, correct?

6    A    Correct.

7    Q    And from Linden Care, Mr. Fogel, your compliance officer

8    made that call, correct?

9    A    Correct.

10   Q    And someone named Mark Bortnick.  Who is that?

11   A    Mark Bortnick is the Chief Operating Officer at Linden

12   Care.

13   Q    And did they tell you about this phone call?

14   A    Yes.  They told me the gist of the phone call, yes.

15   Q    And this phone call, are you aware of when this

16   occurred?

17   A    I'm not -- I know it was obviously after the

18   termination.  I don't know exactly when it occurred.

19   Q    Did Mr. Bortnick and Mr. Fogel tell that you Village

20   Pharmacy said they could handle up to thirty patients a day?

21   Did they tell you that?

22   A    I don't believe they told me that.

23   Q    Did they tell you that Village Pharmacy indicated that

24   if they didn't have the medication in stock, they could get

25   it within five or six hours?

*Mark Weiner - Cross - Ms. Hellmann*                    291

1   A    I don't believe they told me that, no.

2   Q    Did Mr. Bortnick or Mr. Fogel tell you that Village

3   Pharmacy indicated that if there was an issue getting that

4   much from a supplier, they could call the supplier and talk

5   to them?  Did they tell you that?

6              MS. CLARK:  Objection, Your Honor.  This is getting

7   deep into hearsay.  We have the call; it's in the record.

8              THE COURT:  Overruled.

9   Q    Did they tell you that?

10  A    No.  But I do know that wholesalers don't just increase

11  your allocation with narcotics or controls on the spot.

12  Meaning you have to build up your allocation.  You can't just

13  go from servicing two patients for certain narcotics and,

14  whether it's a TIRF REMS drug or another narcotic, to

15  servicing thirty patients.  But also was the understanding

16  that the owner and the pharmacy director had no -- did not

17  want to get into this business.

18  Q    And I just want to make sure I'm clear.  It's your

19  understanding from what Mr. Fogel told you and Mr. Bortnick

20  told you after that call that Village Pharmacy didn't want to

21  be involved in this, is that your understanding of the call?

22  A    They did not want to be involved in the volume of

23  patients that we're talking about.

24  Q    Thank you.  Mr. Weiner, you heard testimony from

25  Ms. P██████.  She was one of the members that talked on the

*Mark Weiner – Cross – Ms. Hellmann*                           292

1   phone.  Do you remember that?

2   A    Yes.

3   Q    And she's in Long Island, correct?

4   A    I believe she lives someplace on Long Island, yes.

5   Q    And Ms. P███ went through a number of medications that

6   she's on and indicated that the next closest pharmacy to her

7   was about an hour away.  Do you remember hearing that

8   testimony?

9   A    I believe that's what she said.

10  Q    Do you know if anyone has told Ms. P███ about Village

11  Pharmacy?

12  A    I personally did not tell her about Village Pharmacy.

13  Q    You previously testified in a sworn declaration that

14  Village Pharmacy wasn't a sufficient alternative for another

15  member because they didn't have Subsys.  Do you remember

16  making that statement in one of your declarations?

17  A    Correct.

18  Q    I understand that you weren't on the call and haven't

19  listened to that call, but would it be important for you to

20  know that Village Pharmacy could get that in a matter of

21  hours?

22  A    If that's what they said or if that's what Village is

23  attesting to Express Scripts, but --

24  Q    Village Pharmacy isn't telling Express Scripts that.

25  Village Pharmacy is telling your executives that, correct?

1    A    I don't know because I didn't listen to the call.

2    Q    Would it have been important you to know that, that a

3    member could go a couple miles down the road and get Subsys?

4    A    Yes.  But with that being said, it still goes back to

5    Village Pharmacy people telling us that they have policies

6    that they will not ship and they will not fill prescriptions

7    for patients who don't live -- that live outside a certain

8    amount of radius of their pharmacy.

9    Q    Your understanding on that call is that Village Pharmacy

10   said it wouldn't fill prescriptions for people outside of a

11   certain radius?

12   A    Yes.

13   Q    Do you know that Village Pharmacy talked about whether

14   it needed to get licensed in other states to help these

15   patients?  Did you know that was discussed on the call?

16   A    Yes.

17   Q    Mr. Weiner, in your declaration, another one of your

18   declarations you talked about a member AH was a part of the

19   TIRF REMS program.  Do you remember that?

20   A    Yes.

21   Q    Do you know if anyone's told member AH about Village

22   Pharmacy?

23   A    I don't think so.  I'm not aware of patient AH lives.

24   They might have told her because depending on where patient

25   AH lives, she might live out of state, and it's the patient

1    who I believe, I don't know where AH lives, I think I have it

2    in one of these.

3    Q    Mr. Weiner, we've talked about Village Pharmacy.  And

4    you would agree there is pharmacies in every state that do

5    this type of business, correct?

6    A    Correct.  There is going by the number I believe

7    Ms. Smith said -- Mr. Smith said last Friday that there is

8    500 or 500 in that area, 500 TIRF REMS pharmacies in our

9    country, which seems like a significant number but when you

10   look at 500 pharmacies, and the 70,000 pharmacy, retail

11   pharmacies there are, it's a very small percentage.

12   Q    There is certain other pharmacies besides Linden Care,

13   correct?

14   A    Sure, there is.  There is multiple pharmacies around the

15   country.

16   Q    There is certainly other pharmacies that are TIRF REMS

17   credentialed beside Linden Care, correct?

18   A    Yes.

19   Q    One that's 3 miles down the road from you, correct?

20   A    Three miles down the road if that's the exact, yes.

21   Q    Mr. Weiner, are you aware that Express Scripts -- let me

22   back up.

23        I want to make sure I understand your testimony on

24   direct, was that Express Scripts said it couldn't talk to

25   members?  That's what somebody told you, correct?

*Mark Weiner - Cross - Ms. Hellmann*                295

1   A     Yes.

2   Q     Are you aware that Express Scripts has specifically

3   requested the names of members that were having difficulty

4   getting their prescriptions filled?

5   A     Yes.

6   Q     Has Linden Care provided a single name to Express

7   Scripts?

8   A     What we have been doing, I don't feel that -- we've been

9   providing the information, the 800 number and the Express

10  Scripts website, similar the same information that you in the

11  letter to them, to the patients.

12  Q     Speaking of this letter, I thought your testimony on

13  direct also was that members were told by Express Scripts to

14  go to the Express Scripts mail order.  Was that your

15  testimony?

16  A     Which testimony, Ms. Hellmann?

17  Q     Your testimony on direct.  I thought you testified that

18  you had been told by some of your patients that they were

19  told by Express Scripts to go to an Express Scripts pharmacy?

20  A     Yes.

21  Q     Nowhere on this letter does it say go to the Express

22  Scripts pharmacy, does it?

23  A     On which letter?

24  Q     I'm looking at P27.

25  A     It doesn't say -- it just says to locate a pharmacy or

*Mark Weiner - Cross - Ms. Hellmann*

1  call a local and ask them if they're in the Express Scripts

2  network.

3  Q    Now I understand that you haven't provided Express

4  Scripts with any names of people that are having difficulty.

5  And, in fact, Linden Care's telling its own patients that

6  they don't need to think about another pharmacy, isn't that

7  right?

8  A    No, that's not correct.

9  Q    Did you hear Mr. G███ testify, Mr. G███ on the phone?

10  A    Yes, I did.

11  Q    Did you hear him state that he told Linden Care, if I

12  need to find another pharmacy let me know, and Linden Care

13  said no, we'll take care of you.  Do you remember that

14  testimony?

15  A    Yes, I remember that testimony.

16  Q    And is that what Linden Care's telling its patients?

17  A    No, that's not what Linden Care is telling its patients.

18  Q    Linden Care's telling its patients that they may need to

19  find an alternative pharmacy, correct?

20  A    Yes.

21  Q    It's been two weeks, almost two weeks since the

22  agreement terminated, correct?

23  A    Yes.  Tomorrow is two weeks.

24  Q    And you understand that the agreement also has a without

25  cause provision to terminate, correct?

1    A    I don't understand that term.

2    Q    Do you understand that the agreement also allows either

3    side to terminate the agreement for no reason?

4         MS. CLARK:  Objection, Your Honor.  The document

5    speaks for itself on this issue.

6         THE COURT:  Overruled.

7    A    I don't know if it was that two way, but I presume that

8    most contracts could terminate, yes.

9    Q    And given that this agreement could be terminated for

10   cause or without cause, do you think it's important that

11   Linden Care continue to help their patients transition to a

12   different pharmacy?

13   A    It's important that Linden Care makes sure that we don't

14   abandon patients and make sure they have their medications.

15   Q    And in the meantime I understand that you've been doing

16   some bridge fills, correct?

17   A    Yes.  We're doing bridge fills for the care of the

18   patient because we're not talking about legend medications

19   here, Ms. Hellmann, these are narcotic medications.  Linden

20   Care is very useful in keeping these medications off the

21   street and we work with law enforcement.  We've been helpful

22   in putting the bad doctors who are just giving patients the

23   medications and everything else.  So, yes, Linden Care is

24   very important in the chain supply of narcotic medication to

25   the patients.

*Mark Weiner - Cross - Ms. Hellmann*                    298

1   Q    And Linden Care is continuing to give these patients

2   short term pain meds without getting paid for right now,

3   correct?

4   A    Correct.

5   Q    I want to make sure I understand your testimony, because

6   it's kind of contrary to what Mr. G███ said.  But it's also

7   telling these patients that they need to find an alternative

8   pharmacy?

9   A    Yes.  We're telling patients, we're bridging off

10  patients, we're telling the patients that we are -- it's a

11  legal matter and we're going to go into court and hopefully

12  that we could eventually sit down and talk to Express Scripts

13  to work this matter out.  But as you had said, once the

14  lawyers were involved, you know, all communications, although

15  we did try, as noted, to communicate to Express Scripts, all

16  communications has to go through.

17  Q    And did you hear Ms. Roberts' testimony that Express

18  Scripts does not want to do business with Linden Care any

19  more?

20  A    Yes, I did.

21  Q    And knowing that, do you think it's even more important

22  that you tell your patients they may need to find another

23  pharmacy?

24  A    Well, I think the reason why Express Scripts doesn't

25  want to do business with Linden Care is because Linden Care

1    helps the patients get sometimes these expensive medications

2    into the hands of the patients by helping them cut through

3    the red tape, jump through the hoops.  And this also has to

4    do with maybe a matter between Express Scripts and Horizon

5    and Linden Care's being caught up between that dispute.

6    Q    And I understand your opinion of Express Scripts, I do,

7    we've heard them a lot in the past day and a half.  But my

8    question to you is you understand that Express Scripts has

9    said it does not want to do business with Linden Care,

10   correct?

11   A    Yes, I heard it.

12   Q    You heard Ms. Roberts said Express Scripts doesn't trust

13   Linden Care, correct?

14   A    Correct.

15   Q    And given that what you know, are you going to start

16   making sure your patients know they may need to find an

17   alternative pharmacy?

18   A    Yeah.  We're going to do that, but we are going to fight

19   this because, again, this all has to do with Linden Care

20   working to help get the patients the medications that the

21   doctor prescribed that ultimately Express Scripts was the one

22   that ultimately paid for the medication.

23          MS. HELLMANN:  I move to strike his answer

24   unresponsive.

25          THE COURT:  Denied.

*Mark Weiner – Cross – Ms. Hellmann*

300

1          MS. HELLMANN:  No more further questions.

2          THE COURT:  Mr. Weiner, you had mentioned that the

3    company may have shipped medicines to California for

4    emergency reasons.  Is there something that led Linden Care

5    to ship medicines to a state it's not licensed in for

6    emergency reasons?

7          THE WITNESS:  Yes, I believe in California we can

8    ship medicines for emergency reasons.

9          THE COURT:  And what constitute as emergency, do

10   you know?

11         THE WITNESS:  Emergency being vague, but in our

12   opinion, especially dealing with narcotics, or it's not like

13   where patients could miss a medication and be in withdrawal.

14   If anyone ever had, I'm sure we all had patients who have

15   been in pain, friends in pain or family members being in

16   pane.  I'm not talking dental surgery, I'm not talking

17   sprained their knee.  We're talking patients who have failed

18   back surgery, oncology patients, long chronic.  Like I said,

19   there is 100 million Americans living with chronic pain, so

20   if patients were relocated because they might have moved to

21   California because had to be relocated because of either

22   Hurricane Sandy or other reasons that their job maybe moved

23   them to California.  Or I know we had patients who were

24   taking care of terminally ill family members and they were on

25   the medication, so while they were taking care of the family,

*Mark Weiner – Cross – Ms. Hellmann*                    301

1   because they weren't established patients of doctors in

2   California and they needed their medication.  So emergency to

3   me would be somebody that can't continue their care of

4   medication.

5                THE COURT:  I see.  Any redirect?

6                MS. CLARK:  Yes, Your Honor.

7   *REDIRECT EXAMINATION BY MS. CLARK*:

8   Q    Mr. Weiner, we talked a little bit about the Humana

9   termination.  That was a termination with notice, correct?

10  A    Yes.

11  Q    And Linden Care has prepared a response indicating that

12  Humana's bases for termination are just incorrect?

13  A    Yes.

14  Q    And that hasn't had any impact on patients and disrupted

15  their care or anything like that because it was done with

16  notice, correct?

17  A    It was done with notice, yes.

18  Q    And Linden Care intends to avail itself of its rights

19  under New York law to dispute that termination if need be,

20  right, if it can't be resolved?

21  A    Under Public Health, yes, and going to arbitration, and

22  I forgot the number, but yes.

23  Q    You're saying arbitration, you mean the peer review?

24  A    The peer review arbitration or the peer review hearings,

25  yes.

1    Q    With respect to the spreadsheet that was marked as D6,

2    have you seen any evidence from Express Scripts that any of

3    those prescriptions was actually shipped to a location in

4    California?

5    A    No.

6    Q    Have you seen any evidence that any prescriptions on

7    that list or any other prescriptions were shipped to

8    California residents in California?

9    A    No.

10   Q    If Express Scripts gave you the information that they

11   believe is the basis for that claim, would Linden Care be

12   able to research it?

13   A    Yes, we would.

14   Q    Just like Linden Care was able to affirmatively research

15   and refute with documentary evidence all of the prescriptions

16   on the chart with the exception of five that are not in its

17   current software system, is that right?

18   A    Yes, it is.

19   Q    So you're not saying that those five involve deliveries

20   to a California address or to a California resident, that's

21   not what you're saying, right?

22   A    No, I'm not.  I'm saying those five claims are still in

23   our old pharmacy operating system.  We upgraded or operating

24   system from what was the OPUS system to what we now use is

25   ScriptPro, which has more robotics and everything else, so

*Mark Weiner - Redirect - Ms. Clark*                    303

1  those claims are in the old pharmacy system that we're still

2  investigating.

3  Q    So when you're talking about the possibility of a

4  diminimus sort of emergency kind of situation, you're saying

5  that that's a logical explanation if you ever presented with

6  any evidence that that actually occurred, that that would be

7  your belief?  That that probably would be an explanation if

8  you were presented with that evidence, right?

9  A    Yes.

10  Q    In your affidavit you actually say that any shipments to

11  California were diminimus and were sent to residents of other

12  states, right?  That's what your affidavit actually says,

13  correct?

14  A    Yes.

15  Q    You never said or intended to say that Linden Care

16  delivered shipments of drugs to California residents in

17  California, right?

18  A    Correct.

19  Q    And certainly that was not the intent of the press

20  release either, correct?

21  A    No, that was not the intent.

22  Q    And with respect to patient continuity, Linden Care's

23  had a real concern about patient abandonment, right?

24  A    Yes.

25  Q    Is that something that pharmacists as professionals are

*Mark Weiner – Redirect – Ms. Clark* 304

1   concerned about?

2   A    As all health care professionals with the patient

3   abandonment, because especially with the issue of say a

4   patient, whether he or she is on methadone, methadone is a

5   medication that could be used for patients using on pain or

6   methadone could be a drug or is a drug that's used to get

7   patients off other addictive medications.  A patient could be

8   addicted to other medications and they're using methadone.

9   Although yes, it's still a drug and it's still a very

10  powerful medication, but they might be coming off whether

11  it's heroin, crack, but it is a drug to use to keep the

12  patient from -- but someone coming off methadone just like

13  that, because part of the problem is the doctors write the

14  prescriptions on an every thirty day cycle, so that's why

15  patients need the medications and sometimes they can't wait,

16  you know, three or four days or even a day to get the

17  medication.

18  Q    And does patient abandonment concerns and continuity of

19  care, is that one of the reasons that Linden Care is

20  requesting an opportunity to deal with the termination with

21  notice?

22  A    Yes.

23  Q    And as the pharmacy benefit manager responsible for the

24  well being of these individuals in making sure that they get

25  the drugs that they're entitled to from their plan, don't

*Mark Weiner - Redirect - Ms. Clark*                    305

1    they also have the responsibility to take care of the

2    patients and make sure that they're not abandoned and their

3    care is not interrupted?

4           MS. HELLMANN:  Your Honor, Ms. Clark is testifying.

5    If she could just ask a question instead of leading the

6    witness.

7           THE COURT:  Overruled.

8    A    Yes.  I would think that as a member again of -- they're

9    not saying, they're not health care providers, but the

10   process of claims, it should be about patient care, it should

11   be the number one concern.

12   Q    Because they're representing the plans?

13   A    Yeah.  They represent -- I'm sorry, but Express Scripts

14   represents the plans, whose the patients pay their premiums

15   to the plans, the plans then contracts out with Express

16   Scripts to provide the pharmacies benefit side of those

17   plans.  So if patients are paying into those plans to get

18   their medications, they should be able to get the medications

19   from the pharmacies that they want to get the medications

20   from, that's going to provide them with top service, provide

21   the doctors with top service, watch the patient's back, watch

22   the doctor's back, and also watch the public's back.

23   Q    And Express Scripts has referred to the fact that it has

24   attempted to obtain from Linden Care the names, the

25   identities of some of the patients that have complained about

1   Express Scripts' termination of Linden Care, correct?

2   A    Yes.

3   Q    However, Express Scripts has direct access to records

4   that show which patients were approaching the end of their

5   prescription cycles, correct?

6   A    Absolutely.

7   Q    So if I were Express Scripts, I could log in in a few

8   touches of a button and find out when I decided to terminate

9   Linden Care which patients were going to be impacted Monday,

10  Tuesday, Wednesday and Thursday of last week, right?

11  A    Absolutely.  And further on that, just like the similar,

12  the spreadsheet, I don't know what number it is, but the same

13  way as the claim evidence here, information that's also

14  processed or adjudicated online to Express Scripts shows the

15  quantity of the medication and the day's supply.  So if

16  Express Scripts the same way they went into this and able to

17  gather this, they should be able to gather exactly what

18  patients Linden Care filled what medications on what date,

19  what day supply, and if they filled a 21 day supply on

20  November 1st, they would know that patient's going to be

21  running out of medication.  And it also identifies the type

22  of medication it is?

23          THE COURT:  For the record, the witness was

24  referring to D6.

25          THE WITNESS:  I apologize.  There was just no

1   number on it.

2   Q    And did Linden Care through its attorneys affirmatively

3   reach out to Express Scripts in a letter and affirmatively

4   offer to download its information about every patient that

5   was approaching the situation where they would be losing

6   their prescriptions?

7   A    Yes.

8   Q    And I'm going to refer to a document that's been filed

9   at 32-1.  And that letter said, "In the event you are

10  suggesting there is some problem with ESI's ability to access

11  data, we do have available individuals at Linden Care who

12  could communicates with ESI to download our own database of

13  the patients impacted here."  That's what that letter said,

14  didn't it?

15  A    Correct.

16  Q    And did Express Scripts have any interest in contacting

17  Linden Care to get the universe of patients who were being

18  impacted on a daily basis without termination of Linden Care?

19  A    No.

20         MS. CLARK:  That's all I have.  Thank you.

21         MS. HELLMANN:  Just a couple questions, Your Honor.

22         THE COURT:  Yes.

23  *RECROSS-EXAMINATION BY MS. HELLMANN:*

24  Q    Mr. Weiner, I heard you tell this Court that you believe

25  California law has an emergency exception.  Was that your

*Mark Weiner - Recross - Ms. Hellmann*                    308

1    testimony?

2    A    Yes.

3    Q    Did you hear your compliance officer testify that there

4    are no exceptions under California law?

5    A    I don't remember him saying that.

6    Q    Have you found any documentation, any records going

7    through it that would indicate that Linden Care is doing

8    anything less than 70 plus percent of its business out of

9    state?

10   A    No.

11   Q    You would agree that at least 70 percent plus of its

12   business is mailed to people out of the state?

13   A    There is a good portion of our business that's home

14   delivery business, yes.

15   Q    And we keep saying home delivery.  It's mailed, correct?

16   A    It's home delivery.  There is a different definition

17   between mail order pharmacy and home delivery pharmacy.

18   Q    Where is that definition?

19   A    It's just there has always been the definition in the

20   industry that mail order pharmacy is a pharmacy of people

21   getting a ninety day supply of maintenance medications.

22   Q    Do you think that Linden Care does any mail order

23   business?

24   A    Do I believe that --

25   Q    Yeah, that Linden Care does any mail order business?

*Mark Weiner - Recross - Ms. Hellmann*

1        MS. CLARK:  Objection, Your Honor, to the term mail

2    order.  It's been used ten different ways in this proceeding

3    and I think counsel should indicate.

4        MS. HELLMANN:  He just gave me what his definition

5    was.

6        THE COURT:  Overruled.

7    A    Linden Care doesn't dispense any 90 day supply of

8    medication.

9    Q    Why did you represent to Express Scripts that you were

10   doing 39 percent mail order?

11   A    When did I?

12   Q    On the provider certification.  Did you see the provider

13   certification that Linden Care submitted in this case?

14   A    The one from I believe it was December 2013.

15   Q    Yes.

16   A    Yes, so at that given point those numbers were accurate.

17   Q    So at that point Linden Care was doing 39 percent mail

18   order?

19   A    No, at that point Linden Care was doing 39 percent home

20   delivery services.

21   Q    Does it say home delivery services on that provider

22   certification?

23   A    I don't think we had the option of that.

24   Q    You indicated in the box next to where it said mail

25   order 39 percent, correct?

*Mark Weiner - Recross - Ms. Hellmann*                    310

1   A    I indicated that -- not me personally but the company

2   indicated that 39 percent of our medications are home

3   delivery, and that 39 percent represented everything that was

4   shipped from our pharmacy, not all of that 39 percent was

5   outside the pharmacy.

6   Q    Right.  In fact, you noted that only 39 percent and that

7   included in state and out of state, correct?

8   A    39 percent considered home delivery in state and out of

9   state.

10  Q    And we know today that over 70 percent is out of state,

11  correct?

12  A    Approximately, yes.

13  Q    Now Ms. Clark was asking you about the information that

14  Express Scripts has and there is no dispute Express Scripts

15  sees every claim that Linden Care submits?

16  A    That's how they pay us, so we would have to see the

17  claim, yes.

18  Q    And I know I believe from Ms. Clark's testimony and your

19  testimony that that should let Express Scripts know what

20  members are having difficulty finding an alternative

21  pharmacy, right?  Is that your testimony?

22  A    No, that's not.

23          MS. CLARK:  Objection, counsel.  Referred to

24  Ms. Clark's testimony and I think it might be an error.

25  A    Restate the question.

*Mark Weiner - Recross - Ms. Hellmann*

1  Q   Was it your testimony to Ms. Clark's question that

2  Express Scripts has the ability from the claims data, Exhibit

3  D6, that Express Scripts has information regarding what

4  members can't find an alternative pharmacy?

5  A   Not from the claims data.  I think you're getting two

6  things mixed up.  What we were addressing to that, if Express

7  Scripts wanted to, they can identify the patients that would

8  need the medication.  If patients did call up Express Scripts

9  and say I got a CSR, or customer service representative, on

10 the phone, maybe would there be a note section in Express

11 Scripts.  I don't know if Express Scripts puts notes in every

12 file if they call, and so forth.

13 Q   Mr. Weiner, not every one of Linden Care's patients has

14 had trouble finding an alternative pharmacy, right?

15 A   I don't know.

16             MS. HELLMANN:  Thank you.

17             THE COURT:  Any further questions?

18             MS. CLARK:  No, Your Honor.

19             THE COURT:  Thank you, Mr. Weiner.  You're excused.

20             Ms. Clark, do you have any more evidence that

21 you're seeking to present?

22             MS. CLARK:  No, Your Honor, other than the video,

23 and I think the Court is going to look at that some point

24 offline, because it's become part of the testimony today and

25 I would just -- I don't know if you want to watch it.

1          THE COURT:  Is it a video or a tape recorded phone

2     call?

3          MS. CLARK:  I think it's actually a tape recorded

4     call of the Village Pharmacy contact.

5          MR. COST:  Videotape of a phone call.

6          THE COURT:  Was that admitted into evidence?

7          MS. CLARK:  It was, Your Honor.

8          MR. COST:  It was.

9          THE COURT:  Let's just confirm.

10         MR. COST:  P17.

11         THE COURT:  Yes, that's admitted into evidence.

12    And, yes, the Court will listen to the phone call.

13         Ms. Hellmann, did you have any evidence to present

14    today?

15         MS. HELLMANN:  No, Your Honor.  I just want a

16    chance to make a statement to the Court.

17         THE COURT:  Okay.  And Ms. Hellmann, do you have

18    any evidence that Linden Care shipped medicines out of state

19    to California?

20         MS. HELLMANN:  Let me tell you what we based it on

21    was, what information we have in our systems.

22         THE COURT:  Let me ask you first.  Do you have any

23    evidence to present today that Linden Care has shipped

24    medicines to California?

25         MS. HELLMANN:  We don't have any specific delivery

1    information, no.  We don't have that in our possession.  We

2    don't get that unless we do an audit.  That's not information

3    that comes to us.

4           What we have is what the members tells us, a

5    shipment address and a resident address, that's what we have

6    in our system, that's their eligibility data, and if both

7    those addresses show California, sometimes they don't,

8    sometimes they do show different states, that's the only

9    information we have.

10          THE COURT:  Okay.  So you have no evidence to

11   present to the Court?

12          MS. HELLMANN:  No.  Other than what we presented on

13   Friday, no.  We have no further evidence to present.

14          THE COURT:  At this point why don't we have

15   argument regarding the case.  And let me just state I would

16   like to start with I guess some thoughts and questions for

17   counsel.

18          And my first question with respect to the merits of

19   the case relates to the addendums to the Provider Manual, and

20   it appears to me, and maybe I'll ask Ms. Hellmann, that there

21   is an addendum, a New York Medicaid addendum to the Provider

22   Manual that has a termination provision that would appear to

23   apply here.  As I understand it, Linden Care does have

24   members of New York Medicaid.

25          And so, Ms. Hellmann, I would be interested in your

1   views of why the termination provision in the Medicaid

2   addendum does not apply.

3           MS. HELLMANN:  Sure, Your Honor.  So that

4   termination provision which requires -- is a notice provision

5   for the Medicaid.  It only applies to those members.  Now,

6   Linden Care again in their provider certification shows no

7   Medicaid business, that's what they represented to us.

8           THE COURT:  Let me stop you there.  What are you

9   referring to?

10          MS. HELLMANN:  The provider certification, Your

11  Honor.

12          THE COURT:  Okay.

13          MS. HELLMANN:  Again, this is part of the reason we

14  asked for the information to be updated.  Mr. Weiner

15  testified to thousands of members of Medicaid.  I mean, that

16  wasn't represented to us, Your Honor.  So I would agree a

17  termination for those specific Medicaid members to the extent

18  they're identified would apply.  I'm not saying otherwise.

19          THE COURT:  And the termination provision requires

20  that Express Scripts give thirty days notice and that there

21  be a hearing after that thirty day notice period -- or a

22  hearing within thirty days, and that no termination should be

23  effective earlier than sixty days from the receipt of the

24  notice of termination?

25          MS. HELLMANN:  Yes.  I don't have the addendum in

1    front of me, but again, yes, if they're identified Medicaid

2    members with respect to that termination provision, yes.

3          Now, yes, I would admit that that's exactly what

4    that New York Medicaid addendum says, I'm not disputing that.

5    But in terms of I think your question was why didn't you guys

6    do that and I'm telling you what the representations were.

7    And I understand what Mr. Weiner said today.  But I hope that

8    answers your question.  Yes, it is a thirty day notice with a

9    nonbinding hearing.

10         THE COURT:  I guess my question is I'm looking at

11   the likelihood of success on the merits, and there is a

12   breach of contract claim that claims of Express Scripts

13   failed to comply with its Provider Manual, and the

14   termination is in the Provider Manual.  So are you conceding

15   this Express Scripts breached its contract with Linden Care

16   in connection with terminating immediately with respect to

17   the New York Medicaid members?

18         MS. HELLMANN:  If there are New York Medicaid

19   members, if they can be identified, I would agree there is a

20   thirty day notice provision under that agreement, yes.

21         THE COURT:  And at this point would Express

22   Scripts, if Linden Care provides evidence of the Medicaid

23   members, agree to rescind its immediate termination with

24   respect to those individuals?

25         MS. HELLMANN:  Your Honor, no.  And I'll tell you

 1   why.  I mean Linden Care is not asking for a TRO to enforce a

 2   hearing.  They're asking for a TRO to get back into this

 3   network.  There is no irreparable harm if they're right that

 4   we breached the contract on this issue.

 5          THE COURT:  Let me just say, aren't you conceding

 6   that you breached the contract on this issue?

 7          MS. HELLMANN:  If they can identify that.  And none

 8   of the exceptions apply.  Then that's money damages.  It's

 9   not injunctive relief.

10          THE COURT:  What about as to the patients, Medicaid

11   patient, who may have trouble in the way that patients have

12   indicated they're having trouble with their ongoing pain

13   medication and controlled substance medication, controlled

14   medications?

15          MS. HELLMANN:  Your Honor, the patients are

16   absolutely so important, and we've been saying that from day

17   one.  I mean, there has been a lot of stuff that's thrown out

18   there about how Express Scripts doesn't care about its

19   members and that's simply not true.  We reached out to them,

20   member notifications have gone out.  But the irreparable harm

21   in this case is the irreparable harm to Linden Care.  I'm not

22   saying the members don't matter, that comes in in the public

23   interest section, but there is no irreparable harm to Linden

24   Care if they can prove a breach of this.  It is money

25   damages.  It's the money they lost because of this notice

1    provision.  It's not irreparable harm.

2         And I don't think, I mean, we haven't heard any

3    testimony about a Medicaid member not being able to get their

4    medication.  And I think, Your Honor, the testimony has been

5    that we have tried, we have outreached to members, and there

6    has been some hearsay and some he said/she said stuff, but

7    what we do know is that Linden Care's not telling its members

8    that they need to go somewhere else.  So if they win on that,

9    to answer your question, it's not irreparable harm to Linden

10   Care.

11        THE COURT:  I think the Court can look at

12   irreparable harm in terms of looking at the harm to members

13   to the extent they are in severe pain, they have medications

14   that if they do not have, they may have withdrawal symptoms,

15   and I think that's a factor that the Court can consider with

16   respect to irreparable harm, the patients.

17        MS. HELLMANN:  I think there is a law that says

18   it's not harm to the third parties.  I do believe that there

19   is law that says that.  But this evidence of, I mean, all

20   we've heard is a bunch of generalities.  The two patients

21   that testified, that didn't support that there is irreparable

22   harm there.  I mean, we have so much hearsay in this case,

23   but the two patients that testified said, one said I told

24   them if I needed to go somewhere to let me know and they're

25   not.  And the other woman, I mean, there is a pharmacy down

1    the road that can help her.

2          THE COURT:  Ms. Clark, with respect to the New York

3    addendum for managed care provider IPA contracts.

4          MS. CLARK:  Yes, Your Honor.

5          THE COURT:  It appears to me when I look at this or

6    at least I'm not clear whether that addendum applies in this

7    case.  The termination provision appears to apply to the

8    termination of an MCO when there is an agreement between an

9    MCO and another entity such as an IPA, or an MCO and a

10   provider, it's not clear to me that termination provision

11   applies here.

12         MS. CLARK:  Yes, Your Honor.  I think what we need

13   to do is step back.  And actually I prepared a very brief

14   PowerPoint with link to the statutes, but we don't have

15   PowerPoint in this courtroom, so I'm not sure how to handle

16   exactly that.

17         But the problem is, Your Honor, that New York has

18   created a definition of IPA that embraces downstream entities

19   downstream from the HMO that have responsibility for creating

20   a network that serves the members.  So if you take a look at

21   that linkage, and specifically -- give me one second.  At the

22   definition of IPA, it says that it means, "A corporation,

23   limited liability company or professional services limited

24   liability company which contracts directly with providers of

25   medical or medically related services in order that it may

1    then contact with one or more MCOs, et cetera, et cetera.

2    This is very clearly designed to encompass all downstream

3    contractors that have the responsibility for putting together

4    networks of health care providers.  That would include

5    physician practices, and by its very definition it would

6    certainly include pharmacies.

7           So we don't understand how Express Scripts can

8    claim that it's not encompassed by the IPA definition,

9    remembering that the IPA definition is incorporated, you

10   know, directly into their own contracts, specifically the

11   2011 amendment.

12          THE COURT:  But if you're looking at the

13   termination provision, which is the termination provision for

14   the managed care/IPA contracts, it appears to apply to

15   terminations between an MCO and an IPA, which isn't the

16   situation that we have here.  We have a termination --

17   assuming Express Scripts is an IPA, we have a termination

18   from an IPA is terminating a provider.

19          MS. CLARK:  And what section are you looking at,

20   Your Honor?

21          THE COURT:  I'm looking at the New York addendum to

22   the participating Provider Agreement, the part that deals

23   with standard clauses for managed care provider/IPA

24   contracts, and the termination provision is Section 5.

25          MS. CLARK:  Yes, I'm looking at 5, and it says, "If

1   the agreement is between the MCO and the health care

2   professional, the MCO shall provide such health care

3   professional written explanation."  Is that what we're

4   talking about?

5           THE COURT:  Yes, all of those 5.1 you're reading, I

6   think 5.2 and 5.3.  This agreement isn't between an MCO and a

7   health care professional.  This agreement is if you're

8   correct by Express Scripts being an IPA, it's between an IPA

9   and a health care professional, assuming Linden Care is a

10  health care professional.

11          MS. CLARK:  Your Honor, I think an IPA is an MCO

12  under the standard clauses and under the guidelines issued by

13  the New York State Department of Health.  And the whole

14  structure of these agreements is that the obligations of the

15  MCO to provide these provider termination rights flows

16  downward in the contracts, and that's why Department of

17  Health required Express Scripts to have the overall reference

18  specifically to the mandatory clauses and the guidance

19  document.

20          I don't think it really matters so much the way

21  it's characterize in the addendum when the addendum

22  specifically incorporates by reference the standard clauses

23  and the definitions that we're relying upon in the agreement.

24  So I would say that you have to look at what an MCO is under

25  the New York definitions, which would include an IPA, and go

1    through the linkage by going through the managed care

2    clauses.

3           Now I wanted to point out that in exhibit in

4    appendix B on page -- this reference to the mandatory

5    New York provisions related to 4406-d shows up in the addenda

6    that you're talking about but also is specifically referenced

7    in appendix B at page 242.

8           THE COURT:  Are you talking about the amendment to

9    the agreement, the 2011 amendment?

10          MS. CLARK:  It's actually in the large manual that

11   we've been talking about.  And I don't know that Your Honor

12   has a complete copy of the manual.  I think it's in --

13          MR. COST:  I can provide the Court a copy.

14          MS. CLARK:  I know it was an exhibit because I

15   think I handed it to one of the witnesses and said is this

16   the Provider Manual.

17          THE COURT:  The New York addendum to the

18   participating provider agreement is in the Provider Manual.

19          MS. CLARK:  That is.  But let me read from page 242

20   of the manual itself.

21          MR. COST:  Your Honor, may I approach?

22          THE COURT:  I think I probably have that.

23          MS. CLARK:  On page 243 it specifically says, "As

24   required by the New York State Department of Health, solely

25   with respect to services rendered in the State of New York

under this agreement to any member of any prescription drug

plan offered by a sponsor that is certified as a managed care

organization under Article 44 of the New York Public Health

Law, the New York State Department of Health standard clauses

for managed care/IPA contracts shall be and are expressly

incorporated and adopted herein by reference.

So, you know, we have it in the addenda, the

New York addenda, which is an amendment to the Provider

Agreement actually, not just an amendment to the Provider

Manual.  We have the Provider Manual in Appendix B at

page 242 and 243, again incorporating by reference in a

superseding way the New York managed care clauses and this

very important right both for patients and for professionals.

And then we have the 2011 amendment.  And if we

turn to the 2011 amendment, that is even more explicit.  It

attaches a copy of those clauses, which include 4406-d

hearing rights.  And I'm going to grab a copy of that real

quick here.  So if we look at exhibit -- this is the exhibit

that is the 2011 amendment that Your Honor was just referring

to?

THE COURT:  Yes.

MS. CLARK:  If we look at that document, this

amendment is a superseding amendment to the original

contract, and it not only specifically refers to the rights

that we're talking about that are set forth in the standard

1    clauses and we'll look at the standard clauses in a second,

2    but those standard clauses are actually attachment.

3            THE COURT:  And I'm looking at that and that's what

4    I don't see how that applies to Express Scripts, because

5    again the termination provisions in that addendum, which is

6    Section 5, termination and transition, appears to apply to

7    agreements between an MCO, which Express Scripts is not.

8    Unless I'm missing something, Express Scripts is not an MCO.

9    Terminations between an MCO and an IPA or terminations

10   between an MCO and a health care professional.

11           And I understand that your argument that Express

12   Scripts is an agent of an MCO, but I don't see other than

13   that argument how Express Scripts is bound by this

14   termination provision.

15           MS. CLARK:  Your Honor, I think to develop that

16   linkage, you need to look at the standard clauses that apply

17   to an IPA, the guidelines.  We submitted those as one of our

18   exhibits.  It's in the docket at 25-4.

19           THE COURT:  Which clause are you referring to?

20           MS. CLARK:  It will take me a second to get there.

21   Section five on page 9.  So if you go to page 12 on that

22   exhibit 25-4, and I think this is featured in our brief but I

23   want to point it out.  There's a specific note on page 9

24   below section 9B.

25           THE COURT:  I'm not sure I have that document.

1        MR. COST:  I can provide with you a document.

2        MS. HELLMANN:  Do you have a copy for me as well?

3        MS. CLARK:  It's 25-4.  It was an attachment to our

4    brief, Your Honor, so that's why it's in the record.  But we

5    have extra copies that we can provide.

6        THE COURT:  So 25-4 and which page?

7        MS. CLARK:  Page 12.

8        THE COURT:  Yes.

9        MS. CLARK:  It says, "PHL 4406-d," which is the

10   statute we're talking about," prohibits termination of a

11   health care professional contract by an MCO or IPA without

12   notice and the opportunity for a hearing, subject to certain

13   exceptions; nonrenewal is permitted on sixty days notice and

14   shall not be considered a termination under 4406-d."

15       And take a look at the end of that sentence, do you

16   see the open parentheses, SC E.2?

17       THE COURT:  Yes.

18       MS. CLARK:  That's the reference back to the

19   standard clause.  So the Department of Health has

20   specifically issued this guidance to clarify that the

21   contract between the IPA and the provider is subject

22   specifically to the 4406-d protections.

23       THE COURT:  Ms. Hellmann.

24       MS. HELLMANN:  Yes.

25       THE COURT:  Do you have any response?

1        MS. HELLMANN:  I do.  Express Scripts is not an

2   IPA.  It does not meet the definition of an IPA.  I mean,

3   there are specific limitations on what you need to do to be

4   an IPA.  You need to have IPA in your name.  You need to

5   register with certain -- you need to take certain steps with

6   the state.  I mean, and it was one of the questions you

7   asked, Your Honor, about is there a law, is there law out

8   there that somehow takes these state regulations and prevents

9   a PBM from terminating its Provider Agreement, and there is

10  not.

11        THE COURT:  Well, with respect to Medicaid there

12  is.

13        MS. HELLMANN:  Right.  But I'm talking about the

14  case law that these state notice laws, these laws somehow

15  prevent a termination, and there is absolutely no law that

16  has found that this section that has held an IPA applies to a

17  PBM, there is nothing out there.  I mean, Ms. Clark keeps

18  referring that there is but we haven't seen any authority for

19  that.

20        I mean, the definition of an IPA, like I said,

21  there is certain things you need to make.  We can talk about

22  diversified IPA, which is an Express Scripts subsidiary, but

23  they're not a party to this case.  This agreement, the

24  Provider Agreement, for Express Scripts' entire network was

25  based on the Provider Agreement, the entire agreement.  So I

1    guess Ms. Clark just keeps saying that Express Scripts has to

2    be an IPA and they're, therefore, bound by all these

3    provisions.  There is no support for that.  And IPA it's very

4    limited.  I mean, this section, this New York IPA, MCO, it's

5    very limited to, and she pointed to the language on page 242.

6              With respect to services rendered in the State of

7    New York to any member of an MCO, that is what this section

8    applies to.  No, Express Scripts, and you were exactly right,

9    is not an MCO.  And there is just simply no authority for

10   this fact that this New York addendum then controls Express

11   Scripts' entire contractual relationship with Linden Care

12   that's based in every state.

13             Express Scripts is simply not an IPA under the

14   definitions set by New York and there is no limitation

15   extending it to it.  And there is also nothing in the

16   definition about and if you act on behalf of one, or one is a

17   subsidiary; I mean, it is a very strict definition.

18             THE COURT:  And let me ask you the definition

19   that's attached in the Exhibit 1, Appendix 1 to the 2011

20   amendment to the Linden Care Express Scripts agreement.

21             MS. HELLMANN:  Right.  Give me a minute.  Are you

22   looking at the definition of IPA?

23             THE COURT:  Yes.

24             MS. HELLMANN:  Okay.

25             THE COURT:  That defines an IPA as an entity formed

1   for the limited purpose of arranging by contract for the
2   delivery or provision of health services by individuals,
3   entities and facilities licensed or certified to practice
4   medicine and other health professionals.
5           MS. HELLMANN:  Your Honor, Express Scripts wasn't
6   formed for the limited purpose of arranging for contract
7   delivery for MCO members, New York MCO members.  And that's
8   one of the reasons why the state has those requirements in
9   terms of IPA has to be in your name and you need to take
10  these certain steps.
11          THE COURT:  Where is the requirement that an IPA
12  has to be in the name?
13          MS. HELLMANN:  It's in our brief, Your Honor.  I
14  will find it and I will refer you to exactly the section.
15  It's actually, it's a state regulation and I know we cited it
16  in our brief and I can get it for you.
17          THE COURT:  Okay.  That would be helpful.
18  Ms. Clark, do you have any response?
19          MS. CLARK:  Yes, Your Honor.  If you look at
20  10MICRR98-1.2 in the definitions, it also has this definition
21  of IPA.  And I don't understand counsel's argument.  These
22  are undisputedly members of MCOs.  All the members that are
23  members of the plans meet the definition of members of the
24  MCOs that are referenced in these guidelines and definitions
25  that we're talking about.

1        Whether or not Express Scripts has complied with

2   other regulations relating to what an IPA should do is really

3   irrelevant here.  These are patient protected provisions.

4   They're designed to protect the patients and the provider in

5   this situation.  So that's really the focus of the statute.

6   And I think the Court can see that in the Medicaid addendum

7   that there is, you know, you can put those two side by side

8   and you can see that the intention of this trickle down

9   patient protection scheme is clearly designed to run having

10  non-delegable duties to managed care organization that can't

11  be thwarted by a hiring a contractor to which you delegate

12  these managed care responsibilities.

13       I think that's the clear intent of the statutory

14  structure, it's buttoned up through the provisions that we

15  just looked at.  But it's such a stretch in terms of

16  likelihood of success on the merits and the standard that we

17  have here to say that this body of law repeated, I don't even

18  know how many times in Express Scripts' own manual where they

19  repeatedly assent to the application of New York law and this

20  statute in particular, and then they claim, oh, we put it in

21  there but it doesn't apply to us.  This is in their own

22  agreement.  This is not in some ancillary agreement.

23       So the idea that they've agreed with the State of

24  New York to abide by these laws in their PBM contract, and

25  then say that it doesn't apply to PBMs.  Your Honor, that's

1    nonsensical.  The fact that they're including those in their

2    contract is an admission that those addenda apply to them.

3              THE COURT:  And Ms. Clark, I see the guidance that

4    you've cited to.  But it seems to me what should govern here

5    is what the parties -- the appendix, the addendum to the

6    Provider Agreement, and if I look at the language to the

7    addendum to the Provider Agreement, which presumably

8    incorporates New York law to this contract and this

9    situation, the termination provision is written as though it

10   applies to terminate when an MCO terminates an agreement.

11             MS. CLARK:  Well, Your Honor, I think that -- give

12   me one second to catch up with you here.  I think that you

13   have to look at not what is in just the manual.  I think you

14   have to look at the specific clauses and mandatory New York

15   provisions that are specifically incorporated by reference in

16   the manual.

17             So, in addition to the addendum, you have several

18   provisions in the agreement where Express Scripts agrees that

19   it will be bound by New York law.  So regardless of how it's

20   stated in the addendum, you still have to go back to the

21   New York mandatory provisions and the guidance document that

22   we provided, the New York State guidelines, that are

23   incorporated specifically by reference, and realize that

24   those end up trumping anything in the agreement, regardless

25   of how Express Scripts has stated the issue.

1          THE COURT:  So you would agree that if Express

2    Scripts is not an IPA, then this, the 4406-d does not apply.

3          MS. CLARK:  Well, Your Honor, we wouldn't agree

4    with that.  Because even if they weren't an IPA under that

5    definition that we discussed, they would -- it would still

6    apply because the whole structure of these contracts calls

7    for Express Scripts to be the agent of the MCO in terms of

8    fulfilling this important responsibility to manage these

9    prescription benefits.

10          So, you know, that's very clear from the agreement.

11    It's supported by the case law that we cited, including the

12    *Pierce Apothecary* case, where courts have recognized that

13    this responsibility is really non-delegable.  And as an agent

14    they can't do something that the managed care organization

15    couldn't do.

16          THE COURT:  And it seems to me that they could be

17    an agent in certain factual scenarios, such as the case law

18    that you cited to the Court, they could be an agent where

19    they're working with the HMO, or the MCO, or where they're

20    doing something that the MCO asked them to do.  But in this

21    case we have Express Scripts, and I haven't heard any

22    evidence that they're doing something at the behest of an MCO

23    or an HMO, there is no evidence of that before the Court.

24          MS. CLARK:  Well, Your Honor, I would disagree with

25    that.  We had evidence from Dr. Weingarten.  We had evidence

1    from Mr. Fogel describing how in fact the formularies come

2    from the MCOs and are administered by Express Scripts as a

3    PBM on behalf of the MCOs.

4         So I think there is that linkage there in the

5    record, and I don't think that's been contradicted or

6    disputed by Express Scripts in any way, that they're acting

7    as the representative of the managed care organization in

8    implementing that plan's formulary, and that the patients

9    we're talking about are members of those MCO plans.  I don't

10   think there is any dispute about that in the record.

11        MS. HELLMANN:  Your Honor, if I may respond to that

12   just very briefly.  Under Ms. Clark's reading, this limited

13   exception would swallow the rule.  Express Scripts terminated

14   not only half of a New York MCO, and you're exactly right,

15   there are times actions that are taken on behalf of a client.

16   A client can have their own pharmacy network and may say,

17   Express Scripts, I don't want Linden Care in this network.

18   This was an action taken for its entire provider network.  We

19   know and the evidence is undisputed that less than 30 percent

20   of Linden Care's business is New York.  And besides just not

21   applying on its face, nothing about agents, that limited

22   exception would swallow the rule of the agreement, the entire

23   contractual agreement between these two parties.

24        And Your Honor, I want -- Ms. Clark referred to

25   that the *JE Pierce* case and kind of goes to the question of

1    is there a law out there on this specific issue with respect

2    to, you know, do these various state laws apply, do they

3    apply to a termination and do they apply to limit it.  And

4    I'm still hoping that I can walk through a short presentation

5    with Your Honor because there is case after case that I will

6    cite to you that where various state laws have not stopped a

7    termination of an entire contractual relationship with

8    respect to a PBM and a pharmacy.

9              *Sorkins* is a case that I know I cited in some

10   briefs, and I have the cite for you, 2015 WL 249488.  In

11   fact, the pharmacy was a New York pharmacy.  They actually

12   raised violations of 4406-d.  That was one of the claims they

13   raised.  That preliminary injunction was denied.

14             I would like to go through a couple of other cases

15   where these state laws do not invalidate when you are

16   terminating what's at issue is an entire contractual

17   relationship over an entire network.

18             THE COURT:  Let me ask you, but you do agree that

19   with respect to the individual members of New York Medicaid,

20   that the Provider Agreement does require that Express Scripts

21   provide thirty day notice?  It does not -- Express Scripts

22   cannot immediately terminate those patients.

23             MS. HELLMANN:  I agree with respect to those

24   New York Medicaid members.  But I also will disagree that the

25   relief, if this is violated and none of the exceptions apply,

1    is not reinstatement into the network.

2          THE COURT:  And what would be the harm to Express

3    Scripts of reinstating Linden Care into the network for the

4    purposes of the New York Medicaid patients who it breached

5    the addendum in failing to provide notice with respect to?

6          MS. HELLMANN:  The harm to Express Scripts would be

7    that this relationship is over.  And even if I mean now at

8    this point member notification letters have gone out, members

9    are not served by now, okay, you're back in for thirty days,

10   what served to get these members transitioned?  And the

11   damage, if any, to Linden Care are money damages.

12         So that is the harm.  The harm is that this is a

13   pharmacy that we don't want to do business with any more and

14   we're not contractually obligated to.  And Your Honor, even

15   under that Medicaid, I mean, it's simply a matter of time.  I

16   mean, that's what it is.  And that's not irreparable.  You

17   know, the *Trilogy* case that we cite in our briefs, that

18   you're basically prolonging the inevitable that this

19   relationship is going to end.  So what we need to do is get

20   the members transitioned, many of whom I probably believe

21   it's been two weeks have been.  And again, if Linden Care

22   thinks we breached it, go to arbitration, we can talk about

23   money damages.

24         THE COURT:  Ms. Clark, I'll let you respond.

25         MS. CLARK:  Yes, Your Honor.  With respect to the

1    question of irreparable harm.  You know the courts in

2    New York have found and in this circuit have found that this

3    kind of a severance of a relationship between a patient and

4    their health care provider is exactly the kind of harm that

5    should be avoided.  And I'm citing specifically to the

6    *Medical Society of New York versus Toia* case, 560 F.2d 535,

7    which is a Second Department 1977 case.

8          But there is quite a legion of cases that deal with

9    the severance based upon breach of contract and those types

10   of concerns of a professional relationship between a patient

11   and a provider.  And here that's not incidental, there is

12   plenty of evidence in the record, Your Honor, that these

13   patients rely heavily upon Linden Care for these pain

14   medications and for management of those medications and

15   everything else.  So that's a very important factor here.

16         So we think that irreparable harm has been well

17   establish from the patient's perspective, from Linden Care's

18   perspective.  You heard today the testimony about the

19   implications from Linden Care.  And again, we know that

20   courts have recognized that the damage to the

21   pharmacist/patient relationship is also irreparable harm.

22         So I think there has been a gross underestimation

23   of the scope of this issue.  It's the pharmacists, frankly,

24   Your Honor that have a right to this name clearing

25   proceeding.  And so that's another aspect of this.  This

1    isn't just a breach of contract case.  This is the well-being

2    of the professionals involved and this professional

3    corporation that has its reputation on the line and has the

4    ability to advocate for patients.

5          And so I would also disagree, Your Honor, that this

6    is a matter of time.  If we had the notice that's required

7    under New York law and the 4406-d hearing, both for all

8    members of New York managed care organizations that has

9    Express Scripts as a representative of them, ultimately if we

10   had that hearing, we would be able to show that this was an

11   improper termination because it violates 4406-c.

12         Now 4406-c is very important here.  That's the

13   statute that says that no contract in New York shall prevent

14   a health care professional or provider from advocating for

15   their patients to get the medical treatment that they need.

16   And there cannot be not even a termination without cause,

17   there can't even be a nonrenewal in New York when it's done

18   for impermissible reasons.  And we've seen in this case, Your

19   Honor, that the reasons that have been offered are clear

20   pretext.  You know the Maryland thing, California.  There has

21   been no evidence whatsoever that we violated a California law

22   by shipping a prescription into California to a

23   nonresident -- to a California resident in violation of law.

24   I think we spent a lot of time dealing with the intricacies

25   with the so-called mail order ban which doesn't exist in the

1    agreement.

2           So we have a very strong case that this is all a

3    pretext for punishing Linden Care for being a high volume

4    dispenser of expensive drugs that may not be good for the

5    PBM.  And but we know all those utilization review functions

6    are directly in play here.  So it's not a matter of time.  We

7    will be able to show that and that would even prevent a

8    nonrenewal.  It would certainly prevent a termination with or

9    without notice.

10          THE COURT:  Let me say it appears to the Court that

11   what you're asking for is really a mandatory injunction

12   because Express Scripts did terminate effective immediately,

13   so what Linden Care is asking for is something that turns

14   back time to a pretermination state.  The standard is more

15   difficult for a mandatory injunction.  It requires a clear

16   showing that the moving party's entitled to the relief

17   requested or extreme or very serious damage will result from

18   the denial of preliminary relief.

19          I am interested -- I'm not sure we have evidence,

20   significant evidence before us on irreparable harm with

21   respect to the Medicaid members because I don't think the

22   Court -- I don't think there is a clear showing that the

23   termination provisions apply to members of MCO.  So I'm not

24   sure that there is that clear showing with irreparable harm

25   with respect to Medicaid members.

1          I am troubled by Express Scripts' kind of varied

2     explanations for what it did here, and I would like evidence

3     of whether there are any shipments to California and whether

4     there are emergency exceptions under the law that would allow

5     Linden Care to ship to California.  And whether there is

6     anything else that plaintiff wants to offer with respect to

7     irreparable harm with respect to the Medicaid, the members of

8     Medicaid, Linden Care's Medicaid members.

9          With that, I will allow counsel to argue with the

10    remaining time.  I know, Ms. Hellmann, I haven't given you an

11    opportunity to argue, so I'll let you argue and then let

12    Ms. Clark finish.  And let me just say I have read the cases

13    that you have cited to the Court so I don't think you need to

14    go over those, except to the extent they refer to what I've

15    mentioned are my concerns in this case.

16         MS. HELLMANN:  Thank you, Your Honor.  And I will

17    move quickly through those cases.  There's a couple of cases

18    I don't think we've had a chance to cite yet, so thank you.

19         MS. CLARK:  Your Honor, I'm hearing from our team

20    that we need a quick two minute break.

21         THE COURT:  Yes, that's fine.

22         (Recess at 11:30.)

23         (Reconvene at 11:35.)

24         THE COURT:  Now that we're back on the record, just

25    to let the parties know we canceled a conference we had at 12

1   so I have until 12:20 or 12:25.

2           MS. HELLMANN:  Thank you, Your Honor.  Again, I

3   will try to move through what we've already talked about.

4           Your Honor, as you know, Linden Care is asking that

5   this Court put together two parties to re-contract them, and

6   from what I just heard from Ms. Clark, that's a contract for

7   infinity, according to Ms. Clark, and that's not the

8   agreement at issue here.  As you noted, and I'm going to talk

9   about the two things, irreparable harm and likelihood of

10  success, those are two of the four elements for a mandatory

11  injunction.

12          As to Court noted, when it's a mandatory injunction

13  it's even a higher burden.  The central issue in this case

14  and what it stems around is did Express Scripts have the

15  right to terminate its relationship with Linden Care.  That

16  is the central issue in this case.

17          Now we've talked a lot about the addendums and what

18  they apply, but this agreement, Ms. Clark talked a lot about

19  4.2(b).  4.2(c) allows for immediate termination in certain

20  circumstances on written notice.  And it's under that

21  provision that this agreement was terminated, not 4.2(b).

22  Additionally, this agreement, an agreement between two large

23  sophisticated entities, allows either party, it's not

24  unilateral, either party to terminate the agreement for no

25  reason with written notice.

1          Express Scripts terminated Linden Care because it

2     misrepresented that it was a retail provider given the amount

3     of mail order business that it was doing.  The definition,

4     I'm going to talk about it again, is primarily a retail

5     provider.  And Express Scripts terminated Linden Care for

6     shipping prescriptions into the State of California.

7          THE COURT:  Do you have any evidence of that?

8          MS. HELLMANN:  Your Honor, so what we have, we

9     don't have the delivery logs.  We have a lot of prescriptions

10    going into a state where the member lives and the member has

11    given us their shipping address.  That good faith belief led

12    us to believe and determine that they were shipping these

13    prescriptions into the State of California.

14          Now Linden Care presented six witnesses in this

15    case.  And what wasn't disputed was that Linden Care does not

16    meet the definition of a retail provider under the agreement.

17    That definition is they primarily dispense medications via a

18    retail store front.  That's the definition.  And even more

19    so, it specifically excludes mail order.  So this concept

20    that mail order is this term we don't know, it's the opposite

21    of a retail pharmacy.

22          And we do know, and again not disputed, not one

23    person said, they ship over 70 percent of their prescriptions

24    out of the State of New York.  And what we do know, and

25    Mr. Weiner offered some on this, when they gave us their

1    provider certification at the end of 2013, they understood

2    mail order, they answered it, it's 39 percent.  And it's not

3    home delivery, it's mail order.  That's what it says in the

4    provider certification.

5         And they indicated they do 39 percent and that

6    includes local and it includes out of state.  And Linden Care

7    also admitted they had an obligation to be truthful in that

8    and they had an obligation to update it, because it's the

9    only way we know what type of business they're doing.  And as

10   Ms. Roberts talked about, we have to have them appropriately

11   contracted.  There are different networks and they were in

12   the retail network.  It's the number one representation in

13   warranty that Linden Care made.  This is a retail provider

14   contract, and they represented and warranted that they were

15   one.  And to come in now and say we're not, we ship

16   70 percent out of state, it just doesn't hold any water that

17   claim that they're not a mail order pharmacy, especially when

18   they told us they were, they just told us that they just only

19   39 percent mail order.

20        THE COURT:  Can you go back to the slide you had,

21   Linden Care is not appropriately licensed.

22        MS. HELLMANN:  Right.  In the State of California.

23   That goes to the California.  And then did not provide the

24   accurate and updated provider certification.  Again, updating

25   how much mail order they're doing.

1          I mean, and Your Honor, more evidence has come just

2    today.  I hear there are thousands of Medicaid members.  That

3    same provider certification didn't indicate any Medicaid

4    business.  Express Scripts doesn't want to do business with

5    them in part because of these misrepresentations.  We've

6    talked about the issue with the PIC, pharmacist in charge, it

7    wasn't in the termination letter.  But there is law that not

8    every reason has to be stated in a termination for the bases

9    for terminating a pharmacy.

10         THE COURT:  And if Express Scripts paid for

11   prescriptions, wouldn't Express Scripts have known that they

12   have members of Medicaid?

13         MS. HELLMANN:  Your Honor, this goes back to the

14   trust factor.  We cannot look at every claim that's submitted

15   to see what type of claims.  We look at what they represent

16   in that provider certification.  What do they represent their

17   business is?  I mean it would be impossible to say, okay,

18   they submitted this claim, now are we up to 40 percent mail

19   order.  It's why we have to trust the pharmacies.

20         They've talked a lot about the audits.  The audits

21   are scripts here, scripts there.  The credentialing process

22   is where we learn the type of business a pharmacy is and what

23   they're engaged in, and we have to rely on the fact that

24   we're going to get updates to that.  It's only the way that

25   we can feasibly have 65,000 pharmacies in our network and

1   continue to do business.

2           As I mentioned, there is law that you're not bound

3   by the reasons you state in the termination letter, but we

4   stated reasons in the termination letter, and those reasons

5   are enough.  But what it does go to show is these continuing

6   things that we've learned, discipline in Oregon, not updating

7   the PIC, not representing Medicaid.  It's just more evidence

8   that we don't want to do business with them.  And this claim

9   that other PBMs are terminating them because of Express

10  Scripts is silly.  Those other PBMs terminated because they

11  found that they breached their agreement.

12          And Linden Care's response on the retail versus

13  mail.  First Linden Care said, well, we use FedEx so that's

14  not really mail.  It's silly.  It's just a silly distinction

15  that somehow if you FedEx something, it's not mail order.

16          They also indicated that Linden Care's shipment

17  numbers change so they couldn't possibly update it.  We're

18  not talking about going from 39 percent to 40 percent.  We're

19  talking about going from 39 percent state and local to over

20  70 percent out of state.  That is a huge change.  You go from

21  being mail order in the minority to being a great, great

22  majority, because 70 percent now is again completely out of

23  state.  It is not primarily a retail provider.

24          And then finally there was some testimony that

25  Linden Care is a retail pharmacy because people actually walk

1    in the door.  Again, the definition of retail provider wasn't

2    that if you do any, you're a retail provider.  It's if you

3    primarily, if you primarily dispense prescriptions from that

4    retail store front.  And they're not doing that.  And there

5    is nothing, nothing said they weren't.

6            We've touched on this a little bit about the

7    New York law somehow prevents what's happened here, and there

8    is not a single reported decision that agrees with Linden

9    Care's position.  There is not.  The *JE Pierce* case found

10   that PBM was not bound by AWP laws.  It wasn't a pharmacy

11   termination case, it was a conspiracy case.  And likewise,

12   the same thing with the Mississippi case that they cited, it

13   never held that PBM was subject to state laws.

14           There is a number of cases in here we cite, most of

15   which are in our brief.  I just want to point out a couple of

16   things.  The *Medcare Diabetic* case was a pharmacy termination

17   case arguing that state law notice requirements prevented the

18   termination.  In this case this pharmacy was terminated

19   because they represented they were a retail provider and they

20   were doing mail order.  So this isn't this like crazy idea

21   that we came up with.  It is important, because as

22   Ms. Roberts testified to, you have to be appropriately

23   contracted because there is different standards for mail

24   order than there is for retail.

25           *North Shore Home Medical Supply versus Catamaran*,

344

1   this is a decision that just came out of the District of

2   Massachusetts a couple of months ago.  Again, pharmacy argued

3   that the state law prohibited the termination.  And in this

4   case the pharmacy at issue was a pharmacy that it sounds

5   similar in that they delivered pharmacy supplies to people

6   that were unable to leave their homes.  And again, the Court

7   held that the statute did not prevent a carrier from

8   sanctioning on their network-wide basis noncompliant

9   pharmacies.

10          And I want to talk about irreparable harm.  Linden

11  Care has had no evidence about irreparable harm to them.

12  They have talked about money damages.  They have talked about

13  that Express Scripts is 20 percent of their business.  But

14  they cannot establish irreparable harm with a contract that

15  is terminable at will.  There is no legal authority for this.

16          Again, I mentioned the *North Shore Home* case.

17  There the court found that the loss of business, the loss of

18  good will, it's money damages and it's not irreparable.  And

19  again, this was the pharmacy similar to a Linden Care that

20  specialized in delivering prescriptions to patients.  There,

21  similar to Linden Care, this pharmacy about 15 percent of its

22  customer base is insured by health plans that was serviced by

23  *catamaran*.  The Court found it was relatively minor, and more

24  importantly, quantifiable.  And then the Court went on to

25  note about the members and the announcement of public

1    interest and the balance of equities, sympathetic to the

2    member disruption.  But there are other pharmacies that are

3    available.

4            The *Sorkins* case I referenced early.  This is the

5    case where the pharmacy alleged a violation of 4406-d.  And

6    here there was an alleged loss of 40 percent of its customer

7    base.  Again, the Court found that it is not irreparable and

8    money damages could be addressed following a trial, following

9    an arbitration, following getting to the merits of this case.

10           In *Trilogy* the testimony was even stronger, *Trilogy*

11   *versus Medco*, out of the District of New Jersey.  There was

12   testimony that the business was going to be destroyed, that

13   they were going to have to lay off the remaining workers.

14   And again Judge Chesler said it's not irreparable harm.  In

15   looking at this, and this is important, the Court noted that

16   the contract was terminable at will with sixty days notice.

17   And the Court found there is nothing unique about these

18   damages because in sixty days it's going to happen and it

19   doesn't make it irreparable.  *Alternative Medicine and*

20   *Pharmacy* is the same, the parties agreed that the contract

21   could be terminated.  It's not irreparable harm.

22           Mr. Fogel testified about the hundreds of thousands

23   of dollars they're spending each day.  They alleged, and

24   Mr. Weiner confirmed, that Express Scripts represents

25   20 percent of Linden Care.  These are money damages.  As the

1    Court in *Trilogy* noted, the best case scenario, it kicks the

2    challenge, if there is a challenge, down the road, and it's

3    not unique and it's not peculiar.  And if Express Scripts is

4    wrong on the claims, Linden Care can recover monetary

5    damages.

6              And I want to talk about member impact, because it

7    is important, and I'm not saying it's not relevant to this

8    Court's analysis.  But Dr. Weingarten confirmed that there

9    are other pharmacies available.  We know that there is

10   hundreds of TIRF REMS pharmacies.  And one pharmacy is

11   Village Pharmacy located minutes from Linden Care.

12             And I know Ms. Clark referred to the video

13   recording, and if we had time I would ask that we all listen

14   to it together, because I listened to it and what as

15   represented in this court as to what Village Pharmacy said

16   and what Village Pharmacy could do and could not do is not

17   accurate.  It was question after question by Linden Care

18   representatives I think trying to get Village Pharmacy to say

19   they couldn't do it.  And it was concession, I can try to do

20   this if you give me the prescriptions, I can get the

21   medications today.  And that's -- I mean, we keep talking

22   about Village Pharmacy because it's so close to Linden Care,

23   and we're not saying Village Pharmacy is the only one, but

24   it's just an example that there are other alternatives out

25   there.

1          And Express Scripts has reached out and we're still

2     willing to reach out and we're still willing to do that,

3     because contrary to kind of the smear that's gone against

4     Express Scripts, they're our members.  We need to keep them

5     happy.  We need to make sure they're getting their

6     medications and finding a pharmacy.  If not, we're going to

7     lose our clients.  We're going to lose the members.  And we

8     have every incentive to make sure that happens.

9          So irreparable to Linden Care is zero.  It is money

10    damages, if that.  And the member impact, while important,

11    does not establish irreparable for Linden Care.  And it's

12    being addressed and it has been addressed.  And for Linden

13    Care to continue to say there is no other pharmacies by

14    telling Mr. G██████ he doesn't need to go to one and

15    representing that Village Pharmacy just can't do this work,

16    it's wrong and it's simply not fair.

17         Your Honor, before I sit down I want to address the

18    arbitration issue.  And I feel like it's been a little bit of

19    a moving target of the enforceability of this arbitration

20    provision.  There has been a number of reasons of is it

21    enforceable, where, what, and I continue hearing new

22    arguments from Linden Care.  And first of all, the question

23    of enforceability, and we address this in our brief, it's a

24    question for the arbitrator.  And Ms. Clark seems to concede

25    that in the last filing, it's the *Rent a Car*, United States

1    Supreme Court case.

2              So the first time Linden Care raised the issue that

3    there was no agreement to arbitrate, and it appears that

4    Linden Care has taken the position that this addendum or the

5    appendix superseded or amended the agreement to arbitrate in

6    the underlying Provider Agreement.  And that's not accurate.

7    The arbitration provision in the New York addendum, if it

8    applies, it simply venues the arbitration in New York.  It

9    doesn't say that it supersedes a mandatory arbitration

10   provision.  There is one.  It is binding, it is broad, it

11   encompasses this entire dispute.  At most, at most the

12   New York addendum does is it venues an arbitration in

13   New York.

14             And I mean, to some extent some of this could be

15   shortcut if I know that their position is we're going to

16   arbitrate, it's just a matter whether we're going to

17   arbitrate in Missouri or New York.  Originally when we first

18   had a couple hearings on the phone, that's what I thought the

19   issue was.  Now I feel that there is an issue there is not

20   even an agreement to arbitrate, that's why I wanted to

21   address those arguments.

22             But again, we have a venue provision for

23   arbitration but we still have a binding arbitration.  It's

24   never been amended, superseded, deleted, anything.

25             THE COURT:  Ms. Hellmann, do you agree that the

1   venue provision applies here?

2         MS. HELLMANN:  I don't, for the same reason that it

3   goes back to your question of when would this addendum apply.

4   And it's the fact scenario that I gave you.  If Express

5   Scripts on behalf of one of its MCO members terminated Linden

6   Care and there was that dispute, it would be venued in

7   New York.  And it makes sense because the decision makers,

8   the players are in New York.  I mean, here if you're going to

9   venue an arbitration for a network-wide termination that,

10  frankly, effects a heck of a lot more people outside the

11  State of New York because they're shipping so much outside of

12  the State of New York, because this venue provision, again

13  it's limited to members of managed care plans.

14        That said, Your Honor, if Ms. Clark said we

15  absolutely need to arbitrate, you know what, we're

16  sophisticated parties, send it to the AAA.  We can arbitrate

17  in Chicago, we can arbitrate in Phoenix.  But I'm not sure

18  that there is disagreement to arbitrate.  Again, the AAA the

19  place of hearing is relatively minor.  The AAA, the

20  arbitrator sets the rules, and the AAA arbitration provision

21  in the Provider Agreement is a binding arbitration provision.

22  If we can get there, I think we could go wherever the parties

23  want to go.  I mean, we have no problem with that.  But in

24  these later filings, I'm hearing unconscionability arguments.

25  I'm hearing that the public law policy trumps the arbitration

1    provision, and that's inaccurate.  I mean, the

2    unconscionability argument, the fact that they're claiming

3    this is a contract of adhesion.  They're asking this Court to

4    reinstate that contract and then they're also saying that

5    it's a contract of adhesion.  This is a very large company.

6    We saw the number of lawyers and executives that were here on

7    Friday.  These are two large companies and there has been no

8    evidence this is a contract of adhesion.  On the

9    unconscionability aspect, they make the argument that --

10          THE COURT:  Let me just ask you.  Do you agree that

11   New York law governs the arbitration with respect to members

12   of the New York managed care organization?

13          MS. HELLMANN:  I don't, for the reason that I said.

14   Because again, when it's a network-wide termination, I don't

15   think that addendum applies.  I guess we're saying we could

16   have two competing arbitrations going on.

17          THE COURT:  Yes.

18          MS. HELLMANN:  And I don't -- frankly, I don't

19   think that makes much sense.  So again, if we have an

20   agreement to arbitrate, we could send it to the AAA and they

21   could pick a locale.  It's getting to this agreement to

22   arbitrate where I think there is some disconnect, and perhaps

23   before I even go any further, maybe that's a question for

24   Ms. Clark because I don't need to keep arguing about why the

25   arbitration provision is binding if she agrees that it is.

1          THE COURT:  Didn't Express Scripts agree in the

2     2011 amendment that solely with respect to services rendered

3     by any pharmacy location within New York State to any member

4     of any prescription drug program offered by a sponsor that's

5     certified as a managed care organization, the agreement shall

6     be construed and governed in all respects according to the

7     internal laws of the State of New York?

8          MS. HELLMANN:  I think that's the introduction

9     paragraph, yes.

10         THE COURT:  Don't you agree that with respect to

11    those members that New York law applies?

12         MS. HELLMANN:  The New York arbitration provision?

13         THE COURT:  That New York law applies to the claims

14    that have been made by the plaintiff in this case?

15         MS. HELLMANN:  With respect to those members of a

16    New York MCO -- I just want to make sure I understand your

17    question.  Is it that New York governs or that we're going to

18    arbitration in New York?

19         THE COURT:  New York law governs.

20         MS. HELLMANN:  New York law governs with respect

21    to -- I mean, I agree that that could work.  I think in

22    practicality how this could possibly work because it's not

23    these individual claims, again because it was a network-wide

24    termination.  It's a breach of contract.  So we're not

25    talking about really these provisions when there is a payment

1  dispute relating to these members.  So yes, New York law

2  applies to the extent there is members of an MCO -- I'm

3  sorry, service by a New York MCO.

4        THE COURT:  And should that arbitration be venued

5  in New York under your agreement with Linden Care?

6        MS. HELLMANN:  I don't think that -- the dispute is

7  much broader than New York.  So I mean, no, do I think there

8  should be two arbitrations?  I don't, I don't.  So I think

9  there should be one arbitration proceeding and where that is

10  venued, I mean because, again, if all we're talking about a

11  venue provision, we believe it should be St. Louis County.

12  But really it could be lots of places.  What I don't think

13  makes sense is we're going to have two competing arbitrations

14  going on.

15        THE COURT:  Because you've asked the Court to

16  transfer this case to Illinois.

17        MS. HELLMANN:  To Missouri.

18        THE COURT:  I'm sorry, Missouri.  So that your

19  position is, as I understand it, arbitration should be in

20  Missouri.  That's something the Court has to decide whether

21  to transfer this case to Missouri.

22        MS. HELLMANN:  Right.  And we do believe, I mean,

23  we believe it should be transferred to Missouri.  Your Honor,

24  I guess part of what I'm saying a little bit, if we could cut

25  to the chase a little bit, and I know that if we're agreeing

1   that there is a binding arbitration provision that governs

2   this entire dispute, what law applies, whether we violated

3   New York law, everything, all of these questions that are

4   going to be decided in arbitration, but I don't know that we

5   have that agreement.  So yes, we're asking that it be

6   transferred to St. Louis County.  It's exactly what I said,

7   if we can get past the is there an agreement to arbitrate,

8   then I think we can get past perhaps a motion to transfer it.

9   But I don't think Ms. Clark agrees with that.

10       And many of the questions that are raised in terms

11   of the conflict of laws, you know, okay, so now we have

12   New York for some of it, Missouri has some of it.  Again,

13   it's an issue for the arbitrator.

14       And I think I want to anticipate the arguments

15   against that we have an agreement to arbitrate, the

16   procedural and the subject of unconscionability, New York and

17   Missouri are clear, you do not need mutuality with respect to

18   the arbitration provision.  The three cases that Linden Care

19   cited outside of Missouri or New York, so whatever state

20   applies, one's been expressly overruled, that you need

21   consideration for an agreement and that includes the

22   arbitration agreement.  And there is no doubt that we have

23   consideration for this agreement.  Agree to arbitrate, agree

24   to uphold the terms and conditions, reimbursement for all the

25   claims they submitted, and we have consideration for this

1    agreement.

2         Even with respect to 4406-d and 4803, they're

3    questions for the arbitrator.  There is nothing about these

4    laws that somehow trump the binding arbitration provision.

5    It is a very broad provision.  It encompasses everything.

6    I'm not going to go through the cases, they're cited in our

7    brief, with respect to why all aspects of this dispute,

8    choice of law, New York public policy, it's issues for the

9    arbitrator.

10         One of the cases that Ms. Clark has referred to

11   repeatedly, the *Foong* case, in that case the Court held that

12   terminating without this notice provision under 4406-d, you

13   know, a provider could do it but it's going to be subject to

14   judicial or in this case review by an arbitrator.  There is

15   nothing about those claims that takes this outside of that

16   scope.

17         What we're left with is a binding arbitration

18   provision that encompasses this entire dispute.  And, yes,

19   the venue provision of New York, I do not believe for that

20   limited part trumps this, the venue provision of St. Louis

21   County, which is why we asked for it to be transferred.  I

22   would be interested if the parties can agree to a binding

23   arbitration provision.  Like I said, we can take maybe

24   New York off and St. Louis off and we can agree to someplace.

25   Thank you, Your Honor.

1          THE COURT:  Thank you, Ms. Hellmann.  Ms. Clark.

2          MS. CLARK:  Thank you again.

3          MR. MURPHY:  We're having some connectivity issues,

4    for today the connection seems to be different.  I don't know

5    it it's possible for us to e-mail a copy to the clerk to put

6    up or else if there is another --

7          MS. CLARK:  Is there another way to plug in?

8          MR. MURPHY:  Another connection to a laptop.

9          MS. CLARK:  You know, Your Honor, we started this

10   litigation with a request for sanctions, and I think that

11   where we are now in looking back on that gives us a telling

12   perspective on how this unfolded.  The agreements -- my

13   colleague David Cost is going to address very briefly the

14   arbitration and venue provision.  Even from the very

15   beginning the entire case involved a shell game of agreements

16   and addenda and various provisions that Express Scripts

17   claimed applied.  It also involved the termination notice

18   that was shown here today is like an ice cube on a summer

19   day.

20          Now we framed that as breach of contract, as a

21   breach of good faith and fair dealing.  Your Honor, I think

22   we've shown very clearly, I don't want to spend a lot of time

23   on this, what the other reasons, what the true reasons might

24   have been for the termination.  You know we've had testimony

25   about what pharmacists go through to try and connect these

1    patients to these expensive but very valuable and therapeutic

2    drugs they need.  You heard that from the patients.  You

3    heard it from Mr. Weingarten.  It's been uncontradicted on

4    the record of this Court, that's a very important factor

5    here.

6              And that goes to the heart of the 4406-d claim, the

7    4406-c claim.  Those are protected activities in New York.

8    These statutes exist to promote and protect professionals

9    from that activity.  I'm going to address in a little while

10   via the PowerPoint the agreements and why we think even under

11   the contract it applies.  What we have here going back to the

12   termination is a clear pretext.

13             You heard the testimony of the Express Scripts'

14   witness, the person who was given to us as the person

15   knowledgeable for the basis for the termination.  She said

16   she did no investigation.  She received notification from an

17   individual named Mr. Nevel who was her superior who told her

18   that there was a decision to terminate.  She admitted she

19   never investigated any three of the bases that were offered

20   as the bases of terminating Linden Care's contract.  That

21   dovetails immediately the problem with a no-notice

22   termination.  If there had been any effort under Section 4 of

23   the Provider Agreement, where there is this back and forth

24   provision where there is notice of a problem and an

25   opportunity to cure, if we give any meaning to that

1    provision, then what should have happened and what would have

2    been best for everyone concerned, including the tens of

3    thousands of patients who are impacted here losing their

4    relationship with their trusted prescriber and pharmacy, is

5    that there should have been that give and take of

6    information, notice of a problem, opportunity to cure.  And

7    you know what, Mr. Weiner and his team, just like they did

8    this weekend, they would have rolled up their sleeves and

9    said, great, we'll give you an explanation.  You have a

10   suspicion.  You don't have time apparently to look in your

11   audit files.  You're not going to look in our own system for

12   the obvious solution, which was apparent to me as I walked to

13   the podium on Friday.  Instead, we're going to terminate

14   first and ask questions later.

15          If they had done that, Linden Care would have had

16   an opportunity to show that each of those three bases was not

17   a legitimate basis for termination.  We know, oops, we made a

18   mistake about Maryland.  We spread that in the press about

19   Linden Care, it was in the Chicago Tribune, the Wall Street

20   Journal, New York Times, but, oops, we made that mistake.

21   Then we look at California.  There was a directed admission

22   in response to the Court's questions that there is no

23   evidence whatsoever that Linden Care ever delivered a

24   prescription to California, to a California resident in

25   violation of law.  There has been no presentation to the

1    Court to contradict our witness's testimony that it's

2    important as a matter of patient abandonment to honor those

3    emergency requests.  No one has come in here to tell the

4    Court how that would be a violation of law if they had ever

5    bothered to investigate it and provide evidence.  So that's

6    item number two.

7              Number three, the violation of the so-called mail

8    order ban.  Ms. Roberts' testimony was very telling on that.

9    There is no provision in the agreement that says you can't

10   mail order.  Certainly doesn't define mail order.  And it

11   certainly doesn't prohibit the practice of home delivery.  We

12   heard Ms. Roberts say that there really is no standard, that

13   the criteria that's referred to in 1.14, which is in the

14   Provider Agreement, Your Honor, Exhibit --

15             THE COURT:  I have it.

16             MS. CLARK:  Okay.  You know, even in this provision

17   it says that Express Scripts will develop criteria

18   established from time to time to provide guidance about what

19   they need and what the standards will be.  At what point do

20   you become a mail order pharmacy if you're a New York

21   registered retail pharmacy that ships out of state.

22   Ms. Roberts, she didn't even know what the criteria meant.

23   Certainly had never been issued.  There is no basis to say

24   that there was a misrepresentation of an identified defined

25   prohibition in the contract that was committed by Linden

1    Care.  That was in the termination notice.  But looking

2    carefully at this, all we have is a definition.  We know that

3    Linden Care is a registered New York retail pharmacy.  We

4    know that they -- let's look at the definition, they fill and

5    sell.  They dispense out of that New York location.  There is

6    just nothing here that makes the percentage of delivery out

7    of state the barometer as a violation of what is really just

8    a definition in the contract.

9            THE COURT:  But you would agree that the

10   certification that was made is no longer true as of today?

11           MS. CLARK:  Well, Your Honor, the certification was

12   true at the time that it was made.  And, Your Honor, the

13   other thing about the certification that I think came out is

14   that there is no indication on the certification whether or

15   not it was by percentage of prescriptions, by percentage of

16   dollars.  That certification has very little guidance

17   whatsoever.  And all the certification says is that if you

18   get information indicating that your answers are untrue, you

19   need to tell us.  There is no evidence that that

20   certification was untrue or needed to be amended because at

21   the time that it was submitted it was untrue.  Ms. Roberts

22   admitted that.  She admitted there was nothing untrue about

23   that certification, in her testimony which is in the record.

24           So, you know, from Linden Care's perspective, sure,

25   if somehow we figured out that our representation was

1    incorrect and untrue, would there have been an obligation to

2    go back and say, hey, back in 2013 we mentioned 39 percent,

3    but we figured out that our math was wrong and we really

4    should have told you it was 45 percent, that would be one

5    thing.  But that's not what they're talking about.

6    Ms. Roberts stated that it's not their practice to have

7    pharmacies routinely update that certification with the

8    percentage of mail order.  That's a moving target, it changes

9    every day.  And she admitted that there was no standard

10   internally for Express Scripts to expect an update.

11           Besides that, Your Honor, Express Scripts is

12   audited a dozen times a year or more by Express Scripts.

13   They sit down with representatives of Express Scripts who

14   have responsibility for applying, defining, interpreting and

15   enforcing the contract provisions.  They disclosed to those

16   individuals everything they were doing, the claims files

17   show, where they're shipping, the audits revealed where they

18   were shipping through the delivery documentation that was

19   required.  The idea that there was no information given to

20   Express Scripts that would have given them this eureka

21   realization that we ship a lot of prescriptions out of state

22   via home delivery is just disingenuous.  There is just no

23   evidence to support that.  And nobody came here and said, oh,

24   we couldn't have known that, and nobody came here and said we

25   didn't actually know that from our data.  They actually new

1    all of that at every moment from their own data.  And we know

2    that because the infamous spreadsheet shows exactly what they

3    could collect by pressing a button.

4          They're suggesting that some violation of the

5    certification would justify a termination, but also remember

6    a lot of these details on the certification were not in the

7    termination notice.  Much of what we heard was post hoc.

8    Well, what we had was an alleged violation of a ban on mail

9    order.  And I think that's been shown, none of that evidence

10   came into this courtroom.  To the contrary, the Express

11   Scripts' witness really evidenced a complete massive

12   confusion about what that meant, what the standard was, what

13   the percentages might be in a way that would make it

14   ludicrous for a pharmacy to have second-guessed and somehow

15   expected what the standard might be.

16         THE COURT:  And Ms. Clark, the agreement allows

17   Express Scripts to terminate on ninety days notice for no

18   reason whatsoever.  So how is it irreparable harm to Linden

19   Care at this point?

20         MS. CLARK:  Sure.  There is a couple different

21   aspects of irreparable harm.  I think that's very

22   well-established, Your Honor.  I won't spend too much time on

23   that unless you have a question.

24         I talked in my prior comments about the severance

25   of the professional relationship and the cases that I cited

1    to the Court into the record show that that interruption of a

2    professional relationship between a medical provider and a

3    patient, particularly in these circumstances, is a matter of

4    significant and irreparable harm to the pharmacist and the

5    patient.  You know, for Linden Care the issue of irreparable

6    harm is very substantial.  We're talking about a huge sector

7    of this very concentrated market that Linden Care will no

8    longer be able to access.

9           You heard Mr. Weiner talk about, and I think

10   Mr. Fogel, mentioned that once you lose the large portion of

11   that market, you become a non-option for the prescribers and

12   the manufacturers who manufacture these very specialized

13   drugs.

14          THE COURT:  But under the agreement Express Scripts

15   could have terminated Linden Care, so Linden Care would lose

16   that, in any event.  So how is it irreparable harm?

17          MS. CLARK:  Well, Your Honor, if we -- if we had

18   ninety days notice, if we could go back and handle things

19   that way, we could have gone to Express Scripts and showed

20   them that their three criteria were baseless.  And we are

21   very confident that we could have resolved that if they had

22   done it on notice.

23          In addition, we could have gone to court, Your

24   Honor, and we could show that the termination is

25   impermissible under New York law.  Under 4406-c, Express

1    Scripts cannot enforce contract terms that inhibit or punish

2    a provider -- I'm paraphrasing, inhibit or punish a provider

3    for advocating for a patient in this utilization review

4    managed care setting.

5           It's our position that would have, should have,

6    could have, if they had given us ninety days notice or if

7    they give us ninety days now, we're prepared to deal with

8    that.  Very frankly, we think that by advocating to the

9    plans, the plans need to know that Express Scripts is taking

10   the position that they're now bound by New York law.  I'll

11   tell you, the New York State Department of Health is having a

12   meeting as we speak on this issue, and we filed a complaint

13   with the New York State Department of Health because Express

14   Scripts is taking what we think is the outlandish position

15   that they as a contractor for an MCO is not bound by New York

16   law.

17          So the truth is a lot could happen, we expect would

18   happen, in ninety days.  The problem here is that Express

19   Scripts gave no consideration for the patients that are

20   involved here.  They terminated Linden Care, not because of

21   items one, two and three in the contract.  We know now why

22   they terminated us.  It came out very clearly during

23   testimony, that Express Scripts is engaged in a massive

24   $140 million rebate war that is the subject of a lawsuit that

25   they filed, that they served on Horizon the same day that

1    they served us with an instant termination notice.  So this

2    is not conspiracy theory.  This is a well-documented evidence

3    based explanation, alternative explanation for the true

4    motives of why Express Scripts terminated Linden Care.

5            THE COURT:  What's the legal relevance of that?

6    Because if they terminated because of this lawsuit, they do

7    have the right to terminate on ninety days notice.

8            MS. CLARK:  Well, they don't have a right to

9    terminate for impermissible reasons under 4406-c, and they

10   don't have the right to terminate for anticompetitive reasons

11   under the antitrust laws.  We've identified and we've pled,

12   we're going to be pleading now that we have these other

13   terminations, that there is an actual PBM conspiracy afoot,

14   just as the Court recognized is an appropriately pled

15   allegation in the *Paduano* case.

16           And the Court saw the PowerPoint that Ms. Roberts

17   acknowledged documented the PBM meetings where they talk

18   about what to do with a problem type of pharmacy.  And we

19   allege that's exactly what happened here and our pleadings

20   are going to be amended based upon this quickly developing

21   evidence to also plead the *Paduano* conspiracy because now we

22   have those facts.  So that's very important here.

23           Lastly, good faith and fair dealing.  You know, we

24   think it's very important here that with 4406-d and 4406-c in

25   play, protecting patients' rights, protecting the prescriber

1    from retaliatory conduct when it's an advocate in a

2    utilization review scenario, that that is bad faith and it's

3    not fair dealing.  And when you issue a termination without

4    notice that affects tens of thousands of people, and it turns

5    out that the bases for that termination are demonstrably

6    incorrect, then that is a violation of good faith and fair

7    dealing, it's a violation of the contract, and it's an

8    invalid basis for termination.

9            So maybe some day we'll have to deal with the

10   ninety day thing.  But this is not a situation where they

11   have an undisputed ironclad ability to terminate with notice

12   within '90s days.  And we're willing to deal with it in

13   ninety days, but it's not the type of issue in these

14   circumstances that should be dealt with by the Court at this

15   time.

16           THE COURT:  Thank you.  Perhaps with the time

17   remaining, I should hear from Mr. Cost.

18           MS. CLARK:  I do have the 4406-d issue.  How much

19   time do you have left, Your Honor?

20           THE COURT:  I can break at 12:30.

21           MS. CLARK:  In terms of what your interest is, are

22   you interested hearing the arbitration at this point?  It

23   really wasn't in your four points of interest, but it would

24   be a matter for closing.  What's your pleasure in terms of

25   what you would like to focus on?

1          THE COURT:  It seems to me a tough sell to argue

2     that this arbitration provision was unconscionable because it

3     was a provision that two sophisticated business enterprises

4     entered into.  I think it would be of great assistance to the

5     Court if the parties could agree, it appears the case will be

6     headed for arbitration, if the Court could agree on an

7     expedited arbitration and venue, that would be of great

8     assistance to the Court.

9          MS. CLARK:  And Your Honor, I think that's

10    something we could consider, but structuring the arbitration

11    so that it honors 4406-d is something that's very important

12    to our pharmacists.  This is their professional reputations.

13    These are New York pharmacists, this is a New York pharmacy,

14    it's bound by New York law.  That's all things we would be

15    happy to discuss.  But what we think should happen here is

16    what just happened in the Southern District of New York.

17    This case should not be referred to arbitration without a

18    resolution, without the protection of a status quo, which at

19    this point is patients getting their drugs.  I understand

20    Your Honor's argument that you think it's a mandatory

21    injunction, but the reality is the patients are still in

22    limbo.  We've been providing these fills and their interests

23    are at stake here too.  So in that sense it's not truly a

24    fait accompli that gives rise to a mandatory injunction.  And

25    I believe that the case that Your Honor just cited also

1    recognized that the alternative standard is when there's

2    severe harm.  The other half of the quote that I think Your

3    Honor might have been referring to refers to an exception

4    when there's a likelihood of great harm.  And if there is one

5    thing that's clear here, is the likelihood of great harm to

6    the patients here.

7           All we have now is letters trickling out with

8    misinformation and what should be done in what an effective

9    way to transfer the prescription.  The response of Express

10   Scripts to this entire crisis that they themselves created

11   without any notice is just astounding given the scale of tens

12   of thousands of very sick infirm, many cases very disabled

13   patients that we're serving.  That's very shocking here.  And

14   we suggest that that alone in light of the merits that I

15   already discussed would certainly justify sending this case

16   off to arbitration with a temporary injunction in place,

17   subject to whatever the arbitrators want to do in that

18   scenario.

19          So, that is the issue here.  And looking at

20   *Paduano*, it's an identical set of circumstances in terms of

21   the patient care issues and all of those things.  And there

22   is very strong precedent in that case, and a good blueprint,

23   frankly, for what the Court should do, putting aside the

24   venue issue, which Mr. Cost will address.  I'm going to

25   mention 4406-d here, because it's something that's critical

1    to the heart of the case.  I ask the Court to step back and

2    look at the regulatory structure.  We have provided the Court

3    with the agreements between the MCOs and Express Scripts

4    where we clearly show that linkage and the agreement to

5    follow New York law and the way that agency works.  We've

6    shown that these are non-delegable duties that are imposed

7    upon everyone in that chain of delivery of managed care

8    services.  I walked the Court through earlier through the

9    mandatory clauses, which are specifically referenced in the

10   appendix B, which I referenced today, in the New York

11   addenda, in the Medicaid addenda.  They're referenced in the

12   2011 New York agreement.  They're actually appended to that

13   agreement.

14          So remembering that the only purpose that Express

15   Scripts functions is as a representative of these MCOs in

16   connection with the administration of benefits.  It is really

17   the key here.  I have this PowerPoint that can connect the

18   dots.  I think what I'm going to do, Your Honor, is just

19   submit it at this point.  It has the linkage because these

20   complicated provisions and I'm happy to submit that and yield

21   to my colleague, Mr. Cost.

22          THE COURT:  Wouldn't that only apply to members of

23   New York MCOs, in any event?

24          MS. CLARK:  No, Your Honor.  And I'll tell you why.

25   4406-d does not apply just to New York members.  4406-d

1    protects the pharmacists.  Okay, and the pharmacy.  It is not

2    dependent upon where the patient that might some day be

3    affected resides.  It affects the pharmacist's credentials,

4    their reputation.  New York has recognized the very

5    substantial impact that these kinds of terminations can have,

6    and that was one of the reasons that 4406-d was enacted.  So

7    if it's a New York pharmacy and New York pharmacist, they're

8    credentialed in New York, they're New York licensed, then

9    they're entitled to a New York hearing.  The hearing does not

10   depend on who the patient is or where the patient resides.

11   And we think that should be a very straightforward and simple

12   issue for the Court to resolve.  Thank you, Your Honor.

13           THE COURT:  Thank you, Ms. Clark.

14           MR. COST:  Your Honor, knowing that you're running

15   short on time, again, I will say following up on what

16   Ms. Clark said, this whole arbitration issue is somewhat of a

17   red herring.  I don't think the other side disputed that the

18   Court is within its power to grant preliminary injunction

19   TRO, all these issues of arbitrability will be hammered out

20   between the parties.  They withdrew their forum selection

21   clause argument.  The arbitration provision doesn't have a

22   forum selection clause that compels forum for an action.  It

23   just says Missouri.

24           When you look at the language of the contract, the

25   language itself does not compel transfer of forum, it just

says binding arbitration in Missouri.  I think what's
important here is if you look at the language of the clause
itself, it specifically references dispute arising to this
agreement or any prior agreement.  And the word this
agreement is repeated within the arbitration clause itself.

Well, the 2011 amendment, which then brings in the
New York standard clauses, amends that agreement.  And then
you have the standard clauses which give the guidelines for
the termination and, again, not to rehash what Ms. Clark
said, we say those apply to the ESI as an IPA under its own
contract as well as under the agency.  And all those topics
have been discussed.

With regard to the unconscionability argument,
these are one-sided agreements.  This is a take it or leave
it agreement by ESI.  Yes, Linden Care is not two people
sitting in a shop doing things, but it's, you know, it is
bigger fish, smaller fish, and bigger fish says, you want to
be in our pool, you've got to agree to these terms.
Completely one sided.  And I think what we pointed out in our
brief what the Court focused on, ESI provides its right to go
into the court and get a TRO and preliminary injunction.  It
doesn't afford the same remedy.  If you look at the later
provision in the Provider Manual and other provider mutuals,
there is those kind of similarity.  Why is that?  It goes to
the principles of fairness and mutuality.

1          They're saying we're saying the contract itself is

2    wholly unconscionable.  No, the arbitration clause is

3    procedurally and substantively unconscionable in itself.

4    Which doesn't compel -- which the Court can look and

5    invalidate that provision and there is always these saving

6    clauses in contracts says one provision, in the Provider

7    Agreement, the rest of the contract remains intact.

8          Again, we've briefed this, Your Honor.  You can't

9    get the rights in arbitration that 4406-d provides.  Peer

10   review.  Again by the plans, the arbitrator, it's a whole

11   different standard where they say this can be raised in

12   arbitration, this can be raised in arbitration.  Its

13   different.  There is a reason why the 4406-d doesn't say go

14   to arbitration, it says goes to peer review before the panel.

15         THE COURT:  Isn't 4406-d essentially incorporated

16   in the provider manual through the addendum.

17         MR. COST:  That's what we said, the appendix?

18         THE COURT:  Yes.

19         MR. COST:  Yes.  We talked about that today, so I

20   didn't want to go over old ground.  And again, there is the

21   arbitration provision within the Medicaid addendum itself.

22   And again the argument then there is if we are going to have

23   arbitration, it doesn't say, it says breach of the Provider

24   Agreement.  Right.  Termination of the Provider Agreement,

25   period.  It doesn't say termination of the New York portion

1    of the Provider Agreement, just termination, period.  So if

2    the Court is going to compel arbitration, it has got to be in

3    New York.

4            Your Honor, those are the points that we raised in

5    our briefs.  And we would submit that, number one, we're not

6    disputing the scope of the arbitration here, we're just

7    debating the validity which the Court can rule on, which I

8    think is a threshold issue.

9            THE COURT:  Thank you, Mr. Cost.  Anything further,

10   Ms. Hellmann?  Any wrap-up on that?

11           MS. HELLMANN:  If I could just have two minutes.

12           THE COURT:  Yes.

13           MS. HELLMANN:  There is two points I just want to

14   make.  One, 4406-c, which Ms. Clark has referenced a number

15   of times, I have no doubt you would read it, she was

16   paraphrasing it.  It was you cannot terminate a provider

17   solely because they're advocating for a patient.  It's very

18   different than how it was phrased and I wanted to bring that

19   to your attention.

20           Also I heard the suggestion that the burden to make

21   sure that Linden Care's provider certification is accurate is

22   on Express Scripts.  We know about audits, and I hope that

23   it's that clear auditing you're looking at a couple of

24   claims, you're not looking at a book of business.  That's not

25   the burden.  That's why we don't just ask for accurate

1    certifications, we ask for updated certification.  So if

2    39 percent was accurate when they made it and it's not now,

3    that's a breach.  That burden cannot be on us to continue to

4    look to see what percentage of business, book of business

5    that this pharmacy is doing.  And to somehow claim that while

6    they make the representation it's accurate and they're going

7    to provide any changes and if they don't it can be a breach

8    of the agreement, they now claim that it's our fault that we

9    didn't figure out that they were mailing 70 percent of mail

10   order.  That's not our burden.  That's exactly why we ask our

11   pharmacies to do it.  That's the two points I wanted to

12   raise.  Thank you.

13          THE COURT:  There are a couple of issues that I've

14   asked counsel for, so I'll give you an opportunity to

15   respond.  I know one issue is whether there were, in fact,

16   any shipments of medicines to California.  I know Mr. Weiner

17   expected they would know the answer to that by the end of the

18   day.  And Ms. Hellmann, if it you have any information on

19   that, the Court is interested in that.

20          The one question, another question the Court had is

21   whether there are emergency exceptions under the law that

22   allow a pharmacy to send drugs into a state in which it's not

23   licensed, specifically California.  And I think it would be

24   very helpful if the parties could, in light of the kind of

25   the needs of patients and issues all the issues presented

374

1    here, if the parties could attempt to work out agreement

2    regarding arbitration, expedited arbitration and location.

3            And I understand the Court has to rule on the

4    motion for a temporary restraining order/preliminary

5    injunction, and I expect to rule shortly on that.  How much

6    time does counsel need to provide the Court with the

7    information I just asked for?

8            MS. HELLMANN:  Your Honor, could I just get a

9    clarification on the shipments into California?  I know that

10   Mr. Weiner said he was going to finish going through that

11   spreadsheet and look, and then there was also some issue that

12   we could ship in there on this emergency basis.  I'm assuming

13   that all of that -- I just didn't get the sense that that

14   could all be done by the end of the day today.  So I want to

15   make sure that we're clear on what's being looked at.  Were

16   there shipments into the State of New York and is there an

17   emergency?

18           THE COURT:  Yes, you a referred to something in

19   your papers that indicated there was no emergency.

20           MS. HELLMANN:  That's correct.

21           THE COURT:  I'm not familiar with that.

22           MS. HELLMANN:  I think I said there was testimony.

23   But regardless, we'll clear that up.  I think it was

24   testimony by Mr. Kersey, but we'll get it in our papers, Your

25   Honor.

1          MS. CLARK:  Your Honor, I would just add, I mean,

2   the Express Scripts comes to court and provides to us this

3   information without having provided it before, without

4   explaining it in the termination letter.  We've done this

5   huge effort to debunk every single claim except for a handful

6   that are going to be difficult to track down.  We're happy to

7   do whatever you want us to do, it would seem that that would

8   not be something that Linden Care would have to do at this

9   point.

10          We've responded effectively and shown that their

11   data was faulty, that it's incomplete.  And that really

12   should be something that Express Scripts should come up with

13   at this point rather than asking us to prove our --

14          THE COURT:  I understand.  And the Court's point is

15   I will consider any information either party has.  It is

16   rather curious that Express Scripts would say it's

17   terminating an entity for shipments to California when, in

18   fact, there is no evidence of shipments to California.  I

19   understand your position on that.  But I will consider any

20   evidence that either party has with respect to whether in

21   fact there were any shipments of medicine to California.  And

22   my question is how time do counsel want to provide that, by

23   tomorrow?

24          MS. HELLMANN:  Your Honor, just one more.  There

25   has been the issue with the mail order.  Do you want any

1    backup or information on whether the 39 percent was -- I just

2    want to make sure that I'm clear that I'm addressing each of

3    the three issues that we've addressed in this case and

4    whether there is any backup or information or additional

5    information you want provided about why it went from

6    39 percent to 70 percent.

7              THE COURT:  No, I'm not aware of any.

8              MS. CLARK:  Your Honor, we can do that by the end

9    of the day in terms of the interaction between New York

10   patient abandonment laws and the issue of nonresident

11   Californians and how that works.  I think we can get you

12   something on that by the end of the day.  I don't know that

13   it's going to be established by case law or anything, but

14   we'll get you what we can on that issue.

15             But again, Express Scripts has not, never cited to

16   any violation, never proved any violation.  And that's what

17   the state of the record is.  I don't know that we're going to

18   be able to resolve that issue definitely for Your Honor

19   because it's never really been affirmatively asserted in any

20   way that we can respond to.

21             MS. HELLMANN:  Your Honor, we're traveling most of

22   the day today, but the end of the day tomorrow.

23             THE COURT:  The Court will accept additional letter

24   response by the end of the tomorrow, by 5 p.m.

25             MS. HELLMANN:  I assume you wanted to limit it to

1    these two issues and whether the parties can agree on a

2    venue.

3            THE COURT:  Yes, including whether the parties can

4    agree on an expedited administration and the venue for the

5    that.  I'm assuming the parties want an expedited

6    arbitration, but at least agree on an arbitration and a

7    venue.

8            MS. HELLMANN:  Thank you.

9            THE COURT:  I don't expect that I will find that

10   arbitration provision unconscionable, so in the event the

11   Court does not find it unconscionable where the parties will

12   proceed for arbitration, because in any event, I understand

13   that's what has to happen next.  I know there needs to be a

14   ruling on the injunction, but the next step would be

15   arbitration.

16           MS. CLARK:  Except for the 4406-d hearing, Your

17   Honor.

18           THE COURT:  Yes, presumably those could proceed

19   simultaneously.

20           MS. CLARK:  That would be possible.  I mean, the

21   4406-d hearing is supposed to be a threshold peer review

22   proceeding where other pharmacists look at this and decide if

23   this is appropriate.  So we would argue that that absolutely

24   has to happen first.

25           MS. HELLMANN:  Your Honor, there needs to be a

1   decision that the 4406-d hearing applies, that Express

2   Scripts is a health care plan.  So you're kind of jumping the

3   gun that assuming that 4406-d applies and we violated it.  So

4   that is an issue for arbitration.  And that it may be we need

5   to go do a 4406-d hearing.  But there is an assumption there.

6   I mean, they have a claim, one of their claims for relieve is

7   that it's a breach of 4406-d, so that needs to be decided on

8   the merits before there is this injunction to force a 4406-d

9   hearing, which I don't even think they're seeking in the

10  case.  The relief they're seeking is back into the network.

11          THE COURT:  I understand.  I do believe there needs

12  to be a hearing.  And, obviously, that's not an issue, or the

13  Court can't decide that at this point, but it seems to me

14  under the New York Medicaid addendum there needs to be a

15  hearing with respect to the New York Medicaid members.

16          MS. HELLMANN:  If there is identified New York

17  Medicaid members, if there are, there are literally thousands

18  of them, then I guess a little bit is they've never raised

19  this New York Medicaid.  It's not even a claim in their

20  complaint, Your Honor, is the New York Medicaid addendum.

21          THE COURT:  As I understand it, the New York

22  Medicaid addendum essentially incorporates 4406-d, the notice

23  of termination provisions in the citations that plaintiffs

24  counsel has relied on.

25          MS. HELLMANN:  Let's back up.  If there is --

1    again, I think all of these issues that we're talking about,

2    we're here today on a TRO/PI to order Express Scripts to

3    reinstate with Linden Care.  If there is a breach, if there

4    is identified Medicaid members and none of the exceptions

5    apply, again that's an issue that goes to the underlying

6    claim, the merits of their claim.  So I'm not saying whether

7    there is or there isn't, but that goes to the merits of the

8    dispute and the substance of the dispute.  The relief that

9    they're acting this Court for is a mandatory injunction back

10   into a contract, that's the relief they're seeking.

11           MS. CLARK:  I'm not prejudging what the Court is

12   saying.  We only point is what we're asking for is an

13   injunction maintaining the patient/pharmacy relationship

14   until such time as the 4406-d hearing is offered and the

15   balance of the issues on the likelihood of the merits on the

16   contract are resolved through you're suggesting arbitration,

17   but that's very clearly what we're looking for here.

18           THE COURT:  I understand, Counsel.  I understand

19   the parties' positions and I'll look forward to your

20   summations at the end of the day tomorrow.

21           MS. CLARK:  One housekeeping issue.  I did file the

22   PowerPoint on the 4406-d issue and I'll rest on that because

23   we're out of time.

24           THE COURT:  Thank you, counsel.

25           THE CLERK:  Court is adjourned.

C E R T I F I C A T I O N

I, EILEEN MCDONOUGH, RPR, CRR, Federal Official
Realtime Court Reporter, in and for the United States
District Court for the Northern District of New York,
do hereby certify that pursuant to Section 753, Title 28,
United States Code, that the foregoing is a true and correct
transcript of the stenographically reported proceedings held
in the above-entitled matter and that the transcript page
format is in conformance with the regulations of the
Judicial Conference of the United States.

_____
EILEEN MCDONOUGH, RPR, CRR
Federal Official Court Reporter